# 12-0565-cr

## United States Court of Appeals

*for the*

## Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

EDGARDO SENSI,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT (NEW HAVEN)

## APPENDIX
### Volume 1 of 2 (Pages A-1 to A-297)

LAW OFFICE OF ANDREW FREIFELD
*Attorney for Defendant-Appellant*
30 Vesey Street, 6th Floor
New York, New York 10007
(212) 240-9406

SANDRA SLACK GLOVER
UNITED STATES ATTORNEY'S OFFICE,
 DISTRICT OF CONNECTICUT
*Attorney for Appellee*
157 Church Street, 23rd Floor
New Haven, Connecticut 06510
(203) 821- 3700

i

# TABLE OF CONTENTS

**Page**

Docket Entries................................................................ A-1

Indictment, filed December 4, 2008 .......................... A-16

Superseding Indictment, filed April 2, 2009.............. A-21

Motion to Suppress Physical Evidence Seized from
    Defendant's Home, dated January 19, 2010 .......... A-30

Government's Memorandum of Law, in Opposition
    to Defendant's Motions to Dismiss or in the
    Alternative to Suppress, dated February 16, 2010. A-62

Motion to Suppress Statements, dated May 3, 2010.. A-80

Defendant's Reply Memorandum, in Support of
    Motion to Suppress, dated May 3, 2010 ................ A-83

Affidavits of Edgardo Sensi, Defendant, in Support
    of Motion to Suppress, sworn to May 3, 2010 ...... A-102

Government's Memorandum of Law, in Opposition
    to Defendant's Motions to Dismiss or in the
    Alternative to Suppress, dated May 27, 2010........ A-105

Transcript of Suppression Hearing before and
    Ruling by the Honorable Warren W. Eginton,
    dated June 8, 2010 .................................................. A-128

Government's Witness:

    Brian Broughton  ................................................. A-139

Defendant's Witness:

    Edgardo Sensi  ..................................................... A-251

ii

**Page**

Government's Exhibits:

Search Warrant and
Supporting Affidavit,
dated September 9,
2008       Reproduced ............    A-298

Photograph of House    Reproduced ............    A-317

Photograph of Red
Duffle Bag       Reproduced ............    A-318

Photograph of Video
Cassettes       Reproduced ............    A-319

Photograph of Locked
Black Bag       Reproduced ............    A-320

Conditional Plea Agreement, dated July 8, 2010.......    A-321

Petition to Enter Plea of Guilty Pursuant to Rules 10
and 11 of the Federal Rules of Criminal
Procedure, dated July 8, 2010...............................    A-331

Transcript of Motion and Change of Plea Hearing
before the Honorable Warren W. Eginton, dated
July 8, 2010............................................    A-349

Defendant's Objections and Corrections to
Sentencing Report, dated January 7, 2012.............    A-401

Defendant's Sentencing Memorandum, dated
January 22, 2012....................................    A-405

Sentencing Memorandum of the United States of
America, dated January 26, 2012 ........................    A-412

Motion to Continue Sentencing and attached
Exhibits, filed January 27, 2012 ...........................    A-423

**iii**

                                                  **Page**

Transcript of Sentencing Hearing before the
   Honorable Warren W. Eginton, dated
     January 31, 2012 ................................................... A-455

Notice of Appeal, dated February 6, 2012 ................. A-510

A-1

APPEAL, EFILE

**U.S. District Court**
**United States District Court for the District of Connecticut (New Haven)**
**CRIMINAL DOCKET FOR CASE #: 3:08-cr-00253-WWE-1**

| | |
|---|---|
| Case title: USA v. Sensi | Date Filed: 12/04/2008 |

Assigned to: Judge Warren W. Eginton

**Defendant (1)**

| | | |
|---|---|---|
| **Edgardo Sensi** | represented by | **Gerald Lewis Harmon** |

290 Pratt St.
Meriden, CT 06450
203-639-1956
Fax: 203-639-1959
Email: attygharmon@aol.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Jason M. Wandner**
777 Bricknell Avenue, Ste. 1210
Miami, FL 33131
305-375-6053
Fax: 305-381-7135
Email: jason@wandnerlaw.com
*TERMINATED: 08/19/2009*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Kenneth J. McDonnell**
Gould, Larson, Bennet, Wells &McDonnell
35 Plains Rd., Po Box 959
Essex, CT 06426
860-767-9005
Fax: 860-767-2742
Email: mcdonnell@gould-larson.com
*TERMINATED: 08/19/2009*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Peter L. Truebner**
1150 Summer St.
Stamford, CT 06905
203-323-4540
Fax: 203-327-5466
Email: ptruebner@aol.com
*TERMINATED: 02/24/2010*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Richard D. Kibbey**
416 Camden Avenue
Stuart, FL 34994
772-286-0023
Fax: 772-221-8888

Case 12-565, Document 26, 10/05/2012, 740168, Page6 of 301

**A-2**

Email: kibbeyoffice@aol.com
*TERMINATED: 08/19/2009*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Robert M. Berke**
640 Clinton Ave.
Bridgeport, CT 06605
203−332−6000
Fax: 203−332−0661
Email: robertberke@optonline.net
*TERMINATED: 09/28/2010*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| **Pending Counts** | **Disposition** |
|---|---|
| CONSPIRACY TO DEFRAUD THE UNITED STATES (1) | |
| CONSPIRACY (1s) | Defendant plead guilty to Count 1s of the Superseding Indictment. Defendant shall be imprisoned for a total of 85 years consecutive on all counts. Upon release defendant shall be on supervised released for a total term of Life concurrent on all counts with Mandatory, Standard and Special Conditions. Defendant shall immediately pay $100.00 Special Assessment. |
| SEXUAL EXPLOITATION OF CHILDREN (2) | |
| PRODUCTION OF CHILD PORNOGRAPHY IN U.S. (2s) | Defendant plead guilty to Count 2s of the Superseding Indictment. Defendant shall be imprisoned for a total of 85 years consecutive on all counts. Upon release defendant shall be on supervised released for a total term of Life concurrent on all counts with Mandatory, Standard and Special Conditions. Defendant shall immediately pay $100.00 Special Assesment. |
| ILLICIT SEXUAL CONDUCT IN FOREIGN PLACES (3s) | Defendant plead guilty to Count 3s of the Superseding Indictment. Defendant shall be imprisoned for a total of 85 years consecutive on all counts. Upon release defendant shall be on supervised released for a total term of Life concurrent on all counts with Mandatory, Standard and Special Conditions. Defendant shall immediately pay $100.00 Special Assesment. |
| PRODUCTION OF CHILD PORNOGRAPHY OUTSIDE THE U.S. (4s) | Defendant plead guilty to Count 4s of the Superseding Indictment. Defendant shall be imprisoned for a total of 85 years consecutive on all counts. Upon release defendant shall be on supervised released for a total term of Life concurrent on all countswith Mandatory, Standard and Special Conditions. Defendant shall immediately pay $100.00 Special Assesment. |

**Highest Offense Level (Opening)**
Felony

A-3

| Terminated Counts | Disposition |
|---|---|
| None | |

**Highest Offense Level
(Terminated)**

None

| Complaints | Disposition |
|---|---|
| Defendant child pornography in violation of Title 18 United States Code Section 2251(a) 18:2251.F | |

**Plaintiff**

**USA**                                        represented by  **Alina Reynolds**
U.S. Attorney's Office–BPT
915 Lafayette Blvd. Room 309
Bridgeport, CT 06604
203–696–3000
Fax: 203–579–5550
Email: alina.reynolds@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Krishna R. Patel**
U.S. Attorney's Office–BPT
915 Lafayette Blvd. Room 309
Bridgeport, CT 06604
203–696–3000
Fax: 203–579–5550
Email: krishna.patel@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David B. Fein**
U.S. Attorney's Office–NH
157 Church St., 23rd floor
New Haven, CT 06510
203–821–3700
Email: David.Fein@usdoj.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 12/04/2008 | 9 | INDICTMENT returned before Judge William I. Garfinkel.Returned before grand jury number B–08–2 as to Edgardo Sensi (1) counts 1, 2. (S–Torres, ) (Entered: 12/05/2008) |
| 12/04/2008 | | INDICTMENT UNSEALED as to Edgardo Sensi (S–Torres, ) (Entered: 12/05/2008) |
| 12/04/2008 | | CASE UNSEALED as to Edgardo Sensi (S–Torres, ) (Entered: 12/05/2008) |
| 12/04/2008 | 10 | ELECTRONIC FILING ORDER as to Edgardo Sensi – PLEASE ENSURE COMPLIANCE WITH COURTESY COPY REQUIREMENTS IN THIS ORDER. Signed by Judge Warren W. Eginton on 12/4/2008. (Torres, K.) (Entered: 12/05/2008) |
| 12/15/2008 | | Arrest of Edgardo Sensi (Larsen, M.) (Entered: 12/15/2008) |

| 12/15/2008 | 11 | ORAL MOTION for Pretrial Detention by USA as to Edgardo Sensi. (Larsen, M.) (Entered: 12/15/2008) |
| --- | --- | --- |
| 12/15/2008 | 12 | Minute Entry for proceedings held before Judge Holly B. Fitzsimmons: granting 11 Motion for Pretrial Detention as to Edgardo Sensi (1); Initial Appearance as to Edgardo Sensi (1) held on 12/15/2008; Arraignment as to Edgardo Sensi (1) Counts 1,2 held on 12/15/2008; Plea entered by Edgardo Sensi (1) Counts 1, 2. Not Guilty on Counts 1 &2 ( Jury Selection set for 2/9/2009 09:30AM before Judge Warren W. Eginton). Defendant's motions due 1/26/09; Government's responses due 2/2/09. Defendant detained. 15 minutes(Court Reporter S. Baldwin.) (Larsen, M.) (Entered: 12/15/2008) |
| 12/15/2008 | 13 | ORDER OF DETENTION as to Edgardo Sensi. Signed by Judge Holly B. Fitzsimmons on 12/15/08. (Larsen, M.) (Entered: 12/15/2008) |
| 12/15/2008 | 14 | First MOTION excuse from attendance *in court* by Edgardo Sensi. (McDonnell, Kenneth) (Entered: 12/15/2008) |
| 12/22/2008 | 15 | ORDER granting 14 Motion to excuse Attorney McDonnell from attendance in Court. Signed by Judge Warren W. Eginton on 12/22/08. (Cepler, C.) (Entered: 12/22/2008) |
| 01/16/2009 | 16 | First MOTION for Extension of Time Pre−trial Motion deadline &Trial date by Edgardo Sensi. (Attachments: # 1 Exhibit Speedy Trial Waiver)(Wandner, Jason) (Entered: 01/16/2009) |
| 01/22/2009 | 17 | ORDER granting 16 Motion for Extension of Time as to Edgardo Sensi. Jury selection is scheduled for April 13, 2009 with trial to commence on April 14, 2009. Pretrial motions shall be filed no later than March 24, 2009. The parties should contact Chambers with regard to the March 10 status conference. Signed by Judge Warren W. Eginton on 1/22/09. (Cepler, C.) (Entered: 01/22/2009) |
| 01/22/2009 |  | Set Hearings as to Edgardo Sensi: Jury Selection set for 4/13/2009 09:00 AM in Courtroom Three−Annex, 915 Lafayette Blvd., Bridgeport, CT before Judge Warren W. Eginton. Jury Trial set for 4/14/2009 09:00 AM in Courtroom Three−Annex, 915 Lafayette Blvd., Bridgeport, CT before Judge Warren W. Eginton. Status Conference set for 3/10/2009 10:00 AM in Courtroom Three−Annex, 915 Lafayette Blvd., Bridgeport, CT before Judge Warren W. Eginton.(Candee, D.) (Entered: 01/27/2009) |
| 01/26/2009 | 18 | NOTICE OF E−FILED CALENDAR as to Edgardo Sensi: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION.COUNSEL OUTSIDE OF FAIRFIELD COUNTY SHOULD CONTACT CHAMBERS REGARDING PARTICIPATION BY CONFERENCE CALL (203) 579−5819 Status Conference set for 3/10/2009 10:00 AM in Chambers Room 335, 915 Lafayette Blvd., Bridgeport, CT before Judge Warren W. Eginton (Krajcik, R.) (Entered: 01/26/2009) |
| 02/26/2009 | 19 | NOTICE as to Edgardo Sensi re 18 status conference scheduled for March 10, 2009 at 10:00 a.m. The status conference is hereby rescheduled for March 10, 2009 at 11:00 a.m. in Annex−Courtroom 3, 915 Lafayette Blvd., Bridgeport, CT. Signed by Judge Warren W. Eginton on 2/26/09. (Cepler, C.) (Entered: 02/26/2009) |
| 03/03/2009 | 20 | NOTICE as to Edgardo Sensi re 19 Status Conference. Status conference will be held at 8:30 a.m. on March 10, 2009. Signed by Judge Warren W. Eginton on 3/3/09. (Cepler, C.) (Entered: 03/03/2009) |
| 03/10/2009 | 21 | Minute Entry for proceedings held before Judge Warren W. Eginton:Status Conference as to Edgardo Sensi held on 3/10/2009 20 minutes(Torres, K.) (Entered: 03/13/2009) |
| 03/10/2009 | 22 | Minute Entry for proceedings held before Judge Warren W. Eginton: Status Conference as to Edgardo Sensi held on 3/10/2009. Scheduling Order to be filed. Total Time: 15 minutes(Court Reporter S. Baldwin.)(Candee, D.) (Entered: 03/16/2009) |

A-5

| | | |
|---|---|---|
| 03/23/2009 | 23 | Joint MOTION for Extension of Time by USA as to Edgardo Sensi. (Patel, Krishna) (Entered: 03/23/2009) |
| 03/24/2009 | 24 | ORDER granting 23 Motion for Extension of Time as to Edgardo Sensi (1). Defense motions shall be filed by August 7, 2009; government shall file responses to such motions by August 21, 2009; jury selection is scheduled for September 14, 2009; trial will commence on September 28, 2009 at 9:00 a.m. The parties should contact Chambers in September 2009 regarding at what time jury selection will commence on September 14. Signed by Judge Warren W. Eginton on 3/24/09. (Cepler, C.) (Entered: 03/24/2009) |
| 03/24/2009 | 25 | REVISED TRIAL CALENDAR: NOTICE OF E–FILED CALENDAR: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. Jury Trial set for 9/29/2009 09:00 AM in Courtroom Three–Annex, 915 Lafayette Blvd., Bridgeport, CT before Judge Warren W. Eginton. PLEASE NOTE DATE CHANGE REGARDING JURY TRIAL. (Candee, D.) (Entered: 03/24/2009) |
| 04/02/2009 | 26 | SUPERSEDING INDICTMENT returned before Judge Holly B. Fitzsimmons.Returned before grand jury number B–08–2 as to Edgardo Sensi (1) counts 1s, 2s, 3s, 4s. (Torres, K.) Modified on 4/8/2009 (Gutierrez, Y.). (Entered: 04/07/2009) |
| 04/08/2009 | | Docket Entry Correction as to Edgardo Sensi re 26 Indictment. Entry modified to add Superseding to the text. (Gutierrez, Y.) (Entered: 04/08/2009) |
| 04/20/2009 | 27 | Minute Entry for proceedings held before Judge Holly B. Fitzsimmons:Telephone Status Conference as to Edgardo Sensi held on 4/20/2009 6 minutes(Larsen, M.) (Entered: 04/20/2009) |
| 05/01/2009 | 28 | MOTION to Permit Eligible Law Student to Appear by USA as to Edgardo Sensi. (Torres, K.) (Entered: 05/05/2009) |
| 05/01/2009 | 29 | ORDER granting 28 Motion to Permit Law Student Rebekah Perry to Appear as to Edgardo Sensi (1), in open court, See 30 (Cepler, C.) Modified on 5/6/2009 to edit file date and text (Torres, K.). (Entered: 05/06/2009) |
| 05/01/2009 | 30 | Minute Entry for proceedings held before Judge Holly B. Fitzsimmons:Arraignment as to Edgardo Sensi as to Count 1s,2s,3s,4s held on 5/1/2009, Not Guilty Plea entered on counts 1, 2, 3 &4 of the Superseding Indictment (1s,2s,3s,4s); granting 28 Motion to Permit Law Student Rebekah Perry to Appear ( Jury Selection set for 9/14/2009 09:00 AM in Courtroom Three–Annex, 915 Lafayette Blvd., Bridgeport, CT before Judge Warren W. Eginton, Jury Trial set for 9/29/2009 09:00 AM in Courtroom Three–Annex, 915 Lafayette Blvd., Bridgeport, CT before Judge Warren W. Eginton). Defendant detained. 5 minutes(Court Reporter S. Baldwin.)(Torres, K.) (Entered: 05/06/2009) |
| 06/25/2009 | 31 | NOTICE OF E–FILED CALENDAR as to Edgardo Sensi: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. STATUS Conference set for 7/6/2009 03:30 PM in Courtroom Three–Annex, 915 Lafayette Blvd., Bridgeport, CT before Judge Warren W. Eginton. (Candee, D.) (Entered: 06/25/2009) |
| 07/02/2009 | 32 | MOTION MOTION TO SET HEARING REGARDING STATUS OF COUNSEL by Edgardo Sensi. (Wandner, Jason) (Entered: 07/02/2009) |
| 07/02/2009 | 33 | NOTICE OF E–FILED CALENDAR as to Edgardo Sensi: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. STATUS CONFERENCE RESET for 7/6/2009 1:15 PM in Courtroom Three–Annex, 915 Lafayette Blvd., Bridgeport, CT before Judge Warren W. Eginton. (Candee, D.) (Entered: 07/02/2009) |
| 07/06/2009 | 34 | ORDER as to Edgardo Sensi. Attorney Bob Burke shall file an appearance on behalf of Defendant by 8/6/2009. SO ORDERED by Judge Warren W. Eginton on 7/6/2009. (Garcia, M.) (Entered: 07/06/2009) |

| 07/28/2009 | 35 | ORDER vacating 32 Motion for Hearing on Status of Representation of Defendant as to Edgardo Sensi. Signed by Judge Warren W. Eginton on 7/28/2009. (Garcia, M.) (Entered: 07/28/2009) |
| 07/29/2009 | 36 | MOTION for Jason M. Wandner &Richard D. Kibbey to Withdraw as Attorney by Edgardo Sensi. (Wandner, Jason) (Entered: 07/29/2009) |
| 07/31/2009 | 37 | MOTION to Stay Deadline on Defense Motions by Edgardo Sensi. (Wandner, Jason) (Entered: 07/31/2009) |
| 08/03/2009 | 38 | NOTICE OF E−FILED CALENDAR as to Edgardo Sensi: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. Telephone Motion Hearing set for 8/5/2009 11:30 AM before Judge Warren W. Eginton. COUNSEL TO INITIATE CALL TO CHAMBERS (203)597−5819(Candee, D.) (Entered: 08/03/2009) |
| 08/03/2009 | 39 | AMENDED NOTICE OF E−FILED CALENDAR as to Edgardo Sensi: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. Telephone Motion Hearing set for 8/5/2009 11:30 AM before Judge Warren W. Eginton. COUNSEL TO INITIATE CALL TO CHAMBERS (203)579−5819. PLEASE NOTE corrected telephone number.(Candee, D.) (Entered: 08/03/2009) |
| 08/03/2009 | 40 | ORDER granting 37 Motion to stay deadline on defense motions as to Edgardo Sensi (1) until further order of the Court. Signed by Judge Warren W. Eginton on 8/3/2009. (Garcia, M.) (Entered: 08/03/2009) |
| 08/03/2009 |  | ORDER CANCELING hearing scheduled for 8/5/2009. A new calendar will be issued once the parties submit available dates. Signed by Judge Warren W. Eginton on 8/3/2009. (Garcia, M.) (Entered: 08/03/2009) |
| 08/03/2009 | 41 | NOTICE OF E−FILED CALENDAR as to Edgardo Sensi: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. TELEPHONE Motion Hearing set for 8/11/2009 09:30 AM in Courtroom Three−Annex, 915 Lafayette Blvd., Bridgeport, CT before Judge Warren W. Eginton. COUNSEL TO INITIATE CALL TO CHAMBERS (203)579−5819.(Candee, D.) (Entered: 08/03/2009) |
| 08/07/2009 | 42 | MOTION for Kenneth J. McDonnell to Withdraw as Attorney by Edgardo Sensi. (McDonnell, Kenneth) (Entered: 08/07/2009) |
| 08/11/2009 | 43 | Minute Entry for proceedings held before Judge Warren W. Eginton:Status Conference as to Edgardo Sensi held on 8/11/2009. 15 minutes(Court Reporter S. Baldwin.)(Candee, D.) (Entered: 08/11/2009) |
| 08/11/2009 | 44 | WAIVER of Speedy Trial by Edgardo Sensi (Wandner, Jason) (Entered: 08/11/2009) |
| 08/17/2009 |  | Attorney update in case as to Edgardo Sensi. Attorney Peter L. Truebner for Edgardo Sensi added. (Gutierrez, Y.) (Entered: 08/17/2009) |
| 08/17/2009 | 47 | CJA 20 as to Edgardo Sensi: Appointment of Attorney Peter L. Truebner for Edgardo Sensi. Signed by Clerk on 8/17/09. (Gutierrez, Y.) (Entered: 08/21/2009) |
| 08/19/2009 | 45 | ORDER granting 42 Motion to Withdraw as Attorney. Kenneth J. McDonnell withdrawn from case. Defendant Edgardo Sensi has alternate legal representation. Signed by Judge Warren W. Eginton on 8/19/2009. (Garcia, M.) (Entered: 08/19/2009) |
| 08/19/2009 | 46 | ORDER granting 36 Motion to Withdraw as Attorney. Richard D. Kibbey and Jason M. Wandner withdrawn from case. Defendant Edgardo Sensi has alternate legal representation. Signed by Judge Warren W. Eginton on 8/19/2009.(Garcia, M.) (Entered: 08/19/2009) |
| 09/08/2009 | 48 | First MOTION to Continue *Trial* by Edgardo Sensi. (Truebner, Peter) (Entered: 09/08/2009) |

| 09/10/2009 | 49 | ORDER granting 48 Motion to Continue Trial as to Edgardo Sensi (1). Signed by Judge Warren W. Eginton on 9/10/2009. (Garcia, M.) (Entered: 09/10/2009) |
|---|---|---|
| 09/10/2009 | 50 | SCHEDULING ORDER as to Edgardo Sensi: Defense Motions due 12/7/2009; Government Response due 12/21/2009; Jury Trial set for 1/26/2010 09:00 AM in Courtroom Three–Annex, 915 Lafayette Blvd., Bridgeport, CT before Judge Warren W. Eginton; Jury Selection set for 1/25/2010 09:00 AM in Courtroom Three–Annex, 915 Lafayette Blvd., Bridgeport, CT before Judge Warren W. Eginton. Signed by Judge Warren W. Eginton on 9/10/2009. (Garcia, M.) (Entered: 09/10/2009) |
| 11/30/2009 | 51 | Second MOTION to Continue *Trial* by Edgardo Sensi. (Truebner, Peter) (Entered: 11/30/2009) |
| 12/09/2009 | 52 | ORDER granting 51 Motion to Continue as to Edgardo Sensi (1). Signed by Judge Warren W. Eginton on 12/9/09. (Cepler, C.) (Entered: 12/09/2009) |
| 12/09/2009 | 53 | SCHEDULING ORDER as to Edgardo Sensi: Substantive Motions due 1/19/2010; Government Response due 2/8/2010; Defendant Replies due 2/15/2010; Proposed Voir Dire Questions due 3/25/2010; Proposed Jury Instructions due 3/25/2010; Length of Trial 2 weeks. Jury Trial set for 4/13/2010 09:00 AM in Courtroom Three–Annex, 915 Lafayette Blvd., Bridgeport, CT before Judge Warren W. Eginton; Jury Selection set for 4/12/2010 09:30 AM in Courtroom Three–Annex, 915 Lafayette Blvd., Bridgeport, CT before Judge Warren W. Eginton; Motion Hearing set for 2/22/2010 11:00 AM in Courtroom Three–Annex, 915 Lafayette Blvd., Bridgeport, CT before Judge Warren W. Eginton. Signed by Judge Warren W. Eginton on 12/9/09. (Cepler, C.) (Entered: 12/09/2009) |
| 01/19/2010 | 54 | First MOTION to Dismiss by Edgardo Sensi. (Truebner, Peter) (Entered: 01/19/2010) |
| 01/19/2010 | 55 | First MOTION to Suppress *PHYSICAL EVIDENCE SEIZED FROM DEFENDANT'S HOME* by Edgardo Sensi. (Truebner, Peter) (Entered: 01/19/2010) |
| 01/19/2010 | 56 | First MOTION to Suppress *Evidence Seized from Defendant's Home* by Edgardo Sensi. (Truebner, Peter) (Entered: 01/19/2010) |
| 01/19/2010 | 57 | First EX PARTE MOTION *FOR SPECIAL SERVICES OF A CERTIFIED COMPUTER EXAMINER* by Edgardo Sensi. (Truebner, Peter) (Entered: 01/19/2010) |
| 01/25/2010 | 58 | RULING denying without prejudice 57 Ex Parte Motion as to Edgardo Sensi (1). Signed by Judge Warren W. Eginton on 1/25/2010. (Cepler, C.) (Entered: 01/25/2010) |
| 02/02/2010 | 59 | AMENDED SCHEDULING ORDER as to Edgardo Sensi: Substantive Motions due 1/19/2010; Government Response due 2/8/2010; Defendant Replies due 2/15/2010; Proposed Voir Dire Questions due 3/25/2010; Proposed Jury Instructions due 3/25/2010; Length of Trial 2 weeks. Jury Trial set for 4/13/2010 09:00 AM in Courtroom Three–Annex, 915 Lafayette Blvd., Bridgeport, CT before Judge Warren W. Eginton; Jury Selection set for 4/12/2010 09:30 AM in Courtroom Three–Annex, 915 Lafayette Blvd., Bridgeport, CT before Judge Warren W. Eginton; MOTION HEARING RESET for 2/24/2010 11:00 AM in Courtroom Three–Annex, 915 Lafayette Blvd., Bridgeport, CT before Judge Warren W. Eginton. PLEASE TAKE NOTE: ALL OTHER DEADLINES WILL REMAIN THE SAME. Signed by Judge Warren W. Eginton on 2/2/2010. (Candee, D.) (Entered: 02/02/2010) |
| 02/08/2010 | 60 | First MOTION for Extension of Time to File Response/Reply as to 54 First MOTION to Dismiss until February 16, 2010 by USA as to Edgardo Sensi. (Patel, Krishna) (Entered: 02/08/2010) |
| 02/09/2010 | 61 | ORDER granting 60 Motion for Extension of Time until February 16, 2010 to File Response to Motions as to Edgardo Sensi (1). Signed by Judge Warren W. Eginton on 2/9/2010. (Cepler, C.) (Entered: 02/09/2010) |
| 02/16/2010 | 62 | Memorandum in Opposition by USA as to Edgardo Sensi re 54 First MOTION to Dismiss, 55 First MOTION to Suppress *PHYSICAL EVIDENCE SEIZED FROM* |

| | | |
|---|---|---|
| | | *DEFENDANT'S HOME, 56* First MOTION to Suppress *Evidence Seized from Defendant's Home* (Patel, Krishna) (Entered: 02/16/2010) |
| 02/18/2010 | 63 | MOTION to Seal Exhibit A of Government's Memorandum of Law in Opposition to Defendant's Motions to Dismiss or in the Alternative to Suppress by USA as to Edgardo Sensi. (S–Barrille, J.) (Entered: 02/18/2010) |
| 02/18/2010 | 64 | Sealed Document: Exhibit A by USA as to Edgardo Sensi (S–Barrille, J.) (Entered: 02/18/2010) |
| 02/18/2010 | 65 | ORDER granting 63 Motion to Seal Exhibit A as to Edgardo Sensi (1). Signed by Judge Warren W. Eginton on 2/18/2010. (S–Barrille, J.) (Entered: 02/18/2010) |
| 02/18/2010 | 66 | Minute Entry for proceedings held before Judge Warren W. Eginton:Status Conference as to Edgardo Sensi held on 2/18/2010. 15 minutes(Court Reporter R. Payton.)(Candee, D.) (Entered: 02/18/2010) |
| 02/18/2010 | 67 | NOTICE OF E–FILED CALENDAR: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE.ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. STATUS CONFERENCE set for 11/24/2010 11:00 AM in Courtroom Three–Annex, 915 Lafayette Blvd., Bridgeport, CT before Judge Warren W. Eginton (Candee, D.) (Entered: 02/18/2010) |
| 02/24/2010 | 68 | ATTORNEY APPEARANCE: Robert M. Berke appearing for Edgardo Sensi (Berke, Robert) (Entered: 02/24/2010) |
| 02/24/2010 | 69 | ORAL MOTION for Peter Truebner to Withdraw as Attorney by Edgardo Sensi. (S–Torres, ) (Entered: 02/26/2010) |
| 02/24/2010 | 70 | ORAL MOTION for Extension of Time to File Response until 3/19/2010 by Edgardo Sensi. (S–Torres, ) (Entered: 02/26/2010) |
| 02/24/2010 | 71 | Minute Entry for proceedings held before Judge Warren W. Eginton: Status Conference as to Edgardo Sensi held on 2/24/2010. granting 69 Motion to Withdraw as Attorney. Peter L. Truebner withdrawn from case as to Edgardo Sensi (1); granting 70 Motion for Extension of Time to File Response/Reply as to Edgardo Sensi (1); 10 minutes(Court Reporter R. Payton.) (S–Torres, ) (Entered: 02/26/2010) |
| 03/08/2010 | 72 | MOTION for Extension of Time to File Response/Reply as to 70 MOTION for Extension of Time to File Response/Reply until 3/19/2010 until April 19, 2010 by Edgardo Sensi. (Berke, Robert) (Entered: 03/08/2010) |
| 03/09/2010 | 73 | ORDER granting 72 Motion for Extension of Time to File Response/Reply as to Edgardo Sensi (1). Signed by Judge Warren W. Eginton on 3/9/2010. (Welles, T.) (Entered: 03/09/2010) |
| 04/08/2010 | 74 | MOTION for Extension of Time to file pretrial motions until May 3, 2010 by Edgardo Sensi. (Berke, Robert) (Entered: 04/08/2010) |
| 04/09/2010 | 75 | ORDER granting 74 Motion for Extension of Time as to Edgardo Sensi (1) until May 3, 2010 to file pretrial motions. Signed by Judge Warren W. Eginton on 4/9/2010. (Cepler, C.) (Entered: 04/09/2010) |
| 05/03/2010 | 76 | SCHEDULING ORDER as to Edgardo Sensi: Discovery Motions due 5/3/2010; Government Response due 5/20/2010; Substantive Motions due 5/3/2010; Government Response due 5/20/2010; Defendant Replies due 5/27/2010; Jury Trial set for 7/14/2010 09:00 AM in Courtroom Three–Annex, 915 Lafayette Blvd., Bridgeport, CT; Jury Selection set for 7/12/2010 09:30 AM in Courtroom Three–Annex, 915 Lafayette Blvd., Bridgeport, CT; Motion Hearing set for 6/1/2010 09:30 AM in Courtroom Three–Annex, 915 Lafayette Blvd., Bridgeport, CT. Signed by Judge Warren W. Eginton on 5/3/2010. (Cepler, C.) (Entered: 05/03/2010) |
| 05/03/2010 | 77 | REPLY TO RESPONSE to Motion by Edgardo Sensi re 54 First MOTION to Dismiss, 63 MOTION to Seal Exhibit A of Government's Memorandum of Law (Berke, Robert) (Entered: 05/03/2010) |

A-9

| | | |
|---|---|---|
| 05/03/2010 | 78 | MOTION to Suppress *Statements* by Edgardo Sensi. (Berke, Robert) (Entered: 05/03/2010) |
| 05/03/2010 | 79 | Memorandum in Support by Edgardo Sensi re 78 MOTION to Suppress *Statements* (Berke, Robert) (Entered: 05/03/2010) |
| 05/03/2010 | 80 | REPLY TO RESPONSE to Motion by Edgardo Sensi re 63 MOTION to Seal Exhibit A of Government's Memorandum of Law (Berke, Robert) (Entered: 05/03/2010) |
| 05/03/2010 | 81 | MOTION for Disclosure *of uncharged misconduct* by Edgardo Sensi. (Berke, Robert) (Entered: 05/03/2010) |
| 05/03/2010 | 82 | MOTION for Discovery by Edgardo Sensi. (Berke, Robert) (Entered: 05/03/2010) |
| 05/03/2010 | 83 | MOTION for Giglio Material by Edgardo Sensi. (Berke, Robert) (Entered: 05/03/2010) |
| 05/20/2010 | 84 | AFFIDAVIT by Edgardo Sensi re 78 MOTION to Suppress *Statements* filed by Edgardo Sensi. EXHIBITS submitted in paper form under seal. (Candee, D.) (Entered: 05/21/2010) |
| 05/26/2010 | 85 | AMENDED SCHEDULING ORDER as to Edgardo Sensi. Jury Selection set for 6/16/2010 09:30 AM in Courtroom Three−Annex, 915 Lafayette Blvd., Bridgeport, CT before Judge Warren W. Eginton. All other dates and deadlines will remain as previously set by the Court in 76 Scheduling Order dated May 3, 2010. Signed by Judge Warren W. Eginton on 5/26/2010. (Cepler, C.) (Entered: 05/26/2010) |
| 05/27/2010 | 86 | Memorandum in Opposition by USA as to Edgardo Sensi re 81 MOTION for Disclosure *of uncharged misconduct*, 83 MOTION for Giglio Material, 82 MOTION for Discovery, 78 MOTION to Suppress *Statements* (Patel, Krishna) (Entered: 05/27/2010) |
| 05/27/2010 | 87 | SCHEDULING ORDER as to Edgardo Sensi. Suppression Hearing set for 6/8/2010 11:00 AM in Courtroom Three−Annex, 915 Lafayette Blvd., Bridgeport, CT before Judge Warren W. Eginton. There will not be a hearing on June 1, 2010. Signed by Judge Warren W. Eginton on 5/27/2010. (Cepler, C.) (Entered: 05/27/2010) |
| 06/04/2010 | 88 | AMENDED SCHEDULING ORDER as to Edgardo Sensi: Jury Selection set for 6/21/2010 09:30 AM in Courtroom Three−Annex, 915 Lafayette Blvd., Bridgeport, CT before Judge Warren W. Eginton. Signed by Judge Warren W. Eginton on 06/04/2010. (Cepler, C.) (Entered: 06/04/2010) |
| 06/07/2010 | 89 | RULING denying 54 Motion to Dismiss as to Edgardo Sensi (1). Signed by Judge Warren W. Eginton on 6/7/2010. (Cepler, C.) (Entered: 06/07/2010) |
| 06/08/2010 | 90 | ORDER denying 55 Motion to Suppress as to Edgardo Sensi (1) for the reasons stated by the Court at the suppression hearing on June 8, 2010; finding as moot 56 Motion to Suppress as to Edgardo Sensi (1) because it is duplicative of the motion to suppress at Doc. #55; denying 78 Motion to Suppress as to Edgardo Sensi (1) because defendant was not in custody at the time the alleged statement was made; finding as moot 81 Motion for Disclosure as to Edgardo Sensi (1); finding as moot 82 Motion for Discovery as to Edgardo Sensi (1); finding as moot 83 Motion for Giglio Material as to Edgardo Sensi (1). The motions for disclosure of uncharged conduct and discovery of Brady and Giglio (Docs. #81, 82, 83) are found as moot in light of counsels' agreement; this ruling is without prejudice to defendant reasserting the motions if necessary. Signed by Judge Warren W. Eginton on 6/8/2010. (Cepler, C.) (Entered: 06/08/2010) |
| 06/08/2010 | 96 | Minute Entry − Motion Hearing as to Edgardo Sensi held on 6/8/2010 re denying as moot 81 MOTION for Disclosure *of uncharged misconduct*; denying 55 First MOTION to Suppress *PHYSICAL EVIDENCE SEIZED FROM DEFENDANT'S HOME*; denying as moot 83 MOTION for Giglio Material; denying as moot 82 MOTION for Discovery; denying 78 MOTION to Suppress *Statements*; denying as moot 56 First MOTION to Suppress *Evidence Seized from Defendant's Home* filed by Edgardo Sensi (Candee, D.) (Entered: 06/22/2010) |

| | | |
|---|---|---|
| 06/08/2010 | 97 | Sealed Document: Exhibit List by USA as to Edgardo Sensi re 96 Motion Hearing, (Attachments: # 1 Exhibit list – Part 2)(Candee, D.) (Entered: 06/22/2010) |
| 06/08/2010 | 98 | Witness List by USA as to Edgardo Sensi re 96 Minute Entry – Motion Hearing (Candee, D.) (Entered: 06/22/2010) |
| 06/14/2010 | 91 | Proposed Voir Dire by USA as to Edgardo Sensi (Patel, Krishna) (Entered: 06/14/2010) |
| 06/14/2010 | 92 | MOTION Government's Motion for Protective Order by USA as to Edgardo Sensi. (Patel, Krishna) Modified on 6/21/2010to edit motion type(S–Torres, ). (Entered: 06/14/2010) |
| 06/14/2010 | 93 | Memorandum in Support by USA as to Edgardo Sensi re 92 MOTION Government's Motion for Protective Order (Attachments: # 1 Text of Proposed Order)(Patel, Krishna) (Entered: 06/14/2010) |
| 06/17/2010 | 99 | Minute Entry for proceedings held before Judge Warren W. Eginton: Status Conference as to Edgardo Sensi held on 6/17/2010 re jury trial procedures. 10 minutes. (Court Reporter R. Payton.)(Candee, D.) (Entered: 06/22/2010) |
| 06/18/2010 | 94 | Proposed Voir Dire by Edgardo Sensi (Berke, Robert) (Entered: 06/18/2010) |
| 06/18/2010 | 100 | Minute Entry for proceedings held before Judge Warren W. Eginton: Status Conference as to Edgardo Sensi held on 6/18/2010 re Waiver of Right to Jury Trial. Total Time: 1 hours and 30 minutes(Court Reporter S. Baldwin.)(Candee, D.) (Entered: 06/22/2010) |
| 06/18/2010 | 101 | Waiver of Right to Jury Trial by Edgardo Sensi re 100 Status Conference. (Candee, D.) (Entered: 06/22/2010) |
| 06/18/2010 | 102 | Sealed Document: Letter – by Edgardo Sensi re 100 Status Conference. (Candee, D.) (Entered: 06/22/2010) |
| 06/21/2010 | 95 | ORDER granting 92 Motion for Protective Order as to Edgardo Sensi (1). Signed by Judge Warren W. Eginton on 6/21/2010. (Cepler, C.) (Entered: 06/21/2010) |
| 06/24/2010 | 103 | TRANSCRIPT of Proceedings as to Edgardo Sensi held on 6/8/10 (Suppression Hearing) before Judge Warren W. Eginton. Court Reporter: Steve Bowles. NOTICE RE REDACTION OF TRANCRIPTS: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.ctd.uscourts.gov. Redaction Request due 7/15/2010. Redacted Transcript Deadline set for 7/25/2010. Release of Transcript Restriction set for 9/22/2010. (Bowles, S.) (Entered: 06/24/2010) |
| 07/06/2010 | 104 | Proposed Jury Instructions by USA as to Edgardo Sensi (Patel, Krishna) (Entered: 07/06/2010) |
| 07/06/2010 | 105 | MOTION to Seal motion to witdraw as counsel by Edgardo Sensi. (Berke, Robert) (Entered: 07/06/2010) |
| 07/06/2010 | 106 | MOTION for Robert Berke to Withdraw as Attorney by Edgardo Sensi. (Berke, Robert) (Entered: 07/06/2010) |
| 07/07/2010 | 107 | ORDER granting 105 Motion to Seal as to Edgardo Sensi (1). Signed by Judge Warren W. Eginton on 7/7/2010. (Cepler, C.) (Entered: 07/07/2010) |
| 07/07/2010 | 108 | Memorandum in Opposition by USA as to Edgardo Sensi re 106 MOTION for Robert Berke to Withdraw as Attorney (Patel, Krishna) (Entered: 07/07/2010) |
| 07/08/2010 | 109 | EX PARTE MOTION by Edgardo Sensi. (S–Torres, ) (Entered: 07/08/2010) |
| 07/08/2010 | 111 | Petition to Enter Plea of Guilty as to Edgardo Sensi (Signed by Judge Warren W. Eginton) (Candee, D.) (Entered: 07/09/2010) |
| 07/08/2010 | 112 | ORAL MOTION to Appoint CJA Counsel, ORAL MOTION for Defendant to be Returned to Wayatt Detention Facility by Edgardo Sensi. (Candee, D.) (Entered: 07/09/2010) |

A-11

| | | |
|---|---|---|
| 07/08/2010 | 113 | Minute Entry for proceedings held before Judge Warren W. Eginton: granting 112 Motion to Appoint Counsel as to Edgardo Sensi (1); granting 112 Motion for Defendant to be Returned to Wayatt Detention Facility as to Edgardo Sensi (1); Status Conference; Change of Plea Hearing as to Edgardo Sensi held on 7/8/2010; (Sentencing set for 9/24/2010 10:30 AM in Courtroom Three−Annex, 915 Lafayette Blvd., Bridgeport, CT before Judge Warren W. Eginton); Guilty Plea entered as to Counts 1s,2s,3s,4s. by Edgardo Sensi (1). Defendant detained. Total Time: 1 hours and 15 minutes(Court Reporter S. Baldwin, J. Perez.) (Candee, D.) (Entered: 07/09/2010) |
| 07/08/2010 | 114 | SEALED CJA 23 Financial Affidavit by Edgardo Sensi (Candee, D.) (Entered: 07/09/2010) |
| 07/08/2010 | 115 | PLEA AGREEMENT as to Edgardo Sensi (Candee, D.) (Candee, D.). (Entered: 07/09/2010) |
| 07/08/2010 | 123 | CJA 20 as to Edgardo Sensi: Appointment of Attorney Robert M. Berke for Edgardo Sensi.. Signed by Clerk on 9/24/2010. (S−Torres, ) (Entered: 09/24/2010) |
| 07/09/2010 | 110 | MOTION for Interim Payment by Edgardo Sensi. (Berke, Robert) (Entered: 07/09/2010) |
| 07/09/2010 | 116 | Docket Entry Correction as to Edgardo Sensi − Docket entry re 115 Plea Agreement modified to add PDF. (Candee, D.) (Entered: 07/09/2010) |
| 07/12/2010 | 117 | ORDER denying 106 Motion to Withdraw as Attorney as to Edgardo Sensi (1); finding as moot 109 Ex Parte Motion as to Edgardo Sensi (1) for the reasons stated at the hearing on July 8, 2010. Signed by Judge Warren W. Eginton on 7/12/2010. (S−Cepler, C.) (Entered: 07/12/2010) |
| 07/12/2010 | 118 | ORDER granting 110 Motion for Interim Payment as to Edgardo Sensi (1). Signed by Judge Warren W. Eginton on 7/12/2010. (Cepler, C.) (Entered: 07/12/2010) |
| 07/12/2010 | 119 | Sealed Document: by Edgardo Sensi. (Candee, D.) (Entered: 07/12/2010) |
| 07/13/2010 | 120 | ORDER OF REFERRAL TO PROBATION FOR PRESENTENCE INVESTIGATION AND REPORT as to Edgardo Sensi, (Sentencing set for 11/19/2010 10:30 AM in Courtroom Three−Annex, 915 Lafayette Blvd., Bridgeport, CT before Judge Warren W. Eginton. Signed by Judge Warren W. Eginton on 7/13/2010. (Candee, D.) (Entered: 07/14/2010) |
| 08/13/2010 | | CJA 20 as to Edgardo Sensi: Authorization to Pay Peter L. Truebner. Voucher # 100602000090−1. Final payment Approved by Judge Denny Chin at USCA. Signed by Judge Warren W. Eginton on 6/7/10. (Wood, R.) (Entered: 08/13/2010) |
| 08/13/2010 | | CJA 20 as to Edgardo Sensi: Authorization to Pay Peter L. Truebner. Voucher # 100602000090−2. Final payment Approved by Judge Denny Chin at USCA. Signed by Judge Warren W. Eginton on 6/7/10. (Wood, R.) (Entered: 08/13/2010) |
| 09/08/2010 | 121 | Minute Entry for proceedings held before Judge Warren W. Eginton:Status Conference as to Edgardo Sensi held on 9/8/2010. 5 minutes.(Court Reporter J. Perez.)(Candee, D.) (Entered: 09/17/2010) |
| 09/08/2010 | 122 | Sealed Document: Letter by Edgardo Sensi (Candee, D.) (Entered: 09/17/2010) |
| 09/28/2010 | 124 | ORAL MOTION to Waive Speedy Trial by Edgardo Sensi. (Torres, K.) (Entered: 09/30/2010) |
| 09/28/2010 | 125 | ORAL MOTION for Robert Berke to Withdraw as Attorney by Edgardo Sensi. (Torres, K.) (Entered: 09/30/2010) |
| 09/28/2010 | 126 | Minute Entry for proceedings held before Judge Warren W. Eginton: Motion Hearing as to Edgardo Sensi held on 9/28/2010 granting 124 Motion to Waive Speedy Trial as to Edgardo Sensi (1); granting 125 Motion to Withdraw as Attorney. Robert M. Berke withdrawn from case. as to Edgardo Sensi (1); 15 minutes(Court Reporter R. Payton.) (Torres, K.) (Entered: 09/30/2010) |
| 09/28/2010 | 127 | ATTORNEY APPEARANCE: Gerald Lewis Harmon appearing for Edgardo Sensi (Torres, K.) (Entered: 09/30/2010) |

Case: 3:08-cr-253     As of: 10/02/2012 10:34 AM EDT     12 of 15

| 09/28/2010 | | CJA20 Appointment of Gerald Lewis Harmon for defendant Edgardo Sensi. Signed by Clerk on 12/13/10. (D'Onofrio, B.) (Entered: 12/13/2010) |
|---|---|---|
| 10/07/2010 | 128 | ORDER OF REFERRAL TO PROBATION FOR PRESENTENCE INVESTIGATION AND REPORT as to Edgardo Sensi. First Disclosure−PSI due 1/6/2011, 2nd−Disclosure PSI due 2/2/2011, Memo in aid of sentencing due 2/8/2011, Response due 2/10/2011, Final Objections Due 1/18/2011, Sentencing set for 2/11/2011 10:30 AM in Courtroom Three−Annex, 915 Lafayette Blvd., Bridgeport, CT before Judge Warren W. Eginton. Signed by Judge Warren W. Eginton on 10/6/2010. (Candee, D.) (Entered: 10/08/2010) |
| 11/12/2010 | 129 | First MOTION for Extension of Time Filing of Substantive Motions until December 19, 2010 by Edgardo Sensi. (Harmon, Gerald) (Entered: 11/12/2010) |
| 11/17/2010 | 130 | ORDER granting 129 Motion for Extension of Time as to Edgardo Sensi (1). Defendant shall file any substantive motions no later than December 19, 2010. All other dates and deadlines shall remain in effect, include defendant's sentencing, if necessary, on February 11, 2011. Signed by Judge Warren W. Eginton on 11/17/2010. (Cepler, C.) (Entered: 11/17/2010) |
| 12/18/2010 | 131 | First MOTION to Withdraw Plea of Guilty *entered on July 8, 2010* by Edgardo Sensi. (Attachments: # 1 Memorandum in Support Memorandum in Support of Motion to Withdraw Pleas and Dismiss Counts Three and Four of Superceding Indictment)(Harmon, Gerald) (Entered: 12/18/2010) |
| 12/23/2010 | 132 | First MOTION for Extension of Time to File Response/Reply as to 131 First MOTION to Withdraw Plea of Guilty *entered on July 8, 2010* until January 30, 2011 by USA as to Edgardo Sensi. (Patel, Krishna) (Entered: 12/23/2010) |
| 12/29/2010 | 133 | ORDER granting 132 Motion for Extension of Time to File Response to Motion to Withdraw Guilty Plea as to Edgardo Sensi (1) until January 30, 2011. Signed by Judge Warren W. Eginton on 12/29/2010. (Cepler, C.) (Entered: 12/29/2010) |
| 01/21/2011 | 134 | TRANSCRIPT of Proceedings: Held on 7/8/10 (Motion and Change of Plea Hearing) before Judge Warren W. Eginton. Court Reporter: Steve Bowles. IMPORTANT NOTICE − REDACTION OF TRANSCRIPTS: To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 2/11/2011. Redacted Transcript Deadline set for 2/21/2011. Release of Transcript Restriction set for 4/21/2011. (Bowles, S.) (Entered: 01/21/2011) |
| 01/21/2011 | 135 | TRANSCRIPT of Proceedings: Held on 9/8/10 (Status Conference) before Judge Warren W. Eginton. Court Reporter: Steve Bowles. IMPORTANT NOTICE − REDACTION OF TRANSCRIPTS: To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 2/11/2011. Redacted Transcript Deadline set for 2/21/2011. Release of Transcript Restriction set for 4/21/2011. (Bowles, S.) (Entered: 01/21/2011) |
| 01/27/2011 | 136 | Second MOTION for Extension of Time to File Response/Reply *to Defendant's Motion to Withdraw His Plea* until February 15, 2011 by USA as to Edgardo Sensi. (Patel, Krishna) (Entered: 01/27/2011) |

**A-13**

| | | |
|---|---|---|
| 02/02/2011 | 137 | ORDER granting 136 Motion for Extension of Time until February 15, 2011 to File Response to Edgardo Sensi's motion to withdraw plea. Signed by Judge Warren W. Eginton on 2/2/2011. (Cepler, C.) (Entered: 02/02/2011) |
| 02/14/2011 | 138 | Third MOTION for Extension of Time to File Response/Reply *To Defendant's Motion To Withdraw His Plea* until February 22, 2011 by USA as to Edgardo Sensi. (Patel, Krishna) (Entered: 02/14/2011) |
| 02/18/2011 | 139 | ORDER granting 138 Motion for Extension of Time until February 22, 2011 to File Response as to Edgardo Sensi (1). Signed by Judge Warren W. Eginton on 2/18/2011. (Cepler, C.) (Entered: 02/18/2011) |
| 02/18/2011 | | CJA 20 as to Edgardo Sensi: Authorization to Pay Robert M. Berke. Voucher # 101213000153. Final payment Approved by Judge Gerard E. Lynch at USCA. Signed by Judge Warren W. Eginton on 12/16/10. (Wood, R.) (Entered: 02/18/2011) |
| 02/22/2011 | 140 | Memorandum in Opposition by USA as to Edgardo Sensi re 131 First MOTION to Withdraw Plea of Guilty *entered on July 8, 2010* (Patel, Krishna) (Entered: 02/22/2011) |
| 03/12/2011 | 141 | First MOTION for Extension of Time to File Response/Reply *to 140 Government's Opposition to Withdrawl of Pleas* until April 30, 2011 by Edgardo Sensi. (Harmon, Gerald) Modified on 3/14/2011 to create link to Doc. No. 140 (Ferguson, L.). (Entered: 03/12/2011) |
| 03/14/2011 | 142 | ORDER granting 141 Motion for Extension of Time until April 30, 2011 to File Reply as to Edgardo Sensi (1). Signed by Judge Warren W. Eginton on 3/14/2011. (Cepler, C.) (Entered: 03/14/2011) |
| 04/27/2011 | 143 | Second MOTION for Extension of Time to File Response/Reply as to 140 Memorandum in Opposition to Motion until 6/30/2011 by Edgardo Sensi. (Harmon, Gerald) (Entered: 04/27/2011) |
| 05/02/2011 | 144 | ORDER granting 143 Motion for Extension of Time to File Reply as to Edgardo Sensi (1) to motion to withdraw plea until 6/30/2011. Signed by Judge Warren W. Eginton on 5/2/2011. (Cepler, C.) (Entered: 05/02/2011) |
| 05/03/2011 | 145 | First MOTION for Interim Payment by Edgardo Sensi. (Harmon, Gerald) (Entered: 05/03/2011) |
| 05/05/2011 | 146 | ORDER granting 145 Motion for Interim Payment as to Edgardo Sensi (1). Signed by Judge Warren W. Eginton on 5/5/2011. (Cepler, C.) (Entered: 05/05/2011) |
| 05/15/2011 | 147 | TRANSCRIPT of Proceedings: Held on 6/18/10 (Conference on Waiver of Right to Jury Trial) before Judge Warren W. Eginton. Court Reporter: Steve Bowles. IMPORTANT NOTICE – REDACTION OF TRANSCRIPTS: To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 6/5/2011. Redacted Transcript Deadline set for 6/15/2011. Release of Transcript Restriction set for 8/13/2011. (Bowles, S.) (Entered: 05/15/2011) |
| 06/25/2011 | 148 | Third MOTION for Extension of Time to File Response/Reply as to 140 Memorandum in Opposition to 131 Motion to Withdraw Plea until August 31, 2011 by Edgardo Sensi. (Harmon, Gerald) Modified on 6/28/2011 to create link to document #131 (Inferrera, L.). (Entered: 06/25/2011) |
| 06/27/2011 | 149 | ORDER granting 148 Motion for Extension of Time as to Edgardo Sensi (1), for the defendant to file a reply by 8/31/11. Signed by Judge Warren W. Eginton on 6/27/11. (Wilson, J.) (Entered: 06/27/2011) |

| 06/28/2011 | 150 | MOTION for Reconsideration re 149 Order on Motion for Extension of Time to File Response/Reply by USA as to Edgardo Sensi. (Patel, Krishna) (Entered: 06/28/2011) |
| 08/03/2011 | 151 | RESPONSE/REPLY by Edgardo Sensi re 140 Memorandum in Opposition to Motion, 131 Motion to Withdraw Plea of Guilty, (Harmon, Gerald) (Entered: 08/03/2011) |
| 08/04/2011 | 152 | ORDER finding as moot 150 Motion for Reconsideration as to Edgardo Sensi (1), as defendant has filed his reply. Signed by Judge Warren W. Eginton on 8/4/11. (Wilson, J.) (Entered: 08/04/2011) |
| 09/02/2011 |  | CJA 20 as to Edgardo Sensi: Authorization to Pay Gerald Lewis Harmon. Voucher # 110718000091. Interim #1 payment Approved by Judge Peter W. Hall at USCA. Signed by Judge Warren W. Eginton on 7/25/11. (Wood, R.) (Entered: 09/02/2011) |
| 09/14/2011 | 153 | MEMORANDUM OF DECISION denying 131 Motion to Withdraw Plea of Guilty as to Edgardo Sensi (1). Signed by Judge Warren W. Eginton on 9/14/2011. (Candee, D.) (Entered: 09/14/2011) |
| 10/04/2011 | 154 | First MOTION for Reconsideration re 153 Order on Motion to Withdraw Plea of Guilty by Edgardo Sensi. (Harmon, Gerald) (Entered: 10/04/2011) |
| 10/19/2011 | 155 | SENTENCING SCHEDULING ORDER as to Edgardo Sensi. Sentencing set for 1/31/2012 10:00 AM in Courtroom Three–Annex, 915 Lafayette Blvd., Bridgeport, CT before Judge Warren W. Eginton. Signed by Judge Warren W. Eginton on 10/19/11. (Ladd–Smith, I.) (Entered: 10/19/2011) |
| 10/19/2011 |  | Set Deadlines/Hearings as to Edgardo Sensi: Sentencing set for 1/31/2012 10:00 AM in Courtroom Three–Annex, 915 Lafayette Blvd., Bridgeport, CT before Judge Warren W. Eginton, pursuant to docket 155 Sentencing Scheduling Order.(Blough, B.) (Entered: 11/18/2011) |
| 11/02/2011 | 156 | Memorandum in Opposition by USA as to Edgardo Sensi re 154 First MOTION for Reconsideration re 153 Order on Motion to Withdraw Plea of Guilty (Patel, Krishna) (Entered: 11/02/2011) |
| 12/14/2011 | 157 | ORDER denying 154 Motion for Reconsideration as to Edgardo Sensi (1). Signed by Judge Warren W. Eginton on 12/14/11. (Ladd–Smith, I.) (Entered: 12/14/2011) |
| 12/19/2011 | 158 | PRESENTENCE INVESTIGATION REPORT (Draft Report) *(SEALED – government and defense counsel)* as to Edgardo Sensi. (available to USA, Edgardo Sensi) (Attachments: # 1 SS Indictment, # 2 Plea Agreement)(Lopez, R.) (Entered: 12/19/2011) |
| 01/04/2012 |  | CJA 20 as to Edgardo Sensi: Authorization to Pay Gerald Lewis Harmon. Voucher # 111027000357. Interim #2 payment Approved by Judge Gerald E. Lynch at USCA. Signed by Judge Warren W. Eginton on 11/21/11. (Wood, R.) (Entered: 01/04/2012) |
| 01/07/2012 | 159 | OBJECTION to 158 Presentence Investigation Report by Edgardo Sensi (Harmon, Gerald) (Entered: 01/07/2012) |
| 01/13/2012 | 160 | PRESENTENCE INVESTIGATION REPORT (Final Report) *(SEALED – government and defense counsel)* as to Edgardo Sensi. (available to USA, Edgardo Sensi) (Attachments: # 1 SS Indictment, # 2 Plea Agreement, # 3 Addendum)(Lopez, R.) (Entered: 01/13/2012) |
| 01/13/2012 | 161 | Sealed Sentencing Recommendation: as to Edgardo Sensi (Lopez, R.) (Entered: 01/13/2012) |
| 01/23/2012 | 162 | SENTENCING MEMORANDUM by Edgardo Sensi (Harmon, Gerald) (Entered: 01/23/2012) |
| 01/26/2012 | 163 | SENTENCING MEMORANDUM by USA as to Edgardo Sensi (Patel, Krishna) (Entered: 01/26/2012) |
| 01/27/2012 | 164 | First MOTION to Continue *Sentencing* by Edgardo Sensi. (Attachments: # 1 Exhibit Exhibits A–H)(Harmon, Gerald) (Entered: 01/27/2012) |

Case 12-565, Document 26, 10/05/2012, 740168, Page19 of 301

A-15

| | | |
|---|---|---|
| 01/31/2012 | 165 | Minute Entry for proceedings held before Judge Warren W. Eginton: denying 164 Motion to Continue as to Edgardo Sensi (1); Sentencing as to Edgardo Sensi held on 1/31/2012. Total Time: 1 hours and 20 minutes(Court Reporter S. Baldwin.) (Candee, D.) Modified on 2/3/2012 (Candee, D.). (Entered: 02/03/2012) |
| 01/31/2012 | 166 | Marked Exhibit List by USA as to Edgardo Sensi (Candee, D.) (Entered: 02/03/2012) |
| 02/02/2012 | 167 | JUDGMENT as to Edgardo Sensi (1), Counts 1s, 2s, 3s &4s. Defendant plead guilty to Counts 1s, 2s, 3s, &4s of the Superseding Indictment. Defendant shall be imprisoned for a total of 85 years consecutive on all counts. Upon release defendant shall be on supervised released for a total term of Life concurrent on all counts with Mandatory, Standard and Special Conditions. Defendant shall immediately pay a total $400.00 Special Assessment on Counts 1s, 2s, 3s &4s. Signed by Judge Warren W. Eginton on 2/1/2012. (Candee, D.) (Entered: 02/03/2012) |
| 02/08/2012 | 168 | NOTICE OF APPEAL by Edgardo Sensi re 167 Judgment. (Candee, D.) (Entered: 02/09/2012) |
| 03/01/2012 | | CJA 20 as to Edgardo Sensi: Authorization to Pay Gerald Lewis Harmon. Voucher # 1201190000016. Interim #3 payment Approved by Judge Peter W. Hall at USCA. Signed by Judge Warren W. Eginton on 1/24/12. (Wood, R.) (Entered: 03/01/2012) |
| 04/12/2012 | 169 | MOTION to Unseal Documents by Edgardo Sensi. (Candee, D.) (Entered: 04/20/2012) |
| 05/03/2012 | 170 | ORDER granting 169 Motion to Unseal Document as to Edgardo Sensi (1) to his appellate counsel only. Signed by Judge Warren W. Eginton on 5/3/12. (Ladd−Smith, I.) (Entered: 05/03/2012) |
| 06/14/2012 | | CJA 20 as to Edgardo Sensi: Authorization to Pay Gerald Lewis Harmon. Voucher # 120229000037. Final payment Approved by Judge Robert A. Katzmann at USCA. Signed by Judge Warren W. Eginton on 3/2/12. (Wood, R.) (Entered: 06/14/2012) |
| 06/23/2012 | 171 | TRANSCRIPT of Proceedings: as to Edgardo Sensi Held on 1/31/12 (Sentencing Hearing) before Judge Warren W. Eginton. Court Reporter: Steve Bowles. IMPORTANT NOTICE − REDACTION OF TRANSCRIPTS: To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 7/14/2012. Redacted Transcript Deadline set for 7/24/2012. Release of Transcript Restriction set for 9/21/2012. (Bowles, S.) (Entered: 06/23/2012) |

**UNITED STATES DISTRICT COURT**

**DISTRICT OF CONNECTICUT**

**Grand Jury B-08-2**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal No. 3:08cr |
| v. | : | |
| | : | Violations: |
| EDGARDO SENSI | : | 18 U.S.C. § 371 (Conspiracy) |
| | : | 18 U.S.C. § 2251(a) (Production of Child Pornography) |
| | : | 18 U.S.C. § 2 (Aiding and Abetting) |

**INDICTMENT**

The Grand Jury charges:

**General Allegations**

1. **EDGARDO SENSI**, the defendant herein, is a citizen of the United States and was born on or about April 13, 1956. **SENSI** most recently resided in Jensen Beach, Florida. During the relevant period of time set forth in this Indictment, **SENSI** resided in Fairfield County, Connecticut.

2. Jane Doe, an unnamed co-conspirator, who is not a defendant herein, is a citizen of the United States. During the relevant period of time set forth in this Indictment, Jane Doe resided in Fairfield County, Connecticut.

**COUNT ONE - Conspiracy to Produce Child Pornography**
**(18 U.S.C. § 371)**

3. The factual allegations set forth in paragraphs 1 and 2 are repeated and re-alleged as if set forth fully herein.

4.   From in or about 2001, to in or about 2004, in the District of Connecticut and elsewhere, **EDGARDO SENSI**, the defendant herein, together with Jane Doe, willfully, and knowingly did combine, conspire, confederate, and agree together and with each other to commit an offense against the United States, that is, to produce child pornography in violation of Title 18, United States Code, Section 2251(a).

5.   It was part and an object of the conspiracy that **SENSI** and Doe willfully, and knowingly would and did employ, use, persuade, induce, entice, and coerce a minor victim (hereinafter "M.V.#1"), whose true identity is known to the Grand Jury and who was approximately eight-years-old at the beginning of the period of the conspiracy, to engage in sexually explicit conduct for the purpose of producing visual depictions of such conduct, which visual depictions (i) the defendant knew and had reason to know would be transported in interstate commerce; (ii) were produced using materials that had been mailed, shipped, and transported in interstate and foreign commerce; and (iii) were actually transported in interstate and foreign commerce.

**The Manner and Means of the Conspiracy**

6.   Among the means and methods employed by **SENSI** to manufacture child pornography were to: (1) encourage M.V.#1 to be filmed while **SENSI** and Doe engaged her in sexually explicit conduct; (2) engage in a lengthy grooming process which involved

2

trickery and desensitizing M.V.#1 to accept the sexual abuse that MV#1 was subjected to; and (3) enticing M.V.#1 to engage in sex acts which involved sado-masochistic acts.

## OVERT ACTS

7.    In furtherance of the conspiracy and to effect the unlawful objects thereof, **SENSI** and Doe committed the following overt acts, among others, in the District of Connecticut and elsewhere:

a.    In or about April 2001, **SENSI** instructed Doe on how to use his video-camera so that Doe could take pornographic images of M.V.#1.

b.    Beginning in or about April 2001, **SENSI** and Doe filmed M.V.#1 while she was bathing or wearing only underwear. **SENSI** and Doe also encouraged M.V.#1 to take off her clothes while they filmed her.  When M.V.#1 showed any indications of resisting, Doe reassured her that no one would see the video-tape.

c.    In or about April 2001, **SENSI** and Doe encouraged M.V.#1 to play with a vibrator and then to begin playing with **SENSI'S** penis.

d.    In or about April and May 2001, **SENSI** and Doe encouraged M.V.#1 to watch and subsequently

3

participate in sessions where Doe would masturbate and engage in oral sex with **SENSI**.

e.  In or about April and May 2001, **SENSI** and Doe enticed M.V.#1 to engage in sex acts with them by, among other things, encouraging M.V.#1 to watch pornographic video-tapes with them.

f.  In or about April 2001, **SENSI** began to penetrate the victim using his mouth and encouraged M.V.#1 to penetrate herself using her fingers.

g.  In or about April and May 2001, **SENSI** and Doe engaged in intercourse while M.V.#1 was present and ultimately **SENSI** attempted to engage in intercourse with M.V.#1.

h.  **SENSI** maintained and transported the video-tapes of his sex sessions with M.V.#1.

I.  **SENSI** engaged in other sado-masochistic behavior with M.V.#1 and filmed the acts.

All in violation of Title 18, United States Code, Section 371.

## COUNT TWO – Production of Child Pornography
### (18 U.S.C. § 2251(a))

7.  The factual allegations set forth in paragraphs 1 to 3 and 5-7 are repeated and re-alleged as if set forth fully herein.

4

A-20

8.  In or about 2001, in the District of Connecticut and elsewhere, **EDGARDO SENSI**, the defendant herein, did employ, use, persuade, induce, entice, and coerce a minor, M.V.#1, to engage in sexually explicit conduct for the purpose of producing visual depictions of such conduct, which visual depictions (i) the defendant knew and had reason to know would be transported in interstate and foreign commerce; (ii) were produced using materials that had been mailed, shipped, and transported in interstate and foreign commerce; and (iii) were actually transported in interstate and foreign commerce.

In violation of Title 18, United States Code, Sections 2251(a) & 2.

                                        A TRUE BILL

                                        /S/_____
                                        FOREPERSON


/S/_____
NORA R. DANNEHY
ACTING UNITED STATES ATTORNEY


/S/_____
ALINA P. REYNOLDS
SUPERVISORY ASSISTANT U.S. ATTORNEY


/S/_____
KRISHNA R. PATEL
ASSISTANT UNITED STATES ATTORNEY

A-21

# UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

### Grand Jury B-08-2

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal No. 3:08cr253(WWE) |
| v. | : | |
| | : | Violations: |
| EDGARDO SENSI | : | 18 U.S.C. § 371 (Conspiracy) |
| | : | 18 U.S.C. § 2251(a) (Production of Child Pornography in U.S.) |
| | : | 18 U.S.C. § 2 (Aiding and Abetting) |
| | | 18 U.S.C. § 2423 (c) (Illicit Sexual Conduct in Foreign Places) |
| | | 18 U.S.C. § 2251(c)(1) (Production of Child Pornography Outside the U.S.) |

## SUPERSEDING INDICTMENT

The Grand Jury charges:

## General Allegations

1.  **EDGARDO SENSI**, the defendant herein, is a citizen of the United States and was born on or about April 13, 1956. **SENSI** most recently resided in Jensen Beach, Florida.  During the relevant period of time set forth in this Superseding Indictment, **SENSI** resided in Fairfield County, Connecticut.

2.  Jane Doe #1, an unnamed co-conspirator who is not a defendant herein, is a citizen of the United States.  During the relevant period of time set forth in this Superseding Indictment, Jane Doe #1 resided in Fairfield County, Connecticut.

3.   Jane Doe #2 is a citizen of Nicaragua. During the relevant time period set forth in this Superseding Indictment, Jane Doe #2 resided in a rural community outside Managua, Nicaragua.

### COUNT ONE - Conspiracy to Produce Child Pornography
### (18 U.S.C. § 371)

4.   The factual allegations set forth in paragraphs 1 and 2 are repeated and re-alleged as if set forth fully herein.

5.   From in or about 2001, to in or about 2004, in the District of Connecticut and elsewhere, **EDGARDO SENSI**, the defendant herein, together with Jane Doe #1, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit an offense against the United States, that is, to produce child pornography in violation of Title 18, United States Code, Section 2251(a).

6.   It was part and an object of the conspiracy that **SENSI** and Jane Doe #1 willfully and knowingly would and did employ, use, persuade, induce, entice, and coerce a minor victim (hereinafter "M.V. #1"), whose true identity is known to the Grand Jury and who was approximately eight years old at the beginning of the period of the conspiracy, to engage in sexually explicit conduct for the purpose of producing visual depictions of such conduct, which visual depictions (i) the defendant knew and had reason to know would be transported in interstate commerce; (ii) were produced using materials that had been

2

mailed, shipped, and transported in interstate and foreign commerce; and (iii) were actually transported in interstate and foreign commerce.

### The Manner and Means of the Conspiracy

7.   Among the means and methods employed by **SENSI** to manufacture child pornography were to: (1) encourage M.V. #1 to be filmed while **SENSI** and Jane Doe #1 engaged her in sexually explicit conduct; (2) engage in a lengthy grooming process which involved trickery and desensitizing M.V. #1 to accept the sexual abuse that M.V. #1 was subjected to; and (3) entice M.V. #1 to engage in sex acts which involved sado-masochistic acts.

### OVERT ACTS

8.   In furtherance of the conspiracy and to effect the unlawful objects thereof, **SENSI** and Jane Doe #1 committed the following overt acts, among others, in the District of Connecticut and elsewhere:

a.   In or about April 2001, **SENSI** instructed Jane Doe #1 on how to use his video camera so that Jane Doe #1 could take pornographic images of M.V. #1.

b.   Beginning in or about April 2001, **SENSI** and Jane Doe #1 filmed M.V. #1 while she was bathing or wearing only underwear. **SENSI** and Jane Doe #1 also encouraged M.V. #1 to take off her clothes while they filmed her.  When M.V. #1 showed any

3

A-24

indications of resisting, Jane Doe #1 reassured her that no one would see the videotape.

c.  In or about April 2001, **SENSI** and Jane Doe #1 encouraged M.V. #1 to play with a vibrator and then to begin playing with **SENSI'S** penis.

d.  In or about April and May 2001, **SENSI** and Jane Doe #1 encouraged M.V. #1 to watch and subsequently participate in sessions where Jane Doe #1 would masturbate and engage in oral sex with **SENSI**.

e.  In or about April and May 2001, **SENSI** and Jane Doe #1 enticed M.V. #1 to engage in sex acts with them by, among other things, encouraging M.V. #1 to watch pornographic videotapes with them.

f.  In or about April 2001, **SENSI** began to penetrate the victim using his mouth and encouraged M.V. #1 to penetrate herself using her fingers.

g.  In or about April and May 2001, **SENSI** and Jane Doe #1 engaged in intercourse while M.V. #1 was present and ultimately **SENSI** attempted to engage in intercourse with M.V. #1.

h.  **SENSI** eventually performed oral sex on, received oral sex from, and vaginally penetrated M.V. #1. The videotapes also depict Jane Doe #1

4

A-25

masturbating, anally penetrating and engaging in sexually explicit conduct with M.V. #1.

i.  **SENSI** maintained and transported in interstate commerce the videotapes of his sex sessions with M.V. #1.

j.  **SENSI** engaged in other sado-masochistic behavior with M.V. #1 and filmed the acts.

All in violation of Title 18, United States Code, Section 371.

## COUNT TWO - Production of Child Pornography in the U.S. (18 U.S.C. § 2251(a))

9.  The factual allegations set forth in paragraphs 1-3 and 5-7 are repeated and re-alleged as if set forth fully herein.

10.  In or about 2001, in the District of Connecticut and elsewhere, **EDGARDO SENSI**, the defendant herein, did employ, use, persuade, induce, entice, and coerce a minor, M.V. #1, to engage in sexually explicit conduct for the purpose of producing visual depictions of such conduct, which visual depictions (i) the defendant knew and had reason to know would be transported in interstate and foreign commerce; (ii) were produced using materials that had been mailed, shipped, and transported in interstate and foreign commerce; and (iii) were actually transported in interstate and foreign commerce.

5

In violation of Title 18, United States Code, Sections 2251(a) & 2.

## COUNT THREE – Illicit Sexual Conduct in Foreign Places
### (18 U.S.C. § 2423 (c))

11.  The factual allegations set forth in paragraphs 1 and 3 above are repeated and re-alleged as if set forth fully herein.

12.  From in or about January 2004 to in or about 2005, the exact dates being unknown to the Grand Jury, in a rural community outside Managua, Nicaragua, and elsewhere, **EDGARDO SENSI**, the defendant herein, who is a United States citizen, did travel in foreign commerce from the United States to Nicaragua, and did engage in illicit sexual conduct in violation of Title 18, United States Code, Section 2423(f), with a minor victim (hereinafter "M.V. #2"), whose true identity is known to the Grand Jury, and who was approximately four years old when the illicit sexual conduct began.

### Defendant's Trips to Nicaragua

13.  During various trips to Nicaragua starting January 2004 to in or about 2005, the exact dates being unknown to the Grand Jury, **SENSI** committed the following acts in violation of 18 U.S.C. § 2423(c).

a.  In January 2004, **SENSI**, traveled to Nicaragua for a brief trip in conjunction with a charity

6

organization. While in Nicaragua, **SENSI** befriended Jane
Doe #2, who was approximately twenty-three years old
and who was then working as a maid, earning 500 córdoba
per month (approximately $32.41 in January 2004) and
who was the mother of M.V. #2.

b.   Among the methods utilized by **SENSI** to entice and
persuade Jane Doe #2 to permit **SENSI** to have
access to M.V. #2 was to provide Jane Doe #2 with
monetary and other benefits, including but not
limited to, U.S. and foreign currency, money to
purchase a cell phone, a gold ring, and a bottle
of perfume with **SENSI's** name on it. **SENSI** also
obtained rooms at luxury hotels in Managua,
Nicaragua, where he engaged in sex acts with Jane
Doe #2. SENSI also  discussed with Jane Doe #2's
family, his intention to marry her and provide
financially for her.

c.   In furtherance of this violation, beginning in or
about January 2004 and continuing until 2005, the
exact dates being unknown to the Grand Jury, **SENSI**
engaged in illicit sex acts, including but not
limited to, directing Jane Doe #2 to undress the
child, engaging in sex acts with Jane Doe #2 and
M.V.#2 simultaneously, providing sex toys to Jane

**A-28**

Doe #2 and M.V. #2, encouraging M.V. #2 to use the sex toys, encouraging M.V. #2 to touch **SENSI's** penis, placing food items on his penis and encouraging M.V. #2 to eat the items. **SENSI** videotaped some of his sex sessions with Jane Doe #2 and M.V. #2.

d.   As part of his grooming process, **SENSI** played videotapes of pornography and told M.V. #2 to do what the individuals were doing in the video.

e.   In a effort to control Jane Doe #2, **SENSI** repeatedly reminded her that he was a powerful man and on one occasion became physically violent with her.  **SENSI** also directed Jane Doe #2 to engage in sex acts with other males.

In violation of Title 18, United States Code, Sections 2423 (c) & 2.

**COUNT FOUR - Production of Child Pornography Outside the U.S.**
**(18 U.S.C. § 2251(c)(1))**

14.   The factual allegations set forth in paragraph 1, 3 and 13 above are repeated and re-alleged as if set forth fully herein.

In or about February 2004 until in or about 2005, the exact dates being unknown to the Grand Jury, in the District of Connecticut, the country of Nicaragua, and elsewhere, **EDGARDO**

8

**A-29**

**SENSI**, the defendant herein, did employ, use, persuade, induce, entice and coerce M.V. #2 to engage in sexually explicit conduct in Nicaragua, for the purpose of producing visual depictions of such conduct, and did transport the visual depictions to the United States.

In violation of Title 18, United States Code, Sections 2251(c)(1) & 2.

A TRUE BILL

/S/_____
FOREPERSON


/S/_____
NORA R. DANNEHY
ACTING UNITED STATES ATTORNEY


/S/_____
ALINA P. REYNOLDS
SUPERVISORY ASSISTANT U.S. ATTORNEY


/S/_____
KRISHNA R. PATEL
ASSISTANT UNITED STATES ATTORNEY

9

A-30

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff | : | DOCKET NO. 3:08CR-253 (WWE) |
| | : | |
| vs. | : | |
| | : | |
| EDGARDO SENSI,<br>Defendant. | : | JANUARY 19, 2010 |

## MOTION TO SUPPRESS PHYSICAL EVIDENCE
## SEIZED FROM DEFENDANT'S HOME

The Defendant, EDGARDO SENSI, by and through the undersigned
counsel, and pursuant to Federal Rules of Criminal Procedure 12 and 41(h),
hereby files this Motion to Suppress, and respectfully moves this Court to
suppress the following evidence in the above matter seized by Florida law
enforcement officials pursuant to a search warrant.

## A.      STATEMENT OF RELEVANT FACTS

1.      On September 9, 2008 Detective Brian Broughton, a Deputy with
the Martin County Sheriff's Office in Martin County, Florida submitted an
affidavit for a search warrant to Honorable Elizabeth A. Metzger, Judge of
the Circuit Court, in and for Martin County, Florida in order to search the
home of the Defendant, EDGARDO SENSI.  According to Detective
Broughton's affidavit, probable cause in support of the search warrant

1

consisted of the following: Detective Broughton's law enforcement experience and training, and a general explanation of peer to peer file sharing networks, including the Gnutella network, and how these networks are used by individuals to download, possess, and share child pornography. According to Detective Broughton's affidavit, the only evidence which existed to prove that the Defendant, Edgardo Sensi, possessed child pornography was the following:

"On August 27, 2008, your affiant located an IP address of 76.111.218.152 of a user who possessed movie files that have been previously identified as child pornography in other investigations.  Your affiant attempted to browse the IP address 76.111.218.152 but was unsuccessful.  Your affiant then entered the IP address into the Internet Crimes Against Children database (ICAC) . . . The ICAC database maintains a log of IP addresses that have been previously involved in the possession and distribution of child pornography."  (Exhibit 1, Affidavit for Search Warrant, attached hereto at pages 34 - 35).  The ICAC database showed that the IP address 76.111.218.152 had been logged 78 times, from August 23, 2008 through August 26, 2008 by law enforcement or someone associated with the ICAC Task Force.  (Deposition of Detective Broughton at page 36).

"Each of these entries shows a SHA1 value described above, a date and a time, and a file name associated with the file.  The IP addresses are logged into the database when an ICAC investigation identifies a user's IP address

as having a particular image of child pornography, based on the SHA1 value, for distribution or sharing." (Exhibit 1 at pages 34 – 35). Detective Broughton then stated that he "reviewed the listed SHA1 values and file names associated with the IP address" (Exhibit 1 at page 35).  He then **unsuccessfully** sought to download a movie file associated with one of those SHA1 values from the IP address 76.111.218.152.  Instead, Detective Broughton "downloaded the same movie file from available hosts" and it depicted child pornography (Exhibit 1 at page 35). Detective Broughton then sought to download another movie file associated with another SHA1 value from IP address 76.111.218.152, but once again, **he was unable to do so**. Instead, Detective Broughton downloaded the movie from other available hosts, and it depicted child pornography (Exhibit 1 at page 35).

Detective Broughton then determined that the IP address 76.111.218.152 was issued to Comcast (Exhibit 1 at page 36).  A summons was issued to Comcast for subscriber information for the customer assigned to the IP address 76.111.218.152.  On September 8, 2008, Comcast replied to the subpoena and indicated that the user of IP address 76.111.218.152, between the day and time of August 23, 3008 at 1:00 PM to August 26, 2008 at 6:00 PM was the Defendant, EDGARDO SENSI.  The address that the service was connected to was 2750 NW Windmere Drive, Jensen Beach, FL 34957 (Exhibit 1 at page 36).

Detective Broughton's affidavit sought authority **exclusively** for the search and seizure of computer storage media containing images evidencing child pornography, as well as documents necessary to prove the Defendant owned, used, or controlled such computer storage media.  Nowhere within Detective Broughton's affidavit did he seek authority, nor prove probable cause for the search and seizure of Hi8 video cassettes (Exhibit 1 at pages 26 – 28).

2.      Pursuant to Detective Broughton's affidavit, a search warrant was issued on September 9, 2008 for the Defendant's residence at 2750 NW Windmere Drive, Jensen Beach, FL 34957 (Exhibit 2, Search Warrant, attached hereto, at pages 22 – 25).  The search warrant authorized the search and seizure of items expressly requested by Detective Broughton in his affidavit, and nothing more.  Thus, the search warrant authorized the search and seizure of computer storage media containing images evidencing child pornography, as well as documents necessary to prove the Defendant owned, used, or controlled such computer storage media (Exhibit 2 at pages 22 – 25).  The search and seizure of Hi8 video cassettes was not stated with particularity anywhere within the four corners of the search warrant.

3.      Pursuant to the search warrant, Detective Broughton and Detective Pat Colassuono conducted a search on the home of the Defendant on September 10, 2008 and seized the following: "A Dell Inspirion laptop on the desk in the office, in the room (office) immediately to the right of the

4

Case 12-565, Document 26, 10/05/2012, 740168, Page38 of 301

A-34

front entrance.  Also in the office were a stack of several compact disks, with handwritten labels.  One label in particular was titled 'PTHC.'  Several other CD's were also seized from the office room, with other handwritten labels" (Exhibit 3, Narrative Continuation of Detective Broughton, attached hereto, at page 68).

According to Detective Broughton, he also searched and seized several boxes of pornography which were observed in the suspect's closet, in the master bedroom.  "Inside of the various boxes, were also Hi8 video cassettes, with handwritten labels.  The names on the tapes were indicative of pornography, bearing the term 'XXX', on many of the labels" (Exhibit 3 at page 68).

Also recovered from the bedroom closet was a black canvas duffel bag, which was locked with a silver padlock.  Not knowing its contents, Detective Broughton asked the Defendant if he had a key to the lock.  The Defendant advised that he did not have a key.  Detective Broughton then advised the Defendant that he did not want to cut the lock off if he did not have to. According to Detective Broughton, the Defendant is alleged to have stated, "Take it, it's porn."  Detective Broughton then seized the black bag, and included it in the inventory of seized items (Exhibit 3 at page 68).

According to Detective Broughton, "preliminary review of the Dell Inspiron laptop showed approximately 80 video files saved in a Limewire Shared folder, under the Windows user name "Edgardo Sensi" (Exhibit 3 at

page 68).  All of these files depicted child pornography" (Exhibit 3 at pages

68 – 69).  Further, "a preliminary review of the seized Hi8 video cassettes,

from the Defendant's bedroom closet, including tapes that were located in

the locked black duffel bag, depicted child pornography" (Exhibit 3 at p. 74).

The black duffel bag, which was seized in the search warrant, contained

additional Hi8 video tapes, a VCR tape, several printed text stories of sex

with children, two printed images of child pornography, and a box of floppy

disks (Exhibit 3 at page 75).  A preliminary preview of the floppy disks

showed that numerous disks contained child pornography (Exhibit 3 at page

75).  All of the images relating to this case were found inside the black duffel

bag.

4.     Detective Broughton did not indicate in his affidavit how he came

across the IP address which was later linked to the Defendant.  He corrected

this omission for the first time in the Martin County Sheriff's Office Complaint

Affidavit on September 10, 2008.  Therein, Detective Broughton stated that

"while conducting online Peer2Peer File Sharing internet investigations, I

located a computer with an IP address of 76.111.218.152.  This user had

movie files that have previously been identified as child pornography in other

investigations" (Exhibit 4, Complaint Affidavit, attached hereto at page 2).

5.     Based on the items seized at the Defendant's home, he was

charged by Indictment in the United States District Court for the District of

Connecticut on December 5, 2008 with one count of conspiracy to produce

child pornography in violation of 18 U.S.C. Section 371, one count of aiding

and abetting in violation of 18 U.S.C. Section 2, and with one count of

production of child pornography in violation of 18 U.S.C. Section 2251(a).

The Defendant was subsequently charged by Superseding Indictment on

April 2, 2009 with one count of illicit sexual conduct in foreign places in

violation of 18 U.S.C. Section 2243(c), and one count of production of child

pornography outside the United States in violation of 18 U.S.C. Section

2251(c)(1).  The Defendant was arrested on December 15, 2008.

### B.  **GROUNDS FOR SUPPRESSION**

6.    The first ground for suppression is that the search warrant

violated the Defendant's Fourth Amendment rights because it lacked

probable cause.  The search warrant lacked probable cause because

Detective Broughton's knowledge in support of the warrant was derived from

unknown sources, and Detective Broughton never gained access to the

Defendant's computer to verify the veracity and basis of knowledge from

these unknown sources.  See *United States v. Leon*, 468 U.S. 897, 922

(1984); *U.S. v. Zucco*, 694 F.2d 44 (C.A.N.Y., 1982) citing *United States v.*

*Harris*, 403 U.S. 573, 581 (1971) (plurality opinion) and *Jones v. United*

*States*, 362, U.S. 257 (1960) (hearsay information contained in an affidavit

can suffice to establish probable cause provided there is a "'substantial

7

basis' for crediting the hearsay").  Due to these deficiencies, Detective

Broughton's affidavit in support of the search warrant did not establish a

sufficient nexus between the crimes charged against the Defendant and the

Defendant's home in order to satisfy probable cause.  See *Illinois v. Gates*,

462 U.S. 213, 238 (1983) (An affiant must support a finding of probable

cause by showing that "there is a fair probability that contraband or

evidence of a crime will be found in a particular place.")

Detective Broughton's investigation did not establish probable cause

because it was based upon information from unknown sources whose

credibility cannot be determined.  Specifically, the Detective's knowledge

was derived from the ICAC database and other 'available hosts.'  The ICAC

apparently contained the Defendant's IP address from a previous

investigation.  However, according to Detective Broughton, there exists no

way to tell who, when, or where an investigator placed the Defendant's IP

address in the ICAC database. (Deposition of Detective Broughton, page 25).

Moreover, it may not have even been a law enforcement officer who

identified this IP address and placed it in the ICAC.  In fact, by information

and belief, information is gathered and placed in the ICAC by a computer

program which randomly combs through the internet looking for certain

identifiable information such as child pornography.  However, the specific

process and reliability of this program has not been identified and was not

available to Detective Broughton or the magistrate judge at the time they

8

relied on it.  Therefore, this process and the information that was gained from it, including information in this case, cannot alone satisfy constitutional guarantees of trustworthiness and reliability, and further cannot rise to the level of probable cause without confirming information not found here.  After the ICAC search, Detective Broughton viewed material on other 'available hosts,' and based on the material found on these other computers came to the conclusion that the Defendant's computer downloaded and provided access to pornographic materials.  However, Detective Broughton never gained access to the Defendant's computer to verify the information obtained via the ICAC or the 'available hosts.'  During the deposition of Detective Broughton, defense counsel elicited the following:

BY MR. DECKARD

Q.  "And then at some point you actually accessed the data on this particular computer?"
A.  "What do you mean accessed the data?  I never physically, during the course of my investigation prior to the search warrant, was able to view the contents of a computer at that location. My search warrant was based on the database information and the subpoenaed information from Comcast and the fact that I've downloaded files that were identified to this IP address in previous investigations I knew to be child pornography." Deposition of Detective Broughton, p. 31 – 32).

This testimony is pivotal because it demonstrates that the affiant, Detective Broughton, did not establish a nexus of criminal wrongdoing to the Defendant.  All the Detective knew was that the Defendant's name was in the ICAC database, the database associated the Defendant's computer with

some files, and some other computers showed images of child pornography

on those files.  None of this information could be verified.  Thus, probable

cause did not exist under Federal law.

The probable cause requirement is at the very root of the Fourth

Amendment's protection against general search warrants.  *Henry v. U.S.*, 361

U.S. 98 (1959).  "In order to ensure that … an abdication of the magistrate's

duty does not occur," the Supreme Court has instructed, "courts must

continue to conscientiously review the sufficiency of affidavits on which

warrants are issued." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). As the

Supreme Court emphasized in *Gates*, a warrant affidavit "must provide the

magistrate with a substantial basis for determining the existence of probable

cause, and … wholly conclusory statement(s) … fails[ ] to meet this

requirement."  *U.S. v. Genin*, 594 F.Supp.2d 412, 418 (S.D.N.Y., 2009) citing

*Gates*, 462 U.S. at 239.  Finally, "all data necessary to show probable cause

for the issuance of a search warrant must be contained within the four

corners of a written affidavit given under oath."  *United States v. Anderson*,

453 F.2d 174, 175 (9th Cir. 1971).

*U.S. v. Falso*, 544 F.3d 110 (2nd Cir. 2008) is a case recently decided

by the Second Circuit Court of Appeals dealing with matters similar to the

case at bar.  In *Falso*, the defendant was convicted, upon conditional guilty

plea, to 242-count indictment of crimes relating to child pornography and

traveling with intent to engage in illicit sexual conduct with minors. *Id.* The

defendant appealed the denial of his motion to suppress items seized from

his home and computer.  The affidavit in support of the search warrant

explained that the FBI obtained the Internet Protocol address of a website,

www.cpfreedom.com, which contained approximately eleven images of child

pornography, and which advertised additional child pornography at an

internet address that was hidden until a membership was purchased. *Id.* at

114.  The affidavit further stated that an undercover FBI agent paid $99 for

a one-month membership and received an email from CP Freedom Group,

which provided the internet address, login number, and password for its

membership website, www.cp-members.com *Id.*  The affidavit then

explained that an FBI forensic examination of "the website hosting

www.cpfreedom.com" revealed "several possible subscribers along the email

addresses and other information." *Id.*  According to the affidavit, the FBI

subpoenaed subscriber information for these email addresses, which

included cousy1731@yahoo.com *Id.*  Records obtained from Yahoo revealed

that the defendant had an active Yahoo account, with a login name of

"cousy1731" and the Yahoo email address referenced above. *Id.*  The

affidavit also stated that the residential address associated with defendant's

Yahoo account had active internet service during the period immediately

preceding the warrant request. *Id.*  The affidavit further stated that, based

on the FBI investigation and the forensic examination, "it appear[ed]" that

the defendant "either gained access or attempted to gain access to the [non-member] website, www.cpfreedom.com." *Id.*

The affidavit also revealed that on February 18, 1987 – approximately eighteen years earlier – the defendant was arrested by the New York State Police for sexually abusing a seven-year-old girl, and was charged with Sexual Abuse and Endangering the Welfare of a Child. *Id.*  According to the affidavit, on or about September 21, 1987, the defendant pled guilty to Acting in a Manner Injurious to a Child Less Than Sixteen, a misdemeanor for which the defendant received a sentence of three years probation. *Id.*

The threshold issue presented on appeal in *Falso* was whether a substantial basis for the district court's finding or probable cause existed. *Id.* at page 112.  The Court held that the District Court lacked probable cause to believe that evidence of child pornography would be found in defendant's home, since there were no allegations that defendant in fact gained access to a child porn website, that he was a member or subscriber of any child pornography site, that the sole or principal purpose of website was viewing and sharing child pornography, much less that images were downloadable, or that stale conviction of separate offense had correlation to defendant's propensity to commit both types of crimes, and generalized allegations about child pornography collectors and websites did not establish nexus of illegal activity to defendant. *Id.* at pages 121–122. The court also went on to state that whereas the absence of membership would not be dispositive if

other factors, such as evidence that the defendant otherwise downloaded illegal images, were present, membership in or subscription to a child pornography website is an important consideration in these types of cases because it supports the ultimate inference that illegal activity is afoot. *Id.*

The case at bar is sufficiently analogous to *Falso* to warrant application of the same rule of law with respect to the probable cause issue.  In the present matter, the affiant failed to indicate whether or not the Defendant shared or downloaded child pornography files with anyone because the affiant was never able to browse the Defendant's computer.  All Detective Broughton knew was that the Defendant's computer was somehow identified as being connected with images of child pornography by some process at the ICAC that was completely unknown to him. There is no way to determine when, who, or by what means the Defendant's IP address was placed in the ICAC.  The credibility of that process cannot be determined here, and was not determined by the magistrate who authorized the warrant.  Further, Detective Broughton had no idea whether the Defendant gained access to a child pornography website, that he was a member or subscriber of any child pornography site, that he advertised for child pornography, that he otherwise sought child pornography from others, or spoke with anyone about child pornography.  At best this evidence supports the argument that the defendant "appears" to have shared child pornography.  This is not enough under *Falso* to "establish a nexus of illegal activity to the

Defendant." Therefore, the motion to suppress should be granted because the search warrant lacked probable cause to search the defendant's home under federal law, *C.F. U.S. v. Rogers*, 165 Fed. Appx. 873 (2d Cir. 2005). (Probable cause supported search warrant for defendant's residence and computer, where evidence existed that defendant advertised in internet chat rooms for child pornography.) *United States v. Shields*, 458 F.3d 269 (3d Cir. 2006) (Probable cause was supported by evidence that the defendant was a member of multiple sites, and email addresses or screen names were suggestive of an interest in collecting child pornography.)

7.      The *Leon* good-faith exception to the exclusionary rule is not applicable in this matter. "The good faith exception instructs that suppression of evidence 'is inappropriate when an officer executes a search in objectively reasonable reliance on a warrant's authority,' " even though no probable cause to search exists. *United States v. Hodge*, 246 F.3d 301, 307 (3d Cir. 2001). "The test for whether the good faith exception applies is 'whether a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization.' " *United States v. Leon*, 468 U.S. 897, 922 (1984). Under *Leon* the exclusion of evidence pursuant to a facially invalid warrant is not justified unless one of four exceptions is present:  (1) if the magistrate (judge) was 'misled by information in the affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth'; (2) the magistrate (judge)

14

'abandoned his judicial role' or neutrality; (3) the warrant was 'so lacking in indicia of probable cause' as to render official belief in its existence unreasonable; or (4) the warrant was so 'facially deficient' that it could not reasonably be presumed valid. *Leon*, 468 U.S. at 923.

The *Leon* good-faith exception is not applicable in this matter because the magistrate judge was misled by information in the affidavit that Detective Broughton would have known to be false but for his reckless disregard of the truth. Detective Broughton recklessly disregarded the truth by making a conclusory assertion that the Defendant "possessed" child pornography movie files based upon two movies that Detective Broughton downloaded from "available hosts." (Exhibit 4 at page 10). The Defendant's computer was not one of these "available hosts," but Detective Broughton did not state this fact in his affidavit. In doing so Detective Broughton effectively misled the magistrate into believing that the Defendant's computer was an "available host" that "possessed" child pornography. Once again, there is no way Detective Broughton could honestly make such an assertion because he never even browsed the Defendant's computer until after the search of the Defendant's home. This reckless disregard for the truth constitutes a violation of the *Leon* good-faith exception, and suppression should be granted as a result. See *U.S. v. Reilly*, 76 F.3d 1271 (N.Y. 1996) (A warrant is not a general hunting license, nor is it a mantle of omnipotence, which cloaks its holders in the King's power to "do no wrong."

15

Case 3:08-cr-00253-WWE   Document 55   Filed 01/19/10   Page 16 of 32

And perhaps most important, it is not an excuse if the police are not frank with the magistrate in proceedings to obtain the warrant-proceedings that are typically *ex parte*).  See also *Franks v. Delaware*, 438 U.S. 154 (1978).

The *Leon* good-faith exception is also not applicable because the warrant was so lacking in indicia of probable cause as to render official belief in its existence unreasonable.  Detective Broughton possessed over sixteen years of investigative experience and thousands of hours of training in child pornography cases.  Based upon this experience he should have known that probable cause to search the Defendant's home did not exist because he could not gain access to the Defendant's computer in order to confirm the hearsay information he had become aware of from the ICAC, *United States v. Trung Chi Truong,* 921 F.Supp. 39, 43 (United States District Court Massachusetts, 1996) (An officer's experience and training can be taken into account to determine whether the officer sincerely held an objectively reasonable belief that the warrant was based on a valid application of the law to all the known facts).  Further, the fact that Detective Broughton initiated the investigation, provided very little evidence as an affiant in favor of the search warrant, and was the primary agent who executed the warrant lends greater support to the conclusion that the police did not act in good faith reliance upon the invalid search warrant.  *United States v. Zimmerman*, 277 F.3d 426 (3d Cir. 2002) (Where the affiant who makes a paltry showing of probable cause is also one of the executing officers, less support exists for

16

application of the good-faith exception).  Therefore, the *Leon* good-faith

exception is not triggered, and the motion to suppress should be granted.

## SECOND GROUND FOR SUPPRESSION:  THE POLICE ACTED OUTSIDE THE SCOPE OF THE SEARCH WARRANT IN SEIZING ITEMS NOT STATED WITH PARTICULARITY IN THE WARRANT

8.      The second ground for suppression is that the police exceeded

the scope of the search warrant by seizing items from the Defendant's

residence that were not stated with particularity in the warrant, i.e. Hi8

video cassettes and video tapes.  This is prohibited under federal law.  The

Fourth Amendment requires that warrants "particularly describe[e] ... the

person or things to be seized," United States Constitution, Amendment IV,

thereby prohibiting a "general, exploratory rummaging in a person's

belongings." *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971). This

particularity requirement serves three related purposes: (1) preventing

general searches; (2) preventing the seizure of objects upon the mistaken

assumption that they fall within the magistrate's authorization, and (3)

preventing the issuance of warrants without a substantial factual basis.

*U.S. v. Young*, 745 F.2d 733, 759 (C.A.N.Y. 1984).  See *generally* 2 W. La

Fave, Search and Seizure:  A Treatise on the Fourth Amendment, §4.6

(1974 and 1984 Supp).  The warrant must describe the things to be seized

17

with sufficient particularity and be "no broader than the probable cause on which it is based." *United States v. Weber*, 923 F.2d 1338, 1342 (9th Cir. 1991). Finally, the United States Supreme Court has held that if evidence outside the scope of the warrant is seized, such evidence must generally be suppressed. *Marron v. U.S.*, 275 U.S. 192 (1927). See also *United States v. Dunloy*, 584 F.2d 6 (2d Cir. 1978) (The remedy with respect to any items exceeding the scope of the warrant [is not] invalidation of the search but suppression of those items). *Horton v. California*, 496 U.S. 128 (1990) (If scope of search exceeds that permitted by terms of validly issued warrant or character of relevant exception for warrant requirement, subsequent seizure is unconstitutional without more).

The search warrant did not particularly authorize the search and seizure of any video tapes. This is evident on the face of the search warrant. The search warrant lists twelve items to be seized from Defendant's home. Items 2 through 12 are all expressly limited, by their terms to computers: 2) computer hardware, including data processing devices and computer storage devices; 3) computer input and output devices; 4) computer storage media; 5) computer software; 6) computer software and hardware related to the sharing of Internet access; 7) storage manuals; 8) usernames and passwords; 9) documents regarding child porn or child exploitation; 10) items evidencing ownership or use of computers; 11) items evidencing dominion and control of the property searched; and 12) data on the

computer or computer related storage.  Authorization for the search and
seizure of video tapes clearly did not stem from items 2 through 12 of the
search warrant because these items did not particularly mention the term
video tapes.

The only portion of the search warrant which potentially authorized the
search and seizure of video tapes from the Defendant's home is the first
item.  Item number one of the search warrant seeks "images, movies, or
visual depictions of sexual conduct or sexual performance by a child or
children, in violation of Florida Statutes 827.071." The language within item
number one of the search warrant does not satisfy the particularity
requirement for the search and seizure of Hi8 video cassettes or any other
video tapes for the following reasons:  First, the police did not possess a
substantial factual basis to believe that the Defendant possessed such tapes.
*U.S. v. Young*, 745, F.2d 733 (C.A.N.Y. 1984) citing 2 W. La Fave, Search and
Seizure:  A Treatise on the Fourth Amendment, §4.6 (1974 and 1984 Supp)
(One of the purposes of the particularity requirement is "preventing the
issuance of warrants without a substantial factual basis" to believe particular
evidence will be found at a particular location).  Detective Broughton
admitted this fact in his deposition.  Therein, defense counsel elicited the
following statement:

BY MR. DECKARD

Q. Before you went on I want to understand what you did in terms of your investigation that would lead you to believe that you were searching for child pornography on any other media other than digital computer media?

A. I didn't.  Going into the search warrant and applying for the search warrant I had no evidence that this individual was producing child pornography on video tapes.  Once I got to the house I saw that there were homemade videotapes unknowingly what.  I did not know what the content of those were, but I saw handwritten labels that had female names and XXX on the outside of the videotapes. (Deposition at 43-33) (emphasis added)

Detective Broughton's affidavit supports his deposition testimony. According to Detective Broughton's affidavit, probable cause was premised upon the existence of the Defendant's IP address within the ICAC, a subsequent ICAC search indicating some sort of association between the Defendant's IP address and files that have been previously identified as child pornography in other investigations, and child pornography files downloaded from other "available hosts." These facts provide no basis to believe that video tapes would be found in the Defendant's home.  Therefore, item number one of the search warrant did not particularly authorize the search and seizure of video tapes from the Defendant's home because the affiant possessed no substantial factual basis to believe that such evidence would be found in the Defendant's home.

The second reason why item number one of the search warrant fails the particularity requirement for the search and seizure of video tapes is because item number one does not mention Hi8 tapes, or any other type of tapes.  Item number one refers to "movies" or "visual depictions" of child porn including, but not limited to, the files allegedly found on Defendant's computer prior to the execution of the search warrant.  Therefore, under the plain meaning of the words of item number one of the search warrant, video tapes were not stated with particularity.

Item number one of the search warrant also fails the particularity requirement for the search and seizure of video tapes when we view the intent of the search warrant.  When we read the document as a whole, the intent of the search warrant was to seize "computer media," not video cassettes.  Specifically, the intent of the search warrant was to seize computer video files alleged to reside on the Defendant's computer, and available for sharing via a peer to peer network over the internet.  Video cassettes are not considered "computer media" within the computer industry.  Computer related storage is media that is designed to store data from a computer, such as DVD's, CD's, hard drives, flash drives, etc. Video tapes and Hi8 tapes, on the other hand, are considered audio/visual media; they are designed for, and used in, certain video cameras, not computers. The only association between video tapes and computers is that many camcorders can be attached to a computer, so that the contents of the tape

21

inside the camcorder can be either viewed on the computer, or transferred to the computer.  However, there are many different devices these days that can be physically or even wirelessly connected to a computer.  These devices include such things as cassette recorders, televisions, mobile phones, mp3 players, cameras, DVD players, court stenographer machines, automobiles, security cameras, and many other devices.  But, the fact that a device can be connected to a computer does not make that device a computer related device or a type of computer related storage.[1]  Therefore, when we view the search warrant as a whole, it is evident that it was intended to authorize the search and seizure of "computer media."  Video cassettes are not "computer media."  Thus, item number one of the search warrant did not authorize the search and seizure of video cassettes from the Defendant's home.

9.    The video tapes were not seized pursuant to the "plain view" exception to the warrant requirement because tapes were not "reasonably related to the crime for which the warrant was issued," and "it was not immediately apparent to the police at the time of discovery that the item constituted evidence of, an instrumentality of, or fruit of, a crime." *U.S. v. Melendez*, 1990 WL 109201 (E.D.N.Y., 1990). *United States v. Yu*, 755 F.Supp. 578, 581 (S.D.N.Y. 1991), citing *Horton v. California*, 496 U.S. 128, 136 (1990).  As stated previously, Detective Broughton had no evidence that videos would be found at the Defendant's home prior to the search warrant.

Furthermore, Detective Broughton did not know the videos found at the Defendant's home were fruits of any crime before actually viewing them. Detective Broughton admitted this fact in his deposition.

BY MR. DECKARD

Q.  Was there any label or any picture on any of these tapes that would identify that tape to you before you seized them and viewed them?  Was there anything specific on them that would lead you to believe child pornography appeared on those videotapes?

A.  Child pornography, no.  Pornography, yes.  (Deposition at page 47).

These facts are in contravention to the plain view exception.  Under the plain view exception, the warrantless seizure of an item is justified where:  (1) the police have lawful access to the place from which the item can be plainly viewed; (2) the item seized is in fact in plain view at the time it is discovered; and (3) it is immediately apparent to the police at the time of discovery that the item constitutes evidence of, an instrumentality of, or fruit of, a crime. *United States v. Yu*, 755 F.Supp. 578, 581 (S.D.N.Y. 1991), citing *Horton v. California*, 496 U.S. 128, 136 (1990).  To meet the "immediately apparent" standard, police officers must have probable cause to believe that an object in plain view is contraband without conducting some further search of the object.  *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993); *United States v. Padilla*, 986 F. Supp. 163, 169 (S.D.N.Y. 1997).

23

In Melendez the defendant was charged with various offenses relating to his alleged participation in an extensive heroin and cocaine trafficking organization. *U.S. v. Melendez*, 1990 WL 109201 (E.D.N.Y. 1990). The defendant moved to suppress all physical evidence seized from his residence and business as a result of two searches undertaken based upon warrants issued on oral testimony. *Id*. As to the second warrant, to seize evidence from his residence, the defendant claimed that said search exceeded the scope for the warrant and was in violation of the particularity requirement of the Fourth Amendment. *Id*. The warrant in question authorized the seizure of drug records of any type, cash, guns, and videotape recordings taken by the surveillance systems at the premises and at 'Hot Rod Unlimited' (defendant's place of business). *Id*. The defendant argued that the items seized at his residence were not specifically described in the warrant, and therefore should be suppressed. *Id*. The authorities had seized coats, jewelry, credit card folders, a deed to the residence, paperwork for a luxury car, business agreements, a photo album and bank records from the defendant's residence, none of which were specifically enumerated in the warrant. *Id*. The court found that these items were improperly seized, as they were not listed in the warrant, nor did they bear a logical nexus to the items that were listed in the warrant. *Id*. at 4. Furthermore, the court found there was no broad language contained in the warrant such as "other

24

evidence" that would have the potential to act as a "catch-all" to cover the seizure of items that may have a possible or questionable logical nexus to the named items. *Id.* citing *United v. Young*, 745 F.2d 733, 759-760 (1984), cert. denied, 470 U.S. 1084 (1985).  Therefore, the court suppressed this evidence.

*Melendez* is analogous to the facts in this case, and warrants application of the same rule of law.  In the case at bar the search warrant did not particularly authorize the seizure of videotapes.  Therefore, the only way Detective Broughton could legally seize the Hi8 video cassettes under *Melendez* is if he thought the Hi8 video cassettes were reasonably related to the crime of possession of child pornography, and if the incriminating nature of the tapes was immediately apparent to him. *Id.*  The facts of the case do not support either conclusion.  First, it cannot be argued that the Hi8 video cassettes were reasonably related to the crime of possession of pornography because Detective Broughton himself had no basis to believe that the Defendant possessed videotapes.  Second, Detective Broughton admitted in his deposition that it was not immediately apparent to him that the tapes constituted evidence of possession of child pornography.  Finally, the seizure of the video tapes cannot be justified by any broad language in the search warrant such as "other evidence" that would have the potential to act as a "catch-all."  The search warrant lacked such language. Thus, the video tapes were seized outside the scope of the warrant, and exclusion is necessary

25

because the plain view exception has not been satisfied.  See also *Walter v. U.S.*, 447 U.S. 649, (1980) (opinion of Stevens, J.) ("plain view" rejected where contents of films "could not be determined by mere inspection" without use of a projector); *DePugh v. Penning*, 888 F.Supp. 959, 997 (N.D. Iowa, 1995) (plain view rejected where photo, film, cassettes, and address book were not "of an obvious incriminating character").

## THIRD GROUND FOR SUPPRESSION:  THE POLICE ILLEGALLY SEIZED THE BLACK CANVAS BAG WITHOUT A VALID SEARCH WARRANT AND ABSENT AN EXCEPTION TO THE WARRANT REQUIREMENT

10.    The third ground for suppression is that the police illegally seized the locked black canvas bag from the Defendant's bedroom closet without a valid search warrant, and this seizure did not satisfy an exception to the warrant requirement.  As stated previously within this motion, the search warrant was not valid because it lacked probable cause.  Therefore, the police were required to satisfy one of the exceptions to the warrant requirement in order to seize the black canvas bag from the Defendant's home pursuant to the Fourth Amendment.  *Steagald v. United States*, 451 U.S 204, 216 (1981) (Absent consent or exigent circumstances, a private home may not be entered into to conduct a search or effect an arrest without a warrant).  The police did not comply with the consent exception to the

warrant requirement because the Defendant did not voluntarily consent for the police to search his home.  Further, the police did not comply with the exigent circumstances exception to the warrant requirement because they did not attempt to obtain a subsequent warrant to search the black canvas bag after seizing it from the Defendant's bedroom closet.  Therefore, the motion to suppress should be granted with respect to the black canvas bag because it was seized from the Defendant's home without a valid search warrant and absent an exception to the warrant requirement.

The Defendant's consent was not a product of his free and unconstrained choice, but rather a mere acquiescence to the coercive tactics of three police officers who showed up at his home in the middle of the night armed with an illegal warrant. This conclusion is evident under the totality of the circumstances. *Schneckloth v. Bustamone*, 412, U.S. 218, 227 (1973) (holding that whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances).  Detective Broughton arrived at the Defendant's home in the middle of the night with two armed and uniformed police officers, Detective Pat Colasuono and Deputy Sheriff Todd Lamm.  Equipped with an illegal search warrant, the three officers entered and then rummaged through the Defendant's entire home.  The Defendant was not free to terminate this encounter.  When the officers searched the Defendant's bedroom closet they found a black canvas

bag that was locked.  The officers did not inform the Defendant of his

constitutional rights.  Instead, for no other reason than to obtain an

incriminating statement, Detective Broughton advised the Defendant that he

"did not want to cut the lock off if he did not have to."  In direct response,

the Defendant is alleged to have replied, "take it, it's porn."  It is hard to

believe under the circumstances then and there prevailing that Sensi would

make such an incriminating statement, which he specifically denies.  Detective

Broughton seized the locked black canvas bag, and included it in the

inventory of seized evidence.  (Discovery at page 68).

Since the contraband in question was contained in a locked suitcase,

the contents of which were not visible to the naked eye, the plain view

exception to the warrant requirement does not apply.  Moreover, under

federal law the search of the duffel bag may not be validated by the

Defendant's alleged consent because the police used an invalid warrant to

obtain such consent.  *Bumper v. North Carolina*, 391 U.S. 543, 549 (1968).

(Holding that a search pursuant to an invalid warrant may not be validated

by consent because such consent is presumed to be the product of colorable

lawful coercion and not voluntary).

In addition, the fact that none of the police officers on the scene

informed the Defendant that he possessed a right to refuse consent militates

against a finding of voluntary consent.  *U.S. v. Mendenhall*, 446 U.S. 544,

558-559 (1980) citing *Schneckloth v. Bustamone*, 412, U.S. 218, 227 (1973)

28

("although the U.S. Constitution does not require proof of knowledge of a right to refuse as an indispensible element of an effective consent to search, such knowledge is highly relevant to determining that there has been consent.") See also *U.S. v. Matlock*, 415 U.S. 164 (1974); *U.S. v. Watson*, 423 U.S. 411 (1976), rehearing denied, 424 U.S. 979 (1976); *Ohio v. Robinette*, 519 U.S. 33 (1996).

Finally, the Defendant's consent, if in fact it was given, was obtained in the middle of the night while the Defendant was surrounded by three armed police officers, and was made in direct response to an implied threat of force that was deliberately intended to elicit an incriminating statement. See *U.S. v. Isiofia*, 370 F.3d 226 (2d Cir. 2004) (An admonition to the suspect that his house would be "torn apart" if the police were forced to conduct a search of it under a warrant was coercive enough to invalidate the consent which the statement elicited). See also *Schneckloth*, 412 U.S. at 228. ("But the Fourth and Fourteenth Amendments require that consent not be coerced, by explicit or implicit means, by implied threat or covert force. For, no matter how subtly the coercion was applied, the resulting 'consent' would be no more than a pretext for the unjustified police intrusion against which the Fourth Amendment is directed.")

Nor can the search of the locked black canvas bag be justified on the basis of the exigent circumstances exception to the warrant requirement. In the case at bar Detective Broughton not only seized the locked black canvas

bag from the Defendant's closet without authority to do so, but searched it prior to the issuance of a valid search warrant permitting such a search. This constitutes a violation of federal law.  Detective Broughton was obligated to obtain a separate search warrant prior to actually searching the bag.  This is due to the privacy interests that are invaded when the police conduct a search in a private residence.  As the Supreme Court explained in *Segura v. United States*, 468 U.S. 796, 810 (1984), "The sanctity of the home is not be disputed.  But the home is sacred in Fourth Amendment terms not primarily because of the occupants' possessory interests in the premises, but because of their privacy interests in the activities that take place within ... [a] seizure affects only the person's possessory interests; a search affects a person's privacy interests."  Recognizing the generally less intrusive nature of a seizure, the Court has frequently approved warrantless seizures of property, on the basis of probable cause, for the time necessary to secure a warrant, but has held that an actual warrant is still necessary to conduct a search.  *Malapanis v. Regan*, 335 F.Supp. 2d 285, 290 (D. Conn. 2004) citing *United States v. Martin*, 157 F.3d 46, 53 (2d Cir. 1998) (quoting *United States v.* Place, 462 U.S. 696, 701 (1983) ("Where law enforcement authorities have probable cause to believe that a container holds contraband or evidence of a crime, but have not secured a warrant, the [Supreme] Court has interpreted the [Fourth] Amendment to permit seizure of the property, pending issuance of a warrant to examine its contents, if the exigencies of

the circumstances demand it or some other recognized exception to the warrant requirement is present").  See also *United States v. Jacobsen*, 466 U.S. 109, 121-22 and nn. 20-21 (1984); *Texas v. Brown*, 460 U.S. 730, 749-50 (1983) (Stevens, J., concurring) (container may be seized if there is probable cause to believe it contains contraband, but container may not be searched without a warrant issued by a neutral magistrate); *Arkansas v. Sanders*, 442 U.S. 753, 761-61 (1979); *United States v. Hooper*, 935 F.2d 484, 495, 498 (2d Cir. 1991); *United States v. Respress*, 9 F.3d 483, 486 (6th Cir. 1993); *United States v. Jodoin*, 672 F.2d 232, 235 (1st Cir. 1982).  Therefore, the search of the locked black canvas bag violated the Defendant's Fourth Amendment rights because the police did not obtain a warrant prior to doing so.

WHEREFORE, for the foregoing reasons, Defendant's Motion to Suppress should be granted in all respects.

Respectfully submitted,

/ Peter L. Truebner /

By: _____

Peter L. Truebner
1150 Summer Street
Stamford, CT 06905
(203) 323-4540
Attorney for Defendant

31

ORDER

The foregoing motion having been heard, it is hereby GRANTED / DENIED.

The Court,

By: _____

U.S.D.J.

CERTIFICATION OF SERVICE

I hereby certify that on January 19, 2010, the foregoing MOTION TO SUPPRESS was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system, or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's system.

/ Peter L. Truebner /

_____

PETER L. TRUEBNER

A-62

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 3:08cr253(WWE) |
| | : | |
| v. | : | |
| | : | |
| EDGARDO SENSI | : | FEBRUARY 16, 2010 |

**GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT'S MOTIONS TO DISMISS OR IN THE ALTERNATIVE TO SUPPRESS**

On or about December 5, 2008, a federal grand jury sitting in Bridgeport returned an

Indictment against the defendant, Edgardo Sensi ("Sensi"). The Indictment charged that in or

about 2001, Sensi conspired to produce child pornography and that he produced child

pornography. Essentially, Sensi, along with a co-conspirator, abused an approximately eight-

year-old child, and filmed the abuse. Subsequently, in or about April 2, 2009, a grand jury

returned a Superseding Indictment charging Sensi with additional counts relating to the

production of child pornography and sex tourism charges involving Sensi's abuse of a four-year-

old child in Nicaragua.

On January 19, 2010, defendant filed a motion to suppress seeking to dismiss the

Indictment claiming that the 2001 conduct is time-barred under the applicable statute of

limitations. As set forth in detail below, this crime is not time barred and Sensi's claim that this

Court should not rely on 18 U.S.C. section 3283 which extended the statute of limitations for

federal sex exploitation crimes involving children is unavailing and should not be considered.

Alternatively, Sensi seeks to suppress the physical evidence seized from his home. Sensi

claims that the video-tapes depicting Sensi sexually abusing children, including M.V.#1 and

M.V. #2, were not within the four corners of the warrant. Sensi's claim that the videos were not

somehow covered by the warrant are patently absurd and should be dismissed in their entirety. The plain language of the search warrant which was authorized by a Florida state court judge permitted law enforcement agents to search for and seize *any* images or video of child pornography. Moreover, Sensi consented to the seizure of a black duffel bag which contained the video-tapes that depicted Sensi sexually abusing the minor victims in this case. Accordingly, both motions should be dismissed in their entirety.

## I.  FACTUAL BACKGROUND

On or about August 27, 2008, while conducting an online undercover Peer2Peer File Sharing[1] internet investigations, Detective Brian Broughton, located a computer with a specific IP Address. The user of that IP address had movie files that had previously been identified as child pornography in other investigations conducted by Officer Broughton. Officer Broughton then utilized available law enforcement databases and was able to determine that the particular IP address had been associated with several other images and videos of child pornography. Officer Broughton served a subpoena on the subscriber for that specific IP address and was able to determine that the individual associated with the IP address was Edgardo Sensi and the address that the service was connected to was 2750 NW Windemere Dr., Jensen Beach, FL 34957 .

Based on this and other information, Officer Broughton lawfully sought and obtained search warrant to search Sensi's residence. A state judge determined that Broughton had probable cause to search Sensi's residence for evidence of child pornography. This included but was not limited to any videos or images of child pornography. Broughton's affidavit sets forth

---

[1]     Peer to peer ("P2P") file sharing networks are frequently used to trade digital files of child pornography. These files include both image and movie files.

his considerable experience relating to the sexual exploitation of children as well as his

experience involving the use of the internet to sexually exploit children. The affidavit also sets

forth in some detail, the programs Sensi utilized on his computer to obtain (and share) child

pornography. Based on their training and experience, members of law enforcement who are

experienced in cases involving the sexual exploitation of children, like Officer Broughton, are

aware that most individuals who collect pornography do not simply collect one or two movie

files. Rather, they obtain and possess a variety of child pornography on a variety of mediums.

Therefore, the affidavit sets forth the videos of child pornography accessed by the IP address

associated with Sensi. In addition, the search warrant authorized law enforcement to search for

any and all images and videos of child pornography. The search warrant and accompanying

affidavit are attached as Exhibit A to this memorandum. Paragraph 1 of the property to be seized

provides:

> 1.      Images, movies, or visual depictions of sexual conduct or sexual performance by
>         a child or children. . .

The warrant goes on to provide that law enforcement was authorized to seize any type of :

> 4.      Computer storage media and the digital content to include but not limited to
>         floppy disks, hard drives, tapes, DVD disks, CD-ROM disks or other magnetic,
>         optical or mechanical storage . . .

The warrant therefore clearly and explicitly authorized law enforcement to search the

premises as well as seize any visual depictions of child pornography. Clearly, the tapes at issue

here are videos depicting Sensi sexually molesting very young children. There is simply no issue

that law enforcement was entitled to seized this material.

Moreover, the language of the search warrant clearly goes on to provide law enforcement

with the authority to seize child pornography.  Based on the affidavit, it is clear that law

enforcement was specifically looking for videos of child pornography.  Indeed, the search

warrant itself references the two movies of child pornography that Officer Broughton was able to

associate with Sensi's IP address.

As described in the warrant, one movie was a 5 minute 17 second video file depicting a

nude prepubescent female child, spreading her vagina and anus.  Later in the video clip, an adult

male is observed sodomizing the female child with his penis.

The second video file is an approximately 44 second video for a prepubescent girl

performing oral sex on an adult male, who places his penis between the legs of a stuffed teddy

bear.

On or about September 10, 2008, members of law enforcement, including Officer

Broughton, approached Sensi's residence and identified themselves.  During a brief interview

with Sensi, Sensi was evasive about what was on his computer.  Sensi did state that 15-year-old

son occasionally visits him and may have used Sensi's computer but denied that his son would

access child pornography.  Sensi ultimately denied possessing or viewing child pornography

himself.  The search warrant was then executed.  A girlfriend who appeared to reside at the

location was also present during the search.

As noted above, officers were searching for any evidence of child pornography.  When

law enforcement entered the premises, they had no information that Sensi was himself producing

child pornography. During the search of the home, several items were seized including a laptop,

stacks of compact disks, with handwritten labels.  One label was titled "PTHC".  This acronym is

familiar to law enforcement in child exploitation investigations as referring to Pre-Teen

4

A-66

Hardcore.  Several CD's were also seized with hand written labels.  Several boxes of pornography were observed in Sensi's closet.  Inside the boxes were Hi8 video cassettes with handwritten labels.  Several Hi8 videotapes were labeled with a hand-written female name and then the acronym XXX which raised concerns for law enforcement.  The hand-written labels indicated that the tapes were not commercial and the "XXX" clearly indicated pornography.  The handwritten labels with female names as well as the XXX signaled to law enforcement that Sensi was likely producing pornography.  During the search, law enforcement also located two duffle bags.  Both were located in Sensi's closet.  One was a big red duffle bag.  It was located on the bottom right-hand floor of Sensi's closet.  Several Hi8 video-tapes were located in that bag.  The red duffle bag contained adult pornography as well as additional Hi8 tapes which markings that included M.V. #2's first name "XXX" and dates which corroborate his dates of travel to Nicaragua.  These videos include Sensi abusing the four-year-old girl and also contain other sex acts with an adult females.  Other Hi8 tapes were located in a box where a vibrator was also located.  There was also a black duffle bag with a lock on it which was located in Sensi's bedroom in his closet.  Officer Broughton will testify that he did not want to seize the black back if it didn't contain anything pertinent to his investigation so he specifically asked Sensi if he had a key to the bag and.  Sensi looked at him and told him that he did not have a key to the black duffle bag.[2]  When Officer Broughton asked Sensi what was in the bag, Sensi replied "take it, it's porn."[3]  During this conversation Sensi appeared to be both nervous and sweating.  When Officer

---

[2]      The key to the black duffel bag was later recovered from Sensi's employer.

[3]      Officer Broughton has been deposed by Sensi's counsel in Florida as part of the Florida state case against Sensi.  In his deposition, Officer Broughton was asked about his conversation with Sensi regarding the black duffel bag.  A copy of the deposition transcript has been made available to Sensi.  At the Court's request, the Government will provide a copy of this

Broughton asked Sensi why he was sweating, Sensi replied that he was diabetic. In light of the fact that some of the tapes had hand-written labels and were marked with "XXX," and Sensi's admission that the tapes in the black bag were pornography, Officer Broughton properly seized the black bag.

Once the black bag was opened, the officers located Super8 videos inside the bag labeled with M.V.#1's first name. They also located a box of up to 50 floppy disks, some of which contained child pornography.   The videotapes identified with M.V. #1's first name depicted Sensi and the co-conspirator engaged in sex acts with M.V. #1.  The agents located other video-tapes of child pornography, including tapes of Sensi engaged in sexually molesting other children.  The agents also found  a stack of printed test stories dealing with incest and child pornography.  There was also a booked called "Puppetry of the Penis" which depicted different ways to manipulate a penis.

During their search, the agents also located a video-camera which utilized Hi8 tapes.  In addition cables and wires for the Hi8 video-camera were also seized.  Law enforcement agents will be able to testify that the images from these Hi8 tapes can be transferred onto a computer hard drive.   Subsequently, officer Broughton contacted agents with Immigration and Customs Enforcement.  Based on witness interviews and other information, ICE agents were able to determine that M.V.#1 resided in Fairfield County, Connecticut during the period of time that she was sexually abused.  Agents were subsequently able to determine that M.V.#1 had moved with her family to Georgia.  ICE agents were able to locate M.V. #1 as well the co-conspirator.  ICE agents also were able to determine that M.V.#2 was being sexually abused in Nicaragua.

---

transcript to the Court.

6

A-68

Subsequently, ICE agents traveled to Nicaragua and were able to determine the location of the abuse and were also able to locate the very young child who had been abused by Sensi.

## II.   **ARGUMENT**

Sensi argues that law enforcement improperly seized evidence from his residence.  More specifically, Sensi claims that law enforcement did not have authority to seize the videos of child pornography found at this residence.   Sensi's claim is undercut by the language of the warrant.  To the extent that Sensi wishes to claim that he did not provide, consent, his failure to provide an affidavit is fatal to his claim, see infra,  and therefore the Court should not dismiss this claim without a further hearing.

### A.   **Probable Cause**

The Constitution provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.  Probable cause is "a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . , including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983) (internal quotation marks omitted).  "[P]robable cause is a fluid concept -- turning on the assessment of probabilities in particular factual contexts -- not readily, or even usefully, reduced to a neat set of legal rules." *Id.* at 232.  "In assessing the proof of probable cause, the government's affidavit in support of the search warrant must be read as a whole, and construed realistically." *United States v. Salameh*, 152 F.3d 88, 113 (2d Cir. 1998).

A-69

"Courts do not isolate each factor of suspicion but instead look to the totality of the circumstances. *United States v. Gagnon*, 337 F.3d 230, 236 (2d Cir. 2004) (citing *Gates*, 462 U.S. at 230-31).

A court reviewing the issuance of a search warrant "accord[s] 'great deference' to a judge's determination that probable cause exists[] and . . . resolve[s] any doubt about the existence of probable cause in favor of upholding the warrant." *Salameh*, 152 F.3d at 113; *United States v. Martin*, 157 F.3d 46, 52 (2d Cir. 1998). The court's "duty is 'simply to ensure that the magistrate had a substantial basis for . . . conclud[ing]' that probable cause existed." *Salameh*, 152 F.3d at 113 (quoting *Gates*, 462 U.S. at 238-39). "[T]he resolution of doubtful cases . . . should be largely determined by the preference to be accorded to warrants." *Martin*, 157 F.3d at 52 (internal quotation marks omitted). "A reviewing court should not interpret supporting affidavits in a hypertechnical, rather than a commonsense manner." *Id.* (internal quotation marks omitted).

Here, any claim that the warrant did not permit the officers to search for and seize video-tapes of child pornography is specious. The plan language of the warrant authorized a search for any images or videos of child pornography. *See* Ex. A. The entire warrant was based on a law enforcement officer's investigation that Sensi had videos of child pornography. The fact that the law enforcement officers had no knowledge prior to conducting the search that Sensi was filming his abuse of children is unavailing. Sensi made his own child pornography by video-taping his sexual abuse of children. Since the officers were authorized to search for any evidence of child pornography, Sensi's homemade child pornography was clearly evidence.

8

C.    **The Seizure of the Locked Black Bag Was Proper Because Sensi Voluntarily Consented to It.**

Here, even if this Court were to find that Sensi's homemade child pornography was not included in the warrant, Sensi consented to the search of the black duffel bag where the tapes relating to M.V. #1 were located.  It is well settled that a search conducted pursuant to a voluntary consent is one of the specifically established exceptions to the warrant requirement. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973).  To determine whether consent to a search is voluntarily given, a court must examine "the totality of all the circumstances" to ascertain whether the consent "was a product of that individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority." *United States v. Garcia*, 56 F.3d 418, 422 (2d Cir. 1995) (citations and internal quotation marks omitted); *accord Schneckloth*, 412 U.S. at 226-27.  "So long as the police do not coerce consent, a search conducted on the basis of consent is not an unreasonable search." *Garcia*, 56 F.3d at 422 (citing *Schneckloth*, 412 U.S. at 228).

Whether an individual has voluntarily given consent is a fact-based inquiry. *United States v. Peterson*, 100 F.3d 7, 11 (2d Cir. 1996); *United States v. Gandia*, 424 F.3d 255, 265 (2d Cir. 2005) ("The scope of the suspect's consent under the Fourth Amendment is a question of fact, and the government has the burden of proving, by a preponderance of the evidence, that a consent to search was voluntary") (internal quotation marks omitted).  "In this circuit, the test [whether a consent to search was in fact 'voluntary'] is an objective one – whether the agents had a reasonable basis for believing that there was valid consent to the search." *United States v. Lavan*, 10 F.Supp.2d 377, 384 (S.D.N.Y. 1998) (citing the Second Circuit's decision in *Garcia*, 56 F.3d at 423); *see also United States v. Awan*, 2006 WL 3207858, *4 (E.D.N.Y. Nov. 6, 2006).

9

"The district court's finding that consent was given voluntarily will not be overturned unless it is clearly erroneous." *Peterson*, 100 F.3d at 11  (citing *United States v. Hernandez*, 5 F.3d 628, 632 (2d Cir. 1993)).

Factors taken into consideration when assessing whether a defendant's "will was overborne" to render consent invalid include, *inter alia*, the age, intelligence, and education level of the defendant; whether the defendant is aware of his right to refuse consent; the length of the detention and the prolonged nature of any questioning; whether the defendant was threatened by any further action if he denied consent; whether law enforcement officers displayed a weapon; whether the defendant was under any physical restraint; and whether any physical punishment or deprivation occurred. *Schneckloth*, 412 U.S. at 226; *Hernandez*, 5 F.3d at 633 (fact that defendant was not threatened by any further law enforcement action if he denied consent supported finding that consent had been provided voluntarily); *United States v. Marin*, 669 F.2d 73, 83 (2d Cir. 1982) (fact that law enforcement officers did not display weapon to defendant supported finding that consent was voluntary).  The prosecution is not required to demonstrate knowledge or advice of a right to refuse. *Schneckloth*, 412 U.S. at 248-49.  No single factor is dispositive. *Id.* at 226-27.  "[I]t is well settled that consent may be inferred from an individual's words, gestures, or conduct." *United States v. Buettner-Janusch*, 646 F.2d 759, 764 (2d Cir. 1981).  Consent can be voluntarily given even if a defendant is under arrest. *See Crespo*, 834 F.2d at 271.

Here, during the search of Sensi's apartment, Officer Broughton specifically asked about the locked black duffel bag because officers were not interested in seizing the bag unless it had evidence pertinent to their investigation.  Sensi, who is a well educated individual, clearly understood what the officers were searching for.  Prior to the search, the officers had a

conversation with Sensi about the programs on his computer and whether he had accessed child pornography.  Further, the officers had provided Sensi with a copy of the warrant and so he was a clearly on notice as to what the officers were searching for.

Sensi's consent was voluntary.  "So long as the police do not coerce consent, a search conducted on the basis of consent is not an unreasonable search."  *Garcia*, 56 F.3d at 422 (citing *Schneckloth*, 412 U.S. at 228).  There is simply no claim and no support for any clam that the consent was a product of coercion.  There was no prolonged questioning, no use of physical punishment or deprivation.  No guns were drawn during the search in the bedroom, no threats were made about consequences if he failed to consent, no voices were raised.  Sensi was not placed under arrest. Indeed, Sensi was under no constraint whatsoever. *See, e.g., Crespo*, 834 F.2d at 271 (consent can be voluntarily given even if a defendant is under arrest or handcuffed).

**D.       Defendant Has Not Made a Showing to Warrant an Evidentiary Hearing**

The defendant has submitted no affidavit in support of his motion or provided any details in support of his claim.

It is well-settled in the Second Circuit that a defendant seeking to suppress evidence bears the burden of demonstrating disputed issues of fact that would justify an evidentiary hearing.  See United States v. Culotta, 413 F.2d 1343, 1345 (2d Cir. 1969); United States v. Castellano, 610 F. Supp. 1359, 1439 (S.D.N.Y. 1985).  The defendant's burden is not satisfied by "conclusory, non-particularized allegations of unlawful official behavior."  United States v. Tracy, 758 F. Supp. 816, 820 (D. Conn. 1991).  Rather, the showing required to justify a hearing must be made by an affidavit of someone with personal knowledge of the underlying facts – an attorney's declarations are insufficient.  United States v. Gillette, 383 F.2d 843, 848-49 (2d Cir. 1967) (affidavit by defense attorney in support of motion not based on attorney's personal knowledge

11

A-73

insufficient to create factual issues to be resolved at evidentiary hearing); United States v. Caruso, 684 F. Supp. 84, 87 (S.D.N.Y. 1988) (same).

As Judge Mansfield noted in United States v. Garcia, 272 F. Supp. 286, 290 (S.D.N.Y. 1976):

> Experience shows that unless such serious charges are initiated upon the sworn statement of persons having personal knowledge of the facts, a great deal of time of the parties and the Court is frequently wasted upon unnecessary, expensive and protracted suppression hearings, all for the reason that the attorney demanding suppression merely upon his own say-so often discovers only at the hearing that he had been misled by unsworn misrepresentations of his clients, which they would be unwilling to swear to in an affidavit, particularly if they were questioned closely by their counsel and warned of the consequences of perjury.

Id. at 290.  Accordingly, a motion to suppress that suggests that the factual circumstances are different from those set forth in the incident report and related evidence, but is not supported by an affidavit of someone with personal knowledge of those facts, should appropriately be considered without an evidentiary hearing.  See, e.g., United States v. Ruggiero, 824 F. Supp. 379, 393-94 (S.D.N.Y. 1993); United States v. Sierra-Garcia, 760 F. Supp. 252, 264-65 (E.D.N.Y 1991) (citing United States v. Gillette, 383 F.2d at 848-49; United States v. Gregory, 611 F. Supp. 1033, 1044 (S.D.N.Y. 1985)); United States v. Viscioso, 711 F. Supp. 740, 745 (S.D.N.Y 1989); United States v. Caruso, 684 F. Supp. at 87; United States v. Vasta, 649 F. Supp. 974, 986 (S.D.N.Y. 1986).

Indeed, courts in the District of Connecticut have repeatedly recognized that a motion to suppress based upon purportedly contested factual issues, but not supported by an affidavit by someone with personal knowledge of those facts, should be considered without a hearing.  See, e.g., United States v. Renaldo Rose, 3:03CR33(EBB), 2004 WL 78060 at *5 (D. Conn. Jan. 9, 2004):

A-74

> The defendant claims that the officers conducting the search went beyond the scope of the warrants by "rummaging through all of the defendant's (and other's who lived in the house) possessions." (Def.'s Mot. to Suppress at 14). Beyond this conclusory statement, however, the defendant fails to offer any evidence that the executing officers transformed the search into a "general seizure." Further, the defendant filed no affidavit reciting any supporting facts to his conclusory allegations of wrongdoing. The Second Circuit has made very clear that a defendant seeking to suppress evidence bears the burden of demonstrating disputed issues of fact that would justify an evidentiary hearing. See United States v. Culotta, 413 F.2d 1343, 1345 (2d Cir. 1969). *The required showing must be made by an affidavit from an individual with personal knowledge of the underlying facts.* See United States v. Ruggiero, 824 F. Supp. 379, 393-94 (S.D.N.Y. 1993) (finding a motion to suppress not supported by the proper affidavit may be denied without a hearing.).

Rose, 2004 WL 78060 at *5 (emphasis added); see also United States v. Diaz, 303 F. Supp. 2d 84, 93-94 (D. Conn. 2004):

> [D]efendant filed no affidavit reciting any supporting facts to his assertion that the events in question occurred differently than attested to in the Police Report. The Second Circuit has made very clear that a defendant seeking to suppress evidence bears the burden of demonstrating disputed issues of fact that would justify an evidentiary hearing. See United States v. Culotta, 413 F.2d 1343, 1345 (2d Cir. 1969). *The required showing must be made by an affidavit from an individual with personal knowledge of the underlying facts.* See United States v. Ruggiero, 824 F. Supp. 379, 393-94 (S.D.N.Y. 1993) (finding a motion to suppress not supported by the proper affidavit may be denied without a hearing). *Because defendant has provided no such affidavit and there is no basis for suppressing such evidence on the existing record, defendant's request for oral argument is denied.*

Diaz, 303 F. Supp. at 93-94 (emphasis added).

Sensi claims that there was no probable cause to seize the evidence from his residence and that he did not consent to the search of the black duffel bag. In the absence of any affidavit, Sensi has utterly failed to meet his burden of establishing disputed issues of material fact sufficient to trigger an evidentiary hearing, and the Court may consider the motion to suppress based on the record as it exists.

Indeed, what is obvious from Sensi's motion papers is that he wants an evidentiary hearing so he can cross-examine the government's witnesses. Despite his transparent desire to

13

depose government agents prior to trial, Sensi can not demand an evidentiary hearing to conduct a fishing expedition. Rather, as the aforementioned case law amply demonstrates, Sensi is required to submit an affidavit to obtain a hearing.

**D.    The Statute of Limitations on the 2001 Conduct has Not Expired**

The statute of limitations applicable to the instant offenses is 18 U.S.C. § 3299, which states:

> Notwithstanding any other law, an indictment may be found or an information
> instituted at any time without limitation for any offense under section 1201
> involving a minor victim, and for any felony under chapter 109A, 110 (except for
> section 2257 and 2257A), or 117, or section 1591.

Section 3299 went into effect on July 27, 2006 as part of the Adam Walsh Child Protection and Safety Act of 2006, Pub. L. No. 109-248, § 211, 120 Stat. 587 (July 27, 2006) ("Adam Walsh Act"). The charges relating to production of child pornography all are part of chapter 110.

While an expired statute of limitation cannot be revived by statute, statutory changes to a statutes of limitations can apply to crimes that have already taken place so long as the original statute of limitation was still running. *Stogner v. California*, 539 U.S. 607, 618 (2003) (if prior limitations period has not expired, enlargement of that period does not violate ex post facto clause). Therefore, Section 3299 applies to the charges so long as the statute of limitations was still running on July 27, 2006, the date the statute was created.

Prior to the passage of the Adam Walsh Act, the statute of limitations for sexual offenses involving minor victims was dictated by 18 U.S.C. § 3283. Section 3283 has undergone a number of legislative changes within the past few years set forth below:

1.    Prior to November 29, 1990, there was no specific statute of limitations for child sex offenses.

14

2.      On November 29, 1990,  18 U.S.C. § 3509(k) became law, extending the statute

of limitations for an offense that "involv[es] the sexual or physical abuse of a

child" until the victim reaches age 25.

3.      On September 13, 1994, Section 3509(k) was re-codified at 18 U.S.C. § 3283.

4.      On April 30, 2003, Section 3283 was amended so that the statute of limitations for

an offense that involves the sexual or physical abuse of a child runs for the life of the child.

5.      On January 5, 2006, Section 3283 was amended again so that the statute of

limitations for an offense that involves the sexual or physical abuse of a child expires 10 years

after the offense or runs for the life of the child, whichever is longer.

   Given this history, the applicable statute of limitation at the time of the offenses was until

the victims reached age 25, and then was extended to ten years from the date of the offense or the

life of the victims, whichever was longer.  This means that the statute of limitations for any

offenses that may have occurred in 2001 was still running on July 27, 2006, the date that the

Adam Walsh Act which eliminated the statute of limitations altogether.

   The limitations language that later became Section 3283 was originally codified in 1990

as part of 18 U.S.C. § 3509, which contains provisions relating to the rights of child victims and

witnesses. *See* Crime Control Act of 1990, Pub.L.No. 101-647, 1990  3266 (1990).  Subsection

3509(k) provided that:

>      No statute of limitations that would otherwise preclude prosecution for an
> offense involving the sexual or physical abuse of a child under the age of 18 years
> shall preclude such prosecution before the child reaches the age of 25 years.

   In addition to this language in subsection (k), Section 3509 contains a definition of

"sexual abuse" that applies to the entire section.  18 U.S.C. § 3509(a)(8).  Sexual abuse, as

defined by Section 3509 in 1990 and today, includes:

15

the employment, use, persuasion, inducement, enticement, or coercion of a child
to engage in, or assist another person to engage in, sexually explicit conduct or the
rape, molestation, prostitution or other form of sexual exploitation of children, or
incest with children.

18 U.S.C. § 3509(a)(8).

In 1994, the statute of limitations language of Section 3509(k) was moved, verbatim, into

Chapter 213, entitled "Limitations Periods," as Section 3283.  *See* Violent Crime Control and

Law Enforcement Act of 1994, Pub.L.No. 103-322, 108 Stat. 1796 (1994).  Section 330018 of

Public Law 103-322 was entitled "Repeal of superfluous statute of limitation and transfer of

child abuse statute of limitation."  In other words, in 1994, Congress simply moved the statute of

limitations for sexual abuse cases from the child victims' rights section of the criminal code to

the limitations chapter of the code, amending Section 3283 to contain the statute of limitations

language, and repealing the provision from § 3509(k) as a "conforming repeal."  *Id.*

In 2003, Congress again enlarged the limitations period for child sexual abuse crimes,

amending Section 3283 to allow for prosecution not just until the child reaches the age of 25

years, but for the entire "life of the child."  *See* Prosecutorial Remedies and Tools Against the

Exploitation of Children Today Act, Pub.L.No. 108-21, 117 Stat. 660, Title II, § 202 ("No

statute of limitations for child abduction and sex crimes") (April 30, 2003).  Three years later,

Congress again enlarged the statute of limitations for child sex abuse crimes.  18 U.S.C. § 3283;

*see also* Violence Against Women and Department of Justice Reauthorization Act of 2005,

Pub.L.No. 109-162, 119 Stat. 2960, § 1182 (January 5, 2006).  While twice enlarging the statute

of limitations, Congress never changed the relevant language referring to the sexual abuse or

exploitation of a child, and did not create a new definition of sexual abuse or exploitation.  It

follows that the term "sexual abuse" in 18 U.S.C. § 3283 can be understood only by reference to

16

the definitions of exploitation and sexual abuse that is found in 18 U.S.C. § 3509.

III.     **CONCLUSION**

For the foregoing reasons, defendant's motion to suppress and to dismiss  should

be denied.

Respectfully submitted,

NORA R. DANNEHY
ACTING UNITED STATES ATTORNEY


/S/
KRISHNA R. PATEL
ASSISTANT UNITED STATES
ATTORNEY
United States Attorney's Office
915 Lafayette Boulevard
Bridgeport, CT 06604
(203) 606-3000
Federal Bar Number ct24433

17

A-79

## CERTIFICATE OF SERVICE

This is to certify that on February 16, 2010, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

/s/_____
KRISHNA R. PATEL
Assistant United States Attorney

18

# UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA :

                                                  :     NO. 3:08CR253(WWE)

V.                                                :

Edgardo Sensi                           :     May 3, 2010


## MOTION TO SUPRESS STATEMENTS

The defendant Edgardo Sensi moves to suppress statements that he purportedly made to law enforcement officers on September 10, 2008.  As articulated in the Defendant's Memorandum of Law in Support of Motion to Suppress Statements, and the affidavit of the defendant, the law enforcement agents engaged in a custodial interrogation of the defendant, failed to comply with the requirements of *Miranda v. Arizona* before questioning the defendant, and thus, the statements must be suppressed.  In connection with this motion, the defendant requests that the Court conduct an evidentiary hearing.


**ORAL ARGUMENT REQUESTED,
TESTIMONY REQUIRED.**

Case 3:08-cr-00253-WWE    Document 78    Filed 05/03/10    Page 2 of 3

<u>Conclusion</u>

For the reason stated in this Reply Brief and in defendant's Motion to Suppress and on the basis of the evidence to be elicited during an evidentiary hearing, defendant respectfully requests that the Court grant his Motion to Suppress evidence seized from defendant's residence.

DEFENDANT- Edgardo Sensi

/s/  Robert Berke
By: _____
      Robert Berke
      640 Clinton Avenue
      Bridgeport, CT  06605
      203 332-6000
      203 332-0661
      Fed Bar No. CT 22117
      Email Address: robertberke@optonline.net

2

## CERTIFICATION

I hereby certify that on May 3, 2010 a copy of the foregoing was filed electronically to all counsel. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.

_____/s/__Robert Berke_____
Robert Berke

## UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA :

:   NO. 3:08CR253(WWE)

V.                                  :

Edgardo Sensi                       :   May 3, 2010


### DEFENDANT'S REPLY MEMORANDUM
### IN SUPPORT OF MOTION TO SUPPRESS

#### Introduction

The defendant's Motion to Suppress raises important factual questions, the resolution of which requires an evidentiary hearing. The defendant's claims are rooted in the Fourth Amendment and turn on the unique circumstances of this case. The numerous affidavits and deposition transcripts concerning this case reveal multiple unresolved factual disputes and raise serious questions about the credibility of the lead investigator.

For example, the lead investigator suggests that defendant consented to a search of a locked black duffel bag and that defendant's alleged consent was witnessed by another law enforcement officer. However, none of the other officers involved in executing the search warrant had any recollection of defendant consenting to a search. Moreover, defendant never signed a written consent form. Nor did defendant provide a key or any other means of access to the bag. In fact, defendant has submitted an affidavit denying that he consented to

any search. It follows that whether defendant consented to the search is a pivotal issue in this case and cannot be resolved absent a full evidentiary hearing. *See, e.g., United States v. Nelson*, 2006 WL 2335222, at *1 (2d Cir. Aug. 10, 2006) (affidavit by defendant "sufficed to put into question" assertion by law enforcement witness that defendant consented to a search, requiring a remand to the district court for an evidentiary hearing) (Exhibit 1);[1] *United States v. Mathurin*, 148 F.3d 68 (2d Cir. 1998) (dispute about whether defendant was provided *Miranda* warning "cannot properly be resolved without an evidentiary hearing"; case remanded for evidentiary hearing).

Defendant submits this reply brief advancing the following points.

- The Government's expansive reading of the search warrant is unavailing and runs afoul of its own theory of probable cause.

- The Government wrongly asserts that defendant has failed to demonstrate the need for an evidentiary hearing on the question of whether he consented to the search of the locked duffel bag.

- Additional factual questions exist concerning the location from which certain evidence was seized.

---

[1] A copy of this unreported decision appears in Exhibit 1 to this Reply Brief.

### Argument

**I.   THE GOVERNMENT'S EXPANSIVE READING OF THE SEARCH WARRANT IS UNAVAILING AND RUNS AFOUL OF ITS THEORY OF PROBABLE CAUSE.**

In an effort to expand the scope of the search warrant to capture so-called "Hi8" video cassettes, the Government argues that the "plan [sic] language of the warrant authorized a search for any images or videos of child pornography." (Gov't Brief at 8.) This argument is misplaced.

The Fourth Amendment requires particular descriptions of the articles to be seized. "As to what is to be taken, nothing is left to the discretion of the officer executing the warrant." *Marron v. United States*, 275 U.S. 192, 196 (1927); *see also Stanford v. Texas*, 379 U.S. 476, 485 (1965). Thus, courts must suppress evidence seized outside the scope of the warrant. *See, e.g., United States v. King*, 227 F.3d 732, 753 (6th Cir. 2000) (evidence which exceeded scope of warrant suppressed); *United States v. Carey*, 172 F.3d 1268, 1276 (10th Cir. 1999) (same); *United States v. Fuccillo*, 808 F.2d 173, 177-78 (1st Cir. 1987) (same).

Moreover, when government agents "flagrantly disregard" the terms of a warrant, "wholesale suppression is required." *United States v. Liu*, 239 F.3d 138, 140 (2d Cir. 2000). Suppression of *all evidence* seized pursuant to a search warrant is required when agents: (1) conduct a "widespread seizure of items that were not within the scope of the warrant"; and (2) do not act in good faith. *Id.* (quoting *United States v. Matias*, 836 F.2d 744, 748 (2d Cir. 1988); and citing *Marvin v. United States*, 732 F.2d 669, 675 (8th Cir. 1984)). For example, in *United States v. Foster*, 100 F.3d 846, 852 (10th Cir. 1996), the Tenth Circuit ordered the suppression of all evidence seized pursuant to a search warrant, explaining that

"at the time he obtained the warrant [the officer] knew that the limits of the warrant would not be honored." *Id. See also United States v. Rettig*, 589 F.2d 418, 423 (9th Cir. 1978) (same).

The Government misplaces its reliance on the broad language in the warrant covering "[i]mages, movies, or visual depictions of sexual conduct or sexual performance by a child or children." (Gov't Brief at 3.) The Government ignores the limiting language throughout the search warrant, in which law enforcement officers were restricted to computer-related media, not video tapes and tapes generated from video cameras, such as the "Hi8" cassettes at issue here. (Exhibit 2, p. 2-4.) Indeed, the entire basis for the probable cause in this case was Detective Broughton's computer-based investigation. (Exhibit 3.) Before execution of the overbroad search, there was no evidence that defendant engaged in any illicit activity other than possession of images on his computer. (Exhibit 3.)

In short, the Court must look to the entirety of the search warrant's description of items to be seized, not just the broad self-serving catch-all language on which the Government now relies so heavily. Without the search warrant's limiting language, the warrant would be overbroad and thus invalid. *See, e.g., United States v. Bianco*, 998 F.2d 1112, 1116 (2d Cir. 1993) (warrant authorizing seizure of various documents and records was overbroad because it contained no limiting language as to the types of items sought to be seized); *United States v. Travers*, 233 F.3d 1327, 1330 (11th Cir. 2000) (warrant authorizing the seizure of "any other material reflecting identity, and anything reflecting potential fraud" was improper because it lacked particularity).

4

## II.   THE GOVERNMENT WRONGLY ASSERTS THAT DEFENDANT HAS FAILED TO DEMONSTRATE THE NEED FOR AN EVIDENTIARY HEARING ON THE QUESTION OF WHETHER HE CONSENTED TO THE SEARCH OF A LOCKED DUFFEL BAG.

Defendant's principal argument is that the seizure of Hi8 tapes exceeded the scope of the Warrant and that, accordingly, the tapes must be suppressed. In the alternative, defendant argues that it was unlawful for the detectives to seize evidence from the locked duffel bag absent probable cause or defendant's consent to search. In response, the Government contends that defendant "consented to the search of the black duffel bag where the tapes relating to M.V.#1 were located." (Gov't Brief at 9.) The Government's argument is flawed on multiple levels.

### A.   Defendant Has Submitted an Affidavit Disputing the Government's Assertion of Consent.

The Government claims that "in the absence of any affidavit, Sensi has utterly failed to meet his burden of establishing disputed issues of material fact." (Gov't Brief at 13.) However, simultaneously with the filing of this Reply Brief, defendant has submitted an affidavit in support of his Motion to Suppress ("Defendant's Affidavit"). (Exhibit 4.) In the Defendant's Affidavit, defendant states that: (1) at no time did he sign a written consent to search the locked duffel bag; (2) he never gave any consent to search the locked duffel bag; and (3) consistent with the absence of consent, defendant did not provide the law enforcement officers a key or any other means by which to gain access to the locked duffel bag. (Exhibit 4.)

Defendant's Affidavit is, of itself, sufficient to create a material issue of fact requiring an evidentiary hearing. *See, e.g., United States v. Nelson,* 2006 WL 2335222, at *1 (2d Cir. Aug. 10, 2006) (affidavit by defendant "sufficed to put into question" assertion

5

by law enforcement witness that defendant consented to a search, requiring a remand to the

district court for an evidentiary hearing); *United States v. Mathurin*, 148 F.3d 68 (2d Cir.

1998) (dispute about whether defendant was provided *Miranda* warning "cannot properly be

resolved without an evidentiary hearing"; case remanded for evidentiary hearing).

**B.    The Government's Assertion of Consent is Predicated on the Wholly Uncorroborated and Unreliable Claim of the Lead Investigator.**

The Government ignores the fact that the affidavits and testimony of the lead law

enforcement officer, Detective Brian Broughton, raise serious questions about whether

defendant consented to the search and about Detective Broughton's credibility overall. The

Government emphasizes in its brief that Detective Broughton claims defendant told him to

take the locked duffel bag, stating "take it, it's porn." (Gov't Brief at 5.) This statement

represents the entirety of the Government's evidence of consent. However, the statement is

neither corroborated nor otherwise credible.

To begin with, neither of the two law enforcement officers that accompanied

Detective Broughton during execution of the search warrant recalled defendant's consent to

a search of the locked duffel bag. In his sworn testimony, Detective Broughton suggested

that his colleagues witnessed defendant's consent. Detective Broughton testified that,

"That's what was relayed *to us* by Mr. Sensi. He said take it, it's porn…. And that's one of

the reasons we took it [i.e., the locked duffel bag]." (Exhibit 5 at 69; emphasis added.)

However, in their respective depositions, Detective Broughton's colleagues made no

reference to any such consent.

Instead, Detective Pat Colasuono testified that although he assisted in the execution of the search warrant, he was not present during any conversation with defendant regarding the contents of the locked duffel bag. (Exhibit 6 at 8.)  Similarly, Deputy Sheriff Todd Lamm testified that he also was involved in the search warrant execution and specifically monitored defendant during the search.  Yet Officer Lamm did not here any admissions or confessions that defendant may have made. (Exhibit 7 at 7.)  In other words, there is a complete lack of corroboration for Detective Broughton's claim of consent. Far from supporting Detective Broughton, the accounts of Detectives Colasuono and Lamm are consistent with defendant's position, i.e., that he did *not* consent to a search of the locked duffel bag.

Not only does Detective Broughton's assertion of consent defy the evidence, but his self-serving claim is further discredited by other factors that impeach him more generally. The following is a sampling of statements that Detective Broughton has made during his investigation of defendant that undermine his overall credibility:

- Detective Broughton applied for an arrest warrant of defendant *after* reviewing the contents of the locked duffel bag.  In his affidavit, he made no mention whatsoever to obtaining defendant's consent to search.  Instead, the Complaint Affidavit misleadingly refers only to the contents of the locked duffel bag, omitting any reference to either the bag itself, the fact that it was locked, or the consent allegedly obtained from defendant. (Exhibit 8 at 9.)

- In the Affidavit for Search Warrant, Detective Broughton identifies the Internet Protocol address tracing back to defendant's service provider as "76.111.218.152." (Exhibit 3 at 11.)  By contrast, in the Complaint Affidavit,

Detective Broughton identifies a *different IP address* connected to the
service provider, i.e., "76.108.57.247." (Exhibit 8 at 3.)

- In the Affidavit for Search Warrant, Detective Broughton asserts that his
investigation revealed that the IP address at issue crossed over with two
digital movie file names. (Exhibit 3 at 10.)  In contrast, the Complaint
Affidavit refers to *a third* unnamed movie file, creating the impression that
defendant possessed this file as well, but without any connection to an IP
address. (Exhibit 8 at 3.)

- In the Affidavit for Search Warrant, Detective Broughton makes no mention
of locating defendant's alleged IP address though "Peer2Peer file sharing."
(Exhibit 3.)  However, the detective makes this specific assertion in the
Complaint Affidavit. (Exhibit 8 at 1.)

- In his deposition, Detective Broughton testified that since he had a search
warrant, "everything is in plain view." (Exhibit 5 at 43.)  Yet, Detective
Broughton also testified that he did not know what was in the locked duffel
bag and that he "didn't want to seize it if there was nothing pertinent to our
investigation in it." (Exhibit 5 at 52.)  In other words, there was nothing in
the locked duffel bag that was in plain view, and Detective Broughton had no
basis to reasonably believe that it contained illicit material.

- Detective Broughton falsely described the location of certain evidence in his
Arrest Affidavit.  For example, the detective claimed to have located and
seized a laptop in an office immediately to the right of the entrance to
defendant's home. (Exhibit 9 at 6.)  When questioned about this reference at

8

his deposition, Detective Broughton conceded that he was wrong. (Exhibit 5 at 39.)

In short, the circumstances surrounding Detective Broughton's claim of consent require an evidentiary hearing as there are critical factual and credibility issues that the Court respectfully must resolve. Detective Broughton's assertion of consent conflicts: (1) the Defendant's Affidavit; (2) the fact that there is no written consent form; and (3) the testimony of the two other law enforcement officers that accompanied Detective Broughton during the search. Moreover, there are numerous other factors that undermine Detective Broughton's reliability as a witness. Under these circumstances, it would be reversible error to deny defendant an evidentiary hearing. *See, e.g., Nelson,* 2006 WL 2335222, at *1 (affidavit by defendant "sufficed to put into question" assertion by law enforcement witness that defendant consented to a search, requiring a remand to the district court for an evidentiary hearing); *Mathurin,* 148 F.3d at 68 (dispute about whether defendant was provided *Miranda* warning "cannot properly be resolved without an evidentiary hearing"; case remanded for evidentiary hearing).

## III.   ADDITIONAL FACTUAL QUESTIONS EXIST CONCERNING THE LOCATION OF CERTAIN EVIDENCE.

The Government asserts that "[t]he red duffel bag contained adult pornography as well as additional Hi8 tapes which [sic] markings that included M.V.#2's first name 'XXX' and dates which corroborate his dates of travel to Nicaragua." (Gov't Brief at 5.) The Government offers no support for this assertion. In fact, there is none, because the manner in which the law enforcement officers gathered the Hi8 tapes is not clear from the record.

The inventory of property seized from defendant's residence is woefully deficient. It only lists the laptop, "various cd/dvd media," a video camera, a "Bag (locked containing

misc Porn)" and "various papers". The only other item listed on the inventory is a quantity of "High 8 VIDEO TAPES". The inventory refers to a quantity of "8" Hi8 tapes, but the handwritten quantity reference clearly had been altered in some way. Moreover, the inventory is devoid of any reference to the red duffel bag to which the Government now refers. Hence, the inventory itself raises a myriad of factual issues, not the least of which is whether the tape(s) allegedly concerning M.V.#2 were in the red duffel bag or the locked duffel bag. (Exhibit 2.)

Detective Broughton's deposition offers no further insight as to the location of the Hi8 tapes. He referred to some of the Hi8 tapes as coming from either a box, a red duffel bag or a tin container. (Exhibit 5 at 43-45.) Detective Broughton also explained that additional Hi8 tapes were found in the locked duffel bag. (Exhibit 5 at 57.) During his testimony, Detective Broughton was unable to distinguish between the Hi8 tapes originating from the boxes and the red duffel bag. (Exhibit 5 at 46.) He was only clear on the fact that the Hi8 tapes allegedly concerning M.V. #1 originated from the locked duffel bag. (Exhibit 5 at 57.) Throughout his testimony, the detective displayed utter confusion as to which Hi8 tapes came from which container, raising serious questions about the integrity of the Government's evidence. (See, e.g., Exhibit 5 at 46.)

The key point is that only through an evidentiary hearing can the Court make findings as to the origin of the Hi8 tapes concerning M.V.#2. First and foremost, defendant maintains that the seizure of the Hi8 tapes was beyond the scope of the warrant. Nevertheless, even if the Hi8 tapes were within the scope of the warrant, if the tape(s) allegedly concerning M.V.#2 were contained in the locked duffel bag, then the tape(s) are subject to suppression, because defendant did not consent to the search of that container.

### Conclusion

For the reason stated in this Reply Brief and in defendant's Motion to Suppress and on the basis of the evidence to be elicited during an evidentiary hearing, defendant respectfully requests that the Court grant his Motion to Suppress evidence seized from defendant's residence.

DEFENDANT- Edgardo Sensi

/s/ Robert Berke

By: _____

Robert Berke
640 Clinton Avenue
Bridgeport, CT  06605
203 332-6000
203 332-0661
Fed Bar No. CT 22117
Email Address: robertberke@optonline.net

11

## CERTIFICATION

I hereby certify that on May 3, 2010 a copy of the foregoing was filed electronically to all counsel. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.

_____/s/   Robert Berke_____
Robert Berke

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| vs. | : | 3:08CR253(WWE) |
| | : | |
| EDGARDO SENSI | : | April 3, 2010 |

### AFFIDAVIT OF EDGARDO SENSI

| | |
|---|---|
| STATE OF RHODE ISLAND | : |
| | : ss. Central Falls |
| PROVIDENCE COUNTY | : |

EDGARDO SENSI, being duly sworn, deposes and says:

1.    I am a defendant in the above-captioned case and submit this affidavit in support of the Motion to Suppress that I filed through my counsel on January 10, 2010.

2.    On September 10, 2008, the Martin County Sheriff's Office executed a search warrant ("Search Warrant") at my residence at 2750 Windemere Drive, Jensen Beach, Florida.

3.    At no time during the execution of the Search Warrant, or at any point thereafter, did I sign a written consent to search a black locked duffel bag located in the closet of my bedroom, or any other item.

4.    At no time during the execution of the Search Warrant, or at any point thereafter, did I give my consent to search the referenced locked duffel bag, or any item.

Case 3:08-cr-00253-WWE   Document 80   Filed 05/03/10   Page 14 of 19

5.   At no time during the execution of the Search Warrant, or at any point

thereafter, did I provide the law enforcement officers a key or any other

means by which to gain access to the referenced locked duffel bag.

_____
Edgardo Sensi

Subscribed and sworn to me this 3rd day of April, 2010.

_____
Notary Public/ term expires 10-25-2011

Westlaw.                                                                    Page 1

193 Fed.Appx. 47, 2006 WL 2335222 (C.A.2 (N.Y.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 193 Fed.Appx. 47, 2006 WL 2335222 (C.A.2 (N.Y.)))

**H**
This case was not selected for publication in the
Federal Reporter.

United States Court of Appeals,
Second Circuit.
UNITED STATES of America, Appellee,
v.
Richard A. NELSON, Defendant-Appellant.
No. 05-3315-cr.

Aug. 10, 2006.

**Background:** Defendant was convicted in the
United States District Court for the Southern Dis-
trict of New York, Marrero, J., of possession of a
firearm after a felony conviction, and was sen-
tenced to 37 months' incarceration. Defendant ap-
pealed.

**Holdings:** The Court of Appeals held that:
(1) defendant was entitled to evidentiary hearing on
his motion to suppress;
(2) any error in admission of drug-related evidence
was harmless; and
(3) district court did not abuse its discretion in re-
stricting defendant's cross-examination of police
witness.

Affirmed in part, vacated in part, and remanded.

West Headnotes

**[1] Criminal Law 110 ⬅➡394.6(5)**

110 Criminal Law
    110XVII Evidence
        110XVII(I) Competency in General
            110k394.6 Motions Challenging Ad-
missibility of Evidence
                110k394.6(5) k. Hearing and De-
termination. Most Cited Cases
Felon-in-possession defendant was entitled to evid-

entiary hearing on his motion to suppress firearms
recovered from his apartment and his statements to
detective regarding those firearms, where defendant
stated in sworn affidavit that neither he nor apart-
ment's other occupant consented to search, agents
who conducted search admittedly did so without
warrant and in absence of exigent circumstances,
and no evidence before court at time of hearing
supported government's contention that search and
detective's questioning were discrete. U.S.C.A.
Const.Amend. 4.

**[2] Criminal Law 110 ⬅➡1169.2(5)**

110 Criminal Law
    110XXIV Review
        110XXIV(Q) Harmless and Reversible Error
            110k1169 Admission of Evidence
                110k1169.2 Curing Error by Facts Es-
tablished Otherwise
                    110k1169.2(5) k. Illegally Obtained
Evidence. Most Cited Cases
Any error in admission of evidence, in prosecution
for possession of a firearm after a felony convic-
tion, that police had searched defendant's apartment
in response to tip that marijuana would be found
there, and that marijuana had in fact been found,
was harmless, where evidence of defendant's pos-
session of guns found in apartment was overwhelm-
ing and any irrelevant or prejudicial evidence ad-
mitted favored defendant as much as the govern-
ment.

**[3] Witnesses 410 ⬅➡349**

410 Witnesses
    410IV Credibility and Impeachment
        410IV(B) Character and Conduct of Witness
            410k348 Cross-Examination for Purpose
of Impeachment
                410k349 k. In General. Most Cited
Cases
District court did not abuse its discretion, in prosec-
ution for possession of a firearm after a felony con-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

193 Fed.Appx. 47, 2006 WL 2335222 (C.A.2 (N.Y.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 193 Fed.Appx. 47, 2006 WL 2335222 (C.A.2 (N.Y.)))

viction, in restricting defendant's cross-examination of police witness regarding witness' disciplinary record, absent any indication of specific impropriety on part of district court.

*48 Appeal from the United States District Court for the Southern District of New York (Marrero, J.). ON CONSIDERATION WHEREOF, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the judgment of the district court be and hereby is AFFIRMED in part and REVERSED in part and this case remanded for further proceedings. Vincent Tortorella, Assistant United States Attorney (Harry Sandick, Assistant United States Attorney, on the brief), for Michael J. Garcia, United States Attorney for the Southern District of New York, New York, NY, for Appellee.

Barry S. Turner, New York, NY, for Defendant-Appellant.

Present: Hon. THOMAS J. MESKILL, Hon. CHESTER J. STRAUB, and Hon. ROBERT A. KATZMANN, Circuit Judges.

SUMMARY ORDER

**1 Following a jury trial, defendant-appellant Richard A. Nelson was convicted of possession of a firearm after a felony conviction, in violation of 18 U.S.C. § 922(g), and sentenced to, inter alia, 37 months' incarceration. Prior to trial, the district court denied, without a hearing, Nelson's motion to suppress the firearms recovered from his apartment and his statements to a detective regarding those firearms. United States v. Nelson, 335 F.Supp.2d 477 (S.D.N.Y.2004). On appeal, Nelson challenges the district court's denial of his suppression motion, the Government's failure to disclose certain information prior to the district court's decision on the suppression motion, and two of the district court's evidentiary rulings at trial.

We review the district court's denial of a defend-

ant's request for a suppression hearing for abuse of discretion. United States v. Finley, 245 F.3d 199, 203 (2d Cir.2001). A suppression hearing "ordinarily is required if the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question." United States v. Pena, 961 F.2d 333, 339 (2d Cir.1992) (internal quotation marks and citation omitted).

*49 [1] Here, Nelson's sworn affidavit, in which he stated that neither he nor the other person in the apartment, Gloria Madden, "gave the police permission or authority to search our apartment," sufficed to put into question the Government's contention that investigators (who admittedly were authorized by neither a warrant nor exigent circumstances) had valid consent to search. This case is substantially similar to United States v. Mathurin, 148 F.3d 68 (2d Cir.1998) (per curiam), in which we found a district court to have abused its discretion in not granting an evidentiary hearing where a defendant simply stated that he never voluntarily waived his right to counsel. Nelson's statement, while brief, was "neither vague, nor obscure, nor unspecific" as to which fact he was contesting.[FN1] Id. at 69.

FN1. Because Nelson's own affidavit should have merited an evidentiary hearing, we do not reach the question of whether the district court also should have considered the far more detailed affidavit submitted by Nelson's counsel.

The Government argues that the guns were not recovered pursuant to the search, but rather pursuant to unrelated questioning of Nelson. It further argues that such questioning was legitimate, regardless of the validity of the search itself, and notwithstanding that Nelson was never informed of his right not to answer questions, see Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), under the "public safety" exception to Miranda.[FN2] We reject this argument.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

193 Fed.Appx. 47, 2006 WL 2335222 (C.A.2 (N.Y.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 193 Fed.Appx. 47, 2006 WL 2335222 (C.A.2 (N.Y.)))

FN2. The Government also argues that *United States v. Deutsch,* 987 F.2d 878 (2d Cir.1993), established a rule that agents, once having validly entered a residence, are entitled to talk to suspects inside without regard to *Miranda.* However, in *Deutsch,* it was undisputed that agents properly administered the *Miranda* warnings-the only question was whether they had initially secured consent to enter the apartment-and so that case has no application here.

No evidence before the district court at the time of the suppression motion supported the Government's current theory that the search and questioning were discrete; indeed, what evidence was before the court directly contradicted it. [FN3] *See Complaint* ¶ 4(b) (questioning of Nelson was pursuant to officer's "efforts to ensure safety during the search"). We do not resolve, at present, the application of the public safety doctrine, which permits pre-*Miranda* warning questioning that is justified by an objectively reasonable need to protect law enforcement officers or the public from immediate danger, *see New York v. Quarles,* 467 U.S. 649, 657-69, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984); *United States v. Estrada,* 430 F.3d 606, 612 (2d Cir.2005); *United States v. Reyes,* 353 F.3d 148, 155 (2d Cir.2003). We observe that no case has interpreted this doctrine to permit such questioning during an unconstitutional search, nor do the meager facts in the complaint satisfy the standards we outlined in *Estrada* and *Reyes.* Our decision is without prejudice to the Government renewing its public safety exception argument on remand, after the full hearing and judicial fact-finding that ordinarily *50 will be a prerequisite to the application of such a fact-specific doctrine. *Cf. United States v. Newton,* 369 F.3d 659, 663 (2d Cir.2004).

FN3. The Government argues that we can consider facts adduced only later, at trial, that suggest that the questioning was indeed discrete from the search. However, if

we consider *all* the testimony adduced at trial-including Madden's testimony that the detectives forced their way into her apartment and searched it without her consent-then there can be no serious question that an evidentiary hearing is required. The Government implicitly asks us to consider only the later-adduced facts that support its position, while ignoring those that support Nelson's position. We decline to do so.

**2 Nelson urges us to find that the disclosure requirements of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), apply to pretrial suppression motions, and that the prosecution's failure to turn over certain material (including evidence that the police officer who questioned him, and presumably will testify and be subject to impeachment at the suppression hearing, lied about securing consent to search in another case) is an independent ground for remanding. Whether *Brady* and its progeny require disclosures in advance of pre-trial hearings is an open question in this circuit. In cases that pivot on the outcome of the suppression hearing, such as this one, it seems clear that postponing disclosure until after that hearing will prevent the defense from having key information "no later than the point at which a reasonable probability will exist that the outcome would have been different if an earlier disclosure had been made." *United States v. Coppa,* 267 F.3d 132, 142 (2d Cir.2001); *see id.* at 145 n. 9 (" *Brady* disclosures must be made in sufficient time for their effective use."). On the other hand, as the Government observes, its obligation has been formulated as a requirement to disclose only that which "is material either to guilt or to punishment." *Brady,* 373 U.S. at 87, 83 S.Ct. 1194; *but see United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (*Brady* applies where defendant can show "a reasonable probability that, had the evidence been disclosed to the defense, the result of the *proceeding* would have been different") (emphasis added). The only two circuits to have faced the question squarely have determined that *Brady* does apply in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

193 Fed.Appx. 47, 2006 WL 2335222 (C.A.2 (N.Y.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 193 Fed.Appx. 47, 2006 WL 2335222 (C.A.2 (N.Y.)))

this context. *See United States v. Barton*, 995 F.2d 931, 935 (9th Cir.1993); *Smith v. Black*, 904 F.2d 950, 965-66 (5th Cir.1990), *vacated on other grounds*, 503 U.S. 930, 112 S.Ct. 1463, 117 L.Ed.2d 609 (1992). Other circuits have expressed some doubts, albeit in dicta. *See United States v. Stott*, 245 F.3d 890, 902 (7th Cir.2001); *United States v. Bowie*, 198 F.3d 905, 912 (D.C.Cir.1999); *United States v. Williams*, 10 F.3d 1070, 1077 (4th Cir.1993). In light of our decision to remand for an evidentiary hearing, we decline to address this question, which will be mooted if the Government, in advance of the hearing, turns over any material not already given to the defense in advance of the trial that may bear on the outcome of the suppression hearing.

Finally, we turn to Nelson's appeals of the district court's evidentiary rulings. First, Nelson argues that the district court erred in permitting the jury to hear that the apartment was searched because of a tip that marijuana would be found there, and that marijuana was indeed found, notwithstanding that Nelson was not charged with any drug crime. We review the district court's decision to permit evidence before the jury for abuse of discretion, *see United States v. Pipola*, 83 F.3d 556, 566 (2d Cir.1996), and we will not overturn a conviction because of an evidentiary error if we are convinced that the error was harmless. *See United States v. Germosen*, 139 F.3d 120, 127 (2d Cir.1998).

**3 [2] It appears that the district court first permitted this evidence as a way of allaying its concerns that jurors might well wonder why the police were in Nelson's apartment and keeping the jury focused on the only issue properly before it, *i.e.*, whether Nelson possessed the guns found in the apartment. Providing such background to expedite jury consideration of the truly contested issues is often permissible,**51 particularly where the background facts are not themselves controverted. *See, e.g., United States v. Daly*, 842 F.2d 1380, 1388 (2d Cir.1988). However, in this case, where the defense continued to maintain that the search was not law-

ful, permitting the prosecution to introduce evidence that the search *was* lawful had exactly the opposite effect: It spawned extensive argument over an entirely collateral issue, opening the door for Nelson to introduce his own, contradictory evidence regarding the search and then for the Government to rebut that evidence in turn. It is difficult to sort out which (if any) of this evidence ended up being "properly" admitted, and we decline to do so, because the evidence was overwhelming that Nelson did, in fact, possess the guns,[FN4] Moreover, to the extent that irrelevant and prejudicial evidence was improperly admitted, it favored Nelson as much as the Government.

> FN4. Should either the guns or Nelson's statements telling the police precisely where to find them be suppressed on remand, the district court should reconsider this harmless error inquiry in the first instance before ordering a new trial.

[3] Nelson also argues that he should have been permitted to further cross-examine Detective Rodriguez regarding the detective's disciplinary record. He does not specify how his cross-examination was improperly curtailed, and we see no abuse of discretion here. *Cf. United States v. Cruz*, 894 F.2d 41, 43 (2d Cir.1990).

Having considered all Nelson's other arguments and rejected them, we affirm his conviction and sentence, which will remain in place until the district court conducts a suppression hearing. To expedite matters, the parties may stipulate to the use of any relevant testimony adduced at trial; otherwise, the usual rules governing the use of prior testimony will apply. *Mathurin*, 148 F.3d at 70. Should the district court find that the guns and/or Nelson's statements should have been suppressed and order a new trial, the Government may take an immediate appeal from that ruling before the new trial is held. *Id.* Nelson, of course, is also free to take a new appeal limited to the suppression issue should his motion be denied on remand.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

193 Fed.Appx. 47, 2006 WL 2335222 (C.A.2 (N.Y.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 193 Fed.Appx. 47, 2006 WL 2335222 (C.A.2 (N.Y.)))**

Accordingly, we **AFFIRM** the judgment of the dis-
trict court in part and **VACATE** the judgment in
part and remand this case for further proceedings
consistent with this order.

C.A.2 (N.Y.),2006.
U.S. v. Nelson
193 Fed.Appx. 47, 2006 WL 2335222 (C.A.2 (N.Y.))

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

A-102

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

UNITED STATES OF AMERICA    :
     :
vs.    :   3:08CR253(WWE)
     :
EDGARDO SENSI    :   April 3, 2010

2010 MAY 20  P 2: 51

**AFFIDAVIT OF EDGARDO SENSI**

STATE OF RHODE ISLAND  :
     :   ss.  Central Falls
PROVIDENCE COUNTY  :

EDGARDO SENSI, being duly sworn, deposes and says:

    1.    I am a defendant in the above-captioned case and submit this affidavit in support of the Motion to Suppress that I filed through my counsel on January 10, 2010.

    2.    On September 10, 2008, the Martin County Sheriff's Office executed a search warrant ("Search Warrant") at my residence at 2750 Windemere Drive, Jensen Beach, Florida.

    3.    At no time during the execution of the Search Warrant, or at any point thereafter, did I sign a written consent to search a black locked duffel bag located in the closet of my bedroom, or any other item.

    4.    At no time during the execution of the Search Warrant, or at any point thereafter, did I give my consent to search the referenced locked duffel bag, or any item.

{H:\DOCS\bcs\aff\00187762 DOC}

A-103

5.        At no time during the execution of the Search Warrant, or at any point

thereafter, did I provide the law enforcement officers a key or any other

means by which to gain access to the referenced locked duffel bag.

_____
Edgardo Sensi

Subscribed and sworn to me this _3rd_ day of ~~April~~ *May*, 2010.

_____
Notary Public/ *term expires 10-25-2011*
Commissioner of the Superior Court

A-104

## UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA      :
:
vs.                          :     3:08CR253(WWE)
:
EDGARDO SENSI           :     April 3, 2010

### AFFIDAVIT OF EDGARDO SENSI

STATE OF RHODE ISLAND   :
:   ss.  Central Falls
PROVIDENCE COUNTY     :

EDGARDO SENSI, being duly sworn, deposes and says:

1.     I am a defendant in the above-captioned case and submit this affidavit in support of the Motion to Suppress that I filed through my counsel on January 10, 2010.

2.     On September 10, 2008, the Martin County Sheriff's Office executed a search warrant ("Search Warrant") at my residence at 2750 Windemere Drive, Jensen Beach, Florida.

3.     At no time during the execution of the Search Warrant, or at any point thereafter, did a police officer advise me of my right to remain silent, right to have an attorney, or that any statements that I make may be used against me in court.

_____
Edgardo Sensi

Subscribed and sworn to me this _3rd_ day of ~~April~~ *May*, 2010.

_____
Notary Public
*term expires 10-25-2011*

{H:\DOCS\bex\aff\00187762.DOC}

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA        :      CRIMINAL NO.3:08cr253(WWE)
                                :
        v.                      :
                                :
EDGARDO SENSI                   :      May 27, 2010

**GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANT'S MOTIONS TO DISMISS OR IN THE ALTERNATIVE TO SUPPRESS**

The United States respectfully submits this memorandum in
response to:  1) Edgardo Sensi's (hereinafter "defendant's" or
"Sensi's") motion to suppress statements made to law enforcement
officers on September 10, 2008; (2) compel production of <u>Brady</u>
and <u>Giglio</u> materials and other discovery pursuant to Federal Rule
of Criminal Procedure 16; (3) defendant's motion to preclude
404(b) evidence; and (4) an evidentiary hearing in support of his
January 19, 2010 motion to suppress the evidence obtained
pursuant to a lawfully executed warrant. This memorandum
supplements the Government's memorandum of law dated February 16,
2010, in response to defendant's motion to suppress.

Despite the defendant's efforts to portray law enforcement
as having completely violated the defendant's rights when they
searched and seized evidence from the defendant's property,  the
fact is that on or about September 10, 2008, law enforcement
lawfully entered Edgardo Sensi's Florida residence with a search
warrant signed by a judge that provided them with express
authority to search for and seize any child pornography in the
residence.  Having found incredibly disturbing videos of the

defendant engaged in illicit sex acts with very young children, the defendant now seeks to suppress this evidence making wholly disingenuous claims that the search warrant did not authorize the search and seizure of this material or that the Government's reading of the plain language of the search warrant is somehow expansive.

Moreover, in the course of the search, Sensi made statements that he may now regret having made.  The statements, however, were made voluntarily and willingly and not during a custodial interview and therefore should not be suppressed.  The Government will seek to utilize these statements in support of its alternative theory that the defendant consented to the search of a locked black duffel bag (even though the search warrant itself authorized the search of the contents of the home, including the black duffel bag) and will also seek to utilize the statements in its case-in-chief at trial.  If this Court determines that the seizure of the black duffel bag was clearly within the four corners of the search warrant, the issue of consent need not be decided at this time and as set forth below there is no basis for an evidentiary hearing.

In addition, contrary to defendant's veiled claims regarding discovery, the Government is not lounging on piles of undisclosed evidence.  The fact is that the Government has made all of its evidence available to the defendant for inspection.  The Government has made available all of the documents with the

2

limited exceptions of:  1) grand jury materials and  2)
Government work product.  The Government has been diligent about
its Brady or Giglio obligations.  Indeed, the Government has
essentially been following an "open file" policy with respect to
discovery in this case making all evidence available for
inspection and review.  Sensi's prior counsel (both Florida
counsel and his subsequently CJA appointed counsel) had
separately contacted the case agent and set-up several meetings
to review the discovery in this case.  In at least one instance,
the case agent transported all of the evidence to the Bridgeport
U.S. Attorney's office where Sensi himself has had an opportunity
to view the discovery immediately after a court proceeding with
his former counsel.

    The Government, therefore is now, and always has been, in
compliance with all court orders regarding discovery.  The
Government has produced all Brady and Giglio materials of which
it is aware.  It has done so well before Second Circuit law
requires it to do so.  Coppa, 267 F.3d at 135, 146.  It will
continue to review information in its possession and will make
additional disclosures if warranted.

    Indeed, the defendant has been able to access far more
discovery and information about this case than do most federal
criminal defendants at this stage of a prosecution.  Defendant's
motion raises nothing more than boilerplate complaints about
discovery and provides no specific information about what he

3

A-108

believes has not been made available to him.  Therefore, Sensi's claims relating to discovery issues should be denied.

In addition, Sensi continues to maintain his unsupportable statute of limitations claims and even though the Government has set forth the applicable statute of limitations for child sex offenses in its earlier memorandum, Sensi continues to incorrectly argue that the five-year statute of limitations applies here.  As discussed in its February 2010 memorandum of law and as set forth below, the statute of limitations for child sex exploitation offenses in not subject to the general five year statute of limitations applicable in many federal cases.

Finally, Sensi has not cited to any authority which requires that any 404(b) be presumptively excluded.  The Government has made 404(b) material available and will provide Sensi with a details about any 404(b) material that it intends to use at trial by next Friday.

## I.  Sensi's Statements During the Search Should Not Be Suppressed

In his earlier motion, defendant sought to suppress the evidence seized during the September 2008 lawful search of his home.  In its response, the Government asserted that the search and seizure was executed pursuant to a lawful search warrant which permitted law enforcement to search Sensi's residence for any and all child pornography.  Officer Broughton lawfully sought and obtained search warrant to search Sensi's residence.  A state

4

judge determined that Broughton had probable cause to search
Sensi's residence for all evidence of child pornography.  This
included but was not limited to any videos or images of child
pornography.  Broughton's affidavit sets forth his considerable
experience relating to the sexual exploitation of children as
well as his experience involving the use of the internet to
sexually exploit children.  The affidavit also sets forth in some
detail, the programs Sensi utilized on his computer to obtain
(and share) child pornography.  Based on their training and
experience, members of law enforcement who are experienced in
cases involving the sexual exploitation of children, like Officer
Broughton, are aware that most individuals who collect
pornography do not simply collect one or two movie files.
Rather, they obtain and possess a variety of child pornography on
a variety of mediums.  Therefore, the search warrant authorized
law enforcement to search for, among other things, any and all
images and videos of child pornography.  The search warrant and
accompanying affidavit were attached as Exhibit A to the
Government February 2010 memorandum.  The government relies on
and incorporates by reference all of the arguments previously
made in its February 2010 memorandum as to why the contents of
the black duffel bag were clearly within the four corners of the
warrant.

    Moreover, the language of the search warrant clearly goes on
to provide law enforcement with the authority to seize child

pornography. Alternatively, the Government argued that Sensi's statements to law enforcement during the search also constituted consent.

Defendant makes several arguments in an effort to attack the arrest warrant affidavit. Sensi argues that the arrest warrant affidavit made no mention about defendant's consent to search the black bag.  He also states that in the arrest warrant affidavit, the officer misidentified the IP address.  Finally, he states that the Officer incorrectly identified the location of certain evidence in the arrest affidavit.  The arrest affidavit is not at issue in this case.  Sensi has been charged with state offenses in Florida and he can make those arguments during his state case in Florida.  Having said that, there was no reason for law enforcement to mention Sensi's consent to search since they had already obtained a lawful search warrant.  Moreover, although there is a typo in one paragraph of the affidavit for the arrest warrant, it is clear that it is a typo because the IP address is properly identified everywhere else in the affidavit.

The affidavit for the search warrant, which is at issue in this case, consistently identifies the IP address associated with Sensi.  Sensi's complaints with respect to the search warrant is that they didn't identify all of the evidence that law enforcement was aware about.  He complains that they identified only two movie files for the search warrant but that the affidavit for the arrest warrant identified a third file.  Sensi

6

also complains that law enforcement failed to state that they were able to identify his IP address through a P2P file sharing. For any search warrant, law enforcement is not required to set forth in detail all of its evidence but rather only enough evidence to make a probable cause showing.  The information in the search warrant clearly supports a finding of probable cause and in fact a judge has already determined that probable cause existed because a search warrant was signed by a judge.

Defendant now seeks suppression pursuant to the Miranda doctrine of statements that he made to the officers on the day of the search at his home.  The government respectfully submits that defendant's motion should be denied, without an evidentiary hearing, because he was not in custody within the meaning of the Miranda doctrine at that time. These statements not only constituted consent for purposes of the search but the Government intends to offer these statements at trial in its case in chief.

As indicated in its February 2010 response,  Officer Broughton will testify that he did not want to seize the black back if it didn't contain anything pertinent to his investigation so he specifically asked Sensi if he had a key to the bag.  Sensi responded that he did not have a key to the black duffle bag.[1] When Officer Broughton asked Sensi what was in the bag, Sensi

---

[1]    The key to the black duffel bag was later recovered from Sensi's employer.

replied "take it, it's porn."[2]  During this conversation Sensi appeared to be both nervous and sweating.  When Officer Broughton asked Sensi why he was sweating, Sensi replied that he was diabetic.  Sensi now seeks to have this statement suppressed claiming that this was an interview that was custodial in nature.

A suspect is entitled to Miranda warnings only if he is interrogated while in custody.  See, e.g., Thompson v. Keohane, 516 U.S. 99, 102 (1995) ("Miranda warnings are due only when a suspect interrogated by the police is "in custody"); see also Oregon v. Mathiason, 429 U.S. 492, 494 (1977); Beckwith v. United States, 425 U.S. 341, 345-46 (1976); Miranda v. Arizona, 384 U.S. 436, 444 (1966); United States v. Newton, 369 F.3d 659, 668 (2d Cir. 2004); Tankleff v. Senkowski, 135 F.3d 235, 242 (2d Cir. 1998); United States v. Mitchell, 966 F.2d 92, 98 (2d Cir. 1992) ("Miranda warnings are not required, however, when the defendant is not in custody").  Law enforcement officers are not required to issue Miranda warnings during non-custodial questioning, even when the individual being questioned is a suspect in the crime under investigation.  Beckwith, 425 U.S. at 347; see also United States v. Burke, 700 F.2d 70, 84 (2d Cir. 1984) (Miranda warnings need not be provided in a non-custodial interrogation "even if

---

[2]    Officer Broughton has been deposed by Sensi's former counsel in Florida as part of the Florida state case against Sensi.  In his deposition, Officer Broughton was asked about his conversation with Sensi regarding the black duffel bag.  A copy of the deposition transcript has been made available to Sensi and appears to have been provided to the Court.

the government's criminal investigation has reached a stage where
the defendant is the focus of the inquiry").

In Miranda v. Arizona, 384 U.S. 436 (1966), the Supreme
Court specifically defined "custodial interrogation" as
"questioning initiated by law enforcement officers after a person
has been taken into custody or otherwise deprived of his freedom
of action in any significant way." Id. at 444.  The "ultimate
inquiry" in determining whether an individual was in custody "is
simply whether there was a 'formal arrest or restraint on freedom
of movement' of the degree associated with a formal arrest."
Stansbury v. California, 511 U.S. 318, 322 (1994) (quoting
California v. Beheler, 463 U.S. 1121, 1125 ( 1983)); see also
Oregon v. Mathiason, 429 U.S. 492 (1977) ("Miranda warnings are
required only where there has been such a restriction on a
person's freedom as to render him 'in custody'").

The inquiry, thus, is not simply whether a reasonable person
in defendant's situation would have felt free to leave.  The
Second Circuit has recently instructed that this is only the
first step "because . . . not every seizure constitutes custody
for purposes of Miranda." Newton, 369 F3d at 672.  Where a
seizure of the person has taken place, the court must return to
the fundamental question "whether, in addition to not feeling
free to leave, a reasonable person would have understood his
freedom of action to have been curtailed to a degree associated
with formal arrest." Id.  "Only if the answer to this second

9

question is yes was the person 'in custody'" for purposes of

Miranda.  Id.; see also Mitchell, 966 F.2d at 98 (a court must

consider "whether a reasonable person in the defendant's position

would have understood himself to be 'subjected to restraints

comparable to those associated with a formal arrest'"; quoting

Berkemer v. McCarthy, 468 U.S. 420, 441 (1984)); United States

v. Kirsteins, 906 F.2d 919, 923 (2d Cir. 1990); United States v.

Kirsh, 54 F. 3d 1062, 1067 (2d Cir. 1995).

Under Second Circuit precedent, the primary factors in this

inquiry are whether "a reasonable person in the suspect's shoes

would have understood that his detention was not likely to be

temporary and brief," and whether he "would feel that he was

completely at the mercy of the police." Newton, 369 F.3d at 675

(citing Berkemer, 468 U.S. at 437-38).  In making this

determination, the Second Circuit has emphasized the importance

of certain considerations: (1) including whether defendant has

been handcuffed, Newton, 369 F.3d at 675-76 (defendant deemed to

be in custody primarily on the basis of handcuffing during Terry

detention); (2) the length of the detention, Cruz, 255 F.3d at

86; the number of officers confronting him, Newton, 369 F.3d at

675-76; (3) the location of the defendant, id.; the degree of

restriction on defendant's movements, Cruz, 255 F.3d at 86; and

(4) whether officers have drawn their guns.  Id.

The test used to determine whether a defendant was in

custody is an objective one.  See, e.g., Mitchell, 966 F.2d at 98

(citing <u>United States v. Hall</u>, 421 F.2d 540, 544 (2d Cir. 1969));
<u>see</u> <u>also</u> <u>Stansbury</u>, 511 U.S. at 323 (determination of custody
"depends on the objective circumstances of the interrogation, not
on the subjective views" of the officers or suspect).   For
example, "[t]he subjective, future intentions of the officers [to
arrest the defendant] do not transform an investigatory stop into
an arrest."  <u>United States v. Waltzer</u>, 682 F.2d 370, 373-74 (2d
Cir. 1982).

    Although the government must show that the proper warnings
and waivers have taken place once it is established that
statements were made in response to custodial interrogation, the
defendant bears the burden of proving custody.  <u>United States v.</u>
<u>Abbas</u>, 418 F. Supp.2d 280, 285 (W.D.N.Y. 2006) (citing <u>United</u>
<u>States v. Jorgensen</u>, 871 F.2d 725, 729 (8th Cir. 1989); <u>United</u>
<u>States v. Davis</u>, 792 F.2d 1299, 1309 (5th Cir. 1986).

    Accordingly, before an evidentiary hearing is held, a
defendant must demonstrate a disputed issue of fact justifying a
hearing.  <u>See, e.g.</u>, <u>Culotta</u>, 413 F.2d at 1345; <u>Tracy</u>, 758 F.
Supp. at 820 (to warrant an evidentiary hearing on a motion to
suppress evidence, a "defendant must set forth sufficient facts
which, if proven, would require granting of the relief
requested"), and other cases cited in the preceding section
herein.

    Here, the only affidavit to date submitted by the defendant
is one stating that he did not receive <u>Miranda</u> warnings on the

11

date that his residence was searched and that he never provided
written or oral consent to have the black duffel bag searched.
The Government does not contest that defendant was not provided
Miranda warnings at the time of the search nor do we consent that
defendant did not provide written consent.  The only issue in
dispute is defendant's response to law enforcement when asked
about the contents of the black bag.  The undisputed facts,
however, establish that a reasonable person in defendant's
circumstances at the time he made his statements  would have
understood that his freedom of action had not "been curtailed to
a degree associated with formal arrest."  Newton, 369 F.3d at
672.  In considering the factors to determine whether Sensi was
objectively free to leave, it is clear that there is no factor in
his favor.  Law enforcement never told Sensi that he was under
arrest or that he was not free to leave, he was in his own home
during the time that he made statements, he was not subjected to
any formal interrogation, there is nothing to support that the
officers used any type of coercive tactics, the law enforcement
officers did not brandish any weapons nor did they physically
restrain Sensi's movements, and Sensi voluntarily provided
responses to their questions.  An objective person in Sensi's
shoes would not "feel that he was completely at the mercy of the
police." Newton, 369 F.3d at 675.

Sensi's reliance on U.S. v. Romaszko, 253 F.3d 757, 760-61
(2d Cir. 2001), is equally unavailing.  In that case an employee

12

of the Post Office was believed to have stolen money from the
Post Office.  Investigators planned to interview her at work and
she was directed by her boss to attend the interview, she was
confronted by Postal Inspectors who immediately accused her of
stealing money, she attempted to leave at least five times and
was told that she could not.  Nothing even similar occurred here.

It remains unclear whether Sensi wishes to suppress all of
the statements that he made to law enforcement or only certain
ones. Initially, Sensi denied any knowledge of child pornography
and in fact stated that his teenage son visited his home and used
his computer.  Later on, during the search, when asked about the
contents of the black duffel bag, Sensi admitted it contained
"porn."  Subsequently, in response to the questions about the
fact that he was sweating and appeared nervous, Sensi claimed to
have diabetes. None of these statements were made pursuant to a
custodial interrogation and therefore should not be suppressed.

## II.   **The Defendant's Discovery Complaints Are Unavailing**

The defendants have moved for 1) complete list of criminal
convictions for all government witnesses including all conviction
records in "any local or municipal police arrests" and conviction
records which may exist in any other state or territory or
foreign country;" 2) a complete statement of all arrests where
any and all witnesses were apprehended; (3) list of all crimes
committed by government witnesses; (4) a complete list of all bad
acts committed by any witnesses; (5) specific consideration or

13

specific services received by any government witnesses; (6) any intervention by law enforcement agents on behalf of government witnesses; (7) all law enforcement files on any government witness; (8) all inconsistent statements made by any government witness; (9) any evidence of substance abuse or mental illness by any government witness; and 10) descriptions of negotiations by any government witness.

Their arguments raise two general points.  First, most of their arguments boil down to speculation that the Government must still have undisclosed Brady and Giglio in its files.  This sort of speculation is not enough to require the Government to turn over entire files, even for in camera review, or to establish that the Government has failed to honor its Brady and Giglio obligations.  See, e.g., United States v. Navarro, 737 F.2d 625, 631-32 (7th Cir.), cert. denied, 469 U.S. 1020 (1984)("A due process standard which is satisfied by mere speculation would convert Brady into a discovery device and impose an undue burden upon the district court"); Milikowsky, 896 F.Supp. at 1309 n.38 ("Were this court to grant the Defendants' motion, it would set an absurd precedent, allowing defendants to scour the working notes of prosecutors upon the mere accusation that the government has not sufficiently disclosed every potentially exculpatory detail"); United States v. Upton, 856 F.Supp. 727, 746 (E.D.N.Y. 1994) (noting that "the government is under no obligation to turn over that which it does not have").

14

A-119

Second, the defendants' motions define <u>Brady</u> and <u>Giglio</u> so broadly that, if granted, would convert these rules of due process and fairness into discovery devices -- which they were never intended to be.  <u>Brady</u> does not "create a broad, constitutionally required right of discovery." <u>United States v. Bagley</u>, 473 U.S. 667, 675 n.7 (1985).  Indeed, a "defendant's right to discover exculpatory evidence does not include the unsupervised right to search through the [government's] files," <u>Pennsylvania v. Ritchie</u>, 480 U.S. 39, 59 (1987), nor does it require the prosecution to deliver its entire file to the defense.  <u>United States v. Agurs</u>, 427 U.S. 97, 109 (1976).

The basic rule of <u>Brady</u> "is that the Government has a constitutional duty to disclose favorable evidence to the accused where such evidence is 'material' either to guilt or punishment." <u>Coppa</u>, 267 F.3d at 139.  This duty covers both exculpatory material and information that could be used to impeach Government witnesses.  <u>Giglio v. United States</u>, 405 U.S. 150, 154 (1972).  Evidence is material if it is of a nature "that, if suppressed, [it] would deprive the defendant of a fair trial." <u>Bagley</u>, 473 U.S. at 675.  A defendant is deprived of a fair trial only where there is a reasonable probability that the suppressed evidence could have affected the outcome of the case, <u>id</u>. at 682, or where the suppressed evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." <u>Kyles v. Whitley</u>, 514 U.S. 419, 435 (1995).

15

Brady, however, does not require the prosecution to
disclose absolutely all exculpatory and impeachment material.
Coppa, 267 F.3d at 135.  That some evidence might be merely
useful to the defense is not enough to require disclosure.  Such
a standard would "necessarily encompass incriminating evidence as
well as exculpatory evidence, since knowledge of the prosecutor's
entire case would always be useful in planning the defense."
Agurs, 427 U.S. at 112 n.20.  As a result, the Supreme Court has
held that Brady does not require an open file policy.  Kyles, 514
U.S. at 437 (Brady "requires less of the prosecution than the ABA
Standards for Criminal Justice, which call generally for
prosecutorial disclosures of any evidence tending to exculpate or
mitigate").

As a matter of practice in this case, however, the
Government has not been relying on the materiality standard to
withhold evidence that is exculpatory or that reasonably could be
used to impeach its witnesses.  See Kyles, 514 U.S. at 439 (a
prosecutor "anxious about tacking too close to the wind will
disclose a favorable piece of evidence").  As will be shown
herein, the Government has discharged its disclosure obligations
with respect to each of the categories of documents identified in
the defendant's motions.

The defendant has not stated what, if any defense, they
expect to raise at trial.  Therefore, without knowing what, if
any, defense, the Government has turned over any documents that

16

it believes at this stage may constitute Brady.  Regardless of
the above, the Government has made available all of this kind of
information in its possession.  The Government has made available
any and all evidence that it deems material to its defense; all
Brady and Giglio information currently in its possession,
including the documents from the State of Florida's files; the
defendant has not made any oral statements to federal agents that
the Government is aware of; the Government only worked with the
Florida authorities and does not have constructive possession of
any material that any other federal, state or local agency may
have; the government has not requested any documents nor has it
received any materials from any other state or local agency; the
Government will disclose updated rap sheets for any witnesses as
well as for the defendant within the next two weeks of any and
all witnesses it may call at trial; we will also provide a report
of any witness or victim assistance in this case; no mental or
physical examinations were conducted; the Government has already
provided an initial witness list and will continue to update that
list as our investigation continues; we have turned over or made
available any documents reflecting Brady and Giglio materials
relating to potential government witnesses and will continue to
do so; we have provided copies of the Florida search warrants and
the accompanying affidavit; and we have made available the
evidence seized as well as a log of the material that we have
obtained from Florida State authorities.

Case 3:08-cr-00253-WWE   Document 86   Filed 05/27/10   Page 18 of 23

The Government does not understand the request for information related to Guideline calculations but we have made available the evidence in this case.

Finally, with respect to Jencks Act material, any motion for Jenks Act material is premature.  The Jencks Act provides for disclosure of witness statements only <u>after</u> the witness has testified.  18 U.S.C. 3500(a); <u>United States v. Percevault</u>, 490 F.2d 126, 132 (2d Cir. 1974)(court cannot order earlier disclosure than that provided in the Jencks Act).

The Government is willing to invite defense counsel to discuss arrangements by which both parties would comply with their respective disclosure obligations on an early basis that is fair to both sides.  At this stage, the Government is not interested in making unilateral concessions.  If the defense wants to engage in a fair and even-handed discussion of this matter, the Government invites defense counsel to meet to discuss reciprocal discovery exchange.

Finally, with respect to any 404(b) issues, the Government will identify in detail by next Friday any 404(b) evidence it wishes to raise during its case-in-chief.  The Government respectfully requests that the Court make any 404(b) determinations at trial because certain doors may open based on Sensi's defenses.

18

III. **Defendant Has Not Made a Showing to Warrant an Evidentiary Hearing**

Prior to filing these motions, the defendant had not submitted any affidavit in support of his motion or provided any details in support of his claim. Defendant has now come forward with an affidavit stating that he was never provided with <u>Miranda</u> warnings on the day of the search, that he did not give written consent or oral consent to search the black bag containing home-made videos of child pornography, and that he did not provide a key to investigators for the locked bag.  The only contested factual issue is Sensi's claim that he did not give oral consent to search the bag.   There is no other contested issue.  The government does not claim to have provided Sensi with his Miranda rights nor do we claim that he gave written consent to search the black bag and we have stated in our February 2010 memorandum that the key for the black bag was obtained from Sensi's employer. The issue of Sensi's consent is only relevant if this Court were to find that law enforcement did not have the authority to search and seize any and all child pornography in Sensi's residence.  If this Court were to find that the contents of the black bag was clearly within the four corners of the search warrant, the issue of Sensi's consent does not need to be reached.  For purposes of trial, the government will seek to introduce the statements and Sensi's counsel can cross-examine the officer on this point and

indeed Sensi himself can take the stand, if he wishes, to dispute

that fact.  Officer Broughton has been deposed by Sensi's former

counsel and has stated under oath that he directly asked Sensi

about the contents of the black bag and has testified about

Sensi's statements.

IV.   **The Statute of Limitations on the 2001 Conduct has Not Expired**

While Sensi continues to try to argue for the five-year

general statute of limitations, it is clear that the statute of

limitations applicable to the instant offenses is 18 U.S.C. §

3299, which states:

> Notwithstanding any other law, an indictment may be
> found or an information instituted at any time without
> limitation for any offense under section 1201 involving
> a minor victim, and for any felony under chapter 109A,
> 110 (except for section 2257 and 2257A), or 117, or
> section 1591.

Section 3299 went into effect on July 27, 2006 as part of the

Adam Walsh Child Protection and Safety Act of 2006, Pub. L. No.

109-248, § 211, 120 Stat. 587 (July 27, 2006) ("Adam Walsh

Act").  The charges relating to production of child pornography

all are part of chapter 110. As stated in the Government's

February 2010 brief, while an expired statute of limitation

cannot be revived by statute, statutory changes to a statutes of

limitations can apply to crimes that have already taken place so

long as the original statute of limitation was still running.

*Stogner v. California*, 539 U.S. 607, 618 (2003) (if prior

limitations period has not expired, enlargement of that period does not violate ex post facto clause).  Therefore, Section 3299 applies to the charges so long as the statute of limitations was still running on July 27, 2006, the date the statute was created. Sensi argues that the conduct relating to M.V.#1 occurred only in April 2001 and therefore expired prior the passage of section 3299 in July 2006.  Sensi fails to recognize that in April 2003 when the conduct with respect to M.V. #1 was still within the statute of limitations, the statute of limitations for child sex offenses was still running.  In April 2003, the statute of limitations was changes to permit prosecutions until the child reached the age of 25 which M.V.#1 had not and still has not. The statute was then amended again in 2006 to provide for no statute of limitations.

To the extent, Sensi argues that the charge relating to M.V.#1 is not a child sex offense, his claim is simply disingenuous.  If this is not a child sex offense, it is unclear what is.  Moreover, as the statute of limitation instructs, any chapter 110 offense is included.  The offense of production of child pornography is in chapter 110.

The government relies on all of the arguments made in its earlier response on this issue.

21

A-126

**V.**     **CONCLUSION**

For the foregoing reasons, defendant's motion to suppress and to dismiss  should be denied.

Respectfully submitted,

DAVID B. FEIN
UNITED STATES ATTORNEY

/S/
KRISHNA R. PATEL
ASSISTANT U.S. ATTORNEY
United States Attorney's Office
915 Lafayette Boulevard
Bridgeport, Connecticut 06604
(203)696-3000
Federal Bar No. ct24433

22

### CERTIFICATE OF SERVICE

This is to certify that on May 27, 2010, a copy of the
foregoing was filed electronically and served by mail on anyone
unable to accept electronic filing.  Notice of this filing will
be sent by e-mail to all parties by operation of the Court's
electronic filing system or by mail to anyone unable to accept
electronic filing as indicated on the Notice of Electronic
Filing.  Parties may access this filing through the Court's
CM/ECF System.

_____/S/_____
Krishna R. Patel

1

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA,      .      Case No. 3:08-CR-00253
                               .      (WWE)
              Plaintiff,       .
                               .      Hartford, Connecticut
      v.                       .      June 8, 2010
                               .
EDGARDO SENSI,                 .
                               .
              Defendant.       .
. . . . . . . . . . . . . . .

SUPPRESSION HEARING
BEFORE THE HONORABLE WARREN W. EGINTON
SENIOR UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:        Office of the U.S. Attorney
                          By:  KRISHNA PATEL, AUSA
                               RICHARD SCHECHTER, AUSA
                          915 Lafayette Boulevard
                          Bridgeport, CT 06604

For the Defendant:        Law Offices
                          By:  ROBERT M. BERKE, ESQ.
                          640 Clinton Avenue
                          Bridgeport, CT 06605

Electronic Court
Recorder Operator:        MS. SANDI BALDWIN

Transcriptionist:         MS. SUZANNE BENOIT

Proceedings recorded by electronic sound recording.
Transcript prepared by transcription service.
_____

BOWLES REPORTING SERVICE
P.O. BOX 607
GALES FERRY, CONNECTICUT 06335
(860) 464-1083

A-129

2

```
 1            (Proceedings commenced at 11:05 a.m.)

 2            (Pause; awaiting arrival of Defendant.)

 3            THE COURT:  Well, while we're waiting for the

 4    Defendant we might check out one thing here.  I'm

 5    supposed to have a transcript of the officer's

 6    deposition.  I haven't found that.  You might check

 7    that out with Greg to see if we're supposed to have

 8    that in our file.  Officer Broughton apparently gave a

 9    deposition I guess.

10            MS. PATEL:  Your Honor, I believe that

11    Attorney Berke submitted that to the Court.

12            (Pause; Defendant present.)

13            THE COURT:  Do we have a copy of it?

14            MR. BERKE: Your Honor, before we begin --

15    good morning, sir, Robert Berke for Mr. Sensi.  I had

16    spoke to one of your clerks in regards to a very minor

17    scheduling matter.  I have a very brief matter before

18    Judge Garfinkel, I can't imagine taking more than 20

19    minutes.  It begins at about 1:15.  I just wanted to

20    alert the Court before we begin today.

21            THE COURT:  Wait a minute.  What you better

22    do I guess is speak right into that mic so I can really

23    hear you clearly.  There has been some conversation up

24    here that --

25            MR. BERKE:  This any better?
```

3

1          THE COURT:  Yeah, that's better.  Go ahead.

2          MR. BERKE:  Before we begin today, your

3    Honor, I have a very short scheduling conflict at about

4    1:15.

5          THE COURT:  Oh, I know about that, with Judge

6    Hall.

7          MR. BERKE:  Judge Garfinkel I think is

8    covering it, the hearing.  It shouldn't take very long

9    but I just wanted to bring it to the Court's attention

10   before we begin this morning.

11         THE COURT:  Well, I know about that.  It's

12   during the lunch hour, isn't it?

13         MR. BERKE:  I guess it all depends upon when

14   lunch hour is.

15         THE COURT: 1:00 o'clock.

16         MR. BERKE:  That's about --- I think that's

17   about the time.

18         THE COURT:  Yeah, I think it's before Judge

19   Garfinkel, isn't it?

20         MR. BERKE:  Yes, sir.

21         THE COURT:  Yeah, okay, that's fine.  Well, I

22   knew about that.

23         So we think we have -- are we supposed to

24   have that deposition?  I gather Broughton is not here,

25   I assume.

4

1          MS. PATEL:  Your Honor, I have my copy.  If

2     it would be possible I could take it over to the -- to

3     your law clerk, but I need my copy back.  I understood

4     Mr. Berke filed it under seal with the Clerk's office.

5          THE COURT:  All right.

6          MR. BERKE:  Unfortunately, sir, I don't have,

7     I don't have a clean copy to provide the court.  Mine

8     are marked.

9          THE COURT:  Well, if it becomes important for

10    me to know what he said, and I suppose it will, we're

11    going to need a copy of it eventually.

12         Also I have some questions.  You all sit

13    down.  I had some questions about the affidavits.  I

14    have the affidavit that was filed by Broughton after

15    the examination of the materials, and he's got an

16    Exhibit A which is quite long.  It covers 14 pages.

17    No, actually it covers -- well, maybe it's not -- yeah,

18    it is page 10, 10 pages I guess of his affidavit, and

19    that's attached to the search warrant.  The search

20    warrant seems to have been signed by a Florida state

21    judge other than the one with the affidavit -- the

22    affidavit was (unintelligible) to Elizabeth Metzger

23    apparently in judge's circuit court.  I can't read the

24    signature of the judge who signed it.  I guess it's --

25         MS. PATEL:  You Honor, the officer who is

5

1    present today has indicated it was the same judge.

2            THE COURT:  The same judge?

3            UNIDENTIFIED SPEAKER:  Yep.

4            MS. PATEL:  I'm getting a yes on that.

5            THE COURT:  Yeah, it looks like the 9th day

6    is the signature of Elizabeth Metzger is pretty clear

7    on the affidavit for the search warrant, but I can't

8    read the signature on the circuit judge who actually

9    issued the warrant.  But maybe I suppose that's

10   irrelevant anyway.

11           The search warrant appears as Defense claims

12   to be entirely dealing with computer material except

13   for the first paragraph of it, so I assume we're going

14   to be concentrating on the first paragraph of it.

15           The two memoranda filed by the Government

16   seems to indicate the issue before me is this black

17   duffle bag.  No one had claimed in the February 16th

18   memorandum at page 2 that Sensi consented to the

19   seizure of the black duffle bag, and then on page 6

20   they talk about actually seizing the bag.

21           In the later Government memorandum it's not

22   that clear as to what the position of the Government

23   is, but it seems to be an alternative position that

24   either there was consent or it was covered by the

25   search warrant.  I think there's a typo on page 12 of

6

1   the Government's memorandum dated May 27th, and I think
2   the typo, if corrected, would make it read the
3   Government does not contest that Defendant was not
4   provided Miranda warnings at the time of the search.
5   Nor do we, I think that should be, nor do we contest
6   that Defendant did not provide written consent.
7   Otherwise that sentence makes no sense.
8          MS. PATEL:  That is correct, your Honor.
9          THE COURT:  So the Government's position
10  seems to be twofold here, and I guess so that the
11  Nelson case, it would be smart for me to hold a
12  suppression hearing on the issues, which I assume
13  involve the black duffle bag.  If I'm wrong about that,
14  counsel can tell me what we're going to be dealing with
15  other than the black duffle bag and its contents.
16          The Giglio, Brady and Jencks Act stuff, I
17  really haven't had any problem in this district in a
18  long, long time with Government compliance with Giglio
19  and Brady and Jencks Act, so I've really, never really
20  been concerned about that, and I doubt that I should be
21  concerned about it here because the Government usually
22  does recognize its obligations and the risks that it
23  takes if it turns out later that there was failure to
24  comply with that.  So I'm going to assume that there's
25  been compliance unless counsel bring my attention to

7

1    something I'm supposed to rule on.  Same thing would be

2    404b material.

3             So I intend to limit it, unless I'm told

4    otherwise, to the issues of this black duffle bag.

5    Anything else I'm supposed to be considering besides

6    that?

7             MS. PATEL:  Your Honor, I've actually had an

8    opportunity to speak with Attorney Berke this morning,

9    and I think that's right.  I think my understanding

10   from Attorney Berke, and I'll let him speak on the

11   discovery, is that it's moot.  The issues are moot, and

12   certainly your Honor has now ruled on the statute of

13   limitations, and so that is no longer an issue.

14            THE COURT:  On the statute of limitations I

15   issued a ruling --

16            MS. PATEL:  I saw that.

17            THE COURT:  Yeah, I think it's out, isn't it?

18            MS. PATEL:  Yes.

19            THE COURT:  Yes.

20            MS. PATEL:  And so we're down to the motions

21   to suppress the physical evidence during the search and

22   the motions to suppress the statements based on the

23   fact that the Defendant is -- appears to be alleging a

24   custodial interrogation.

25            In speaking with Mr. Berke he has adopted

8

1    Attorney Truebner's motion on suppressing the physical

2    evidence, and in our response to that motion where no

3    affidavit had been filed, we argued that it's covered

4    by the four corners of the warrant.  We now stand also

5    behind the good faith belief that the law enforcement

6    went in there certainly under a good faith belief that

7    they had a valid search warrant.

8          If your Honor finds that the black bag is

9    covered under the four corners of the warrant, I don't

10   think we actually need an evidentiary hearing.  I don't

11   think there's a basis for an evidentiary hearing on

12   that issue.  We then just turn to whether or not the

13   statements were made pursuant to some type of custodial

14   interrogation.  I think that's the --

15         THE COURT:  Well, I suppose -- I don't find

16   and I don't really think I would find, based upon the

17   evidence here, that there is a custodial situation.

18   The situation appears to be non-custodial at that

19   point.  They showed him the warrant, they showed him

20   what they were there for, and I don't get any sense

21   that he was under a custodial situation at that time.

22   But then the question arises, and I think Nelson case

23   makes rather clear, that I better tie up all the loose

24   ends I can tie up because if the Court were to disagree

25   with me, the Appellate Court, on my finding that the

9

1    paragraph one, I assume we're only talking about

2    paragraph one, that that covers the four corners of the

3    search warrant, then obviously we'd have to go back and

4    reverse everything if the Court of Appeals were to tell

5    me I was wrong in that.

6             So I suppose we ought to go into the other

7    issues as backup issues, whether if it was not covered

8    by the search warrant specifically, the question is

9    whether he gave consent.  And that seems to me to be an

10   issue of credibility, I suppose, and I'm wondering if

11   I'm permitted to draw any inferences based upon the

12   fact that I suppose the Defendant will testify, because

13   defendants usually do testify in suppression hearings

14   since they're not eligible to be used in the course of

15   the trial.

16            The Defense will have a cross examination

17   situation, whereas the Broughton, I guess we'll note

18   I'll only have Broughton's deposition.  Am I wrong

19   about that?

20       (Pause.)

21            MS. PATEL:  Your honor, with respect to your

22   first point, if the Court were to find that the law

23   enforcement's test -- law enforcement officer's

24   testimony is credible and had not been rebutted, the

25   Court doesn't necessarily have to make an adverse

10

1    credibility finding against the Defendant, can

2    certainly make a finding that there's no rebuttable

3    evidence, and therefore the law enforcement's testimony

4    can stand.  But I understand that the Court would like

5    to hear from both sides in order to make an assessment.

6    We're certainly more than willing to put up the law

7    enforcement officer.

8         We are happy to stand on the deposition

9    testimony if the Court thinks that is sufficient.  We

10   also --

11        THE COURT:  Well, I have things to question,

12   whether the Court thinks it's sufficient, the question

13   is what presumptions apply and the Court would have to

14   look into that and I assume there would be briefing on

15   that.  As to whether there is a presumption because of

16   the presence of the Defendant and the Defendant being

17   subject to examination before me and I can judge

18   credibility, whereas as I am not going to have the

19   officer here to judge his credibility on the basis of

20   demeanor before me or anything like that.

21        So that's a question as to how I'll go about

22   ruling and what evidence and what presumptions I use in

23   making the ruling.  And that may be important, so we

24   have to brief that probably.

25        MS. PATEL:  Well, it's certainly our burden,

11

1    your Honor, to show consent, and so to that end it's

2    clearly the Government's burden to show that there was

3    consent.  And so we are happy to put up the law

4    enforcement officer's testimony to support that burden.

5    The Defendant doesn't have that burden and he can

6    certainly choose not to testify or he can testify to --

7    even rebut the law enforcement test -- the officer's

8    testimony.

9         THE COURT:  Well, I assume he would in a

10   suppression hearing.  What do you intend to do about

11   that, Mr. Berke?  Is he going to testify?

12        MR. BERKE:  I believe he will, sir.  And, sir,

13   if it wasn't clear, I don't know if this Court is

14   aware, the Florida officer is present today and it was

15   the understanding of the parties that he, if we would

16   have an evidentiary hearing, would testify at that

17   hearing.  I don't know if the Court was aware of that.

18        THE COURT:  No, I wasn't aware of that.  I

19   thought that the reason they were giving me Broughton's

20   deposition was because he wasn't available.  Is he in

21   the courtroom?

22        MS. PATEL:  Yes, he is, your Honor.

23        THE COURT:  Oh, fine.  All right, then we will

24   have a full evidentiary hearing.  I can stop worrying

25   about the presumptions.

A-139

12

```
1            All right.  Well, then I think the Government
2    can go ahead and put him on the stand.
3            MS. PATEL:  All right.  Your Honor, at this
4    time the Government calls Officer Brian Broughton to
5    the stand.
6        BRIAN BROUGHTON, PLAINTIFF'S WITNESS, SWORN
7            THE CLERK:  Would you please be seated.
8            State your name, spell your last name, and
9    your city and state for the record.
10           THE WITNESS:  My name is Det. Brian Broughton,
11   B-R-O-U-G-H-T-O-N.  I work for the Martin County
12   Sheriff's Office at 800 Southeast Monterey Road in
13   Stuart, Florida 34004.
14                   DIRECT EXAMINATION
15   BY MS. PATEL:
16   Q.   Good morning, Officer Broughton.
17   A.   Good morning.
18           MS. PATEL:  Your Honor, before I begin, just
19   so the record is clear, the Government continues to
20   maintain, obviously, that all of the search that was
21   conducted in this case was conducted pursuant to a
22   lawfully executed search warrant.  For the backup
23   argument on consent, at this time I'm going to limit
24   Officer Broughton's testimony to the actual search and
25   the statements that were made on the issue of consent.
```

13

```
 1              THE COURT:  Well, I think you've properly
 2   presented the situation.  I agree with your
 3   presentation of it.  Go ahead.
 4              MS. PATEL:  Okay.  Thank you.
 5   BY MS. PATEL:
 6   Q.   Officer Broughton, could you tell us whether
 7   you're employed, sir?
 8   A.   Yes, I'm a detective in the Crimes Against
 9   Children Division of the Martin County.Sheriff's
10   Office.
11   Q.   And could you just briefly describe your duties
12   and responsibilities?
13   A.   For the past 14 years being a detective in that
14   division, it's my duties and responsibilities to
15   investigate crimes involving the physical and sexual
16   abuse of children, as well as the exploitation of
17   children on the internet.
18   Q.   And approximately --
19              THE COURT: One thing we want to do here,
20   Frank, maybe you can do it.  Will you get rid of this
21   thing?  Because I can see it on the big screen.
22   Thanks.
23              Okay.  Go right ahead.
24   BY MS. PATEL:
25   Q.   And approximately how long have you been working
```

1   in the area of the exploitation of children?

2   A.   Approximately 14 years.  I've been 18, a little

3   over 18 years as an officer.

4   Q.   And during the course of your duties and

5   responsibilities as an officer in this area,

6   approximately how many warrants have you obtained,

7   search warrants have you obtained?

8   A.   Probably close to a hundred.

9   Q.   And approximately how many investigations

10  involving the exploitation of children have you worked

11  on?

12  A.   Several hundred.

13  Q.   And did there come a time when you began an

14  investigation that led you to a Defendant named Edgardo

15  Sensi?

16  A.   Yes.

17  Q.   And approximately when was that, sir?

18  A.   August 27th, 2008.

19  Q.   And can you very just briefly describe what it is

20  that you were doing that led you to Edgardo Sensi?

21  A.   Sure.  That particular time I was attempting to

22  identify individuals on the internet that were

23  possessing and/or distributing child pornography files.

24  In the course of those investigations what I attempt to

25  do is identify a computer and also attempt to download

1   images from a computer, and I try to locate those

2   individuals and identify those individuals who are

3   possessing child pornography.

4   Q.    Okay.  And during that investigation, did you come

5   across an IP address that led you to Edgardo Sensi's

6   residence?

7   A.    Yes.

8   Q.    And for the purposes of the record and your

9   testimony, could you just explain what an IP address

10  is?

11  A.    IP address, IP stands for internet protocol, and

12  basically in layman's terms it's your phone number to

13  the internet.  An IP address is assigned by your

14  internet provider.  In this case it was Comcast, but it

15  could be Bell South or I think Cablevision is up here,

16  it has internet access.  But your internet company will

17  assign you an IP address, and what you do is you can

18  then access, they give you the ability to access the

19  internet from this IP address.  And, like I said, it's

20  assigned by your internet provider.

21       And so in the course of doing these

22  investigations, once we identify a computer, the IP

23  address, we then subpoena that internet provider for a

24  particular date and time that I was conducting that

25  investigation to see who they assigned or who that

16

1   subscriber was from the internet provider, who has that

2   particular IP.

3   Q.    Okay.  And in this particular case, once you

4   located the IP address, did you in fact issue a

5   subpoena to determine who the subscriber was?

6   A.    Yes, I did.

7   Q.    And who was the subscriber?

8   A.    The internet provider was Comcast and they

9   indicated that the subscriber that I was investigating

10  at that particular time was Edgardo Sensi.

11  Q.    And did they provide you also with an address?

12  A.    Yes.

13  Q.    As you sit here, can you recall that address?

14  A.    I believe it's 2750 Windemere Drive in Jensen

15  Beach.

16  Q.    Okay.  And based on the information that you

17  obtained during the course of your investigation, as

18  well as from all of the subpoena information, did you

19  obtain a search warrant?

20  A.    Yes, I did.

21  Q.    And how did you go about obtaining the search

22  warrant?

23  A.    Based on the information that I had obtained from

24  the internet provider, as well as files that I had

25  previously identified as being child pornography, I put

17

1   together a probable cause affidavit, search warrant,

2   and presented it to Judge Metzger for her review after

3   it was reviewed by a state attorney.  And then she

4   issued, I believe on the 9th of September, she approved

5   the search warrant and the search warrant was then

6   executed the next following day, the following night.

7           THE COURT:  And that actually is her signature

8   but I couldn't read it at the bottom of the search

9   warrant.

10          THE WITNESS:  I believe what she did, she

11  printed out her name and then she just scribbled it on

12  the last page, but it was definitely her.  I was

13  present when she signed it.

14          THE COURT:  Okay.  Thank you.

15          MS. PATEL:  Your Honor, if I may approach I'd

16  like to show Officer Broughton Government's Exhibit 1.

17          THE COURT:  Yeah, he's your witness, so just

18  go ahead and approach him any time you want.

19          MS. PATEL:  Okay.

20      (Pause.)

21  BY MS. PATEL:

22  Q.   Officer Broughton, I just handed you what's been

23  pre-marked as Government's Exhibit 1.  I'm going to ask

24  whether you can identify what that document is.

25  A.   Yes.  That's my search warrant and my affidavit

18

1    for a search warrant.

2    Q.   Okay.

3         MS. PATEL:   Your Honor, at this time the

4    Government would move Government's Exhibit 1 into

5    evidence.

6         MR. BERKE:   No objection for the purpose of

7    this hearing, your Honor.

8    BY MS. PATEL:

9    Q.   I'm going to go ahead and put it up on the ELMO in

10   front of you, and I don't know if you have a screen.

11   Can you see it?

12   A.   I can see.

13   Q.   Okay.  And where I'm pointing to for the purposes

14   of the record, is that the address, 2750 Northwest

15   Windemere Drive, Jensen Beach, Florida?

16   A.   Yes.

17   Q.   Okay.  And this search warrant includes your

18   affidavit; is that correct?

19   A.   That is correct.

20   Q.   Okay.  On the second page of the affidavit it

21   talks about the property to be seized, and on the first

22   line, sir, could you read -- can you read that?

23   A.   Yes, the first line?  After property to be seized?

24   Q.   Yes.

25   A.   Number 1, images, movies or visual depictions of

19

1    sexual conduct or sexual performance by a child or

2    children in violation of Florida State Statue 827-071,

3    to include but not limited to the files titled

4    vickywillingbedrapePTAC11YO.mpg and kidsbjunderagePTAC

5    hussyfankingpassvickylordoftheringmoscowliloplanet

6    nablockedstpetersburgraygold80shivid.mpg (phonetic).

7    Q.   The two files that you just read there, can you

8    tell us what they are?

9    A.   The two files that were specifically named were

10   files that I had downloaded previously and determined

11   those to be child pornography, and they were also files

12   that were associated with the IP address belonging to

13   Mr. Edgardo Sensi.

14   Q.   Okay.  And so why did you include these in the

15   affidavit?

16   A.   Because those were files that I had determined

17   that were associated with the IP address that came back

18   to Mr. Edgardo Sensi, and I knew for a fact that those

19   files did contain or depict child pornography.

20   Q.   Okay.  And are those files images?  Are they

21   videos?  Can you describe for us what they are?

22   A.   Yes.  They are video files and if I can refer to a

23   description, I think I have that in my affidavit.

24         MS. PATEL:  With your Honor's permission, Mr.

25   Broughton is going to refer to his file.

1   A.   The first video titled vickywillingbedrape, this

2   is a 5 minute and 17 second video file depicting a nude

3   child, most likely under the age of 12 years old.  She

4   is observed spreading her vagina and anus.  Later in

5   the video clip in the (unintelligible) is observed

6   sodomizing the female child with his penis.

7   Q.   And the second video?

8   A.   The video file starting with kidsbj is also a

9   video file, it's a 44-second video file also of a child

10  under the age of 12, which is performing oral sex on an

11  adult male who is seen placing his penis between the

12  legs of a stuffed teddy bear.  Like I said, the child

13  appears to be under the age of 12.

14  Q.   So is it fair to say these are both videotapes of

15  child pornography of real children?

16  A.   In the video files, yes.

17  Q.   Video files.  Okay.  And so these were two of the

18  examples of the type of evidence you were looking for?

19  A.   Yes.

20  Q.   All right.  And –

21           THE COURT:  That's why you have the language

22  in there, not limited to those titles?

23           THE WITNESS:  That is correct.

24  BY MS. PATEL:

25  Q.   And, sir, given your -- was it 18 years of

Case 12-565, Document 26, 10/05/2012, 740168, Page152 of 301

1   experience?

2   A.    Yes.

3   Q.    Can you just explain, when it says images, movies

4   or visual depictions, what can that include?

5   A.    A visual depiction is obviously, my understanding,

6   anything including, but not limited to, pictures,

7   printed out pictures, digital files such as this movie

8   file, digital picture files, videotapes, anything that

9   can hold something visually that can depict either the

10  sexual conduct of a child or child posed in a lewd and

11  lascivious manner.

12             THE COURT:  Okay.  Would it help me to see the

13  Florida Statute 827-071 to see what that definition is

14  of the statute?

15             THE WITNESS:  That's our statute for the

16  possession of child pornography.

17             THE COURT:  Okay.  Then it wouldn't give me

18  any details that would help interpret the language

19  preceding that.

20             THE WITNESS:  It may define what child

21  pornography is in Florida State Statute, but basically

22  in Florida it's any depiction of a child under the age

23  of 18 engaged in sexual activity or posed in a

24  lascivious manner.

25             THE COURT:  Okay.  Well, Ms. Patel, if you

```
 1    think it would be helpful for me to see the statute,
 2    that would be fine.  I leave that up to you.
 3                MS. PATEL:  Okay.
 4    BY MS. PATEL:
 5    Q.   All right.  And then if I could actually draw your
 6    attention to paragraph number 4, computer storage media
 7    and digital content.
 8    A.   Yes.
 9    Q.   To include but not limited to floppy discs, hard
10    drives, tapes, DVD disks, CD Rom disks or other
11    magnetic optical or mechanical storage which can be
12    accessed by computers to store or retrieve data or
13    images of child pornography.
14    A.   Yes.
15    Q.   Okay.  In your training and experience, Officer
16    Broughton, is it possible to take a Hi8 videotape and
17    attach it and upload it onto a computer?
18    A.   Yes.
19    Q.   Okay.  For the purposes of today's hearing, could
20    you just explain what a Hi8 videotape is?
21    A.   Physically it looks like a VCR tape but much
22    smaller, and it goes into a video camera, usually a
23    hand held, a little smaller than my fist, and it can
24    connect to computers usually via either USB or a
25    FireWire type cable that can connect to a computer that
```

Case 12-565, Document 26, 10/05/2012, 740168, Page154 of 301

23

1    you can then upload any content that you have recorded

2    on that videotape using the camera to the computer.

3    You can also use it on occasions as a webcam, so you

4    can also use that as a webcam when you're using the

5    computer, you and also -- so it also.

6    Q.    So you could actually attach a video camera to a

7    computer and utilize it as a webcam?

8    A.    Yes.

9    Q.    Is that correct?  Okay.  And you can also upload

10   the material from an H8 tape onto the computer.

11   A.    Correct.

12   Q.    Okay.  And in reviewing your affidavit, sir, were

13   you also requesting the ability to search for and seize

14   documents?

15   A.    Yes.

16   Q.    Okay.  And drawing your attention to paragraphs 9

17   and 11, why is it that in these types of cases you

18   would be searching for documents in a child pornography

19   investigation?

20   A.    Many times we want to rule out -- well, we want to

21   find the person responsible for the possession of child

22   pornography, but we also want to rule out individuals,

23   and by doing so we'd like to show ownership of not only

24   computers but also other items that would possess child

25   pornography.  We want to show ownership and kind of

24

1    connect the contraband to a particular person, and in

2    doing so we would collect, like you said, documents or

3    writings or something like that would maybe identify a

4    certain contraband as belonging to some person.

5             THE COURT:  Yeah, your 9 is echoed in 10 and

6    11 also on ownership issues.

7             THE WITNESS:  Yes, sir.

8    BY MS. PATEL:

9    Q.   And just finally on the issue of the search

10   warrant, is it -- you've indicated you've actually

11   executed many search warrants in this area; is that

12   correct?

13   A.   That's correct.

14   Q.   And in doing that, how common is it for somebody

15   who downloads child pornography to also maintain

16   various collections of other types of child

17   pornography?

18   A.   Can you rephrase that?

19   Q.   When you actually execute a search warrant, how

20   common is it for any individual who may be downloading

21   child pornography to be keeping separate collections of

22   child pornography?

23   A.   It's very common for individuals to not only

24   possess digital images or movies of child pornography

25   on the computer that they used to download, but also to

25

1   back up that collection on different types of media.

2   Q.   With respect to the search warrant, you indicated

3   then you -- your affidavit is attached; is that

4   correct?

5   A.   That is correct.

6   Q.   And that a judge made a probable cause finding?

7   A.   Yes, she did.

8   Q.   And you had a search warrant.

9   A.   Yes.

10  Q.   Okay.  Now, with the search warrant in hand, does

11  there come a time when you actually execute this

12  warrant?

13  A.   Yes.

14  Q.   And when was that?

15  A.   The morning of September 10th, approximately 8:30,

16  8:45.

17  Q.   Right.  In the morning?

18  A.   Yes.

19  Q.   And so approximately 8:45 do you go to the

20  Defendant's address?

21  A.   Yes, I do.

22  Q.   All right.  And tell us what happens.

23  A.   Basically we conduct these type of investigations

24  low key, and so it was me and my partner, Pat

25  Colasuonno, C-O-L-A-S-U-O-N-N-O.  We were next door to

26

1   Mr. Sensi's residence, it's an abandoned house, and we

2   were waiting there in the driveway of that residence

3   for any activity at Mr. Sensi's house.  There was a

4   vehicle there and we were assuming that he was going to

5   work in the morning.

6        We saw the door open, he briefly came out and went

7   back in the house until we knew -- we figured he was

8   leaving for work or getting ready for work.  And so we

9   then walked over to the house and met Mr. Sensi at the

10  front door.

11  Q.   And did --

12          THE COURT:  Now, when you say we, there were

13  two of you, you and Pat, but there was a third officer

14  actually?

15          THE WITNESS:  Later, once the execution of the

16  search warrant was conducted, we invited a road patrol

17  deputy who was in uniform to assist with safety.

18          THE COURT:  Okay.

19  BY MS. PATEL:

20  Q.   So the third officer, why was he there?

21  A.   After we eventually executed the search warrant,

22  he was there because me and Pat's solo job was to

23  collect and identify evidence of child pornography.  He

24  was there to pretty much for a safety reason, to watch

25  our back and also to protect and make sure Mr. Sensi

27

1    didn't hurt himself or hurt us.

2    Q.    Okay.  And so did the third officer in any way

3    participate in the search?

4    A.    No.

5    Q.    All right.  So going back to you and -- I

6    apologize, Officer Calli --

7    A.    Pat Colasuonno.

8    Q.    Colasuonno.  Can you tell us how you were dressed?

9    A.    We usually just dress in slacks and a collared

10   shirt.  We have a badge that's on our belt and a

11   sidearm that's visible on our side.

12   Q.    And so did you knock on the door?  Did you ring a

13   door bell?

14   A.    I believe knocked and he came to the door

15   immediately.

16   Q.    Okay.  And what, if anything, did you say to him

17   at that time?

18   A.    At first we told him that we had an investigation,

19   a computer investigation.  We asked some preliminary

20   questions in the beginning; do you have a computer; do

21   you have internet access, particularly Comcast.  We

22   asked if he had any file sharing software on his

23   computer specifically named LimeWire.  And he had

24   indicated to me that he's not sure what's on his

25   computer.  He has lots of programs on his computer and

28

1    he wasn't sure.  I told him that this investigation

2    involved child pornography, and he said he didn't know

3    anything about child pornography.  And I said, well,

4    due to the nature of the investigation we have a search

5    warrant.

6         One specific thing he did mention once I mentioned

7    I had a search warrant, he wanted to see the address on

8    the search warrant to make sure it was the right

9    address.

10   Q.   And did you in fact let him see the address?

11   A.   I actually read the search warrant to him and he

12   did get a copy of it.

13   Q.   So you read the entire search warrant?

14   A.   Yes.

15   Q.   Why did you do that?

16   A.   It's just current protocol that we read the search

17   warrant.

18   Q.   Okay.  So you read every paragraph of the search

19   warrant?

20   A.   Yes.

21   Q.   To him.  At the front door.

22   A.   Yes.

23   Q.   And you also handed him a copy of it.

24   A.   And he got a copy when we left.

25   Q.   Okay.  And what, if anything, happened next?

Case 12-565, Document 26, 10/05/2012, 740168, Page160 of 301

A-156

29

1   A.   And then basically he invited us in, he indicated

2   where his computer was, his office area.  When you

3   first walk into the house it's the first room to the

4   left.  There's another office area.  He indicated that

5   was his computer.

6        Then shortly after that or at the same time, I

7   believe, Officer Lamb had arrived at the house and was

8   there for safety reasons.  We then started collecting,

9   photographing and then collecting the evidence.

10  Q.   Okay.  I'm going to stop you right there.  I'm

11  going to show you what's been marked, just for the

12  record, Government's Exhibits 2 to 11 and ask whether

13  you can identify them.

14          THE COURT:  And that's in the affidavit he

15  (unintelligible) showing the contents?

16          MS. PATEL:  They are photos of the search

17  warrant, your Honor, and I have an extra copy if your

18  Honor would like.  May I approach?

19          THE COURT:  Yes.  And this is -- well, okay.

20  BY MS. PATEL:

21  Q.   Sir, can you identify these exhibits?

22  A.   Yes.  Number 2 is the picture of the house.  It's

23  also a picture that I included with my search warrant

24  and affidavit.

25  Q.   And are the remaining pictures all pictures that

Case 12-565, Document 26, 10/05/2012, 740168, Page161 of 301

30

1    you took during the course of the search?

2    A.    Yes.

3    Q.    Okay.

4          MS. PATEL:  At this time, your Honor, the

5    Government would ask to admit Government's Exhibits 2

6    to 11.

7          MR. BERKE:  No objection for the purpose of

8    this hearing, your Honor.

9          MS. PATEL:  So I'm going to take them and put

10   them up on the ELMO.

11        (Pause.)

12   BY MS. PATEL:

13   Q.    Can you tell us what Government's Exhibit 2 is?

14   A.    That's a street view photograph of the front of

15   Mr. Sensi's residence.

16   Q.    And can you just give us a brief description of

17   the interior of the home?

18   A.    As you face the front door, if you look

19   immediately to the left there's a front room that was

20   unoccupied.  As you walk into the front door and you

21   take your immediate left, there's another room there

22   which was the office area.  If you go through the front

23   door and continue straight on there's a living

24   room/kitchen area.  If you walk past the living

25   room/kitchen area and turn to the right, there is a

A-158

31

1    master bedroom and it's positioned behind the garage

2    basically, and so there's also a master bath behind the

3    garage, and like I said to the right of the living

4    room/kitchen area.

5    Q.    All right.  So you indicated once you walked in

6    you proceeded where?

7    A.    When we first walked in we could visibly see, when

8    you turned to the left, there as a laptop on the table

9    in a room.

10   Q.    I'm going to show you Government's Exhibit 3.  Can

11   you tell me what that is?

12   A.    That's the office area where we obtained Mr.

13   Sensi's computer and some CDs.

14   Q.    And is this -- when you walked in is this what you

15   first saw?

16   A.    Yes.

17   Q.    Okay.  When you walked in, sir, was there anyone

18   else in the residence?

19   A.    Yes.  I believe he had a girlfriend, her last name

20   escapes me but I think her first name was Tatiana.

21   Q.    And where was Tatiana when you were engaged in the

22   search?

23   A.    She was sitting on a couch watching TV.

24   Q.    Okay.  So, just so we're clear, you go inside, Mr.

25   Sensi is there?

32

1   A.   Yes.

2   Q.   You found the woman, Tatiana, on the couch?

3   A.   Yes.

4   Q.   There's two of you, you and your partner, as well

5   as a third police officer for security purposes.   Where

6   is he physically?

7   A.   He stays between the -- just past the front door

8   and like the living area.

9   Q.   Okay.   Does he stay there during the entire time

10  of the search, to your knowledge?

11  A.   Yes.

12  Q.   Was that a yes?

13  A.   Yes, I'm sorry.

14  Q.   No, that's okay.   And do you and your partner

15  search separately, do you search together?   Can you

16  give us an idea of what you and your partner are doing?

17  A.   Oh, we start photographing and then we start

18  collecting, so we're kind of like photographing and

19  collecting at the same time.

20  Q.   Okay.   And while you're doing this, what is Mr.

21  Sensi doing, if anything?

22  A.   He's walking in and out of the rooms that we're

23  in, he's talking on the phone, walking around the main

24  area of the house.

25  Q.   Okay.   So when you first walk in you tell him you

33

1   have a search warrant.  Did at any time, did you ever
2   tell him that he was under arrest?
3   A.    No.
4   Q.    Was he, in fact, under arrest?
5   A.    No.
6   Q.    Did you arrest him that morning?
7   A.    No.
8   Q.    Okay.  And did at any time during your search, did
9   you -- well, let's try it with Mr. Sensi.  You spoke to
10  him at the door.  Based on your observations, did you
11  believe he could understand what you were saying to
12  him?
13  A.    He seemed very intelligent, articulate.  He
14  indicated no reasons for me to believe that he did not
15  understand the reason we were there.
16  Q.    And did you understand that he -- well, strike
17  that.
18        Were you both speaking in English?
19  A.    Yes.
20  Q.    Did he ever speak any other language while you
21  were there?
22  A.    I found out later -- well, he was speaking either
23  Spanish or Italian, I think Officer Ryan (phonetic) had
24  told me.  I wasn't familiar with that, but I found out
25  later that he did speak Italian.

A-161

34

1    Q.    Okay.  The entire time you spoke to him though he

2    had problem speaking English?

3    A.    No.

4    Q.    Okay.  And did at any time was he confined to any

5    area of the house while you were engaged in the search?

6    A.    No.

7    Q.    Did you in any way restrain him?

8    A.    No.

9    Q.    Were there any handcuffs used to constrain him

10   anywhere?

11   A.    Absolutely not.

12   Q.    Was he free to move around?

13   A.    Yes.

14   Q.    Was he in any way restricted with his movement?

15   A.    Not at all.

16   Q.    You indicated he was walking around, he was on the

17   phone.  Did you tell him one way or the other that he

18   could be on the phone or that he couldn't be on the

19   phone?

20   A.    I indicated neither.  I mean he could do whatever

21   he wanted to do.  It was his house.

22   Q.    And did you ever tell him that he was not free to

23   leave?

24   A.    No.

25   Q.    Did you advise him of his Miranda rights?

35

1   A.   No.

2   Q.   Why not?

3   A.   I felt I wasn't required to.  He wasn't in

4   custody, and so I didn't because I didn't believe I had

5   to.

6   Q.   And you just indicated you never arrested him that

7   day, that morning, right?

8   A.   That morning, correct.

9   Q.   Did you -- did any police officer ever brandish or

10  display their weapon?

11  A.   No.

12  Q.   Was he free to leave?

13  A.   Yes.

14  Q.   If he asked to leave, would you have let him

15  leave?

16  A.   Absolutely.

17  Q.   Why?

18  A.   Well, we were there to collect evidence.  We

19  weren't there to arrest him at that point.  And also,

20  there was another adult in the home, but if for

21  purposes of locking up the residence, she was still

22  home, so that wasn't an issue.  So we never had to

23  address that.

24  Q.   You indicated that when you first approached him

25  at the house you had a conversation about the search

36

1    warrant.  You asked him a few questions.  During the

2    course of the search did you ask him other questions?

3    A.    Yes.  On occasion he would come in and kind of see

4    what we were doing, see what we were, you know,

5    photographing or looking at.  In the office area in

6    particular we found a stack of CDs.  On that second

7    shelf under the printer there was a stack of CDs, and

8    the first CD had in red ink the words PTHC, and you can

9    see it there.

10   Q.    Okay.  So, just for the record, Government's

11   Exhibit 4 is up and you're indicating that this was a

12   stack of CDs that you located in his office area?

13   A.    Yes.

14   Q.    And what were the initials on the CDs?

15   A.    On the first CD as you see it there it says PTHC.

16   Q.    Okay.  And do you understand that acronym?

17   A.    Working many years in the child pornography

18   investigations, that is an acronym for preteen

19   hardcore.

20   Q.    And when you say preteen, what do you understand

21   that to mean?

22   A.    Under the age of 12.  That name, that acronym is

23   also associated with numerous child pornography file

24   names.  That PTHC acronym is usually included in these

25   long child pornography names that we find during peer

A-164

37

1    to peer investigations.

2    Q.   And what do you understand hardcore to mean?

3    A.   Sex.  Some type of intercourse or penetration.

4    Q.   Okay.  And so -- so I'm sorry, I had cut you off.

5    You had indicated that Mr. Sensi would from time to

6    time answer questions for you?

7    A.   Yes.

8    Q.   And with respect to Government's Exhibit 4 did you

9    ask him any questions about the CD that was labeled

10   PTHC?

11   A.   Yes.  I asked him if he knew what that was and if

12   this was his and he kind of -- he didn't know what that

13   was, he didn't know what that stood for.  He actually

14   didn't indicate that he wrote that, but as I was

15   questioning him with that I did notice at that

16   particular time he started to sweat profusely around

17   his underarm and chest area.

18   Q.   And this is something you observed?  Did you at

19   any time ever ask him about it?

20   A.   I did.  I asked him was he okay.  He said he was

21   diabetic and that's why he was sweating profusely.  My

22   mother is diabetic and insulin dependant --

23            MR. BERKE:  I'd object, your Honor.  That's --

24   A.   -- and I've never seen her sweat before like that,

25   so.

Case 12-565, Document 26, 10/05/2012, 740168, Page169 of 301

A-165

38

```
1              MR. BERKE:  Your Honor, I'd object to that
2     aspect.  He's not -- he has no basis to form an opinion
3     about the -- what diabetics have.
4              THE COURT:  All right.  I'll strike the
5     opinion.
6     BY MS. PATEL
7     Q.   All right.  With respect to Mr. Sensi's statement,
8     when you asked him any questions, did you ask him to
9     sit down and conduct any type of formal interview?
10    A.   No.
11    Q.   Did you have any type of formal interrogation of
12    any kind?
13    A.   No, that wasn't our purpose at that time.
14    Q.   Okay.  And you indicated that he would come in and
15    out of the room.  So did you ever tell him that he had
16    to stay in the room and answer your questions?
17    A.   No.
18    Q.   All right.  Did you ever tell him that -- did you
19    ever threaten him in any way that if he didn't answer
20    your questions or with some threat?
21    A.   Absolutely not.
22    Q.   All right.  So you're in the office area.  Can you
23    go ahead and tell us what else you located in this
24    house?
25    A.   We then moved to the master bedroom area and as
```

Case 12-565, Document 26, 10/05/2012, 740168, Page170 of 301

39

1   you walk through the master bedroom and walk towards
2   the garage area there are two large closets on both
3   left and right.  The one on the right had some female
4   clothes in it, the one on the left had some men's
5   clothes in it.  And there's also numerous boxes and
6   duffle bags that are on the floor in the closet that's
7   on the left with the men's clothes.
8        So we start going through some of the duffle bags
9   and find a large amount of adult commercial pornography
10  in a large red duffle bag.
11  Q.   I'm going to show you what's been marked as
12  Government's Exhibit 5 on the ELMO, and I'm going to
13  ask you to identify what that is.
14  A.   That is one of the red duffle bags that was on the
15  floor of the closet I had previously mentioned.
16  Q.   Okay.  And Government's Exhibit 6, did you take
17  this photograph?
18  A.   Yes.  Me or my partner.  I can't be sure who took
19  it.
20  Q.   And so what's the purpose of this photograph?
21  A.   Those were five tapes that we deemed were not
22  commercial and they appeared to be homemade.  They had
23  handwritten labels and they were found within that red
24  duffle bag.
25  Q.   Okay.  And at some subsequent point did you have

40

1    an opportunity to review those tapes?

2    A.    Yes.

3    Q.    And can you tell us what's contained on some of

4    those tapes?

5    A.    There were -- I believe two of them contained

6    pornography involving a child and another woman, look

7    like foreign decent, they were darker complected, and

8    the child looked to be under the age of five or six.

9    Q.    And were they speaking in a different language?

10   A.    Yes.

11   Q.    What language?

12   A.    I'm not a linguist, but I think it was like

13   Spanish or some time of (unintelligible).

14   Q.    Okay.  And on top of the tapes, was there any

15   indicator or anything written that you can recall?

16   A.    One thing that did catch our eye and one reason

17   that we did collect those is that they had -- many of

18   the tapes have female names on them and they also have

19   the acronym XXX on some of the tapes.

20   Q.    And what does the XXX indicate to you, if

21   anything?

22   A.    In my training and experience, it indicates some

23   type of pornography, and like I said, there was female

24   names and then XXX, and so until I viewed those tapes

25   it was my understanding there was some type of

Case 12-565, Document 26, 10/05/2012, 740168, Page172 of 301

A-168

41

1    pornography involved in the female.

2    Q.    Okay.  And did you in fact seize those tapes?

3    A.    Yes, we did.

4    Q.    All right.  But you left the remainder of the

5    contents of the red duffle bag in Mr. Sensi's

6    residence?

7    A.    Yes, we did.

8    Q.    All right.  And do you have those tapes with you

9    today, sir?

10   A.    Yes, they were brought in.

11   Q.    Okay.

12          MS. PATEL:  So just for the purposes of the

13   record, your Honor, we do have those tapes available.

14   Can they both be -- physical tapes available as well as

15   the contents?

16          THE COURT:  I don't have numbers on these

17   exhibits, but this is the exhibit you're talking about.

18          MS. PATEL:  That is correct, your Honor.

19   BY MS. PATEL:

20   Q.    So we now have the red duffle bag and you

21   indicated that there were other items in this closet as

22   well?

23   A.    Yes.

24   Q.    I'm going to show you what's been marked as

25   Government's Exhibit 10.  Can you tell us what we're

42

1    looking at?

2    A.   There was a couple of boxes, cardboard box, a

3    plastic box, and to the left of that picture there is a

4    black, turns out to be like a bowling ball size duffle

5    bag that had a padlock on it.

6    Q.   All right.  So just for the record, my pen here is

7    pointing to the left-hand side of the photograph with

8    this black bag area right here?

9    A.   Yes.

10   Q.   Is that what you're referring to as locked black

11   bag?

12   A.   Yes.

13   Q.   Okay.  And this is another contents?

14   A.   Yes.  That had a variety of (unintelligible) that

15   had sexual devices.  You can see in the center of the

16   box --

17   Q.   I'm going to show you Government's Exhibit 11, is

18   that a closer photo?

19   A.   Yes.

20   Q.   Okay.  So can you identify what that is?

21   A.   That is a, looks like some type of vibrator,

22   dildo, and some type of other insertion device, sexual

23   device.

24   Q.   And in this container did you also find -- did you

25   find any documents?

43

1    A.    I'm not aware if we found -- there were documents,

2    I'm not aware of what the exact documents were at that

3    point.  There were three additional tapes that we found

4    in there that also contained adult pornography, were

5    Hi8 videotapes that were also from that box.

6    Q.    So when you say a Hi8 videotape, this would

7    indicate to you -- why does it necessarily indicate to

8    you that it's not commercial?

9    A.    Well, first of all, it's handwritten labels and it

10   has no indication on it that -- of something that's

11   been preprinted and something that you could buy

12   commercially.  These are blank tapes when you get them

13   and then obviously as a consumer you put content on

14   those tapes.  And so you could also see there is an

15   unopen pack right there at the bottom of the box next

16   to the purple, there's three unopened tapes.  And so

17   they come in like a pack like that and you put them in

18   your device, video camera or such, and then you

19   actually take pictures or movies and put content on

20   there.  So that's what I mean when they're non-

21   commercial, it's consumer grade.

22   Q.    Okay.  So you found three additional Hi8 tapes in

23   here.  You seized them.

24   A.    Yes.

25   Q.    Is that correct?  And did you have an opportunity

A-171

44

1   to review them?

2   A.   Yes.

3   Q.   And what, if anything, did you see on those tapes?

4   A.   Just from memory I think it was just adult

5   pornography.  Mr. Sensi engaged in sex acts with an

6   adult.

7   Q.   Okay.  And in addition to these two then, can you

8   explain what, if anything, you did with the locked

9   black bag?

10  A.   With the locked black bag, it was found with the

11  red bag and also with the sexual devises and the other

12  adult pornography.  I didn't have any device to take

13  off the lock.  So I approached Mr. Sensi, and this took

14  place in the bedroom, I asked him if he had a key for

15  the lock.  I didn't want to break the lock if I didn't

16  have to, but per the search warrant I wanted to see the

17  contents of the locked black bag particularly because

18  it was in close company with the pornography and the

19  tapes that had triple X on it.  And he indicated to me

20  he didn't have a key, and then he just said, take it,

21  it's porn.

22  Q.   And you specifically recall him saying that?

23  A.   Absolutely.

24  Q.   Okay.  So, Officer Broughton, if he had not

25  responded to you or said that you couldn't take it or

45

1    didn't say anything to you, what, if anything, would

2    you have done?

3              MR. BERKE:  Objection, your Honor.

4              THE COURT:  Slow that down and say it again.

5    You're starting to speak a little quickly and so --

6    BY MS. PATEL:

7    Q.   If Mr. Sensi had not said take it, it's porn,

8    what, if anything, would you have done?

9              MR. BERKE:  I would object, your Honor.

10   That's speculative.  It's somewhat irrelevant because

11   his testimony is that he did consent to it.

12             THE COURT:  Yeah, I'll sustain.

13             MS. PATEL:  I'm sorry, your Honor.  Did Mr.

14   Berke say that his testimony is he did consent?

15             MR. BERKE:  He says his testimony.

16             MS. PATEL:  Oh, his testimony.

17             THE COURT:  Speculation.  I will sustain.

18   BY MS. PATEL:

19   Q.   So once he said take it, it's porn, what, if

20   anything, did you do?

21   A.   We did take it due to the fact that I felt that

22   because Mr. Sensi knew that we were there for child

23   pornography, it was there mixed with pornography, that

24   obviously this was an item of interest that I needed to

25   review from the search warrant.

1    Q.    And at a later time did you in fact review the

2    contents of the black bag?

3    A.    Yes.  All the contents that we seized from the

4    house that day were taken back to the sheriff's office

5    where we eventually cut the lock off of the black

6    duffle bag and looked at its contents.

7    Q.    And what did you find?

8    A.    There were several more Hi8 videotapes depicting

9    Mr. Sensi engaged in sex acts with a white girl who

10   appeared to be under the age of 12 years old.  There

11   were numerous videos of that activity.  Also involved

12   were activity involving the white girl's mother

13   involved in sex acts.  There was two printed out

14   pictures of child pornography, color pictures of girls

15   that appeared to be under the age of 12 that were

16   lewdly displayed, with the focus of the camera was on

17   their vagina.  There was also hundreds of text stories

18   dealing with incest and sex with children, and they

19   were inside an interoffice memorandum that had Mr.

20   Sensi's name on it.  And there was a sex book that had

21   to do with a penis and something I think from the New

22   York Opera House.

23   Q.    Okay.  So there's --

24   A.    And a variety of other --

25   Q.    Documents?

47

1    A.    Documents, yes.

2    Q.    What was the first document that you mentioned?

3    You said something about an opera house and then

4    another document.

5    A.    There was an interoffice, you see these

6    interoffice folders that you route stuff that you would

7    handle, like Human Resources goes to John Smith.  There

8    was a red one that contained inside of it text stories,

9    printout text stories of incest and sex with children,

10   but there was also handwritten on the outside of this

11   interoffice folder was Mr. Sensi's name going to

12   another person.

13   Q.    And have you brought that envelop with you today?

14   A.    That's -- yes, that's also here.

15   Q.    Okay.

16         MS. PATEL:  So we'll make that available to

17   your Honor, if your Honor would like to review it.

18   Would your Honor like to see it at this time?

19         THE COURT:  Yes.

20         MS. PATEL:  Okay.

21   (Pause.)

22         THE COURT:  I assume you're going to offer

23   that in evidence.

24         MS. PATEL:  I am, your Honor.  I'm just going

25   to get a --

48

```
1              THE COURT:  There's a sticker on the back.
2    There's a sticker on there.
3              MS. PATEL:  I think the last number was 11.
4    I'm going to offer this as Government's Exhibit 12.
5    I'll just ask Defense counsel if he'd like to review
6    it.
7              MR. BERKE:  Take just a moment, your Honor.
8         (Pause.)
9              MR. BERKE:  Thank you, sir.
10             THE COURT:  Okay.
11             MS. PATEL:  With that, your Honor, the
12   Government would at this time move Government's Exhibit
13   12 into evidence.
14             MR. BERKE:  Sir, no objection for the purpose
15   of this hearing.
16             THE COURT:  It's admitted.
17   BY MS. PATEL:
18   Q.   So, Officer Broughton, if I could just hand this
19   to you, if you could just go through the contents of
20   whatever.
21   A.   The outside of the box, the outside has several
22   lines, deliver to, department sent by and department.
23   There's a last line that's dated 4/30, it says
24   delivered to Ed Sensi from, it looks like initials PR,
25   and then sent by, it looks like Jennifer Tymebaugh
```

49

1   (phonetic) it looks like.

2       The contents are family -- excuse me, printed out

3   and statement stories, they're text documents, and

4   they're labeled like Family 2.  There's another one

5   labeled Sweet Little 5, Mother KN, 12, Kinder 1, Let's

6   Play, and Never 2.  And these are, like I said, just

7   looking at some of the content it has to do with like

8   fathers having sex with their daughters and stuff like

9   that.

10  Q.   Okay.

11       MS. PATEL:  Your Honor, we also have the

12  videotapes, the actual Hi8 tapes that were located in

13  both bags.  Would your Honor like to review those, the

14  outside of those?

15       THE COURT:  (Unintelligible.)

16       MS. PATEL:  Okay.

17   (Pause.)

18       THE WITNESS:  And there was a VHS tape

19  associated with the black bag.

20       (Pause.)

21       MS. PATEL:  I think we ended with Government's

22  Exhibit 13.  So I'm going to mark Government's Exhibit

23  14, 15, 16, 17.  And I think that I did not do a 13, so

24  I'm going to do 13 to 17.

25  BY MS. PATEL:

50

1    Q.    Det. Broughton, if you could please identify what

2    these were and where they were located.

3    A.    These were the tapes that were recovered from the

4    red duffle bag.

5    Q.    And just so that we're all clear, the red duffle

6    bag that you earlier testified about, Government's

7    Exhibit 5; is that correct?

8    A.    Yes.

9    Q.    Okay.  You did not take the red duffle bag, did

10   you?

11   A.    No.

12   Q.    And from the red duffle bag the only things that

13   you took were those tapes in front of you; is that

14   correct?

15   A.    Yes.

16   Q.    And these are the tapes that are photographed in

17   Government's Exhibit 6?

18   A.    That is correct.

19   Q.    Okay.  Why didn't you take the rest of the

20   contents of the red duffle bag?

21   A.    Because I was specifically looking for visual

22   depictions of child pornography and I know for a fact

23   looking at the commercial tapes that those depicted

24   adult pornography and so they weren't seized.

25              MS. PATEL:  Your Honor, at this time the

A-178

51

1   Government would move Government's Exhibit 13 to 17

2   into evidence.

3           MR. BERKE:  Once again, sir, no objection for

4   the purpose of this hearing.

5           THE COURT:  Were 13 to 17 in the red or in the

6   black one?

7           MS. PATEL:  In the red one.

8           THE COURT:  In the red.  That's what I

9   thought, yeah.

10          MS. PATEL:  Right.

11  BY MS. PATEL:

12  Q.   And just again to reiterate, you did view the

13  contents of those videotapes.

14  A.   Yes.

15  Q.   And is it your testimony that the girl was likely

16  to be a foreign born girl?

17  A.   Yes.

18  Q.   Okay.  But was Edgardo Sensi visible in those

19  tapes?

20  A.   Numerous times, yes.

21  Q.   Okay.

22       (Pause.)

23  BY MS. PATEL:

24  Q.   Showing you what's been marked Government's

25  Exhibits 18 and 19, could you identify what these are?

A-179

52

```
 1    A.    Appears to be the locked black bag.
 2              THE COURT:  And this was the bag that was
 3    locked.
 4              THE WITNESS:  Yes, sir.
 5              THE COURT:  Okay.  And you've actually got a
 6    key for it?
 7              THE WITNESS:  And this is the lock -- no, we
 8    actually cut it off, but we did find the key later.
 9    BY MS. PATEL:
10    Q.    Could you actually explain how it is you found the
11    key?
12    A.    Yes.  Well, as you can see the lock has been cut,
13    we did cut it off the day of the search warrant back at
14    the sheriff's office.  The next day we met with Mr.
15    Sensi's employer at Big Five Tools (phonetic), a place
16    where he worked, and we were getting consent from Mr.
17    Marvin -- I'm sorry, I forgot his last name, but the
18    owner of the company gave his consent to look at the
19    company computer, and we also asked if Mr. Sensi had
20    turned in any --
21              MR. BERKE:  Objection, your Honor.
22    A.    -- property.
23              MR. BERKE:  Sir, I object.  These statements
24    are hearsay in nature.  The statements of his employer.
25              THE COURT:  I'll tell you what you can do.
```

Case 12-565, Document 26, 10/05/2012, 740168, Page184 of 301

A-180

53

```
1    Don't stand up.  The rule of this courtroom, sit down
2    and speak right into the mic.  Then I'll hear you very
3    clearly.
4          MR. BERKE:  Okay.  Sir, I thought it would be
5    easier to hear, that's why I stood up.
6          THE COURT:  Okay.
7          MR. BERKE:  Sir, I object on the grounds of
8    hearsay, the statements of the employer.
9          THE COURT:  Oh, I think I'll allow that.  I
10   don't think it's going to be that significant.  If I
11   find something significant, I'll let you know.  But I
12   think the employer is just telling you that you could
13   look at his computer and he had some keys, I guess.
14         THE WITNESS:  Yes.  He turned in apparently
15   some company keys which had a picture of Mr. Sensi's
16   son on it, and one of those keys actually fits into the
17   lock and unlocks the lock.
18         MS. PATEL:  So just to get --
19         THE COURT:  I'll let it stand.
20   BY MS. PATEL:
21   Q.   So the key was found, so the employer had obtained
22   the key from Mr. Sensi; is that correct?
23   A.   Yes.  He said that he had turned it in the day
24   before.
25   Q.   The day before.
```

54

```
 1   A.    The day of the search warrant.
 2   Q.    Okay.  So that was the day of the search warrant?
 3   A.    That afternoon, yes.
 4   Q.    So did he -- do you know one way or the other what
 5   time those keys had been turned in?
 6   A.    Well, it was after we had left the house.  He had
 7   gone back to the house, I don't know the exact time,
 8   but it must have been sometime after 10:00 o'clock.
 9   Q.    Okay.  So after you complete your search Mr. Sensi
10   goes to his employer, turns in a set of keys.
11   A.    Yes.
12   Q.    And that was the same set of keys, in that set of
13   keys was the key to the lock that fit the black bag?
14   A.    That is correct.  And it's also -- has a picture
15   of his son on the key ring.
16   Q.    And you indicated that you obtained the computer,
17   the work computer.
18   A.    Yes.
19   Q.    What, if anything, did you find?  Did you actually
20   examine the work computer?
21   A.    Yes, we did.
22   Q.    And what, if anything, did you find on the work
23   computer?
24   A.    The thing of importance we found on his work
25   computer was several images of a girl that we later
```

Case 12-565, Document 26, 10/05/2012, 740168, Page186 of 301

A-182

1    identified as one of the victims in the child

2    pornography tapes involved with Mr. Sensi.  She's an

3    American girl, and there was numerous pictures in his

4    trash bin on his desktop on his work computer.

5    Q.    You said they were in the trash bin, so they were

6    deleted?

7    A.    Yes.

8    Q.    They were deleted.  Could you tell when they were

9    deleted?

10   A.    They were deleted shortly after the search

11   warrant, and if I can refer to when they were last

12   accessed on my report I can give you an exact time.

13   Q.    And based on --

14   A.    It was in -- basically in the morning after the

15   search warrant.

16   Q.    Would looking at your report refresh our

17   recollection as to the exact time?

18   A.    It would.

19          MS. PATEL:  Your Honor, at this time we would

20   request that Officer Broughton be permitted to look at

21   his report.  We ask that Officer Broughton be permitted

22   to look at his report to determine the time.

23          THE COURT:  Yeah, this is subsequent things

24   taken from the employer's records.

25          MS. PATEL:  Right.

56

```
1              THE COURT:  Now, those are before me also I
2    take it.
3              MS. PATEL:  For the photos, the images?
4              THE COURT:  The stuff that he got from the
5    employer's computer, was that considered to be covered
6    by the search warrant?
7              MS. PATEL:  No, your Honor, because it's
8    certainly the Government's theory that that was a
9    computer owned by the company.
10             THE COURT:  Yeah.
11             MS. PATEL:  And the company turned that over
12   to -- gave a consent, signed a consent agreement to
13   turn that computer over.
14             THE COURT:  Okay.  I wanted to make clear that
15   point.
16             MS. PATEL:  Okay.  So at this time could
17   Officer Broughton take a look at his report to give you
18   the time?
19             THE COURT:  Sure.
20        (Pause.)
21             THE WITNESS:  The majority of images were last
22   accessed in his recycle bin at 10:14 a.m. on September
23   10ᵗʰ, 2008.  So most of them were accessed within a
24   couple seconds of each other on 10:14 in the morning.
25   BY MS. PATEL:
```

57

1   Q.   So the day of the search, what time did you leave

2   his home?

3   A.   It was -- we weren't there that long.  We left

4   about 9:30, 9:45.

5   Q.   Okay.  And --

6          THE COURT:  So you were there about two hours?

7          THE WITNESS:  No, we got there about 8:30,

8   8:45, so we were there approximately about an hour.

9   Maybe a little shorter.

10          THE COURT:  Okay.

11  BY MS. PATEL:

12  Q.   So you leave at about 9:30 or 9:45.

13  A.   Yes.

14  Q.   You then obtain a computer from his employer

15  showing that he or somebody deleted images from a

16  computer used by Edgardo Sensi at what time?

17  A.   10:14 in the morning.

18  Q.   At 10:14 in the morning.  And that's the -- is it

19  your understanding that's the same time he also

20  returned the keys to his employer?

21  A.   Yes.

22  Q.   Okay.  While --

23          MS. PATEL:  I don't think I admitted

24  Government's Exhibit 18 and 19 into evidence.  I'd like

25  to do that at this time.

58

1           (Pause.)

2    BY MS. PATEL:

3    Q.   Sir, I've just handed you two bags.  I've marked

4    them Government's Exhibits 20 and 21.  Each bag

5    contains several -- a variety of several different

6    items.  Can you identify each bag starting with

7    Government's Exhibit 20?

8    A.   Yes.  These both bags are remaining contents of

9    the black locked bag, have approximately 50 floppy

10   disks in a box.  Approximately 10 of those floppy disks

11   contain child pornography images in the form of graphic

12   pictures.  Some of the pictures included images of Mr.

13   Sensi, the American girl and her mother engaged in

14   sexual activity, as well as other child pornography

15   images of unknown victims.

16        There is also a video cassette tape that contained

17   images of the American girl engaged in sex acts with

18   Mr. Sensi, and there were additional Hi8 videotapes,

19   one, two, three, four -- make sure I got them all

20   counted.

21        (Pause.)

22   A.   There are six additional Hi8 tapes that involved,

23   that depicted sexual activity with Mr. Sensi and the

24   American victim.

25   Q.   Okay.  With respect to the actual label, I'm going

59

1    to ask that you not read the label, the name on the
2    label.
3    A.    Right.
4    Q.    But I'm going to ask whether any of the tapes
5    actually depict the American girl's first name.
6    A.    Yes.
7    Q.    Okay.  And next to the American girl's first name,
8    is there anything else?
9    A.    On some of the tapes that -- just review that,
10   some of the tapes use the word soft, early and X.
11   There is one that has the initials of the girl and
12   sexy.  There's one that says XX Part 2.  There's XX
13   Part 1, and XXX with a derivative of the girl's name.
14   Q.    And then if I can actually draw your attention to
15   the second bag?
16        (Pause.)
17   A.    The second bag contained a New York Yankee's 2001
18   season preview magazine.  A Puppetry of the Penis book.
19   Several more text documents depicting sex with
20   children.
21   Q.    Depicting or discussing?
22   A.    Oh, discussing.  I'm sorry.  They're all text.
23   There is an adult magazine.  There's a stage bill opera
24   pamphlet dated April 2002.  There's another printed out
25   interoffice email with Mr. Sensi's name on it, Ed

Case 12-565, Document 26, 10/05/2012, 740168, Page191 of 301

A-187

60

1   Sensi, with some additional text documents depicting
2   sex with children -- excuse me, discussing sex with
3   children.  There is a handwritten note that is
4   addressed to Ed and there are some diagrams that are
5   with it.  It has to do with sexual activity.  Do you
6   want me to read what is on the --
7   Q.   Sure.
8   A.   One says, Ed, you sit on my, and it says you like
9   pussy and make mom gush.  And then there's some stick
10  figures of three individuals.  On the back it says Ed,
11  handwritten.
12       There's another document that says, you suck EP's
13  cock and try to gush, and then there's stick figures of
14  someone performing oral sex on a male.  The back says
15  mom.  And there's a -- and these are all written on it
16  looks like a Westin Hotel paper, it has their emblem on
17  the bottom.  It says, Sex Sex on the top and everyone
18  do your best, and on the back it says sex.  And those
19  were in there.
20       And there were also, and I'll try to find them,
21  there was two pictures of printed out pornography.
22  Q.   Okay.  When you locate them you can just let us
23  know that you've located them.
24  A.   Yep, I did.
25  Q.   Okay.

61

1    A.    They're in here.

2    Q.    So the two, you said two printed out pictures of

3    child pornography.

4    A.    Yes.

5    Q.    Where were they in the black bag when you found,

6    when you opened up the black bag?

7    A.    They were right on top with the stack of text

8    stories.

9    Q.    Is it fair to say it's the first thing you saw

10   when you opened up the black bag?

11   A.    Yes.

12   Q.    Okay.

13         MS. PATEL:  And at this time, your Honor, we

14   move Government's Exhibits 20 and 21 into evidence.

15   BY MS. PATEL:

16   Q.    All of the contents of 20 and 21, correct, Det.

17   Broughton, were all contained in the locked black bag.

18   A.    Correct.

19         MS. PATEL:  Your Honor, we have nothing

20   further at this time.

21         (Pause.)

22         THE COURT:  All right.  Mr. Berke?

23         MR. BERKE:  Thank you.

24         (Pause.)

25                  CROSS EXAMINATION

62

1    BY MR. BERKE:

2    Q.   Good afternoon, sir.

3    A.   Good afternoon.

4    Q.   Sir, if I ask you any question you don't

5    understand, please interrupt me and ask me to rephrase

6    it.

7    A.   Absolutely.

8    Q.   Prior to your testimony today, can you tell us

9    what documents you reviewed in anticipation of your

10   preparation?

11   A.   My reports and some of the videos that were

12   obtained during the course of my investigation.

13   Q.   And did you have a chance to review your

14   deposition that you gave in the state matter in Florida

15   given on November 19th of 2008?

16   A.   Yes, sir.

17   Q.   And did you have a chance to review the deposition

18   testimony on that same date of the two other officers

19   of your department that you had referred to that were

20   part of this execution?

21   A.   Yes, sir.

22   Q.   Did any of the officers aside from you draft a

23   report in regards to this case?

24   A.   No.

25   Q.   And your report consists of a complaint affidavit,

A-190

63

1   a supplement to that complaint on the inventory, a

2   search warrant and an affidavit for the search warrant?

3   A.   Yes.

4   Q.   Sir, are there any other documents that you

5   prepared in furtherance of this investigation?

6   A.   My forensic report of the computer and the digital

7   evidence seized in this case.

8   Q.   And the forensic report, that's with the

9   utilization of the NK software?

10  A.   And FTK.

11  Q.   And that's a specific, for lack of a better word,

12  technical analysis of the computers and the other media

13  that you found.

14  A.   Correct.

15  Q.   And those reports don't detail any particular

16  facts that deal with the execution of the warrant, it's

17  just your analysis at the police department in regards

18  to what is on the media that you seized.

19  A.   Basically it refers to the content that, yeah,

20  we're investigating, correct.

21  Q.   It doesn't deal with the circumstances that led up

22  to the investigation.

23  A.   No, sir.

24  Q.   Now, do you recall where your car was parked prior

25  to your entry?

A-191

64

1    A.    Yes.

2    Q.    Can you tell us where that was?

3    A.    It was actually my partner's car and it was next

4    door in the driveway of an abandoned house.

5    Q.    And do you know where Officer Lamb's car was

6    parked?

7    A.    No.

8    Q.    Did you see him arrive?

9    A.    I saw him arrive.  I don't know how he got there,

10   if he parked on the street or in the driveway or where

11   he may have parked.

12   Q.    So you don't recall that he parked his car behind

13   Mr. Sensi's car.

14   A.    No.

15         (Pause.)

16             MR. BERKE:  Sir, if I could have one moment,

17   please.

18         (Pause.)

19   BY MR. BERKE:

20   Q.    Office Lamb arrived in uniform with a service

21   weapon?

22   A.    Yes, sir.  He was working that day.

23   Q.    And you are a detective, you wear plain clothes?

24   A.    Yes, sir.

25   Q.    As well as your partner?

65

```
 1    A.    Yes, sir.
 2    Q.    And you wear plain clothes during every
 3    investigation?
 4    A.    Yes, sir.
 5    Q.    And both of you had your sidearms that were
 6    visible to Mr. Sensi?
 7    A.    Yes.
 8    Q.    Now, during the investigation that led up to you
 9    obtaining the search warrant, you had done an
10    investigation that you were looking for individuals
11    that were downloading files to a computer.
12    A.    I was looking for individuals possessing child
13    pornography.
14    Q.    And your investigation uncovered someone who may
15    have had access to a peer to peer (unintelligible).
16    A.    Correct.
17    Q.    And in your application for the search warrant you
18    were searching for visual media and were searching for
19    someone who had downloaded those files you referred to
20    in your affidavit.
21    A.    Correct.
22    Q.    And in regards to the first paragraph of the
23    affidavit, you refer to images, movies, visual
24    depictions to include but not limited to files, and you
25    refer to two mpg files, M-P-G files.
```

1   A.   Correct.

2   Q.   And could you describe for the Court what an mpg

3   file is?

4   A.   Yes.  It's a digital file of moving pictures and

5   sound, and -- that's what it is.

6   Q.   So those are digital files that you had

7   identified.

8   A.   Yes.

9   Q.   And the files that you were looking for, were

10  there any other files aside from those two files that

11  you identified?

12  A.   Those were two that I had specifically seen in

13  previous investigations that I knew were child

14  pornography, so I wanted to include those because they

15  had been seen associated with an IP that came back to

16  Mr. Sensi.

17  Q.   And you said an IP that came back to Mr. Sensi.

18  Are you familiar with the terms static IP or dynamic

19  IP?

20  A.   Yes.

21  Q.   And can you describe for the Court what those two

22  terms mean?

23  A.   Dynamic IP is an IP that will change periodically,

24  and that's changed by your internet provider.  A static

25  IP is an IP that's assigned to you and it's permanently

67

1   assigned to you and does not change.

2   Q.   And did Comcast inform you whether Mr. Sensi's IP

3   was static or dynamic?

4   A.   It was dynamic.

5   Q.   So that IP address changes.

6   A.   With Comcast's broadband it's my experience that

7   due to the cable modem issue you can retain, even

8   though it's considered dynamic, you can retain the same

9   IP for -- I've seen some cases where people have

10  retained the same IP for over a year with Comcast, and

11  that's just the nature of how they, you know, how the

12  cable modem and the broadband modem -- where we usually

13  see dynamic is with dial-up, obviously, because every

14  time that you access the internet provider it's a

15  different time and the modem is off or on, or off or

16  on, so you're assigned different times with that time.

17  But the Comcast modem is always on and so you're rarely

18  assigned a new IP.  And to cover that basis I had

19  listed a time frame through Comcast of who had an IP

20  during a particular time frame, not just a particular

21  date in time.

22  Q.   So you were never able to download any materials

23  from Mr. Sensi's computer.

24  A.   That's correct.

25  Q.   And you attempted to do that.

A-195

68

1    A.    Absolutely.

2    Q.    And you weren't able to do that.

3    A.    I try to do that in every case and I was unable

4    to, yes, sir.

5    Q.    And you tried to do that through getting access to

6    a shred directory through a program such as LimeWire.

7    A.    Yes.

8    Q.    And can you describe for the Judge what that

9    entails and what that means to try and access a shared

10   directory in Mr. Sensi's computer when you're in a

11   remote location presumably?

12   A.    Sure.  With the utilization of LimeWire, when you

13   install the software on the computer, the first thing

14   it does, it sets up a folder on your computer that's

15   considered a shared folder, and by default this

16   particular software will enable sharing.  So anything

17   that you download into that shared folder from other

18   computer users, you have the ability to publicly share

19   this material, and it could be music, it could be

20   videos, it could be pictures, programs.

21        And so a couple different things have to happen

22   for me as an investigator to look at somebody's shared

23   folder and to download from them.  Obviously, when I'm

24   searching for files, they have to have the specific

25   files that I'm searching for, and also they have to be

A-196

69

1   on at the same exact time in sharing a folder when I'm

2   on, and he has to be on at the same exact time.  So a

3   couple of different things have to take place for me to

4   actually download from somebody.

5   Q.   So what is the significance of you being able to

6   download a file such as the ones you were looking for

7   from a computer?

8   A.   Many times I take some of these investigations

9   federally and that's one of the aspects, that they look

10  out for distribution or transmission of child

11  pornography.  Also, and it enables me as an

12  investigator, if he has some files that have not been

13  identified as child pornography, to download those

14  files and view them for myself.

15  Q.   And that's something that not just you can do as

16  an investigator, but anyone can do that has access to

17  LimeWire.

18  A.   Yeah.  This is publicly available software, so

19  anybody, any layperson can download anything from

20  another person using this type of software.

21  Q.   But as it pertains to this investigation, you were

22  unable to download any files from Mr. Sensi's computer.

23  A.   Yes.

24  Q.   And we'll refer to (unintelligible), but I'm

25  talking or referring to specifically the shared folder

A-197

70

1   remotely prior to you obtaining the search warrant.

2   A.   Correct.

3   Q.   Now, you referred to an IP address as a phone

4   number to the internet.  Isn't it true that that number

5   can change, if it's a dynamic IP that number can

6   change?  If you're off the internet, the service

7   provider, such as Comcast, routinely give different IP

8   addresses to a particular router.  That's the unit that

9   someone accesses the internet from their computer.

10  A.   Well, as I have stated before, with Comcast it's

11  my experience that those numbers, because it's an

12  always on connection, those IP will stay for extended

13  periods of time, but that there is the ability for

14  those IP numbers to change and that's the reason that

15  we get subpoenas for specific dates and times because

16  in the course of doing business these internet

17  providers will keep that information about their

18  customers.

19  Q.   Now, what led you to a link between the IP address

20  and Mr. Sensi?

21  A.   Okay.  I belong to the Internet Crimes Against

22  Children Task Force.  There are approximately 50 task

23  force around the United States that conduct

24  investigations involving the exploitation of children,

25  and this case the distribution and possession of child

1   pornography files.  The ICAC database keeps a law

2   enforcement maintained database of any IP that has been

3   seen on file sharing networks that have been seen in

4   the past possessing child pornography files.

5        When an investigator, or some of this automated

6   software like the ICAC employs, sees an IP that is

7   possessing known images or images that have been

8   previously identified as child pornography, it will log

9   that information, including the date and the time, the

10  IP information, and the file name into a database that

11  we have, as law enforcement, have access to.

12       And so, as an investigator, one of the tools that

13  I have available to me is to go and look at local IPs

14  in my area and see the amount of child pornography that

15  this particular IP or this particular computer had been

16  sharing over an extended period of time.  And in this

17  case this is one of the things that I did.  Mr. Sensi's

18  IP had in a three or four-day period approximately 78

19  files that have been seen by other law enforcement

20  officers possessing child pornography files.

21       And so based on that information I attempted to

22  download from him.  He was not on line or I was unable

23  to download at that time, so based on the database

24  information I subpoenaed Comcast with a particular date

25  range that was indicated in the database, the ICAC

A-199

72

1   database, and based on that information I did a search

2   warrant because at least two of the files that I've

3   seen in the database I had seen personally before

4   previously and had determined those to be child

5   pornography, and they were eventually found in Mr.

6   Sensi's computer.

7   Q.    But prior to execution of the warrant, you didn't

8   have information to support that those files were on

9   his computer.

10   A.    I had information that those files were seen by a

11   computer that was associated with Mr. Sensi and I had

12   an indication that those files that I was describing

13   were child pornography.

14   Q.    Now, you referred to 78 times.  That's the access

15   from law enforcement.

16   A.    Yes.

17   Q.    That's not -- that has nothing to do with what Mr.

18   Sensi did or did not do in regards to that number of

19   access and response.

20   A.    No.  That has something to do with law enforcement

21   seeing, not any action by Mr. Sensi.  The only action

22   would be possessing those images.

23   Q.    So the IP address is linked to the router at Mr.

24   Sensi's house?

25   A.    It's linked to a computer or a router depending on

A-200

73

1    how it's set up.  Yes.

2    Q.    So if it's linked to a router there could be

3    multiple computers that access that router.

4    A.    Yes.

5    Q.    And were you able to determine whether he had a

6    locked internet access system, a locked WiFi?

7    A.    There was only one computer in the house and I'm

8    unaware at this time if it was an open WiFi or not.  I

9    don't think he had WiFi.  I think it was just a modem.

10   Q.    Weren't there laptops located in the house?

11   A.    One.

12   Q.    So you said there was one computer.  There was a

13   desktop.

14   A.    No, the desktop was from the office area, on the

15   -- his actual office, work office, I'm sorry, which was

16   offsite, away from his house.  The only computer we

17   seized from his house was a laptop connected to a cable

18   modem that was reflected in some of the pictures

19   earlier.

20   Q.    You testified earlier today that your search was

21   conducted at 8:45 a.m. on September 10th of 2008.

22   A.    Yes.

23   Q.    Are you aware that -- would you recall placing in

24   your supplemental report that it was 8:45 p.m.?

25   A.    Yeah, that was a typo.  I apologize.

Case 12-565, Document 26, 10/05/2012, 740168, Page205 of 301

A-201

74

```
1    Q.    Was that corrected?

2    A.    I just was aware of it today actually.

3              THE COURT:  So it was a mistake there

4    (unintelligible).

5              THE WITNESS:  Yeah.  Instead of p.m. I have --

6    put a.m. instead of --  put p.m. instead of a.m., yes,

7    sir.

8              THE COURT:  Okay.

9    BY MR. BERKE:

10   Q.    And once again, the mpg files, the mpg files are

11   digital files.

12   A.    Yes.

13   Q.    Now, in reference to the camcorder.

14   A.    Yes.

15   Q.    Did you seize the camcorder?

16   A.    Yes.

17   Q.    And what is the model of that camcorder?

18   A.    Let me see if I have that information available.

19   I have the actual video camera here today.  I don't

20   know if I have the specific in my notes, the specific

21   model.

22        (Pause.)

23   A.    I'm sorry, sir.  I apologize.  I don't believe I

24   have the specific model, but that's the camera.

25   Q.    Now, in your experience, I know that you have
```

Case 12-565, Document 26, 10/05/2012, 740168, Page206 of 301

1   significant training in regards to the analysis of

2   computers.

3   A.   Yes, sir.

4   Q.   You've been doing this for a while, and prior to

5   the advent of these computer networks that are freely

6   -- people freely share files.  Do you have training in

7   regards to other types of media, for example,

8   camcorders and the way in which they store media?  Do

9   you have training in that regard?

10  A.   Specific training?

11  Q.   Yes.

12  A.   No specific training as it relates to -- I mean

13  I've used those, but no specific like forensic training

14  as it relates to videotapes, no.

15  Q.   Now, as far as using them, you've used them I

16  would imagine in the course of your employment?

17  A.   My employment and also in personal use.

18  Q.   And can you describe a Hi8 camera versus a digital

19  camcorder?

20  A.   Well, digital cameras nowadays can be recorded to

21  different types of media, including hard drives, flash

22  cards and things of that nature.  Hi8 tapes actually

23  use an actual tape, for a better word.

24  Q.   So what's probably more familiar to people is a

25  Hi8, it's probably more similar to a VHS type of tape

Case 12-565, Document 26, 10/05/2012, 740168, Page207 of 301

A-203

76

1   than the digital media that's available today, is that

2   --

3   A.   Well, yeah, I think I described it earlier as

4   actually a smaller VHS tape.

5   Q.   And when you were on the scene you had a chance to

6   look at this camera?

7   A.   Yes.

8   Q.   When you conducted the search?

9   A.   Yes.

10  Q.   And you were able also to take photographs of

11  that?

12  A.   Yes.

13  Q.   Now, you took it the -- did you take the

14  photographs of the location in which you found the

15  camera?

16  A.   Yes.

17  Q.   And where was that?

18  A.   That was in the front, well, when you're first

19  facing the house it's basically a part of the house

20  that kind of juts out when you're facing the front of

21  the house.   It's to the left.   So it's the front part

22  of the house on the left.   Southern part of the house.

23  Q.   Now, it was your testimony earlier today that

24  generically, I don't think you were referring to this

25  camera, but you said generically camcorders can be

Case 12-565, Document 26, 10/05/2012, 740168, Page208 of 301

A-204

1   connected to a computer.

2   A.   Yes.

3   Q.   Through a USB or FireWire.

4   A.   Right.

5   Q.   Did you secure any USB or FireWire cords in the

6   container which had this camera?

7   A.   Right off the top of my head I do not know, but

8   the bag is here so if it was seized it would be in the

9   bag, the black camera bag.  You look on the outside of

10  it, with the power cord or something.

11  Q.   Is this the bag?

12  A.   That's the bag.

13  Q.   And you don't recall if there were a FireWire or

14  USB port (unintelligible)?

15  A.   No, I don't recall.

16  Q.   (Away from microphone) Can you refresh your memory

17  if you get a chance to look in the bag?  Would it

18  refresh your memory if you had a chance to look in the

19  bag?

20  A.   Sure.

21  Q.   Sir, would it refresh your memory to look in the

22  bag itself?

23  A.   Yes.

24        MR. BERKE:  May I please, sir?

25        THE COURT:  Yes.  Well, I'll let you -- I

Case 12-565, Document 26, 10/05/2012, 740168, Page209 of 301

A-205

78

```
 1    don't think he's afraid of you, so you can approach
 2    him.
 3         (Pause.)
 4            THE WITNESS:  There are some video and outputs
 5    for the camera.
 6    BY MR. BERKE:
 7    Q.   And are those analog outputs?  Those are RCA
 8    cables?
 9    A.   Yes.  Yes.
10    Q.   Okay.  And RCA referring to -- connect to what
11    type of media?
12    A.   You can connect those to TVs, monitors, some
13    computers have those types of inputs.
14    Q.   And did you notice those inputs on the computers
15    you seized at Mr. Sensi's house?
16    A.   I do not recall.
17    Q.   Did you notice a USB or FireWire cable in that
18    bag?
19    A.   No, I did not.
20    Q.   And a USB or FireWire cable, would it enable
21    someone to attach this camcorder to a computer?
22    A.   If it had the particular ports available for that.
23    Q.   And are you aware of whether this camera, in
24    particular this camcorder, has the ability to connect
25    to a computer via USB or FireWire?
```

Case 12-565, Document 26, 10/05/2012, 740168, Page210 of 301

A-206

79

1    A.    I thought I did but I -- to recollect I'd have to

2    look at it physically.

3    Q.    If I show you the camcorder would that refresh

4    your memory?

5    A.    Yes, sir.

6          (Pause.)

7    A.    It does have S video and the analog video out.

8          (Pause.)

9    A.    Okay.  That's all I observe.  Looks like they have

10   a couple of video outs.

11   Q.    And those are analog video?

12   A.    Yes.  S video and analog video.

13   Q.    So you do not find any USB or FireWire capability

14   on this particular camera.

15   A.    Not on that particular model, no, sir.

16   Q.    And that was the only camcorder you seized?

17   A.    Yes, sir.

18   Q.    Now, Hi-8 millimeter tapes are analog tapes?

19   A.    Yes, sir.

20   Q.    So without the ability to connect this 8

21   millimeter camcorder to the computer, this material

22   cannot be placed on the computer via this camcorder.

23   A.    Can you rephrase that?

24   Q.    Sure.  8 millimeter tapes cannot be transferred to

25   the computer without the ability to have the USB port

Case 12-565, Document 26, 10/05/2012, 740168, Page211 of 301

A-207

80

1    or FireWire.

2    A.   Or if you had connections of RCA inputs or S video

3    inputs.

4    Q.   But you didn't notice those on the computer you

5    seized?

6    A.   I don't recall; no, sir.

7    Q.   And is it possible to transfer digital images to

8    an analog camera?

9    A.   Digital images to the camera itself?

10   Q.   Yes.

11   A.   I'm not sure.  I know you can use it as a webcam

12   and I think you can record your webcam activity, so in

13   that regards I believe that it has ability to do that.

14   Q.   Well, wouldn't the ability to hook this camcorder

15   in particular up to a computer using webcam, would

16   require either a USB or FireWire connection, or as you

17   said, an RCA connection with a special port?

18   A.   I believe so; yes, sir.

19   Q.   So without having that ability, you cannot use

20   this camera as a webcam.

21   A.   Correct.

22        (Pause.)

23   Q.   Now, you found the red bag with various items in

24   it in a closet?

25   A.   Yes, sir, on the floor.

A-208

81

1   Q.   And did you photograph it in the state in which

2   you found it?

3   A.   No, we had put it out a few feet from the closet

4   to get a better photograph of it and --

5   Q.   And where did you move it, sir?

6   A.   To the middle of the bathroom floor.

7   Q.   And was that bag closed?

8   A.   I believe so.  I think we unzipped it.

9   Q.   So you went in to see what was inside the bag.

10  A.   Correct.

11  Q.   And that bag was in the same closet as the white

12  box?

13  A.   The white box and the black duffle bag.

14  Q.   Now, the black duffle bag as you stated was

15  locked.

16  A.   Yes, with a padlock.

17  Q.   And the materials in that locked area, there are

18  areas of that duffle bag, there's side compartments or

19  a side compartment I believe?

20  A.   Yes, I believe there is.

21  Q.   But the materials that you had analyzed were in

22  the locked portion of that bag.

23  A.   Correct.

24  Q.   And you had cut open the bag back at the police

25  department approximately an hour after it was seized?

Case 12-565, Document 26, 10/05/2012, 740168, Page213 of 301

A-209

82

1    A.   We had utilized a bolt cutter and cut the lock.

2    We didn't cut the bag.

3    Q.   So you didn't open it with a key, you opened it

4    with a bolt cutter.

5    A.   Yes.

6            THE COURT:   Now, let me get the timing here.

7    You hadn't gotten the key when you cut the luck, had

8    you?

9            THE WITNESS:   No, sir.   We got the key the

10   next day.   The bolt had already been cut off and we

11   just confirmed that the key fit the lock, but we didn't

12   have the key at the time.

13           THE COURT:   I thought the -- the bolt was

14   before you got the key.

15           THE WITNESS:   Yes, sir.

16   BY MR. BERKE:

17   Q.   In the search warrant there's no reference to the

18   seizure of analog tapes, is there?

19   A.   Specifically?

20   Q.   Specifically, sir.

21   A.   No, sir.

22   Q.   And there's no reference to a CD, requested

23   seizure of Hi8 tapes, VCR tapes.   Is there a Super 8 I

24   think is another term?   There is no reference to those

25   different types of analog tapes that you were seeking

Case 12-565, Document 26, 10/05/2012, 740168, Page214 of 301

1  seizure of?
2  A.   Specifically they were not named, but I would
3  seize them under visual depictions.
4  Q.   Now, is it fair to say that you had previously
5  testified that if you have a search warrant everything
6  is in plain view?
7  A.   Not necessarily.
8  Q.   No.  You don't recall saying that in your
9  deposition?
10 A.   I believe there was something to that effect but I
11 was referring to when Mr. Deckert, the attorney, had
12 asked me about the tapes that I saw from the red bag,
13 were they in plain view, and I was taking that as they
14 were readily available as opposed to items that were in
15 a locked container I could not see the contents of.  So
16 they weren't in plain view but it wasn't affirmed to
17 the plain view doctrine or anything like that.  It was
18 just in plain view meaning that I could see them, you
19 know, in sight.
20 Q.   Were you able to see the items in the red bag
21 before you opened it?
22 A.   No.
23 Q.   And you weren't able to see the contents of the
24 black bag until you cut the lock at the police
25 department.

A-211

84

```
1    A.    Correct.

2    Q.    Now, you completed I believe one inventory that

3    reflects the seized items in this case.

4    A.    Yes.

5    Q.    Did you complete a second inventory when you went

6    back to the police department and cut the black bag

7    open and examined its contents?

8    A.    Yes.

9    Q.    So there are two separate inventories?

10   A.    There was the inventory for here and then there

11   was a property receipt when it was entered into

12   evidence that included the additional items.

13              THE COURT:  Yeah, there was a property receipt

14   that was very short, and then there was a long --

15              THE WITNESS:  Right.  There was at the house

16   the black bag and its contents were indicated on the

17   inventory while we were at the house, and then the

18   property receipt, once we got into the bag, detailed

19   the additional items.  But the inventory that was left

20   with Mr. Sensi just included the items and then the

21   description of a black bag and its contents.

22   BY MR. BERKE:

23   Q.    Now, referring to the initial part of the

24   execution of the search warrant, you had testified that

25   you were in the -- I believe the driveway of the
```

```
1    building next door, the house next door, which was
2    abandoned?
3    A.   Yes.
4    Q.   And you and your partner were waiting for someone
5    to leave the residence of North Windemere?
6    A.   Well, we wanted to see some activity, and we did.
7    He came out, came to his car, then he went back inside
8    I think for a brief second, and then we got him coming
9    out again or at the front door.  Shortly after that.
10   Q.   And at that time you had a search warrant.
11   A.   We had a search warrant when we came; yes, sir.
12   Q.   And when did you call Officer Lamb?
13   A.   Just a few minutes after we had initial
14   conversation with Mr. Sensi at the front door, and I
15   don't know if it was me or -- it's probably my partner
16   because I was the one mainly conversing, and so he had
17   contacted him.  I think he was staging, Lamb -- Deputy
18   Lamb was staging down the street.
19   Q.   Do you recall your partner having any conversation
20   with Mr. Sensi?
21   A.   If he did it was just in the course of me talking,
22   he would like maybe ad lib or something, but I was --
23   he didn't have any details of the investigation so I
24   was the main investigator, and any conversations that
25   took place even though they were brief were mostly
```

86

1   conducted by me.

2   Q.   Is it fair to say Officer Lamb's involvement was

3   essentially limited to staying in that living room area

4   during the course of your execution of the warrant?

5   A.   His main duties were to provide safety for me and

6   Officer Colasuonno, as well as safety of Mr. Sensi and

7   Tatiana.

8   Q.   And are you aware if Officer Lamb had any

9   discussions with Mr. Sensi on that date?

10  A.   Not that I'm aware of.

11  Q.   And do you recall Officer Lamb carrying the black

12  duffle bag out of the room?

13  A.   I think at the end because there was several items

14  that were taken out once they were inventoried and

15  photographed.  I think he assisted in carrying out some

16  of the items, which may have included the black duffle

17  bag as well as the computers and CDs and things of that

18  nature.  It wouldn't be out of the ordinary if he did

19  help.

20  Q.   So during the course of your execution of the

21  search warrant, you were doing the physical search and

22  your partner was talking photographs?

23  A.   Yes.  And he was also physically searching also.

24  Q.   Now, during your execution of a search warrant, is

25  it your habit or custom to audiotape what happens

Case 12-565, Document 26, 10/05/2012, 740168, Page218 of 301

A-214

88

1          (Pause.)

2     Q.   During your deposition do you recall being asked

3     if anything would lead you during the course of your

4     investigation to believe that you would find child

5     pornography on any media other than digital media?  Do

6     you recall that question?

7     A.   Prior to going to the house?

8     Q.   Yes.

9     A.   I'd have to see the actual transcript, refresh my

10    memory.

11         THE COURT:  Yeah, you can show him the

12    transcript.  I guess I probably have it here.

13    BY MR. BERKE:

14    Q.   Can you turn to page 42, lines 13 through

15    (unintelligible).

16         (Pause.)

17         THE COURT:  What are you looking at?

18         THE WITNESS:  Page 42?

19         MR. BERKE:  Yes.  Lines 13 --

20         THE COURT:  13?  Page 13 --

21         THE WITNESS:  Page 42.

22         THE COURT:  42.

23         THE WITNESS:  Of my deposition, I guess he's

24    -- starting on line 13?

25         THE COURT:  Okay, I got (unintelligible) 13.

Case 12-565, Document 26, 10/05/2012, 740168, Page219 of 301

A-215

89

```
 1              THE WITNESS:  Okay.
 2         (Pause.)
 3              THE WITNESS:  Okay.
 4    BY MR. BERKE:
 5    Q.    Now, sir, having had a chance to review that
 6    deposition transcript, does that refresh your memory?
 7    A.    Yes, sir.
 8    Q.    And is it fair to say you didn't have any
 9    indication that you would find media other than digital
10    media?
11    A.    I wasn't expecting it, no.
12    Q.    And that's prior to the execution of the warrant.
13    A.    Correct.
14    Q.    Now, when you first approached Mr. Sensi you
15    informed him that you were conducting an investigation.
16    A.    Correct.
17    Q.    You informed him of the nature of the
18    investigation being child pornography.
19    A.    Eventually, yes.
20    Q.    You asked him some preliminary questions regarding
21    internet access and Comcast was his provider.
22    A.    Yes.
23    Q.    You asked him questions about whether he utilized
24    the LimeWire program?
25    A.    Yes.
```

Case 12-565, Document 26, 10/05/2012, 740168, Page220 of 301

A-216

1    Q.   And then you read the search warrant.

2    A.   Yes.

3    Q.   In detail, in full, without --

4    A.   And then gave him a copy.

5    Q.   Without eliminating any section.

6    A.   No.  He actually was telling me to hurry up, come

7    on, come on, you know, let's go.  He just wanted to see

8    the address, and then, you know, I had to keep

9    stopping, so there were times when we stopped and I

10   didn't read the whole (unintelligible) to him.  But he

11   would stop me periodically and he'd just go, yeah,

12   yeah, yeah, yeah, yeah, and just kind of hurry me

13   along.  But we did read three or four pages of the

14   search warrant in its entirety, then gave him a copy of

15   it.

16   Q.   Is it fair to say that he was evasive during some

17   of the questioning that you had asked him at that

18   initial meeting?

19   A.   Yes.

20   Q.   And did he appear nervous to you?

21             THE COURT:  Did you actually give him a copy

22   of the search --

23             THE WITNESS:  Yes, sir.

24   BY MR. BERKE:

25   Q.   Did he appear nervous to you?

A-217

91

```
1    A.    He did.

2    Q.    And at that point was he sweating?

3    A.    At some point he did begin to sweat profusely.

4    Q.    And do you recall him -- or were you making

5    observation based upon something he said to you that he

6    was anxious to get to work?

7    A.    When he first walked out his door we said we have

8    an investigation, can we talk to you.  Well, I'm

9    heading to work.  And then that's when we asked him

10   about, well, here's what the investigation is about,

11   and then he came in with us when we did the search

12   warrant, so he did not go to work at that point.  But

13   prior to him knowing what the investigation was about

14   he did say he was on his way to work.

15   Q.    Did he make any phone calls?

16   A.    Yes, he had a cell phone.  He was on the phone

17   most of the time while we were in the house.

18   Q.    And was anyone monitoring who he was calling?

19   A.    No.

20   Q.    Did Officer Lamb take any notes in regards to what

21   he was saying at the time?

22   A.    No.

23   Q.    Did you ever obtain -- was it a cell phone or a

24   house phone?

25   A.    It was a cell phone.
```

```
 1   Q.   Did you ever obtain his cell phone records for
 2   that day?
 3   A.   No.
 4        (Pause.)
 5             THE COURT:  Do you want to stop here?
 6             MR. BERKE:  Certainly, sir.  I realize it's
 7   about 1:00 o'clock.
 8             THE COURT:  And then you continue after lunch.
 9             MR. BERKE:  Yes, sir.
10             THE COURT:  You've got an appointment with
11   Magistrate Garfinkel I guess.
12             MR. BERKE:  I do, sir.
13             THE COURT:  So, but you think you'll be back
14   by 2:00.
15             MR. BERKE:  I certainly hope so.
16             THE COURT:  Okay.  We'll come back at 2:00 and
17   I'll -- all right.  We'll take a recess until 2:00
18   o'clock.
19        (Recess at 12:58 p.m., to 2:06 p.m.)
20                        AFTER RECESS
21             THE COURT:  Okay.  Might as well put him back
22   on the stand.  All right.
23        (Pause.)
24             MR. BERKE:  My client's here, your Honor.  May
25   I inquire?
```

Case 12-565, Document 26, 10/05/2012, 740168, Page223 of 301

A-219

93

```
 1              THE COURT:  Yes.
 2              BRIAN BROUGHTON, PLAINTIFF'S WITNESS,
 3                      PREVIOUSLY SWORN
 4              CROSS EXAMINATION (CONTINUED)
 5   BY MR. BERKE:
 6   Q.   Good afternoon, sir.
 7   A.   Good afternoon.
 8   Q.   Now, when you were in the house and identified
 9   these Hi8 tapes in the red bag after you opened the
10   bag, is there anything about the names on the outside
11   of the tape that would lead you to believe that that
12   was child pornography?
13   A.   Specifically child pornography, no; but
14   pornography, yes.
15   Q.   And also located within that red bag were what you
16   refer to as commercial tapes of pornography that you
17   were able to identify based upon, I would imagine, the
18   outside packaging?
19   A.   Yes.
20   Q.   And you identified those Hi8 tapes that we were
21   just talking about, that is being homemade or having
22   handwriting on it.
23   A.   Yes.
24   Q.   And those are the tapes that you were referring to
25   in the red bag.  You were unable to determine whether
```

A-220

94

1   or not they were in fact child pornography; is that --

2   A.   Until I reviewed the contents, yes, sir.

3   Q.   And you didn't review the contents on the scene,

4   you reviewed that back at the police department.

5   A.   Correct.

6   Q.   Now, the black bag was not opened on the scene at

7   the Windemere Drive house, correct?

8   A.   Correct.

9   Q.   So you didn't know what was in that bag at all.

10  A.   I had an indication from Mr. Sensi when he said it

11  was porn.

12  Q.   But you didn't know if it was child pornography.

13  A.   Correct.

14  Q.   Did you specifically or any other officer on the

15  scene advise Mr. Sensi that he was allowed to leave?

16  A.   Specifically told him?

17  Q.   Yes.

18  A.   I don't think we specifically told him he was

19  allowed to leave, but we also didn't say that he had to

20  stay either.

21  Q.   And did you specifically or any other officer to

22  your knowledge specifically inform him that he had a

23  right to refuse the search of that black bag?

24  A.   No.

25  Q.   And you didn't obtain a written consent to search

Case 12-565, Document 26, 10/05/2012, 740168, Page225 of 301

A-221

95

1    that black bag from Mr. Sensi.

2    A.    A written consent, no.

3    Q.    But you did utilize written consent the very next

4    day at his employer's establishment to seize and search

5    the computer that they had.

6    A.    Correct.

7    Q.    And was that after they had given you the consent

8    to take it?

9    A.    It was at the same time, yeah.

10   Q.    So you opted not to obtain a written consent from

11   Mr. Sensi.

12   A.    I believe it was part of the search warrant, the

13   black bag.

14   Q.    And that's why you chose not to get a written

15   consent?

16   A.    I had a search warrant.  That's the reason I was

17   there, so I didn't need consent.

18   Q.    Do you recall whether your partner had played the

19   8 millimeter tapes that we're referring to that were in

20   Sensi's home back at your department on an 8 millimeter

21   player?

22   A.    Yes.

23   Q.    And do you recall if you were able to ever play

24   that 8 millimeter tape or camcorder on a computer at

25   your department?

96

```
 1   A.    Did we play the 8 millimeter content from the

 2   camera; is that what you're asking me?

 3   Q.    You played it on the 8 -- those tapes you played

 4   on an 8 millimeter player, correct?

 5   A.    We have an 8 millimeter player, yes.

 6   Q.    Do you recall saying in your deposition of

 7   November 19th of 2008 in Florida that Officer Lamb

 8   watched Sensi during the execution of the warrant?

 9   A.    That was his duty; yes, sir.

10   Q.    To watch Mr. Sensi.

11   A.    Yes.

12   Q.    Now, there was a complaint affidavit that you had

13   completed on September 10th after the execution of the

14   search warrant.

15   A.    Complaint affidavit, yes.

16   Q.    And then there was a supplemental report that you

17   completed on the 15th of September of that same month?

18   A.    Correct.

19   Q.    So it's five days apart.

20   A.    Okay.

21   Q.    Are those the correct dates?

22   A.    Should be.  I can refer to my reports to --

23   Q.    If that will refresh your memory, please, sir.

24   A.    Okay.

25         (Pause.)
```

97

1   A.    Supplemental report was done on the 15th, and the

2   complaint affidavit was -- is that the other document

3   you were refer --

4   Q.    Yes.

5   A.    Was on the 10th.

6   Q.    So the supplement was to that September 10th

7   report.  The supplement of 9/15 --

8   A.    The complaint affidavit was for possession of

9   child pornography and that was written the afternoon of

10  the 10th, after the search warrant, the same day of the

11  search warrant.

12  Q.    Isn't it correct that in that report of September

13  10th there is no indication regarding a locked black

14  bag?

15  A.    In the complaint affidavit?

16  Q.    Yes, sir.

17  A.    If I can refer to my document?

18  Q.    Certainly, if that will refresh your memory.

19        (Pause.)

20  A.    I refer to the contents of some videotapes that

21  were from the black locked bag and from the master

22  bedroom, but I didn't refer specifically to the red

23  duffle bag or the black duffle bag.  Just the fact that

24  there was Hi8 tapes seized.

25  Q.    So there's no reflection that one of the bags was

Case 12-565, Document 26, 10/05/2012, 740168, Page228 of 301

A-224

98

1   locked.

2   A.    No.   Just the fact that we seized them.

3   Q.    And you said that you had cut the lock on that

4   same day that you seized the bag?

5   A.    Shortly after the search warrant, yes.

6   Q.    And was that done before or after you wrote that

7   report, cutting of the lock?

8   A.    The lock was cut off first.

9   Q.    So that also was not part of your report that you

10  wrote.

11  A.    Basically the complaint affidavit is just facts to

12  support the position on child pornography.  It's not a

13  full in-detail report.

14  Q.    And are you aware that the difference between the

15  complaint affidavit and the supplement consists of two

16  paragraphs which --

17          MS. PATEL:  Objection.  Your Honor, I'm going

18  to object.  I don't know what relevance the arrest

19  affidavit has to do with any of this.  We're not, you

20  know, this was not -- the Government had a separate,

21  the Federal Government had a separate arrest warrant.

22          THE COURT:  Well, all of the questions about

23  the two affidavits, I'm looking for the second one.  I

24  found the first one.  Can't find the second one.  I saw

25  it before.  They're both in the -- the first affidavit

A-225

99

```
 1   is quite long and has the long list, that's the first
 2   one in my collection here, and that's signed on the
 3   10th.  Then I have the search warrant.
 4              MR. BERKE:  There's another document, sir,
 5   that has --
 6              THE COURT:  Oh, I got it.  I found it.  Yeah,
 7   they're both dated the 10th.  Yep.
 8   BY MR. BERKE:
 9   Q.   Sir, are you aware of the difference between the
10   initial complaint affidavit and the supplement is two
11   paragraphs that deal with the fact that the black bag
12   is locked?
13   A.   I indicated in my report some information, my
14   office report, some information about the black bag.
15   Q.   So you said that the initial complaint affidavit
16   is not your complete report.  Is that what you --
17   A.   Correct.  It's just enough information to support
18   possession of child pornography charges.
19   Q.   And are you also aware that the only difference
20   between that initial report and the supplement is two
21   paragraphs -- I'm sorry, three paragraphs that deal
22   with the black bag?
23   A.   Most of the probable cause that's contained in the
24   complaint affidavit is indicated in the
25   (unintelligible) report as well as I also did another
```

A-226

100

1    report beyond that, my computer forensic report, that

2    details a lot of the evidence that we recovered.

3    Q.    But you already said that the forensic report

4    doesn't deal with the execution of the search warrant

5    itself, that just deals with your forensic analysis.

6    A.    Correct.

7    Q.    Okay.  So just referring to your complaint

8    affidavit and the supplement, you said that the initial

9    complaint affidavit is just the basic report, it

10   doesn't have all the details.  And I'm suggesting to

11   you the only difference between the initial complaint

12   affidavit and your supplement is the inclusion of three

13   paragraphs that deal with the locked black bag.

14   A.    Correct.

15   Q.    So that's the only difference between the two

16   reports, between the initial report which doesn't have

17   all the details and the supplemental report which only

18   has three additional paragraphs that deal with the

19   black bag.

20   A.    Correct.

21   Q.    And -- excuse me one moment.

22         (Pause.)

23   Q.    Referring back to that initial report --

24   A.    Which one?

25   Q.    The initial -- the complaint affidavit.

101

1    A.    Yes.

2    Q.    Is there any mention in that affidavit that Mr.

3    Sensi said, take it, it's porn?

4    A.    I'll refer to my document?

5    Q.    Sure.  If it will refresh your memory, sir.

6          (Pause.)

7    A.    No, sir.

8    Q.    And that was completed after the execution was

9    performed, that report, that complaint affidavit was

10   done later in that day.

11   A.    Yes, the complaint affidavit was.

12   Q.    And that omits the line that Mr. -- that you're

13   attributing to Mr. Sensi, take it, it's porn.

14   A.    Correct.

15         (Pause.)

16   Q.    What steps did you undertake to corroborate the

17   information in the arrest warrant affidavit regarding

18   the entry of information that you identified through

19   ICAC, I-C-A-C?

20   A.    Meaning the -- repeat that, please.

21   Q.    I'll try to.  Were you able to corroborate the

22   information, the identifying information, when you saw

23   the ISP attributed to a file?  Do you know the entrant

24   of that information into the database?

25   A.    Yes, I confirmed that the -- and there's a whole

Case 12-565, Document 26, 10/05/2012, 740168, Page232 of 301

A-228

102

1    list of them so I can't say that every single one, but

2    the majority of files that I observed prior to the

3    search warrant that were identified as associated with

4    an IP belonging to Mr. Sensi during my investigation,

5    the file names I was seeing in the database were

6    eventually recovered from Mr. Sensi's computer.  Some

7    had file names.

8    Q.    But in regards to the investigation that led up to

9    your search warrant?  You mentioned that there were 78

10   entries regarding that particular IP address.

11   A.    Correct.

12   Q.    And who made those entries?

13   A.    Those entries are made by -- they are logged

14   automatically by the system that we're involved in.

15   Each individual officer is given a serial number to

16   operate and you're identified by this particular

17   number, and so specific officers I couldn't tell you,

18   but it's an automated process where we investigate

19   computers and involves an IP that is sharing known

20   child pornography files.  It's an automated process.

21        (Pause.)

22   Q.    You testified earlier today that you and your

23   partner waited outside for someone to leave the

24   residence and Mr. Sensi -- and please correct me if I'm

25   wrong about this, opened up his front door, walked to

1   his car, returned to inside his residence and that's

2   when you and your partner went to the front door?

3   A.   Yes.

4   Q.   Do you recall stating in your deposition of

5   November 19th that you waited for someone to come out,

6   you saw two cars, as soon as someone came out of the

7   house you approached and identified yourself?

8   A.   We approached the house and were met at the front

9   door and identified ourselves, yes.

10   Q.   And do you recall during that deposition answer

11   whether you ever stated that Mr. Sensi walked outside

12   the house and went back inside?

13   A.   I don't recall if I did or not.

14   Q.   Would it refresh your memory, sir, if you had a

15   chance to look at that document again?

16   A.   I don't think I have my deposition.

17   Q.   I do.

18   A.   Okay.

19           THE COURT:  What's the page?

20           MR. BERKE:  Page 37, sir.

21           THE COURT:  37.

22   BY MR. BERKE:

23   Q.   It's the -- the question begins on page 36, line

24   24.

25   A.   Okay.

Case 12-565, Document 26, 10/05/2012, 740168, Page234 of 301

A-230

104

1           (Pause.)

2   A.    Okay.

3   Q.    Sir, does that refresh your memory on whether you

4   had indicated in the deposition whether Mr. Sensi left

5   the house, went to his car and came back inside?

6   A.    Basically it's kind of generic, but it says that

7   he came outside briefly and then it says we identified

8   ourselves and then proceeded (unintelligible) Mr.

9   Sensi.

10  Q.    But this is your testimony.

11  A.    Correct.

12          (Pause.)

13  Q.    Now, you had pointed out a compact disk that had a

14  notation PTHC?

15  A.    Yes.

16  Q.    And you had in your experience dealt with that

17  acronym before.

18  A.    Yes.

19  Q.    And you described what that meant.  Were there any

20  Hi8 tapes that had any acronyms that were familiar to

21  you that would identify them as child pornography?

22  A.    Just the triple X which I've seen in both child

23  pornography and pornography I guess.

24  Q.    But that wouldn't in itself, did the nomenclature

25  of triple X have any indication to you that that's

A-231

105

```
 1   child pornography?
 2   A.   Solely, no.
 3   Q.   And there's no other markings on those Hi8 tapes,
 4   those analog tapes, that would reflect that it is a --
 5   that child porn, unlike that disk that you talked about
 6   earlier today, the PTHC?
 7   A.   Just the no names and acronym triple X.
 8   Q.   So that could be adult tapes or pornography tapes
 9   as well as --
10   A.   It's possible.
11   Q.   Now, during your deposition and earlier today you
12   had testified in your deposition as well as today about
13   the transfer of materials from a camcorder to a
14   computer.  Is it fair to say that that testimony was
15   not related to the particular camcorder that you viewed
16   earlier this afternoon?
17   A.   Correct.
18   Q.   So what was just a generic response to camcorders
19   in general, not necessarily the one that Mr. Sensi had
20   in his house.
21   A.   Correct.
22        (Pause.)
23   Q.   Now, during the deposition do you recall
24   testifying that the Hi8 camcorder had the ability to
25   transfer images to the computer?
```

1    A    I'd have to refer to it again.

2    Q.    Page 51, line 7.

3    A.    Line?

4    Q.    7.

5    A.    Okay.  Yes.

6    Q.    So you did testify at the deposition that his

7    camcorder had the ability to do that, yet today you

8    testified after reviewing the camcorder that there was

9    no USB or FireWire connection.

10    A.    There was no USB or FireWire cable, but I did

11    mention that the camera still has ability to transfer

12    images to a computer, send analog images to a computer

13    if that computer is capable of that.  So that is

14    capable still, and I also mentioned in my deposition

15    that I think there's USB cables in the bag, but don't

16    hold me to that.  I believe there's cables and stuff in

17    the bag but -- and that's all I said when I said don't

18    hold me to that, but there were cables, like I said,

19    there's an analog cable that you can connect your

20    computer to.

21    Q.    But you didn't testify that they were USB or

22    FireWire.

23    A.    You mean I --

24    Q.    During your deposition.

25    A.    I said that those are two of the cables that you

107

1   can use to transfer images.

2   Q.   You didn't testify that you found a USB cable or

3   FireWire cable.

4   A.   Right, I did not.

5        (Pause.)

6   Q.   Did any other officer during the execution of the

7   warrant witness the statement that you attributed to

8   Mr. Sensi, take it, it's porn?

9   A.   I don't believe so.

10  Q.   And where -- who was in the room when that

11  statement was made?

12  A.   We were in the bedroom.  It was just me and Mr.

13  Sensi.

14  Q.   Are you aware that there are different IP

15  addresses in the search warrant affidavit as well as

16  the search warrant itself?

17  A.   Say that again?

18  Q.   That there are different IP addresses in the

19  search warrant affidavit than the search warrant

20  itself?

21  A.   In the search warrant affidavit and in the search

22  warrant?

23  Q.   Yes.

24  A.   I'm unaware of that.  I know there's a typo in the

25  complaint affidavit I believe.

108

```
 1    Q.    Regarding the IP address?
 2    A.    Yes.  But it's not in the search warrant, or the
 3    search warrant --
 4    Q.    I'm sorry.  I was referring to the complaint
 5    affidavit.
 6    A.    Yes.
 7    Q.    Not the search warrant.  And was that a typo
 8    corrected with a supplement?
 9    A.    No, not at this time.
10    Q.    Sir, do you have a copy of the affidavit for the
11    search warrant with you?
12    A.    Yes.  Yes.
13    Q.    This may be easier for you to answer this
14    question.  Referring to page 8, paragraph 14 of that
15    affidavit.
16    A.    14?
17    Q.    I'm sorry, page 8, paragraph 14.
18    A.    Okay.
19    Q.    Once a file is identified, the download process
20    can be initiated?
21    A.    Yes.
22    Q.    You were unable to complete the download process
23    in this case.
24    A.    Correct.
25    Q.    And the download process allows you to detect and
```

A-235

109

1   investigate computers that possess child porn; is that

2   fair to say?

3   A.    That's one way.

4   Q.    And you were also unable to obtain a list of

5   files, a list of downloaded files or partial downloaded

6   files from Mr. Sensi's computer?

7   A.    According to the database I was able to see a list

8   of files that he had possessed during a period of time.

9   Just because I wasn't able to download doesn't mean

10  that somebody else hadn't come across that IP.

11          MR. BERKE:   Sir, if I could have one moment,

12  please.

13      (Pause.)

14  BY MR. BERKE:

15  Q.    During the course of the LimeWire download, can

16  the IP address change in a dynamic IP setting?   Could

17  it start downloading in one IP address and then change

18  to another IP address?

19  A.    Well, typically in the public version of LimeWire,

20  when you download from a file, when you download,

21  excuse me, from a computer, you are normally

22  downloading from a variety of different sources bits

23  and pieces of that file, and it's put together once the

24  file is completely downloaded to your computer.   In our

25  law enforcement flavors of this software we have one

A-236

110

1   source direct download.  Sometimes it takes a little

2   longer but we only draw from one source, so if I'm --

3   in this case it wasn't a download case, but if I am

4   downloading from an individual, I would download

5   individually from that same IP continuously until that

6   file is completely downloaded or the person gets

7   offline and I'm unable to download that file anymore.

8   Q.   Thank you, sir.

9        MR. BERKE:  I have nothing else, sir.

10       THE COURT:  All right.  Ms. Patel?

11               REDIRECT EXAMINATION

12  BY MS. PATEL:

13  Q.   Det. Broughton, you've been asked a great deal

14  about downloading and not being able to download Mr.

15  Sensi's files.  Prior to obtaining the search warrant

16  you indicated that you are part of an ICAC group; is

17  that correct?

18  A.   Correct.

19  Q.   Okay.  And you gave a brief overview of how the

20  ICAC is able to capture IP addresses that are accessing

21  child pornography.

22  A.   Correct.

23  Q.   And prior to your obtaining the search warrant,

24  how many files did an IP address to whom the subscriber

25  was Edgardo Sensi, access of child pornography?

A-237

111

1    A.    He was seen approximately 78 times, and some of

2    the files are duplicates, but I would say that at least

3    50 files were seen that were identified as child

4    pornography or suspected child pornography, two of

5    those of which I have previously downloaded.

6    Q.    Sir, I'm handing you Government's Exhibit 22.  I'm

7    going to ask whether you can identify it.

8    A.    Yes, this is the information that the database

9    that I have been referring to, some of the information

10   that is provided to me when I do a query with the ICAC

11   database.

12   Q.    Okay.  So is it fair to say this logs in the IP

13   address to whom the subscriber was Edgardo Sensi

14   accessing various files?

15   A.    Yes.

16   Q.    Okay.  I'm going to put --

17         MS. PATEL:  Your Honor, at this time the

18   Government would ask to admit Government's Exhibit 22

19   into evidence.

20         MR. BERKE:  No objection.

21   BY MS. PATEL:

22   Q.    So I'm going to put it up on the ELMO here and I'm

23   going to point on the bottom here on the left-hand side

24   under IP.  Can you tell me what that column stands for?

25   A.    IP is the internet protocol address.

Case 12-565, Document 26, 10/05/2012, 740168, Page242 of 301

A-238

112

1   Q.   And is that the address for whom the subscriber

2   was Edgardo Sensi?

3   A.   Yes.

4   Q.   Okay.  And it says the time and the date.  Are

5   these -- what does that mean?

6   A.   The time and date is the time and date that that

7   file was seen on the network and that time is minus

8   600, which is (unintelligible) time, so it's like plus

9   one, so you would add an hour for Eastern time.

10  Q.   And what's the sha (phonetic) value?

11  A.   A sha value is just basically a digital

12  fingerprint of the physical file itself.

13  Q.   Okay.  And then on the right-hand side, what is

14  file name?

15  A.   That is the actual file name.

16  Q.   And based on just reading the file names, does

17  that indicate to you one way or the other as to whether

18  or not these files may be related to child pornography?

19  A.   For the most part all these file names, somewhere

20  in the file name there is some indication that the file

21  possibly could be a child pornography-related file just

22  based on the words.

23  Q.   And this particular log goes from August 23rd until

24  August 26th; is that correct?

25  A.   That is correct.

A-239

113

1    Q.    And you indicated earlier that you did get a

2    subpoena.  Did you get a subpoena for that time period?

3    A.    Yes, I did.

4    Q.    And for that IP address.

5    A.    Correct.

6    Q.    Did the IP address during that time period ever

7    change?

8    A.    No.

9    Q.    It remained the same; is that correct?

10   A.    It remained the same and assigned to Edgardo

11   Sensi.

12   Q.    Okay.  And was this the probable cause on which

13   you based that an IP address coming from the location

14   2750 Northwest Windemere Drive, Jensen Beach, Florida,

15   that there was an IP address at that location, a

16   computer accessing child pornography?

17   A.    That coupled with the fact that two of the files

18   that I did observe being shared by the IP I had

19   physically seen before in previous investigation and

20   determined those to depict child pornography.

21   Q.    And once you obtained the search warrant, you were

22   asked about what your expectation was when you obtained

23   -- when you entered the house.  When you write your

24   search warrants do you -- or your affidavits, do you

25   based them on what you solely expect to find?

A-240

114

1    A.    No, because like I said, every time you go to a

2    front door you never know what to expect.  But my main

3    job was to look for and corroborate my investigation

4    and look for evidence of child pornography in a variety

5    of different ways.

6    Q.    And I'm going to actually ask you to focus again

7    on what's been marked as Government's Exhibit 1, and

8    this is part of your affidavit for search warrant and

9    what you would be looking for.  And under paragraph 1,

10   it says images, movies or visual depictions of sexual

11   conduct or sexual performance by a child or children in

12   violation of a possession statute, including by not

13   limited to, and you make reference to digital files; is

14   that correct?

15   A.    That is correct.

16   Q.    Okay.  And does images, movies or visual

17   depictions, is that in any way limited only to digital

18   files?

19   A.    No, and that's why I said not limited to.

20   Q.    And so, sir, when you walk into a house and you

21   are searching for child pornography, are you interested

22   in any image of child pornography in that house?

23   A.    Absolutely.

24   Q.    Whether or not it's on a digital media.

25   A.    Absolutely.

Case 12-565, Document 26, 10/05/2012, 740168, Page245 of 301

A-241

1    Q.    And again, paragraph 4, in paragraph 4 are you

2    looking only for digital evidence?

3    A.    No.

4    Q.    Okay.  Why is that?

5    A.    Because I'm also looking for any type of

6    mechanical storage.

7    Q.    And in this particular case you've been asked a

8    lot about the Hi8 tapes.  Is there any way to take the

9    contents of a Hi8 tape and put them onto a computer?

10   A.    Actually, we did that.

11   Q.    In this case?

12   A.    Yes.

13   Q.    Okay.  And how is that?

14   A.    I mean there's a variety of different ways to play

15   a Hi8 tape and then input that into a computer.

16   There's a variety of different cables that can hooked

17   directly up into a camera or there's other breakout

18   boxes and other devices that can play Hi8 tapes that

19   can connect to a computer.  In this case we had copied

20   the images that were found on the Hi8 tapes to a

21   computer and then burned them onto a DVD so we wouldn't

22   have to play the Hi8 tapes over and over again.

23   Q.    So you were asked a lot about cables in this case,

24   USB cables.  Are USB cables readily available?

25   A.    Absolutely.

1    Q.    Do you have to have a particular license to own a

2    USB cable?

3    A.    Not at all.

4    Q.    Can anyone buy one?

5    A.    Yes.

6    Q.    Are you restricted to buying only one video

7    camera?

8    A.    Nope.

9    Q.    You've also been asked a lot about the consent

10   issue in your arrest warrant.  I'm going to actually

11   take you to your report, Supplement Number 1, dated

12   September 23rd, 2008.  Do you have a copy of it there,

13   sir?

14   A.    Let me see.  The offense incident report?

15   Q.    It is --

16         (Pause.)

17            THE COURT:  You'll have to show me that

18   report.  My reports are dated September 10th.

19            MS. PATEL:  Supplement Number 1, let me

20   actually -- your Honor, may I approach?

21            THE COURT:  Yeah.  I'll see if I can find

22   that.

23            THE WITNESS:  Yes.

24   BY MS. PATEL:

25   Q.    And what is that attached to?

Case 12-565, Document 26, 10/05/2012, 740168, Page247 of 301

A-243

```
1              THE COURT:  Yeah, let me have a copy of that
2      and I'll figure out if I got them.
3          (Pause.)
4              THE WITNESS:  Supplement 1 is attached to my
5      offense incident report, which is just a face sheet.
6      BY MS. PATEL:
7      Q.   And on page 168, do you make any mention of the
8      consent?
9      A.   Okay.  Page what?
10     Q.   I believe it was 68.  1, 6 -- what, 1, 6 -- 6 of
11     8, sorry.
12     A.   Okay.
13         (Pause.)
14     A.   I'm a little lost on the actual page.
15     Q.   I know.  I'm sorry.
16     A.   Sorry.
17             MS. PATEL:  Your Honor, may I approach?
18             THE COURT:  Oh, this is the report.  Okay.
19     Let's see, I think I've got that.  Yes, I have that.  I
20     didn't realize that was dated -- oh, it's dated August
21     27th?
22             MS. PATEL:  No, your Honor, the date is on the
23     bottom.
24             THE COURT:  September 13?  Yeah.  I don't have
25     the same format.  I have --
```

A-244

118

1              THE WITNESS:  This one?

2              THE COURT:  This is the same document.  Is

3    this the (unintelligible)?

4              THE WITNESS:  That's the complaint affidavit.

5              THE COURT:  Seems to be the same.  It's got

6    the list and everything.

7         (Pause.)

8              THE WITNESS:  I don't what that 68 is.  Okay.

9         (Pause.)

10             THE WITNESS:  Yes, okay.

11   BY MS. PATEL:

12   Q.   Do you have it in front of you?

13        (Pause.)

14   Q.   Why don't I just mark it.

15   A.   Yeah.  I don't have it in front of me.

16        (Discussion off the record.)

17             MS. PATEL:  Government's Exhibit 24, your

18   Honor.

19             MR. BERKE:  No objection.

20             THE COURT:  Yeah, let me see what that -- I

21   want to compare that with what I got here.  I want to

22   look at that date again.  It looks like the same

23   document.  Let's see.  It says September 23rd.

24             MS. PATEL:  It's the supplemental report.

25             THE COURT:  Yeah, it looks as though it's the

Case 12-565, Document 26, 10/05/2012, 740168, Page249 of 301

A-245

```
 1    same document.  Yeah, it is the same document.  So

 2    there's no difference really, is there, between this

 3    report that's -- it's Exhibit A but I'm trying to

 4    figure out what the date of it is.  I thought it was

 5    your report of September 10th also.  It says August 27th

 6    but that's the complaint.  September 10th.

 7            MS. PATEL:  And then there was a supplemental

 8    report.

 9            THE COURT:  Yeah.  I'm trying to see what this

10    thing says.  They look like the same.  Yeah, this is

11    the 9th of September.

12        (Pause.)

13            THE COURT:  Okay.  Now I got it.  Yeah,

14    September 10th is the signature of this.  This looks

15    like the same document to me.  I will check these out

16    but it seems to be the same as this one which is dated

17    (unintelligible).

18            MS. PATEL:  Your Honor, that's the

19    supplemental report.

20            THE COURT:  Yeah, I understand that, but the

21    contents looks the same.

22            THE WITNESS:  There's a lot of the same

23    language.

24            MS. PATEL:  Yeah, there is a lot of

25    similarity.
```

**A-246**

120

1           THE COURT:  Yeah, that's what

2   (unintelligible).  Let me see if I can see what can

3   make the difference here.

4       (Pause.)

5           MS. PATEL:  What's been marked as Exhibit 24

6   --

7           THE COURT:  This is the (unintelligible).

8           THE WITNESS:  Okay.  Yes, sir.  Correct.

9           THE COURT:  You can see where the --

10          THE WITNESS:  That is correct.

11          THE COURT:  Okay.  All right.

12          THE WITNESS:  Thank you.

13          THE WITNESS:  Yeah, you want to mark this

14  other one?

15          MS. PATEL:  I did, your Honor.  It's marked,

16  yeah, Exhibit 24.

17  BY MS. PATEL:

18  Q.    Sir, in your supplemental report, did you make any

19  mention of Mr. Sensi's statement about, take it, it's

20  porn?

21  A.    Yes.

22  Q.    Okay.  And that was dated -- what was the date on

23  that?

24  A.    9/15.

25  Q.    And finally, sir, you were asked about a police

Case 12-565, Document 26, 10/05/2012, 740168, Page251 of 301

A-247

121

1    car blocking Mr. Sensi's car.  Do you know in fact

2    whether the police car blocked his car?

3    A.    I do not, no.  I don't recall.

4    Q.    Did he ever ask you to move the car?

5    A.    No.

6    Q.    Was there anything preventing him from walking out

7    the door?

8    A.    No.

9    Q.    You were also asked about that Det. Lamb's job was

10   to watch him; is that correct?

11   A.    Correct.

12   Q.    You were asked about that?  To your knowledge, did

13   Officer Lamb in any way restrict his movement?

14   A.    Not at all.

15         MS. PATEL:  Nothing further, your Honor.

16         THE COURT:  Okay.  Anything else?

17         MR. BERKE:  Just very briefly, sir.  I have

18   just a few follow-up questions.

19         THE COURT:  Okay.

20              RECROSS EXAMINATION

21   BY MR. BERKE:

22   Q.    Now, you indicated that you took these 8

23   millimeter tapes and put them on a computer?

24   A.    Yes.  Connected to a computer, yes.

25   Q.    Now, the 8 millimeter camera that you found, I

Case 12-565, Document 26, 10/05/2012, 740168, Page252 of 301

A-248

1   know we've been through this already, doesn't have the

2   capability to do that short of having that RCA plug-in

3   you talked about.

4   A.   Correct.

5   Q.   And those RCA plugs to your knowledge were not on

6   the computers located at the residence.

7   A.   I don't recall if they were or not, I'm sorry.

8   Q.   Do you have that computer?

9   A.   I don't, I don't think -- I think it's still in

10   evidence.

11   Q.   Do you have photographs of that computer?

12   A.   I do have a general photograph I can refer to and

13   see if I can make that determination.

14   Q.   If that may refresh your memory, sir.

15   A.   I don't think I took pictures of all the ports.

16       (Pause.)

17   A.   I really don't have any side shots of it, but I

18   can make a true and accurate at this time.

19   Q.   Now, you were asked a couple of questions just now

20   by Attorney Patel about whether anyone could buy a USB

21   cable and whether USB cables are readily available.

22   It's impossible to hook up a USB cable to that

23   camcorder that receives --

24   A.   That specific camera, yes, sir.

25   Q.   That was the camera at his residence.

A-249

123

1    A.    Yes.

2    Q.    And that's the only camcorder that you found at

3    the residence.

4    A.    Yes.

5    Q.    Now, there was a notation on an inventory in

6    regards to the black duffle bag and there was a

7    notation in quotes -- or not in quotes, I should say in

8    parentheses that says, containing porn.  At what point

9    was that entered into the inventory?  When I say

10   entered, I mean written on that inventory sheet.

11   A.    I believe at the time we seized the item.

12   Q.    At the time you seized the item, that black bag,

13   you could not see inside the black bag.

14   A.    No.

15   Q.    And that was done by who?  Who put that notation

16   on there?

17   A.    I believe it's probably my handwriting.

18   Q.    Do you recall testifying in deposition that your

19   partner had completed the inventory?

20   A.    No, I haven't.  No, I didn't.

21         (Pause.)

22   Q.    Page 69 of your deposition --

23              THE COURT:  What's the page, 59?

24              MR. BERKE:  I'm sorry, 69, sir.

25              THE COURT:  69.

A-250

124

1    BY MR. BERKE:

2    Q.    And I'm referring to lines 6 through 15.

3          (Pause.)

4    A.    Okay.

5    Q.    Does that refresh your memory on whether your

6    partner had completed that inventory?

7    A.    Yes.  I can look at the actual document again and

8    I can confirm that it looks like his handwriting so,

9    yeah, that is his handwriting.  So as according to my

10   deposition I relayed that information for him, what to

11   write down.

12   Q.    So it wasn't your handwriting on the inventory.

13   A.    No, it was not.

14         MR. BERKE:  I have nothing else.

15         THE COURT:  Okay.  You can step down.

16         THE WITNESS:  Thank you, sir.

17   (Witness excused.)

18   (Pause.)

19         THE COURT:  Okay.  Is that the end of the

20   Government's presentation?

21         MS. PATEL:  Yes, it is, your Honor.

22         THE COURT:  Okay.  Counsel?

23         MR. BERKE:  Thank you, your Honor.  Can I ask

24   Mr. Sensi to take the stand?

25         THE COURT:  Yes.

A-251

125

1          EDGARDO SENSI, DEFENDANT, SWORN

2          THE CLERK:  Please be seated.  Please state

3     your name, spell your last name, and your city and

4     state, please.

5          THE WITNESS:  My name is Edgardo Sensi.  The

6     last name is S-E-N-S-I.  I reside in Jupiter, Florida.

7          THE CLERK:  Thank you.

8                    DIRECT EXAMINATION

9     BY MR. BERKE:

10    Q.   Good afternoon, sir.

11    A.   Good afternoon.

12    Q.   I'd like to turn your attention to the search

13    warrant execution that occurred at Northwest Windemere,

14    Jensen Beach on September 10th of 2008.

15    A.   Okay.

16    Q.   And can you describe what happened that led you to

17    realize that police officers were at your house?

18    A.   That morning there was a knock, either a knock or

19    the doorbell rang.  I went to answer the door and Det.

20    Broughton and Colasuonno were there.  He showed me a

21    search warrant and indicated that he had a search

22    warrant for evidence of child pornography.  He asked me

23    if there was a computer in the house and I indicated

24    that there were two.  There was a laptop in my son's

25    room which doubles as a study, as he indicated, at the

A-252

1   front of the house.  And there was also a laptop on the

2   kitchen counter that belonged to my girlfriend who was

3   also in the house.

4   Q.   You indicate this was the morning.  Do you have a

5   more exact time of when this was?

6   A.   I would say around 8:30.  I was getting ready to

7   go to work.

8   Q.   And were you dressed to go to work?

9   A.   At that point I believe I was, yes.  Yes, I was,

10  because I had stepped out and I had forgotten

11  something, went back in the house.  So, yes, I was.

12  Q.   And do you recall any officers reading you the

13  search warrant?

14  A.   I believe he did start reading parts of it, and as

15  he was reading it he was showing it to me.  I did

16  indicate that I needed to go to work, how long would it

17  take.  He said it wouldn't take long.  (Unintelligible)

18  come and show me where the computers were and wait in

19  the living room.

20  Q.   And was anyone with you in the living room?

21  A.   Tati was, yes.  My girlfriend.

22  Q.   And was there anyone else?

23  A.   No, sir.

24  Q.   And what officers were at your residence on that

25  date?

A-253

127

1    A.    At that point, I believe as I was waiting outside

2    speaking to the detective, he had parked his car behind

3    my car or my girlfriend's car, and I observed the

4    sheriff's patrol car pull up and he parked

5    perpendicular to those cars on the driveway, so it was

6    partially on the road and partially on our driveway.

7    And I believe that's Sheriff or Officer Lamb.

8    Q.    Now, the first car, the car that Det. Broughton

9    came in, was that an unmarked car?

10   A.    Yes, sir.

11   Q.    And you're distinguishing that car from the marked

12   sheriff's car which has a notation on the side of the

13   car.

14   A.    Correct.   Right.

15   Q.    And the officer that came in that parked car, that

16   uniformed officer, where was he during the course of

17   the search warrant execution?

18   A.    The entire time he was at the entrance to my

19   house.   In fact, I remember him specifically playing

20   with my dog, but he stayed at the entrance of the

21   house.

22   Q.    And did you engage in any discussion with him?

23   A.    No, I did not.

24   Q.    Did he ask you any questions?

25   A.    No, he did not.

Case 12-565, Document 26, 10/05/2012, 740168, Page258 of 301

A-254

128

1    Q.    And did you remain in the living room during the

2    entire course of the search warrant execution?

3    A.    With the exception of when he called me into the

4    bedroom.

5    Q.    And when you say he, who are your referring to?

6    A.    I'm sorry.  To Officer Broughton.

7    Q.    And when Officer Broughton, Det. Broughton, called

8    you into the bedroom, with whom was he with, if anyone?

9    A.    He was alone.

10   Q.    And what had happened when he called you to the

11   bedroom?

12   A.    He had placed a black duffle bag at the foot of my

13   bed and he came in and asked me if I had the key to the

14   bag.  And I replied I did not.  He then informed me he

15   would have to take the bag with him back to the office

16   to break the lock.  And that was the entire

17   conversation.

18   Q.    Did he ever ask you to sign a consent to search

19   form?

20   A.    No, he did not.

21   Q.    And did you ever give him consent to either search

22   the bag or take the bag?

23   A.    No, I did not.

24   Q.    And did you ever tell him or make the statement,

25   take it, it's porn?

Case 12-565, Document 26, 10/05/2012, 740168, Page259 of 301

A-255

```
 1   A.   Made absolutely no reference to any contents of
 2   the bag.  Made no statement whatsoever.  He told me he
 3   needed to take the bag to break the lock.
 4   Q.   Were you ever told that you were allowed to leave
 5   your home during the course of the search warrant
 6   execution?
 7   A.   No, absolutely not.
 8   Q.   Did you believe that you were free to leave?
 9   A.   No.
10   Q.   And what about your girlfriend, Tatiana?
11   A.   Her name is Tati.
12   Q.   I apologize.
13   A.   That's okay.
14   Q.   Was she ever advised in your presence that she was
15   free to leave?
16   A.   No, she was not.
17   Q.   Did you ever ask to leave to go to work?
18   A.   No, I did not.  I was told to go stand or sit in
19   the living room or be in the living room while they
20   conducted the search, that it wouldn't take long, and I
21   could then go to my office.
22   Q.   And how long did that search take?
23   A.   Might have (unintelligible) about 20 minutes,
24   perhaps 30.
25   Q.   How would you describe the interaction between you
```

A-256

130

1   and Det. Broughton during the search warrant execution?

2   A.   It was pretty matter of fact.  I can't describe it

3   in any other way.  He simply had questions.

4   Q.   Were you nervous?

5   A.   A little bit.

6   Q.   Do you recall sweating?

7   A.   Yes.

8   Q.   Do you recall advising Officer Broughton that you

9   were sweating because of diabetes?

10  A.   Yes.  It's connected to peripheral neuropathy

11  after you especially come out of the shower, diabetics

12  tend to continue sweating.  And it's Florida.

13       (Pause.)

14  Q.   Do you recall what Officer Lamb was doing during

15  that 20 to 30-minute span?

16  A.   I recall that he was always standing or kneeling

17  at the door.  Kneeling in the sense that he was playing

18  with my dog.  He was always stationed at the door.  I

19  believe Det. Broughton states it in the deposition, we

20  had him stationed at the door.

21  Q.   Sir, I apologize if I already asked you this.  I

22  apologize for being repetitive, but were you ever

23  advised that you were free to leave?

24  A.   No, I was not.

25  Q.   And were you ever advised that you were not under

A-257

131

1    arrest?

2    A.    No.

3    Q.    That's a double negative.

4    A.    Yes.  No, I was not.

5          MR. BERKE:  I have nothing else.

6          THE WITNESS:  Can I explain about the

7    inventory list that was given to me?

8          MR. BERKE:  There's no question.

9          THE WITNESS:  Okay.

10         (Pause.)

11                    CROSS EXAMINATION

12   BY MS. PATEL:

13   Q.    Sir, on September 10, 2008 you resided at 2750

14   Northwest Windemere Drive?

15   A.    Yes, ma'am.

16   Q.    That was in fact your residence?

17   A.    At the time, yes, ma'am.

18   Q.    Okay.  And who else was living there with you?

19   A.    And Tati.

20   Q.    Was she living with you there or was she just a

21   guest?

22   A.    No, she was (unintelligible) with me, yes, ma'am.

23   Q.    And we've heard a lot about the black bag today.

24   Is that black bag yours?

25   A.    Yes, ma'am.

Case 12-565, Document 26, 10/05/2012, 740168, Page262 of 301

```
 1   Q.   Is the contents of that black bag yours?
 2   A.   I believe so.
 3   Q.   And you wanted to make sure that it was locked; is
 4   that correct?
 5   A.   I believe it had been locked for quite some time.
 6   Q.   So in the morning of September 10th, 2008, you get
 7   a knock at the door and you have two individuals who
 8   identify themselves as police officers; is that
 9   correct?
10   A.   Yes.
11   Q.   They showed you badges?
12   A.   Yes.
13   Q.   They did.
14   A.   Yeah, they did.
15   Q.   And they identified themselves as police officers.
16   A.   Correct.
17   Q.   And they told you they were there pursuant to a
18   search warrant.
19   A.   Correct.
20   Q.   They showed you the search warrant.
21   A.   Correct.
22   Q.   They gave you a copy of the search warrant.
23   A.   After the search.
24   Q.   They didn't draw any weapons, did they?
25   A.   No.
```

Case 12-565, Document 26, 10/05/2012, 740168, Page263 of 301

A-259

133

```
1    Q.   Did they ever tell you you were under arrest?

2    A.   No, they did not.

3    Q.   Did they give you your Miranda rights?

4    A.   No, they did not.

5    Q.   You're familiar with Miranda rights, right?

6    A.   I believe so, yes.

7    Q.   You watch TV, you watch movies.

8    A.   Yes, ma'am.

9    Q.   You know what Miranda rights are, right?

10   A.   Um-hum.

11   Q.   You were never told you had the right to remain

12   silent; is that correct?

13   A.   That's correct.

14   Q.   You never were told you had a right to have a

15   lawyer?

16   A.   Correct.

17   Q.   And that's because you weren't under arrest; is

18   that correct?

19   A.   Not at that time.

20   Q.   No handcuffs were put on you during that time?

21   A.   No, ma'am.

22   Q.   Okay.  You weren't put in the back of a police

23   vehicle and taken down to the police station?

24   A.   No, ma'am.

25   Q.   No.  You were told that they were there pursuant
```

Case 12-565, Document 26, 10/05/2012, 740168, Page264 of 301

1   to a search warrant, they were going to be in your

2   house and they were in your house for 20 or 30 minutes

3   to conduct a lawful search; correct?

4   A.   Correct.

5   Q.   Okay.  And so while you were there you now

6   indicate that you were in the living room.

7   A.   Correct.

8   Q.   Did they ever take away your phone?

9   A.   No.

10   Q.   Did they take away your car keys?

11   A.   No.

12   Q.   In fact, you used your phone, didn't you, while

13   they were there.

14   A.   I don't think so.

15   Q.   You don't think so or you don't remember?

16   A.   I believe the first call I made was after they

17   left.  I'm not a hundred percent sure, but I believe

18   so.

19   Q.   And you now sit here today and you say that your

20   car was blocked.  Did you ever ask them to move the

21   car?

22   A.   No, ma'am.

23   Q.   You have a back door to your house, correct?

24   A.   They're sliding doors.

25   Q.   Yes.  They're doors, right, that lead to the

Case 12-565, Document 26, 10/05/2012, 740168, Page265 of 301

```
 1   outside?

 2   A.    Um-hum.

 3   Q.    Did you walk outside those doors?

 4   A.    No.

 5   Q.    Was there anything preventing you from walking

 6   outside those doors?

 7   A.    The officer told me to stay in the living room.

 8   Q.    Were you bound?

 9   A.    No, but --

10   Q.    Were you handcuffed?

11   A.    If a law enforcement officer tells me to go

12   someplace I obey him.

13   Q.    Okay.  So he asked you to wait in the living room

14   and he's out there conducting a search in your house,

15   correct?

16   A.    Correct.

17   Q.    Did you say I want to leave, I don't want to talk

18   to you?  Did you say that?

19   A.    No.

20   Q.    Did you say I'm gonna leave?

21   A.    No, certainly not.  I wouldn't dare say that.

22   Q.    Okay.  Your hands weren't tied, your feet weren't

23   tied?

24   A.    No, ma'am.

25   Q.    You weren't beaten?
```

A-262

136

1   A.   No, ma'am.

2   Q.   Okay.  Did they tell you you couldn't drink any

3   water, you couldn't have any food?  Did they tell you

4   any of those things?

5   A.   No, ma'am.

6   Q.   Okay.  And you on your own decided you weren't

7   going to go try to walk out the back door.  Right?

8   A.   I was told to stay in the living room by a law

9   enforcement officer.

10  Q.   Did you ever say, I'm going to leave, I don't want

11  to stay here?

12  A.   No, I didn't.

13  Q.   You signed an affidavit in this case, correct,

14  sir?

15  A.   Yeah.

16  Q.   Executed two affidavits for the purposes of this

17  case, correct?

18  A.   I don't know what you mean, I'm sorry.

19          MS. PATEL:  May I approach, your Honor?

20          THE COURT:  No --

21  A.   I know I signed an affidavit though.

22          THE COURT:  Have I  got a copy of that

23  affidavit?

24          MS. PATEL:  Yes, your Honor, they were

25  included as part of the Defense motion.

Case 12-565, Document 26, 10/05/2012, 740168, Page267 of 301

A-263

```
1              THE WITNESS:  Oh, yeah, I did.  I'm sorry.
2    Forgive me.  Yes.
3    BY MS. PATEL:
4    Q.    That's okay.
5    A.    Attorney Berke had given them to me.  There were
6    two.
7              THE COURT:  Yeah, let me take a look at the
8    affidavit.
9              THE WITNESS:  And there were sent
10   (unintelligible) detention facility and notarized
11   there.
12             THE COURT:  And here is the affidavit.  Yeah,
13   I've got it.
14        (Pause.)
15          MS. PATEL:  Your Honor, may I approach?
16          THE COURT:  Now, are we talking about the
17   affidavit dated the 3rd of May?
18          MS. PATEL:  Yes, your Honor.  There's two
19   affidavits, both that were part of the motion.  One is
20   just dated April 3rd, 2010, and the second one is dated
21   April 3rd, 2010 and has a signature for May 3rd.
22             THE COURT:  For May 3rd.  Now, I've got that.
23   Where's the other one?  It's attached to something?
24          MS. PATEL:  It was attached to --
25             MR. BERKE:  It was attached to the motion to
```

A-264

138

1    suppress.

2         MS. PATEL:  -- to the motion to suppress, your

3    Honor.

4         THE WITNESS:  Right.

5         MS. PATEL:  The Defendant's motion to

6    suppress.

7         (Pause.)

8    BY MS. PATEL:

9    Q.   Do you recall those two affidavits, sir?

10   A.   Yes, I do.

11   Q.   Okay.

12   A.   Yeah, I apologize.  I do.

13   Q.   No, that's fine.

14        MS. PATEL:  I'm going to ask that they be

15   admitted as Government's Exhibits 23, and I've stapled

16   them together.

17        MR. BERKE:  No objection.

18   BY MS. PATEL:

19   Q.   Sir, I'm going to ask you to take a look on the

20   ELMO.  These are the two affidavits.

21   A.   Right.

22   Q.   This is the one dated April 3rd (unintelligible).

23   A.   Right, right.

24   Q.   You identify yourself as the Defendant in this

25   case?

A-265

139

```
1    A.    Correct.

2    Q.    You indicated that there was a search done at your

3    residence on September 3rd?

4    A.    No, September 10.

5    Q.    On September 10.

6          THE COURT:  Somebody's got to find this for me

7    I guess.  Well, let me see if I can find it.

8        (Pause.)

9          THE COURT:  No, I guess not.  I have a 32-page

10   motion, but I don't have (unintelligible).

11         MS. PATEL:  Your Honor, it's actually attached

12   to the end of the Motion to Suppress.  It's right

13   before a copy of the case.  I do have a copy here.  I

14   have a copy of both of them.  May I approach, your

15   Honor?

16         THE COURT:  Yeah, I don't have a copy of it.

17       (Pause.)

18         THE COURT:  The only page was the paragraph 4

19   then?

20         MS. PATEL:  The paragraph 4 and 5, yes.  And

21   so on one of them -- your Honor, I'm sorry, I've just

22   been told I've actually taken up Government's Exhibit

23   24 already, so I'm going to mark it as Government's

24   Exhibit 25.

25         THE COURT:  Okay.  It's attached to the other
```

A-266

140

1    one.  I see it now.  I've got them, they're attached

2    together (unintelligible).  Okay.  So we have it.  Do

3    you want these back?

4          MS. PATEL:  Sure.

5      (Pause.)

6          MS. PATEL:  So I'm going to, just for the

7    record, your Honor, I'm going to mark them as

8    Government's Exhibit 25, I'll mark them separately, 25

9    and 26.

10         THE COURT:  Now, these are both dated the same

11    date.

12         MS. PATEL:  That's correct, your Honor.

13    BY MS. PATEL:

14    Q.   Government's Exhibit 25 I've put up on the screen,

15    and Mr. Sensi if I could just draw your attention to

16    paragraph 3, you indicate that you never gave written

17    consent; isn't that correct?

18    A.   Yes, ma'am.

19    Q.   And you also say here that you did not give

20    consent to search the locked duffle bag.

21    A.   That's correct.

22    Q.   And on paragraph 5 you say that at no time did you

23    give law enforcement officers a key; is that correct?

24    A.   That's correct, ma'am.

25    Q.   But you in fact did have a key.

Case 12-565, Document 26, 10/05/2012, 740168, Page271 of 301

A-267

1   A.   That's correct, ma'am.

2   Q.   But you in fact did have a key for the locked

3   duffle bag, right?

4   A.   Apparently it was on my key chain, yes.

5   Q.   And with respect to the other affidavit, which I'm

6   going to mark as Government's Exhibit 26, you indicate

7   that you were never given Miranda warnings, right?

8   A.   That's correct.

9   Q.   And you weren't given Miranda warnings but you

10  also weren't place -- you also weren't under arrest on

11  the morning of the search, correct?

12  A.   That's correct.

13  Q.   Okay.  You have been incarcerated, sir, since

14  September 10th, 2008; is that correct?

15  A.   Correct.

16  Q.   You've had a lot of time to think about the case?

17  About your case?

18  A.   Yes, ma'am.

19  Q.   In fact, you've read the deposition of Officer

20  Broughton, right?

21  A.   Yes ma'am.

22  Q.   All right.  You had close to, I don't know, 20, 21

23  months to prepare your affidavits, correct?

24  A.   Correct, ma'am.

25  Q.   Are your affidavits truthful?

Case 12-565, Document 26, 10/05/2012, 740168, Page272 of 301

A-268

```
 1    A.    Yes, absolutely.

 2    Q.    You didn't lie in your affidavits at all, right?

 3    A.    No.

 4    Q.    Okay.  And nowhere in your affidavit do you

 5    mention that you were in custody or that you weren't

 6    free to leave.  You didn't put that in your affidavit,

 7    did you?

 8    A.    No, ma'am.  It's hard to prepare the affidavit

 9    while you're incarcerated.  My counsel prepared it.

10    Q.    But you didn't put anywhere in there, sir, that

11    you were in custody and that you were not free to

12    leave, correct?

13    A.    No, but I can tell you truthfully right now.

14    Q.    And you're being truthful with us today?

15    A.    Absolutely.  Absolutely.

16    Q.    And in fact, sir, not only were you not under

17    arrest, but the police officers left your home that

18    day, right?

19    A.    After they seized the items, yes.

20    Q.    And then they walked out the door and then you

21    walked out the door.  Correct?  You were free to leave.

22    A.    That's correct.

23    Q.    And you went to your workplace?

24    A.    Yes.

25    Q.    Right?  You were engaging in all of your business
```

Case 12-565, Document 26, 10/05/2012, 740168, Page273 of 301

A-269

143

```
1    activities, you turned over keys to your employer.
2    A.    Um-hum.
3    Q.    And in fact you went and destroyed some evidence
4    on your computer.
5    A.    No.
6    Q.    You deleted a bunch of files relating to the first
7    minor victim in this case right after the police
8    searched your home that morning.
9    A.    Um-um.
10   Q.    Right?
11   A.    I don't recall, ma'am.
12   Q.    Okay.  And then right after you did that at some
13   point you called a lawyer, right?
14   A.    Prior to getting to the office.
15              MR. BERKE:  Objection, your Honor.  That's
16   beyond the scope of this hearing.  Also inappropriate
17   based on --
18              THE COURT:  I'll allow it.  Go ahead.
19              MS. PATEL:  It's to his freedom of movement,
20   your Honor.
21   BY MS. PATEL:
22   Q.    And so after -- you weren't even arrested until
23   that evening when you voluntarily surrendered.
24   A.    I was told to, yes.
25   Q.    Okay.  So at no point that morning were you under
```

144

1    the custody of law enforcement; is that correct?

2    A.    When I was -- for the time that they were there I

3    was told I could not leave, I need to stay in the

4    living room.  I would have to take that as an

5    assumption that I could not leave the premises, ma'am.

6    Q.    And with respect to your statement to Officer

7    Broughton, you walked into the bedroom; is that

8    correct?

9    A.    Right, when he took out a black bag, yes.

10   Q.    And no one pointed a gun to you, no one forced you

11   to go into that bedroom; is that correct?

12   A.    That's correct.

13   Q.    All right.  And he asked you a question and you

14   answered it; is that correct, about the black bag?

15   A.    And the question was?

16   Q.    About the key or the lock.

17   A.    That's correct.

18   Q.    Okay.  And you chose voluntarily to answer that

19   question, correct?

20   A.    Correct, at that time he told me, yes.

21   Q.    All right.  So he asked you about the key.  What

22   did you say about the key?

23   A.    He asked if I had a key to the black bag.  I said

24   no.

25   Q.    And was that a truthful answer?

A-271

145

```
1    A.    I didn't recall that I had the key, ma'am.
2    Q.    Okay.  And after he takes -- he asks you, you now
3    say that he asked you more questions about the bag, and
4    you contest that you ever said, take it, it's porn; is
5    that correct?
6    A.    He did not me ask me further questions.  He simply
7    told me he would take the bag.
8    Q.    But yet you were given a search warrant with an
9    inventory sheet, correct?
10   A.    That was after that point.
11   Q.    At the end of the search, right?
12   A.    That's correct.
13   Q.    Before the officers left, right?
14   A.    Correct.
15   Q.    And on that inventory sheet it said black bag,
16   contains miscellaneous porn.
17   A.    No, it did not.
18   Q.    It did not say that?
19   A.    No, it did not.
20   Q.    Your copy didn't say it?
21   A.    Nope.
22   Q.    Do you have a copy?  Do you have your copy?
23   A.    They're trying to get --
24         THE WITNESS:  Counsel, can you explain please
25   that they're trying to get a copy of it.
```

A-272

146

1    BY MS. PATEL:

2    Q.   Your counsel will have plenty of opportunity to

3    come up and ask you your questions.

4    A.   The original copy was given to Asheesh Sengrashka

5    (phonetic) in my office, along with the original search

6    warrant that he gave me.  I also gave a copy to

7    Attorney Robert Watson (phonetic) in Stuart, Florida,

8    who at that time I had retrained.  So he has a copy of

9    the copy that was given to me.

10   Q.   You don't have a copy with you today, correct?

11   A.   No, ma'am.  I was put in jail.

12   Q.   Okay.  And thus far at this hearing we haven't

13   seen a copy, correct?

14   A.   And that copy simply says locked bag.

15   Q.   Mr. Sensi, I'm asking you about the copy you've

16   seen here today, it (unintelligible) miscellaneous porn

17   on it, correct?

18   A.   Um-hum.

19   Q.   Okay.  And today, right here at this hearing, you

20   haven't been able to produce any other copy, correct?

21   A.   Hopefully I will be able to soon.

22   Q.   That would be a yes or no answer, sir.  Have you

23   been able to produce at this hearing a copy of the

24   inventory sheet?

25   A.   And the answer is apparent, no.

A-273

1    Q.    Okay.  You indicated that Officer Broughton didn't

2    ask you any other questions but whether or not you had

3    a key to the black bag?

4    A.    That's correct.

5    Q.    He didn't ask you about the PTHC in the office?

6    A.    He asked me at that point in the bedroom.

7    Q.    Did he ask you any other questions?

8    A.    He didn't ask me other questions.  He asked me at

9    one point, called me in from the living room to go to

10   the front room, which was a study, and he asked me

11   questions I believe about the CDs, yes.

12   Q.    And did you know what PTCH stood for?

13   A.    No, I did not.  No.

14   Q.    No.  Were those your CDs?

15   A.    No.

16   Q.    As you sit here today is it your testimony you

17   don't know what PTHC stands for?

18   A.    Well, he just described it.

19   Q.    Okay.  Until he defined it --

20   A.    I read it in the deposition as well.

21   Q.    Okay.  So prior to reading it in the deposition,

22   you never knew what PTHC stood for?

23   A.    No, I did not, ma'am.

24   Q.    Okay.  Did he ever ask you about -- when he first

25   knocked on the door, did he tell you why he was there?

Case 12-565, Document 26, 10/05/2012, 740168, Page278 of 301

A-274

1   A.   Yes, he did.

2   Q.   And what did he say?

3   A.   I don't recall specifically, but it had something

4   -- he had a search warrant for computers because they

5   had a probable cause that there was child pornography

6   on the computer at this house.

7   Q.   And what, if anything, did you say about whether

8   or not there was child pornography in the house?

9   A.   I said that can't be possible.

10   Q.   Okay.  And was that -- why couldn't it be

11   possible, sir?

12   A.   I don't know if I used those words, ma'am, I'm

13   sorry.  I may not have -- I may not ever even made a

14   comment.  He did ask me about if I had LimeWire.

15   Q.   Let's go back to the child pornography.

16   A.   Right.

17   Q.   There's two officers knocking on your door with a

18   search warrant telling you they're there to search and

19   seize child pornography.

20   A.   Right.

21   Q.   So what, if anything, did you say about whether or

22   not there was child pornography in your home?

23   A.   He didn't ask me.

24   Q.   Oh, now he didn't ask you.  Before I had asked you

25   and you --

Case 12-565, Document 26, 10/05/2012, 740168, Page279 of 301

A-275

149

```
 1   A.   Ma'am, I don't know, ma'am, I didn't say he asked
 2   me if there was.  He told me he had a search warrant on
 3   probable cause that there was evidence of that on a
 4   computer in the house.
 5   Q.   And did you make any statements about whether or
 6   not there was child pornography in your home?
 7   A.   He didn't ask me to.  I don't recall him asking me
 8   if there was.  He asked me if there was a LimeWire
 9   program on my computer.
10   Q.   And what did you say?
11   A.   And I said I believe there is, yes.  There are
12   many programs on the computer.
13   Q.   And what do you use LimeWire for, sir?
14   A.   Well, my son was using it at times for music
15   downloads.
16   Q.   I'm going to go back and ask you the question
17   again.
18   A.   Um-hum.
19   Q.   You have just been told with a search warrant that
20   they're there for child pornography.  Do you make any
21   statements at all regarding whether or not there is
22   child pornography in your home?  You just heard Officer
23   Broughton testify.  Did you make any statements to him
24   one way or the other as to whether there was child
25   pornography in your home?
```

Case 12-565, Document 26, 10/05/2012, 740168, Page280 of 301

A-276

1   A.   No.

2   Q.   Now, as you sit here and testified today, you

3   never made any statements at all.

4   A.   No.

5   Q.   And as you sit here and testify, you have no idea

6   what PTHC stands for.

7   A.   Correct.

8   Q.   But you do know what's in the contents of your

9   black bag, right?  You do know what's in there.

10   A.   Yes, ma'am.

11   Q.   What's in there?  What was in that?

12   A.   Well, there were tapes.  They're videotapes.

13   Q.   What are they videotapes of?

14   A.   That's to be determined, ma'am.

15   Q.   Have you -- you created them, didn't you?  You

16   made those movie files, right?

17   A.   Um-hum.

18   Q.   And they're movie files of you engaged in sex with

19   underage children, correct?  That's why you locked them

20   up.  That's why you told him -- isn't that right?

21   A.   I don't recall when it was locked.

22   Q.   You locked them up because you are engaging in sex

23   with four-year-olds and eight-year-olds on videotape.

24   You lock them up in a black bag and you told Officer

25   Broughton, take it, it's porn, didn't you?

A-277

151

1    A.    No, I did not.

2    Q.    And the reason you said it is because you knew if

3    he opened it up right there you would have been

4    arrested on the spot; isn't that right?

5    A.    No, ma'am.

6    Q.    Because right in the black bag, right on top there

7    were two pictures, two pictures that were child

8    pornography.  So right then and there if he had opened

9    it up he would have had probable cause to arrest you

10   right on the scene.

11   A.    But that's his prerogative I guess, ma'am.

12   Q.    And that's why you did say to him, take it, it's

13   porn.

14   A.    No, I did not say that, ma'am.

15   Q.    Because you were worried that you were going to

16   get arrested --

17   A.    I did not say that.

18   Q.    -- right there and then.

19   A.    Ma'am, I did not say that.

20   Q.    And in fact with your intent you ran to your work

21   and you made sure you went and deleted any other

22   pictures of minor victim number one on your work

23   computer because you know the gig was up, that law

24   enforcement knew that you not only do you possess child

25   pornography, sir, you create it.  You actually rape

Case 12-565, Document 26, 10/05/2012, 740168, Page282 of 301

1   minor children to create it.

2   A.   People had access to the computer in my office,

3   ma'am.

4   Q.   I'm sorry, what did you say?

5   A.   There are other people that had access to my

6   computer in the office as well as my laptop, which

7   traveled with me wherever I went.

8   Q.   Oh, so you're saying someone else put the pictures

9   of minor victim on the computer?  That wasn't you?

10  Someone else may have put those pictures of minor

11  victim number one on your computer at work?

12  A.   No, no, I didn't say that.  You asked who deleted

13  it.

14  Q.   Did you --

15  A.   I don't recall, ma'am.

16  Q.   Is it your testimony today that you did not delete

17  it?

18  A.   I don't recall.

19  Q.   You don't remember.

20  A.   No.

21  Q.   So there's certain things you remember and then

22  there's certain things you conveniently don't remember,

23  correct?

24  A.   (Unintelligible).

25  Q.   You don't remember if you -- immediately after the

1   search warrant you ran to your work to go delete

2   pictures of minor victim one, the same minor victim

3   whose videotapes were in that black locked bag where

4   you were engaged in sex acts with who was approximately

5   eight years old.  That's what you don't recall?  That's

6   your testimony today?

7   A.   That's correct, ma'am.

8   Q.   Okay.  But you do -- but you make sure that you

9   very clearly recall that you didn't say to Officer

10  Broughton, take it, it's porn.  That you make sure you

11  remember.

12  A.   It's pretty apparent.

13  Q.   What's pretty apparent?

14  A.   Well, why would I -- he didn't ask what the

15  contents was.  He didn't ask if he could take it.  He

16  said he was going to take it if I didn't -- wasn't able

17  to open the lock.

18  Q.   There's two law enforcement officers searching

19  through your entire house.

20  A.   Yes, ma'am.

21  Q.   They're opening up other duffle bags.  They see a

22  lock --

23  A.   I wasn't aware that they were doing that.

24  Q.   You weren't aware that the were doing that?  You

25  weren't aware that your red duffle bag had just been

Case 12-565, Document 26, 10/05/2012, 740168, Page284 of 301

A-280

154

1  opened?

2  A.   No, I was not.

3  Q.   Okay.  So, you were here today in this courtroom

4  while you heard Officer Broughton testify, right?

5  A.   That's correct.

6  Q.   You heard that he opened up your red duffle bag

7  and he took pictures.

8  A.   Right.

9  Q.   But the same duffle bag that also contained

10  homemade videos of you engaged in sex acts, right, that

11  duffle bag?

12  A.   And they're for adults.

13  Q.   You were here for this testimony?

14  A.   Yes, ma'am.

15  Q.   Okay.

16  A.   Um-hum.

17  Q.   And so while he goes for the black one he asks you

18  for a key.

19  A.   Um-hum.

20  Q.   So you don't have a key.

21  A.   Right.

22  Q.   Right?  And now you're saying, oh, he didn't ask

23  you about the contents.

24  A.   That's right.

25  Q.   Two law enforcement going through your entire

Case 12-565, Document 26, 10/05/2012, 740168, Page285 of 301

A-281

1  house searching for child porn are not going to be

2  interested in a bag that's locked with a bunch of other

3  child pornography?

4  A.   Ma'am, you asked me if I made the statement, take

5  it, it's porn.  The answer is no.  I did not give

6  consent to take the bag nor did I describe the contents

7  of the bag.

8  Q.   Are you in fact a diabetic, sir?

9  A.   Yes.

10  Q.   What kind of medication do you take?

11  A.   I take Arantis (phonetic).

12  Q.   Do you take it every day?

13  A.   Twice a day.

14  Q.   Did you take it today?

15  A.   This morning.

16  Q.   Do you feel fine to testify?

17  A.   Yes, ma'am.

18  Q.   All right.

19       MS. PATEL:  Your Honor, may I have a moment?

20       (Pause.)

21  BY MS. PATEL:

22  Q.   With respect to the key, you heard Officer

23  Broughton's testimony, sir, about the key.  Where was

24  that key?

25  A.   You said it was on my key chain.

Case 12-565, Document 26, 10/05/2012, 740168, Page286 of 301

A-282

1   Q.   The same key chain you turned over to your boss.

2   A.   Right.

3   Q.   Okay.  And so you have a locked black duffle bag

4   in your bedroom containing videos of you engaged in sex

5   acts with children and you don't know where the key is?

6   That's your testimony?

7   A.   That's correct, ma'am.

8   Q.   Okay.  Because you're not worried about keys that

9   open up bags with child pornography in them,

10   particularly when you're the one who is actually having

11   sex with children?

12   A.   I don't understand the question, ma'am, the

13   relevance of it, about what --

14   Q.   It's not for you to actually object to the

15   relevance, sir.  Because the way this works is I --

16   A.   Well, that's the answer.  You asked me about

17   worrying.

18   Q.   Okay.  Here's the question.

19   A.   Okay.

20   Q.   The question is, you have testified that you

21   didn't know where the key was.

22   A.   Correct.

23   Q.   And so is it really your testimony to this judge

24   that you have a locked bag in your bedroom --

25   A.   Um-hum.

A-283

157

1   Q.   -- with videos of you actually having sex with

2   young children, and you're not going to worry about

3   where that key is?  You're not going to make sure that

4   you know where that key is?  That's your testimony?

5   A.   You're asking if I was worried.  The key

6   apparently was on my key chain which I gave to my boss

7   since I also leased the vehicle, my car was leased from

8   the company, so he would need to have the key to the

9   car.  The house was actually owned by Asheesh

10  Sengrashka, who is also one of my bosses, I was renting

11  it from him, so the keys to the house I need to give to

12  him.  So I gave him the key chain.

13  Q.   So you weren't arrested, why did you turn around

14  and give him all the keys?

15  A.   I was going to turn myself in, ma'am.

16  Q.   And why was that, sir?

17  A.   Because I was told to.

18  Q.   That morning when you went to your employer you

19  were already told to turn yourself in?

20  A.   The lawyer called me and he had spoken --

21  Q.   Okay, I don't want -- I actually don't want to get

22  into communications between you and your lawyer.

23  A.   Okay.

24  Q.   But you turned over all your keys, so at some

25  point it was clearly in your possession, in your

A-284

158

1  control, correct?

2  A.   Correct.

3  Q.   That key.  Okay.  And when the police officer,

4  when Officer Broughton took that bag out of the house

5  you know what it contained, you knew what it contained.

6  Why didn't you protest?  Why didn't you say, no, you

7  can't take it?  Why didn't you say, no, you don't have

8  a right to have that?

9  A.   Ma'am, I wasn't aware of the rights that I had.  I

10 was shown a search warrant by three armed officers who

11 come into my house, told me to wait in the living room

12 while they search the house.  I'm sorry, but I didn't

13 feel I had a right to ask anything.

14 Q.   Well, but the fact of the matter is that when you

15 saw Officer Broughton take a black bag, which you knew

16 contained child pornography, because you were the one

17 who actually had manufactured it, you weren't

18 protesting because you knew that he had a warrant for

19 any and all child pornography.  That's why you didn't

20 protest, right?

21 A.   No, ma'am.  I didn't know he had a warrant for

22 that.

23 Q.   You didn't know he had a warrant for child --

24 A.   He had a warrant for computer storage items, and

25 I'm making an assumption that he had the ability and

Case 12-565, Document 26, 10/05/2012, 740168, Page289 of 301

A-285

1   the right to take whatever he'd like from my house.

2   Q.   He read the warrant to you, sir?

3   A.   He started to read it, yes, ma'am.

4   Q.   He gave you a copy?

5   A.   After the search, yes.

6   Q.   You've been sitting here while he testified?

7   A   Yes.

8   Q.   It said any images or visual depictions of child

9   pornography, and what was contained in that bag was not

10   a visual depiction of child pornography?

11   A.   I believe it said -- alluded to files, which are

12   computer files, ma'am.

13   Q.   Really?  Did it say that, sir?  I don't think it

14   --

15   A.   Yes, it does say that in the application?

16   Q.   It said that it's limited to video files?

17   A.   Not limited to files such as.  So I would have to

18   interpret the word files as computer generated.  Where

19   is the search warrant?  The search warrant --

20   Q.   Property to be seized.  Right here, sir.  Where

21   does it -- it says included, but not limited to.  Where

22   does it say limited to?

23   A.   Not limited to, not limited to the files, file --

24   Q.   Including but not limited to.

25   A.   To files.

1   Q.    Above that, images, movies or visual depictions.

2   Is that correct?

3   A.    Depictions that are files.

4   Q.    Okay.  So if that's the case, why didn't you say,

5   oh, no, no, what's contained in that bag are not

6   computer files.

7   A.    Once again, I am not an attorney.  I don't know

8   the laws in that regard.  If a police officer comes to

9   my house, three of them, and one at the door, telling

10  me to stay in the living room and says he's going to

11  take whatever he wants from the house, I'm sorry, I

12  didn't feel like I had a right to say you can't take

13  it.

14  Q.    And in fact two years later, in signing the

15  affidavits, nowhere in your affidavits are any of these

16  complaints.  Nowhere in this affidavit does it say you

17  were under the custody or control over law enforcement,

18  that you were not free to leave.  It doesn't say that

19  anywhere, right?  In any of these pages.

20  A.    I swear that I did not give consent, ma'am.

21  Q.    It's like you didn't give consent, but it doesn't

22  say that you were in their custody and that you were

23  not free to leave.  Does it say that anywhere in here?

24  I was not free to leave?

25  A.    I'm sorry.  Well, if you like I'll do another one

1   that says that I felt I was not free to leave.

2   Q.   You had 20 months to put this one together, right?

3   20 months in jail while you've done nothing but think

4   about your case.

5   A.   Well, unfortunately the computer in the prison

6   doesn't work in my favor.  I cannot create that.

7   Q.   You signed -- I just want to verify your affidavit

8   which is the reason we're all here today.  You signed

9   it.  That's your signature?

10   A.   Yes, ma'am.

11   Q.   You dated it?

12   A.   Yes, ma'am.

13   Q.   Okay.  And you didn't add or write anything to it,

14   right?

15   A.   No, I did not.

16        MS. PATEL:  No further questions at this time,

17   your Honor.

18        THE COURT:  Mr. Berke?

19        MR. BERKE:  Thank you, sir.

20             REDIRECT EXAMINATION

21   BY MR. BERKE:

22   Q.   Officer Broughton, as you've testified, was in --

23   had a badge and a gun.

24   A.   Correct.

25   Q.   And he told you to stay in the living room.

162

1    A.    Correct.

2    Q.    And there was a uniformed officer at the door of

3    your home inside your door.

4    A.    Correct.

5    Q.    And you were asked to remain in that room where

6    the armed uniformed officer was stationed.  How far

7    away from you was Officer Lamb?

8    A.    I would say about 15 feet.  15, one five.

9    Q.    And you were asked to leave the living room by

10   Officer Det. Broughton to go to your bedroom.

11   A.    Um-hum, correct.

12   Q.    And he asked you questions about the black bag.

13   A.    Correct.

14   Q.    And you were asked to go to a different location

15   in your house when he asked you other questions?

16   A.    Prior to that he asked me to come into the front

17   room.

18   Q.    And that was at the direction of Officer

19   Broughton?

20   A.    Yes, sir.

21   Q.    You didn't just walk into the room, you were asked

22   to come in.

23   A.    That's correct.  He came out and got me.

24   Q.    And that was during the course of three armed

25   officers in your home.

Case 12-565, Document 26, 10/05/2012, 740168, Page293 of 301

A-289

1   A.   Correct.

2   Q.   You had testified in regards to I believe, if it's

3   fair to say, two separate inventories that you saw in

4   this case?

5   A.   That's correct, ma'am -- sir.  I'm sorry.

6   Q.   And the first inventory you saw did not include

7   the terms miscellaneous porn?

8   A.   That's correct.  That's the copy that was given to

9   me.

10  Q.   When did you receive that copy, that first copy?

11  A.   It was given to me by Detective Broughton.

12  Q.   And at what point did you receive the second copy

13  which --

14  A.   I happened to notice it when I asked for copies of

15  documents concerning my files from the previous

16  counsel, and I believe it was in July of last year.  It

17  was sent to me at Wyatt.

18  Q.   Do you recall whether the red duffle bag was

19  closed?

20  A.   Yes.  They were all closed.  All the containers

21  was shut.

22  Q.   The black bag had a lock.

23  A.   Yes, sir.

24  Q.   The red bag was closed?

25  A.   Right.  A zipper, yeah.  A zip (unintelligible).

A-290

164

1    Q.    And there was another container which you saw --

2    A.    I'd say it was a white plastic drawer.  It's the

3    kind that you can buy at Wal-Mart to make drawers, and

4    it was closed, it was taped shut.

5            MR. BERKE:  I have nothing else.

6            THE COURT:  All right.  Anything else?

7                        RECROSS EXAMINATION

8    BY MS. PATEL:

9    Q.    Sir, let's just talk about your missing inventory

10   list.  How many lawyers have you had in this case?

11   A.    I dismissed -- let's see.  I only dismissed Mr.

12   Kibbe and Mr. Wymer (phonetic), who worked together.

13   In fact, yesterday I had a grievance hearing.

14   Q.    That wasn't my question, sir.  How many were

15   there?

16   A.    And then you, the court appointed, Mr. Peter

17   (unintelligible).  In the interims I was trying to

18   retain Mr. Berke.

19   Q.    So you had four lawyers.

20   A.    Um-hum.

21   Q.    You've had 20 months, and now we're supposed to

22   believe there's a missing inventory list somewhere.

23   A.    That's correct.

24   Q.    And yet today when you're shown an inventory list

25   dated September 10th, the date of the search, you're

1   problem is it says on there, miscellaneous porn, and it

2   says that because you said it to Officer Broughton, and

3   so you need to figure out a story to get around that,

4   right?

5   A.    No, ma'am.  We'll provide the original document

6   for you.

7          MS. PATEL:  I have no further questions, your

8   Honor.

9          THE COURT:  Okay.  You step down.

10         (Witness excused.)

11         MR. BERKE:  Sir, I have no other witnesses.

12         THE COURT:  Okay.  Does that conclude all the

13   evidence on the suppression hearing?

14         MS. PATEL:  Yes, your Honor.

15         MR. BERKE:  I believe so, sir.

16         THE COURT:  All right.  I'm going to rule from

17   the bench on it because it didn't turn out to be as

18   complicated as I thought it might be, so I'll just rule

19   from the bench.

20          I agree with counsel that the issue of the

21   scope of the search warrant is for me to determine, not

22   for credibility of witnesses to determine.  It's an

23   issue of my examining the language of the search

24   warrant and determining whether it covers anything

25   other than computer documents.  And I hold on the basis

Case 12-565, Document 26, 10/05/2012, 740168, Page296 of 301

1    of the language in it that paragraph 1 is broad enough,

2    and my attention was also called to paragraph 4.  I'm

3    relying mainly on paragraph 1 as being enough to cover

4    the documents which are in question here as having been

5    seized.  So on that issue I rule in favor of the

6    Government.

7            The issue of custody I also find in favor of

8    the Government, that he was not in custody while they

9    were making their relatively brief investigation of the

10   house and the contents to determine what they could

11   seize under the search warrant.

12           Now, on the third issue I cannot find for the

13   Government, I cannot really find, make any finding with

14   respect to consent with respect to the black duffle

15   bag, which was locked.  I find that there are

16   credibility issues and I cannot really resolve those

17   credibility issues as to what he said or didn't say

18   with respect to that black duffle bag.  So the black

19   duffle bag would have to be covered, as I am covering

20   my ruling, with respect to the language of the search

21   warrant.

22           Now, is there anything else I'm supposed to

23   rule upon?  I understand that the discovery issues on

24   Giglio and the Brady material and the Jencks Act and

25   the 404b, those are all being taken care of by counsel

A-293

167

1    or is there something you need help with?

2            MR. BERKE:  Your Honor, those are taken care

3    of by counsel.  We had some discussions before the

4    hearing today and the Government had provided me some

5    documents which satisfy my inquiry and my purpose of

6    filing these motions.

7            THE COURT:  Yeah, I find that that would be

8    typical of the way the Government operates in this

9    district.  They've been very good in our history here

10   of compliance with the requirements.  They know the

11   requirements.  The United States Attorneys know the

12   requirements and they make sure that the Assistant

13   United States Attorneys carry out those requirements.

14   So I'm comfortable with not having to rule about that.

15           Anything else I'm overlooking?

16           MS. PATEL:  Nothing, your Honor.  That's it.

17   I know we have a jury selection in the 21st and the

18   Government has to file its voir dire by the end of the

19   week, and I understand a much larger panel has been

20   called in.  I just want to confirm that.

21           The only other issue is Attorney Berke and I

22   have spoken and with your Honor's consent we are

23   requesting 15 to 20-minute opening statements.

24           THE COURT:  I'm sorry, what?

25           MS. PATEL:  15 to 20-minute opening

1    statements.

2           THE COURT:  Oh, I never limit opening

3    statements.

4           MS. PATEL:  Okay.

5           THE COURT:  I never have limited opening

6    statements and I've never been abused.

7           MS. PATEL:  Okay.

8           THE COURT:  So I never worry about that.  I

9    know some judges set time limits.  I was in the pit for

10   30 years and I hated time limits, so I'm not going to

11   impose them unless somebody takes advantage and abuses

12   the system.  But I don't find that happening, so you

13   can take whatever time you need on opening statements.

14          MS. PATEL:  And finally, your Honor, Mr. Berke

15   was gracious enough, we have requested because we are

16   now getting closer to trial, we have agreed to

17   physically start turning over some of the evidence, not

18   the child pornography, but some of the evidence where

19   the minor victims' identity is there.  Pursuant to the

20   statutory requirements that all parties protect the

21   minor victims' identify, we are going to be submitting

22   a protective order, and Mr. Berke I think has no

23   problem with that.

24          THE COURT:  All right.  I assume you'll comply

25   with the Jencks Act and I will handle whatever has to

Case 12-565, Document 26, 10/05/2012, 740168, Page299 of 301

A-295

169

```
1    be signed.

2              All right.   Thank you very much.

3         (Proceedings concluded at 3:42 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 12-565, Document 26, 10/05/2012, 740168, Page300 of 301

A-296

INDEX

|  | Direct | Cross | Redirect | Recross | Further Redirect |
|---|---|---|---|---|---|
| WITNESSES FOR THE PLAINTIFF: | | | | | |
| Brian Broughton | 12 | 62 | 110 | 121 | -- |
| WITNESSES FOR THE DEFENDANT: | | | | | |
| Edgardo Sensi | 125 | 131 | 161 | 164 | -- |

| EXHIBITS: | | Offered | Admitted |
|---|---|---|---|
| P-1 | Search Warrant | 17 | 18 |
| P-1-11 | Photographs | 29 | 30 |
| P-12 | Interoffice Envelope and Contents | 48 | 48 |
| P-13-17 | Tapes from Red Duffle Bag | 50 | 51 |
| P-18-19 | Photographs of Locked Black Bag | 52 | 57 |
| P-20-21 | Bags Containing Contents of Locked Black Bag | 59 | 61 |
| P-22 | Database Log | 111 | 111 |
| P-23 | (Renumbered to P-25 and 26) | 138 | |
| P-24 | Supplemental Report | 118 | 118 |
| P-25 | Affidavit of Mr. Sensi | 140 | |
| P-26 | Affidavit of Mr. Sensi | 140 | |

Case 12-565, Document 26, 10/05/2012, 740168, Page301 of 301

A-297

171

C E R T I F I C A T E

I certify that the foregoing is a correct transcript
from the electronic sound recording of the proceedings
in the above-entitled matter.


/s/_____         June 22, 2010
STEPHEN C. BOWLES