# 12-0565-cr

## United States Court of Appeals

*for the*

## Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

EDGARDO SENSI,

*Defendant-Appellant.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT (NEW HAVEN)

## APPENDIX
## Volume 2 of 2 (Pages A-298 to A-511)

LAW OFFICE OF ANDREW FREIFELD
*Attorney for Defendant-Appellant*
30 Vesey Street, 6th Floor
New York, New York 10007
(212) 240-9406

SANDRA SLACK GLOVER
UNITED STATES ATTORNEY'S OFFICE,
   DISTRICT OF CONNECTICUT
*Attorney for Appellee*
157 Church Street, 23rd Floor
New Haven, Connecticut 06510
(203) 821- 3700

i

# TABLE OF CONTENTS

**Page**

Docket Entries..............................................................  A-1

Indictment, filed December 4, 2008 ..........................  A-16

Superseding Indictment, filed April 2, 2009.............  A-21

Motion to Suppress Physical Evidence Seized from
    Defendant's Home, dated January 19, 2010 ..........  A-30

Government's Memorandum of Law, in Opposition
    to Defendant's Motions to Dismiss or in the
    Alternative to Suppress, dated February 16, 2010.  A-62

Motion to Suppress Statements, dated May 3, 2010..  A-80

Defendant's Reply Memorandum, in Support of
    Motion to Suppress, dated May 3, 2010 ...............  A-83

Affidavits of Edgardo Sensi, Defendant, in Support
    of Motion to Suppress, sworn to May 3, 2010 ......  A-102

Government's Memorandum of Law, in Opposition
    to Defendant's Motions to Dismiss or in the
    Alternative to Suppress, dated May 27, 2010........  A-105

Transcript of Suppression Hearing before and
    Ruling by the Honorable Warren W. Eginton,
    dated June 8, 2010 .................................................  A-128

Government's Witness:

    Brian Broughton  ..................................................  A-139

Defendant's Witness:

    Edgardo Sensi  ......................................................  A-251

ii

**Page**

Government's Exhibits:

Search Warrant and
Supporting Affidavit,
dated September 9,
2008                    Reproduced ............    A-298

Photograph of House    Reproduced ............    A-317

Photograph of Red
Duffle Bag             Reproduced ............    A-318

Photograph of Video
Cassettes              Reproduced ............    A-319

Photograph of Locked
Black Bag              Reproduced ............    A-320

Conditional Plea Agreement, dated July 8, 2010.......    A-321

Petition to Enter Plea of Guilty Pursuant to Rules 10
    and 11 of the Federal Rules of Criminal
    Procedure, dated July 8, 2010...............................    A-331

Transcript of Motion and Change of Plea Hearing
    before the Honorable Warren W. Eginton, dated
    July 8, 2010...............................................    A-349

Defendant's Objections and Corrections to
    Sentencing Report, dated January 7, 2012.............    A-401

Defendant's Sentencing Memorandum, dated
    January 22, 2012...................................    A-405

Sentencing Memorandum of the United States of
    America, dated January 26, 2012 ........................    A-412

Motion to Continue Sentencing and attached
    Exhibits, filed January 27, 2012 ...........................    A-423

iii

**Page**

Transcript of Sentencing Hearing before the
  Honorable Warren W. Eginton, dated
    January 31, 2012 ................................................... A-455

Notice of Appeal, dated February 6, 2012 ................. A-510

A-298

MCSO Case# 08-10166

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
IN AND FOR MARTIN COUNTY, FLORIDA

SEARCH WARRANT

IN THE NAME OF THE STATE OF FLORIDA.

TO:   The Sheriff of Martin County, Florida; or any of their duly constituted
      Deputies/Officers or Agents,

WHEREAS, an affidavit, has been made this date before the undersigned,

AND WHEREAS, said facts made known to me have caused me to find there is probable
cause to believe that certain laws have been and are being violated in or about a certain
premises or curtilage thereof, or that evidence of, or evidence relevant to proving, a
violation of certain laws, in the form of computer equipment and data described
hereinafter, is being kept in or on certain premises or curtilage thereof, in Martin County,
Florida, being known and described as follows:

2750 NW Windemere Dr
Jensen Beach, FL 34957

The starting point will be the intersection of Jensen Beach Blvd. and Windemere Dr,
at the entrance to the Pines subdivision. Proceed South on Windemere Dr, (into The
Pines) for approximately .5 miles. The residence to be searched will be located on
the west (right) side of the roadway, located at 2750 NW Windemere Dr  The Target
location is a single family home. The exterior is a tan stucco finish with white trim.
The roof is pitched with grey shingles. The numbers 2750 are affixed to the front of
the residence.  The garage door is a double car garage, facing the roadway. It is
white in color.
*A picture of the residence is attached. (Hereinafter the "Premises").*

The Premises is occupied by or under the control of Edgardo M Sensi as verified
through the Florida Department of Highway Safety and Motor Vehicles and the the cable/
Internet provider, Comcast; and there is now being kept in or about said premises and the
curtilage thereof the following item[s]:

GOVERNMENT
EXHIBIT

**THIS PAGE INTENTIONALLY LEFT BLANK**

MCSO Case# 08-10156

*Images, movies, or visual depictions of sexual conduct or sexual performance by a child or children, in violation of Florida Statute 827.071.*

## PROPERTY TO BE SEIZED:

1    Images, movies, or visual depictions of sexual conduct or sexual performance by a child or children, in violation of Florida Statute 827.071, to include, but not limited to the files titled: "Vicky willing bed rape pthc 11yo.mpg" & "kids--bf--UNDER AGE (Pthc) (Hussyfan) (Kingpass) (Vicky) (Lordofthering) (Moscow) (Liluplanet) (Nablof) (St Petersburg) (R@Ygold) (Babyshivid.mpg"

2.    Computer hardware to include any and all computer equipment used to collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data. Hardware includes (but is not limited to) any data processing devices (such as central processing units, personal computers to include "laptop" or "notebook" or "pocket" computers); internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk drives and diskettes, tape drives and tapes, optical storage devices, and other electronic media devices).

2.    Computer input and output devices to include but not limited to keyboards, mice, scanners, printers, monitors, network communication devices, modems and external or connected devices used for accessing computer storage media.

4.    Computer storage media and the digital content to include but not limited to floppy disks, hard drives, tapes, DVD disks, CD-ROM disks or

Case 12-565, Document 27, 10/05/2012, 740170, Page8 of 219

A-300

MCSO Case# 08-10166

other magnetic, optical or mechanical storage which can be accessed by computers to store or retrieve data or images of child pornography.

5.    Computer software and application software installation and operation media.

6.    Computer software, hardware or digital contents related to the sharing of Internet access over wired or wireless networks allowing multiple persons to appear on the Internet from the same IP address.

7.    Manuals and other documents (whether digital or written) that describe operation of items or software seized.

8.    Items containing or displaying passwords, access codes, usernames or other identifiers necessary to examine or operate items, software or information seized.

9.    Correspondence or other documents (whether digital or written) pertaining to the possession, receipt, origin or distribution of images involving the exploitation of children. Correspondence or other documents (whether digital or written) exhibiting an interest in the exploitation of children.

10.   Items that would tend to establish ownership or use of computers and ownership or use of any Internet service accounts accessed to obtain child pornography to include credit card bills, telephone bills, correspondence and other identification documents.

11.   Items that would tend to show dominion and control of the property searched, to include utility bills, telephone bills, correspondence, rental agreements and other identification documents.

A-301

MCSO Case# 08-10166

12.    Data maintained on the computer, or computer related storage devices such, but not limited to, floppy diskettes, CD/DVD Media, tape backups, computer printouts, and USB thumbdrives . In particular, data in the form of images, and/or log files recording the transmission of images as they relate to violations of Florida law cited herein related to the possession and/or distribution of child pornography.

Which is/are being kept and used in violation of the laws of the State of Florida or is/are being kept and constitute(s) evidence of a violation of the laws of the State of Florida, to-wit:    *Section 827.071 (4) Possession with Intent to Promote Child Pornography and Section 827.071(5) Possession of Child Pornography.*

In addition to the seizure of the above-mentioned property, the Court gives permission to conduct an off-site search of the computer hardware, devices, storage media, and software for the evidence described.

NOW THEREFORE, you, with such lawful assistance as may be necessary, to include forensic computer analyst experts, are hereby commanded, in the daytime or in the nighttime, or on Sunday, as the exigencies of the occasion may demand, to enter and search the aforesaid premises and curtilage thereof, or any persons located on the premises or within the curtilage reasonably believed to be connected with said illegal activity, for the items described in this warrant and if the same or any part thereof be found, you are hereby authorized to seize and secure same, giving proper receipt therefore and delivering a completed copy of this warrant to the person in control of the premises, or in the absence of any such person, leaving a completed copy where the items are found, and making a return of your doings under this warrant within ten (10) days of the date hereof, and you are further directed to bring said property so found before the Court having jurisdiction of this offense to be used in the prosecution of persons violating this offense and thereafter to be disposed of according to law.

WITNESS my hand and seal this 9th day of Sept, 2008

CIRCUIT JUDGE

Case 12-565, Document 27, 10/05/2012, 740170, Page10 of 219

A-302

MCSO Case# 08-10166

## IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT IN AND FOR MARTIN COUNTY, FLORIDA

### AFFIDAVIT FOR SEARCH WARRANT

BEFORE ME, *Elizabeth A. Metzger*, Judge of the Circuit Court, in and for Martin Count, Florida, personally came Det. Brian Broughton, Affiant, a Deputy with the Martin County Sheriff's Office, Martin County, Florida, who being duly sworn, deposes and says that affiant has probable cause to believe that certain laws have been and are being violated in or about a certain premises and the curtilage thereof and that evidence of the violation of certain laws in the form of computer equipment and data described hereinafter is being kept in or about certain premises and the curtilage thereof, in Martin County, Florida, being known and described as follows:

**2750 NW Windemere Dr**
**Jensen Beach, FL 34957**

The starting point will be the intersection of Jensen Beach Blvd. and Windemere Dr, at the entrance to the Pines subdivision. Proceed South on Windemere Dr, (into The Pines) for approximately .5 miles. The residence to be searched will be located on the west (right) side of the roadway, located at 2750 NW Windemere Dr  The Target location is a single family home. The exterior is a tan stucco finish with white trim. The roof is pitched with grey shingles.  The numbers 2750 are affixed to the front of the residence.  The garage door is a double car garage, facing the roadway. It is white in color.
*A picture of the residence is attached. (Hereinafter the "Premises").*

The Premises is occupied by or under the control of Edgardo M Sensi as verified through the Florida Department of Highway Safety and Motor Vehicles and the the cable/Internet provider, Comcast; and there is now being kept in or about said premises and the curtilage thereof the following item[s]:

1.   Images, movies, or visual depictions of sexual conduct or sexual performance by a child or children, in violation of Florida Statute 827.071, to include, but not limited to the files titled: "Vicky willing bed rape p!hc llvo.mpg" &  "kids–bl–UNDER AGE (P!hc) (Hussyfan) (Kingpass) (Vicky)



1

MCSO Case# 08-10166

(Lordofthering) (Moscow) (Lilaplanet) (Nablof) (St. Petersburg) (R@Ygold)
(Babyshivid.mpg)"

2.   Computer hardware to include any and all computer equipment used to collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data. Hardware includes (but is not limited to) any data processing devices (such as central processing units, personal computers to include "laptop" or "notebook" or "pocket" computers); internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk drives and diskettes, tape drives and tapes, optical storage devices, and other electronic media devices).

3.   Computer input and output devices to include but not limited to keyboards, mice, scanners, printers, monitors, network communication devices, modems and external or connected devices used for accessing computer storage media.

4.   Computer storage media and the digital content to include but not limited to floppy disks, hard drives, tapes, DVD disks, CD-ROM disks or other magnetic, optical or mechanical storage which can be accessed by computers to store or retrieve data or images of child pornography.

5.   Computer software and application software installation and operation media.

6.   Computer software, hardware or digital contents related to the sharing of Internet access over wired or wireless networks allowing multiple persons to appear on the Internet from the same IP address.

7.   Manuals and other documents (whether digital or written) that describe operation of items or software seized.

2

MCSO Case# 08-10166

8.    Items containing or displaying passwords, access codes, usernames or other identifiers necessary to examine or operate items, software or information seized.

9.    Correspondence or other documents (whether digital or written) pertaining to the possession, receipt, origin or distribution of images involving the exploitation of children. Correspondence or other documents (whether digital or written) exhibiting an interest in the exploitation of children.

10.    Items that would tend to establish ownership or use of computers and ownership or use of any Internet service accounts accessed to obtain child pornography to include credit card bills, telephone bills, correspondence and other identification documents.

11.    Items that would tend to show dominion and control of the property searched, to include utility bills, telephone bills, correspondence, rental agreements and other identification documents.

12.    Data maintained on the computer, or computer related storage devices such as floppy diskettes, tape backups, computer printouts, and "zip" drive diskettes. In particular, data in the form of images, and/or log files recording the transmission of images as they relate to violations of Florida law cited herein related to the possession and/or distribution of child pornography.

Which is/are being kept and used in violation of the laws of the State of Florida or is/are being kept and constitute(s) evidence of, or evidence relevant to proving, a violation of the laws of the State of Florida, to wit: _Section 827.071 (5) Possession of Child Pornography._

3

A-305

MCSO Case# 08-10166

And the facts which establish probable cause for this application are as follows:

Your Affiant, Detective Brian Broughton has been a law enforcement officer in Florida since March 1992. Your Affiant is currently employed as an investigator for the Martin County Sheriff's Office assigned to the Child Abuse Unit. Your Affiant has approximately 16 years investigative experience. Your Affiant has attended several training courses to include Protecting Children Online PCO-1, Protecting Children Online PCO-2, ICAC (Internet Crimes Against Children) Peer Precision Training, ICAC Undercover Chat Operations, ICAC Investigative Techniques, FBI Image Scan, Basic Data Recovery and Acquisition, Forensic ToolKit Boot Camp, Encase Forensic Training, Basic Sex Crimes Investigation and Sexual Deviant Behavior, Computer Evidence Recovery Training. Your Affiant is also a Computer Forensic Examiner, and has examined 100's of computers and computer related media, for both local and Federal law enforcement agencies.  Since 2000, your Affiant has also been assigned to the South Florida Internet Crimes Against Children (ICAC) Task Force to investigate crimes dealing with online solicitation and sexual exploitation of children, including the collection and trading of images of child pornography. As part of your Affiant's training, your Affiant has attended the ICAC Peer Precision Training dealing specifically with investigation of child pornography distribution through the use of peer-to-peer computer networks.

As a result of your Affiant's training and experience as set forth above, your Affiant has probable cause to believe the following:

Peer to peer (P2P) file sharing networks, including the Gnutella network, are frequently used to trade digital files of child pornography. These files include both image and movie files.

Peer to Peer (P2P) file sharing programs are a standard way to transfer files from one computer system to another while connected to a network, usually the Internet. Peer-to-Peer file sharing programs allow groups of computers using the same file sharing network and protocols to connect directly to each other to share files.

4

MCSO Case# 08-10166

Many P2P file sharing networks are designed to allow users to download files and frequently provide enhanced capabilities to reward the sharing of files by providing reduced wait periods, higher user ratings, or other benefits. In some instances, users are not allowed to download files if they are not sharing files. Typically, settings within these programs control sharing thresholds.

Based on your Affiant's training and experience, your Affiant knows the following about the operation of the Gnutella file-sharing network:

1.     Gnutella is an open source public file-sharing network. Most computers that are part of this network are referred to as peers or hosts. A peer can simultaneously provide files to peers while downloading files from other peers. Peers may be elevated to temporary indexing servers referred to as an "ultra-peer." Ultra-peers increase the efficiency of the Gnutella network by maintaining an index of the contents of network peers. Gnutella users query ultra-peers for files and are directed to one or more peers sharing that file. There are many ultra-peers on the network, if one shuts down the network continues to operate.

2.     The Gnutella network can be accessed by computers running many different client programs. These programs share common protocols for network access and file sharing. The user interface, features and configuration may vary between clients and versions of the same client.

3.     During the default installation of a Gnutella client, settings are established which configure the host computer to share files. Depending upon the Gnutella client used, a user may have the ability to reconfigure some of those settings during installation or after the installation has been completed.

4.     Typically, a setting establishes the location of one or more directories or folders whose contents (files) are made available for distribution to other Gnutella peers.

5.     Typically, a setting controls whether or not other users of the network can obtain a list of the files being shared by the host computer.

5

MCSO Case# 08-10166

6.      Typically, a setting controls whether or not users will be able to share portions of a file while they are in the process of downloading the entire file. This feature increases the efficiency of the network by putting more copies of file segments on the network for distribution.

7.      Files located in a peer's shared directory are processed by the client software.  As part of this processing, a SHA1 hash value is computed for each file in the user's shared directory.  SHA1 or Secure Hash Algorithm Version 1 is a mathematical function which may be used to produce a unique digital signature of a file.  It is computationally infeasible ($2^{160}$) to find two different files that produce the same SHA-1 value.  The Secure Hash Algorithm (SHA) was developed by the National Institute of Standards and Technology (NIST), along with the National Security Agency (NSA), for use with the Digital Signature Standard (DSS) as specified within the Secure Hash Standard (SHS). The United States of America has adopted the SHA-1 hash algorithm described herein as a Federal Information Processing Standard.

8.      A file processed by this SHA1 operation results in the creation of an associated hash value often referred to as a digital signature.  SHA1 signatures provide a certainty exceeding 99.99 percent that two or more files with the same SHA1 signature are identical copies of the same file regardless of their file names.

9.      The Gnutella network uses SHA1 values to improve network efficiency.  Users may receive a selected file from numerous sources by accepting segments of the file from multiple peers and then reassembling the complete file on the local computer. The client program succeeds in reassembling the file from different sources only if all the segments came from exact copies of the same file.  The network uses SHA1 values to ensure exact copies of the same file are used during this process.

10.     Upon connecting to the Gnutella network, the Gnutella client compiles a list of the shared files, file details and the file's associated SHA1 values and submits the list to the ultra-peers.  This information is then propagated to other ultra-peers throughout the network. The

6

A-308

MCSO Case# 08-10166

frequency of updating information as file changes occur or candidates leave the network is dependent upon the client software being used and Gnutella networking protocols. The information sent to the ultra-peers is data about the file and not the actual file. The file remains on the peer computer. In this capacity, the ultra-peer acts as a pointer to the files located on each peer. The network may be referred to as decentralized due in part to the fact that files do not reside on a single server but are located on individual peers throughout the network.

11.     The Gnutella software allows the user to search for pictures, movies and other files by entering descriptive text as search terms. These terms are typically processed by the ultra-peers based upon the information about the files that had been sent by individual peers.

12.     Entering search terms into a Gnutella client returns a list of files and descriptive information including, in some client software, the associated SHA1 signature. Figure 1 below is a partial file listing resulting from the use of a search term known to be associated with child pornography. The file list in figure 1 is typical of a list returned by an ultra-peer. The file list in figure 1 is for demonstration purposes and does not reflect information related to the current investigation.

| | | | | | | |
|---|---|---|---|---|---|---|
| Japanese Lolitas n@ygold_6yo_with_two | 28,123,... | 100 | 6 | 397 6 hosts | 6 hosts | XQWYEGGS766WP4VZLMYTVPA4ERWOX4HN5 |
| Baby J 01 (pthc pedo Preteen) - Help#.mpg | 1,336,... | 100 | 8 | 337 6 hosts | 6 hosts | NRD6F4ZXPQZNGWXWZGREAM2EP3TCD#I8B |
| baby3 - Very aroused lil 6yo getting.mpg | 2,838,... | 100 | 6 | 350 6 hosts | 6 hosts | XLIZIOXXAPXXUFZ4ICWYFSSLA6ZTBRY6 |
| 6 yo little sweet girl pedo illegal sex.jpg | 20,667 | 100 | 8 | 380 6 hosts | 6 hosts | LNRGGLXQF43QXQ4SRDL4QAT44TYTZI2 |
| ░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░ | | | | | | |
| Baby3-Ass-Fuck.wmv | wmv | 4,274,... | 6 | 384 4 hosts | 4 hosts | A4WY4E4N7M4A3OAAPS4JAOXZO644HU7 |
| Japanese Porn AV 6yo_kids_dad_inces4 | 41,445,... | 100 | 6 | 268 4 hosts | 4 hosts | 2HENOOLMAG9VCEDYLXX3OGH2QPSI4QRL |
| baby1 za077aka kinder porno 29.wmv wmv | 1,168,... | 100 | 6 | 288 4 hosts | 4 hosts | SSGLIVSDOCLDXVLACJBGIPSZUXQ77YH4OK |
| PROBLEM 6Yo With Dad Incest Under.mpg | 108,44... | 100 | 6 | 414 4 hosts | 4 hosts | BFVK5SSVCNMAYZVWAXG5#O2B2ER1I4HT3 |

Figure 1: Partial file list by a Gnutella Client with SHA1 value displayed. SHA1 values are displayed in the right column. (data from prior research – not this warrant)

13.     A person is able to compare the SHA1 signatures of files being shared on the network to previously identified SHA1 signatures of any file including child pornography. Using a publicly available Gnutella client a user can select the SHA1 signature of a known file and attempt to receive it. Figure 1 above shows a partial file list from a client that displays SHA1

7

A-309

MCSO Case# 08-10166

values. The file name is in the left column and file SHA1 is in the right
column.

14.   Once a specific file is identified, the download process can be
initiated.  Once initiated, a user is presented with a list of peers or IP
addresses that have recently been identified as download candidates for
that file. This allows for the detection and investigation of computers
involved in possessing, receiving and/or distributing files of previously
identified child pornography. Internet computers identify each other by an
Internet Protocol or IP address.  IP addresses can assist law enforcement in
finding a particular computer on the Internet.  IP addresses can typically
lead the law enforcement officer to a particular Internet service company
and that company can typically identify the account that used the IP
address to access the Internet. Figure 2 shows a download candidate list.

| Download Candidates | |
|---|---|
| Sharing Host | Vendor |
| 68.160.179.3:22186 | Morpheus |
| 68.239.137.54:1026 | Shareaza |
| 80.44.198.59:6346 | Limewire |
| 84.10.9.74:6346 | Shareaza |
| 84.172.216.243:6346 | BearShare |
| 192.168.1.4:6346 | Limewire |
| 192.168.1.101:6348 | GN2L |
| 210.5.85.9:6348 | Limewire |

Figure 2. Candidate list

15.   The IP addresses can be used to identify the location of these
computers.  A review of the SHA1 signatures allows an investigator to
identify the files that are child pornography.

16.   The returned list of IP addresses can include computers that are
likely to be within this jurisdiction.  The ability to identify the
approximate location of these IP address is provided by IP geographic
mapping services, which are publicly available and also used for
marketing and fraud detection.  At this point in the investigative process, a
recent association between a known file (based upon SHA1 comparison)
and a computer having a specific IP address (likely to be located within a
specific region) can be established.

8

A-310

MCSO Case# 08-10166

17.    Once this association has been established, an investigator can attempt to download the file from the associated peer or view the contents of the shared directory.    Depending upon several factors including configuration and available resources, it might not be possible to do either.

18.    Depending on the associated peer configuration and available peer resources a listing of the files being shared may be displayed.  In order to obtain this list of files, a direct connection between the computers must occur. This list can be a partial listing of the shared files. The file list can only be obtained if the associated peer is connected to the network and running a Gnutella client at that moment.

19.    By receiving either a file list or portions of a download from a specific IP address the investigator can conclude that a computer, likely to be in this jurisdiction, is running a Gnutella client and possessing, receiving and/or distributing specific and known visual depictions of child pornography.

This investigation of peer-to-peer file sharing networks is a cooperative effort of law enforcement agencies around the country.  Many of these agencies are associated with the Internet Crimes against Children Task Force Program.  Many of the officers involved in this effort are using the technology and methods described herein. This methodology has led to the issuance and execution of search warrants around the country resulting in many seizures of child pornography and arrests for possession and distribution.

On August 27, 2008, your Affiant located an IP address of 76.111.218.152 of a user who possessed movie files that have been previously identified as child pornography in other investigations.  Your Affiant attempted to browse the IP address 76.111.218.152 but was unsuccessful.  Your Affiant then entered the IP address into the Internet Crimes Against Children database. The ICAC database is a law enforcement maintained database utilized by federal and state law enforcement agencies in child exploitation investigations nationwide. The ICAC database maintains a log of IP addresses that have been previously involved in the possession and distribution of child pornography. Your Affiant has used

9

Case 3:08-cr-00253-WWE   Document 164-1   Filed 01/27/12   Page 15 of 52

MCSO Case# 08-10166

this database for over three years and has verified that information your Affiant had entered into the database was depicted timely and accurately.

The ICAC database showed that the IP address 76.111.218.152 had been logged seventy eight times, from August 23rd, 2008 thru August 26th, 2008. Each of these entries show a SHA1 value described above, a date and time, and the file name associated with the file. The IP addresses are logged into the database when an ICAC investigation identifies a user's IP address as having a particular image of child pornography, based on the SHA1 value, for distribution or sharing.

Your Affiant reviewed the listed SHA1 values and file names associated with the IP address. Your Affiant located SHA1 value: I7HJHJSKYSDEZ2PLM32WKCLXOC432YV3 with a file name: ""Vicky willing bed rape nthc 11yo.mpg"". This file was first observed on 8-23-08 and last observed on by on 8-26-08, in the database, and associated with IP 76.111.218.152.

*Your Affiant downloaded the same movie file, based on SHA1 value and file name, from available hosts and it depicted the following: a 5 minute 17 second video file depicting a nude prepubescent female child, spreading her vagina and anus. Later in the video clip, an adult male is observed sodomizing the female child with his penis.*

Your Affiant reviewed the listed SHA1 values and file names associated with the IP address. Your Affiant located SHA1 value: DN5O7BW4UTAI7RZPIQLJBWLYMXRULSAQ with a file name: "kids-!--UNDER AGE (Pthc) (Hussyfan) (Kingpass) (Vicky) (Lordofthering) (Moscow) (Liluplanet) (Nablot) (St Petersburg) (R@Ygold) (Babyshivid.mpg". This file was first observed on 8-23-08 and last observed on by on 8-26-08, in the database, and associated with IP 76.111.218.152.

*Your Affiant downloaded the same movie file, based on SHA1 value and file name, from available hosts and it depicted the following: a 44 second video of a prepubescent girl performing oral sex on an adult male, who places his penis between the legs of a stuffed teddy bear. The child appears to be under 12 years of age.*

MCSO Case# 08-10166

Your Affiant determined that the IP address 76.111.218.152 was issued to Comcast. A summons was issued to Comcast for subscriber information for the customer assigned to the IP address 76.111.218.152. On September 8th, 2008, Comcast replied to the subpoena and indicated that the user of the IP address 76.111.218.152, between the date and time of 68-23-08 @ 1300 hours EST to 8/26/08 @ 1800 hours EST, was Edgardo Sensi. The address that the service is connected to is 2750 NW Windemere Dr, Jensen Beach, FL 34957. It was also noted that the account was currently active.

Your Affiant knows from training and experience that searches and seizures of evidence from computers require agents to seize most or all computer items (hardware, software, passwords and instructions) to be processed later by a qualified person in a laboratory or other controlled environment. Computer storage media to include but not limited to floppy disks, hard drives, tapes, DVD disks, CD-ROM disks or other magnetic, optical or mechanical storage which can be accessed by computers to store or retrieve data or images of child pornography can store the equivalent of thousands of pages of information. Users may store information or images in random order with deceptive file names, which requires searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting process renders it impractical to attempt this kind of data search on site.

Your Affiant knows from training and experience that searching computer systems for criminal evidence requires experience in the computer field and a properly controlled environment in order to protect the integrity of the evidence and recover even "hidden", erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to tampering or destruction (both from external sources or from destructive code imbedded in the system as a "booby trap"), the controlled environment of a laboratory is essential to its complete and accurate analysis.

Your Affiant knows from training and experience that in order to fully retrieve data from a computer system, the analyst needs all magnetic storage devices as well as the computer. In cases like this one where the evidence consists partly of graphics files, the input and output devices to include but not limited to keyboards, mice, scanners, printers, monitors, network communication devices, modems and external or connected

11

MCSO Case# 08-10166

devices used for accessing computer storage media and the storage media are also essential to show the nature and quality of the graphic images which the system could produce. In addition, the analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media) as well as documentation, items containing or displaying passwords, access codes, usernames or other identifiers necessary to examine or operate items, software or information seized or to activate specific equipment or software.

Your Affiant knows from training and experience that persons trading in, receiving, distributing or possessing images involving the exploitation of children or those interested in the actual exploitation of children often communicate with others through correspondence or other documents (whether digital or written) which could tend to identify the origin of the images as well as provide evidence of a persons interest in child pornography or child exploitation.

Your Affiant knows from training and experience that files related to the exploitation of children found on computers are usually obtained from the Internet using application software which often leaves files, logs or file remnants which would tend to show the exchange, transfer, distribution, possession or origin of the files. Also that computer software or hardware exists that allows persons to share Internet access over wired or wireless networks allowing multiple persons to appear on the Internet from the same IP address. Examination of these items can reveal information about the authorized or unauthorized use of Internet connection at the residence.

Your Affiant knows from training and experience that computers used to access the Internet usually contain files, logs or file remnants which would tend to show ownership and use of the computer as well as ownership and use of internet service accounts used for the internet access. Your Affiant is aware that search warrants of residences involved in computer related criminal activity usually produces items that would tend to establish ownership or use of computers and ownership or use of any Internet service accounts accessed to obtain child pornography to include credit card bills, telephone bills, correspondence and other identification documents.

12

A-314

MCSO Case# 08-10166

Your Affiant knows from training and experience that search warrants of residences usually reveal items that would tend to show dominion and control of the property searched, to include utility bills, telephone bills, correspondence, rental agreements and other identification documents.

The above information leads your Affiant to believe and to have probable cause to believe that the Premises and the curtilage thereof are being used for the purpose of storing and/or distributing images, movies, or visual depictions of sexual conduct or sexual performance by a child or children, in violation of sections 827.071, Florida Statutes, related the possession of images of child pornography.

**Your Affiant hereby requests the Court's permission to seize the following items, and to conduct an off-site search and analysis, or to delegate the search and analysis to an off-site computer forensic analyst, of the following items (hereinafter the "Property"):**

1.     Images, movies, or visual depictions of sexual conduct or sexual performance by a child or children, in violation of Florida Statute 827.071, to include, but not limited to the files titled: "Vicky willing bad rape pthc 11yo.mpg" & "kidz-bi--UNDER AGE (Pthc) (Hussyfan) (Kingpass) (Vicky) (Lordofthering) (Moscow) (Liluplanet) (Nablot) (St Petersburg) (R@Ygold) (Babyshivid.mpg"

2.     Computer hardware to include any and all computer equipment used to collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data. Hardware includes (but is not limited to) any data processing devices (such as central processing units, personal computers to include "laptop" or "notebook" or "pocket" computers); internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk drives and diskettes, tape drives and tapes, optical storage devices, and other electronic media devices).

13

MCSO Case# 08-10166

3.    Computer input and output devices to include but not limited to keyboards, mice, scanners, printers, monitors, network communication devices, modems and external or connected devices used for accessing computer storage media.

4.    Computer storage media and the digital content to include but not limited to floppy disks, hard drives, tapes, DVD disks, CD-ROM disks or other magnetic, optical or mechanical storage which can be accessed by computers to store or retrieve data or images of child pornography.

5.    Computer software and application software installation and operation media.

6.    Computer software, hardware or digital contents related to the sharing of Internet access over wired or wireless networks allowing multiple persons to appear on the Internet from the same IP address.

7.    Manuals and other documents (whether digital or written) that describe operation of items or software seized.

8.    Items containing or displaying passwords, access codes, usernames or other identifiers necessary to examine or operate items, software or information seized.

9.    Correspondence or other documents (whether digital or written) pertaining to the possession, receipt, origin or distribution of images involving the exploitation of children. Correspondence or other documents (whether digital or written) exhibiting an interest in the exploitation of children.

10.    Items that would tend to establish ownership or use of computers and ownership or use of any Internet service accounts accessed to obtain

14

MCSO Case# 08-10166

child pornography to include credit card bills, telephone bills, correspondence and other identification documents.

11.    Items that would tend to show dominion and control of the property searched, to include utility bills, telephone bills, correspondence, rental agreements and other identification documents.

12.    Data maintained on the computer, or computer related storage devices such, but not limited to, floppy diskettes, CD/DVD Media, tape backups, computer printouts, and USB thumbdrives . In particular, data in the form of images, and/or log files recording the transmission of images as they relate to violations of Florida law cited herein related to the possession and/or distribution of child pornography.

Your Affiant believes that the above items is/are being kept and used in violation of the laws of the State of Florida or is/are being kept at the Premises and constitute(s) evidence of, or evidence relevant to proving, a violation of the laws of the State of Florida, to wit:  Section 827.071 (5) Possession of Computer Child Pornography.

WHEREFORE, Your Affiant makes this affidavit and prays for the issuance of a Search Warrant in due form of law commanding the Sheriff of Martin County with all necessary assistance, including forensic computer analyst expert(s), either in the daytime or in the nighttime, or on Sunday, as the exigencies of the occasion may demand, to enter and search the above described Premises and the curtilage thereof, or persons located within the Premises and the curtilage reasonably believed to be connected with said illegal activity, for the said Property heretofore described, and to seize and safely secure same, and to search and analyze said Property at an off-site location as needed, or delegate said search to an off-site forensic analyst, in order that the evidence may be procured in the prosecution of such person or persons who have unlawfully used, possessed, or are using or possessing the same in violation of the laws of the State of Florida.









A-321

**U.S. Department of Justice**

*United States Attorney*
*District of Connecticut*

| | |
|---|---|
| *Brien McMahon Federal Building* | *(203) 696-3000* |
| *915 Lafayette Boulevard, Room 309* | |
| *Bridgeport, Connecticut 06604* | *Fax (203) 579-5575* |

July 8, 2010

Robert M. Berke, Esq.
640 Clinton Avenue
Bridgeport, Connecticut 06605

Re:   <u>United States v. Edgardo Sensi</u>
      <u>Criminal No. 3:08CR253 (WWE)</u>

Dear Attorney Berke:

This letter confirms the conditional plea agreement entered into between your client, Edgardo Sensi (the "defendant"), and the United States Attorney's Office for the District of Connecticut (the "Government") concerning the referenced criminal matter. The defendant agrees to enter a guilty plea, to <u>all</u> four counts in the Superseding Indictment in the above-referenced criminal matter. Pursuant to Fed. R. Crim. P. Rule 11(a)(2), the <u>only</u> promise that the Government is entering into for the purposes of this plea is to permit the defendant to reserve his right to appeal the Court's June 8, 2010 ruling relating to the suppression hearing. In exchange for the Government's consent to permit the defendant to appeal only the Court's ruling regarding the suppression of physical evidence obtained from his residence, the defendant will give up <u>**all of his other appeal rights**</u> and is pleading guilty because he is guilty of the offenses charged against him.

**THE PLEA AND OFFENSE**

The defendant understands that, to be guilty of these crimes the essential elements as set forth in Exhibit A must be satisfied. The defendant also understands that he is subject to the minimum and maximum penalties listed in Exhibit A, and that the Court has discretion to order that any terms of imprisonment on each count be run concurrently or consecutively.

The defendant understands that any sentence of incarceration under this provision must be followed by a term of supervised release of at least five years and as much as life. 18 U.S.C. § 3583(k). The defendant understands that, should he violate any condition of the supervised release, he may be required to serve a further term of imprisonment of up to five years with no credit for time already spent on supervised release. However, if the defendant is required to register under the Sex Offender Registration and Notification Act, and violates a condition of

1

supervised by committing any felony offense in chapters 109A, 110, 117, or sections 1201 or 1591 of Title 18, United States Code, then the defendant shall be required to serve a term of not less than five years of imprisonment.  18 U.S.C. § 3583(k).

The defendant also is subject to the alternative fine provision of 18 U.S.C. § 3571.  Under this section, the maximum fine that may be imposed on the defendant is the greatest of the following amounts: (1) twice the gross gain to the defendant resulting from the offense; (2) twice the gross loss resulting from the offense; or (3) $250,000.

In addition, the defendant is obligated by 18 U.S.C. § 3013 to pay a special assessment of $100 on each count of conviction.  The defendant agrees to pay the special assessment to the Clerk of the Court on the day of his sentencing.

The defendant is also subject to restitution, as discussed below.  Unless otherwise ordered, should the Court impose a fine or restitution of more than $2,500 as part of the sentence, interest will be charged on the unpaid balance of the fine or restitution not paid within 15 days after the judgment date.  18 U.S.C. § 3612(f).   Other penalties and fines may be assessed on the unpaid balance of a fine or restitution pursuant to 18 U.S.C. § 3572 (h), (i) and § 3612(g).

Finally, in addition to the standard conditions of any supervised release, the defendant does not object to the Court ordering certain additional conditions, as set forth in the attached Rider: Additional Conditions of Supervised Release.

Restitution

In addition to the other penalties provided by law, the Court must also order that the defendant make restitution under 18 U.S.C. § 3663A and under 18 U.S.C. § 2259.  The scope and effect of the order of restitution are set forth in the attached Rider Concerning Restitution. Restitution is payable immediately unless otherwise ordered by the Court.

Forfeiture

The defendant understands and agrees that by virtue of his plea of guilty he waives any rights or cause of action to claim that he is a "substantially prevailing party" for the purpose of recovery of attorney fees and other litigation costs in any related forfeiture proceeding pursuant to 28 U.S.C. § 2465(b)(1).

**THE SENTENCING GUIDELINES**

Applicability

The defendant understands that the Court is required to consider any applicable Sentencing Guidelines as well as other factors enumerated in 18 U.S.C. § 3553(a) to tailor an

2

appropriate sentence in this case and is not bound by any promises, representations or plea agreement. The defendant understands that the Sentencing Guideline determinations will be made by the Court, by a preponderance of the evidence, based upon input from the defendant, the Government, and the United States Probation Office. The defendant further understands that he has no right to withdraw his guilty plea if his sentence or the Guideline application is other than he anticipated. At this time, the Government is notifying the defendant that the Government has made no promises or representations of any kind with respect to whether the defendant has accepted responsibility for his criminal conduct. More specifically, the Government will absolutely oppose the defendant's request to receive acceptance of responsibility if the defendant seeks to withdraw his plea of guilty or takes a position at sentencing, or otherwise, that, in the Government's assessment, is inconsistent with affirmative acceptance of personal responsibility for all of his criminal conduct. The defendant understands that he may not withdraw his plea of guilty if, for the reasons explained above, the Government chooses not to recommend acceptance.

Guidelines

By this letter we are notifying the defendant that in the Government's view, the applicable term of incarceration under the Guidelines is ninety-five (95) years of incarceration. In addition, the defendant will be subject to the special conditions of supervised release that are attached as a Rider to this plea agreement.

Waiver of Right to Appeal or Collaterally Attack Sentence

The defendant acknowledges that under certain circumstances he is entitled to challenge his conviction and sentence. The parties agree that notwithstanding his guilty plea, the defendant reserves his right to appeal the district court's order dated June 8, 2010, which denied his motion to suppress. In consideration of this conditional plea, in all other respects, the defendant agrees not to appeal or collaterally attack his conviction in any proceeding, including but not limited to a motion under 28 U.S.C. § 2255 and/or § 2241. Nor will he pursue such a challenge to the sentence imposed by the Court to the extent that his aggregate sentence does not exceed the statutory maximum term of 95 years in prison, a lifetime term of supervised release, $400 in special assessments, a $1,000,000 fine. The Government and the defendant agree not to appeal or collaterally attack the Court's imposition of a sentence of imprisonment concurrently or consecutively, in whole or in part, with any other sentence that may be imposed in other proceedings. The defendant acknowledges that he is knowingly and intelligently waiving these rights. Furthermore, the parties agree that any challenge to the defendant's sentence that is not foreclosed by this provision will be limited to that portion of the sentencing calculation that is inconsistent with (or not addressed by) this waiver.

Information to the Court

The Government reserves its right to address the Court with respect to an appropriate

sentence to be imposed in this case. Moreover, the Government will discuss the facts of this case, including information regarding the defendant's background and character, 18 U.S.C. § 3661, with the United States Probation Office and will provide the Probation Officer with access to material in its file, with the exception of grand jury material. The Government reserves the right to introduce statements of not only the victims in this case but also additional victims that have come forward during the investigation. Additionally, the Government reserves its right to put forth evidence in the form of records and testimony at a sentencing hearing to support its sentencing recommendation.

## WAIVER OF RIGHTS

### Waiver of Trial Rights and Consequences of Guilty Plea

The defendant understands that he has the right to be represented by an attorney at every stage of the proceeding and, if necessary, one will be appointed to represent him.

The defendant understands that, if he pleads guilty, the Court may ask him questions about each offense to which he pleads guilty, and if he answers those questions falsely under oath, on the record, and in the presence of counsel, his answers may later be used against him in a prosecution for perjury or making false statements.

### Waiver of Statute of Limitations

The defendant agrees that, should the conviction following defendant's plea of guilty pursuant to this plea agreement be vacated for any reason, then any prosecution that is not time-barred by the applicable statute of limitations on the date of the signing of this plea agreement may be commenced or reinstated against defendant, notwithstanding the expiration of the statute of limitations between the signing of this plea agreement and the commencement or reinstatement of such prosecution. The defendant agrees to waive all defenses based on the statute of limitations with respect to any prosecution that is not time-barred on the date the plea agreement is signed.

### Waiver of Right To Post-Conviction DNA Testing of Physical Evidence

The defendant understands that the Government has various items of physical evidence in its possession in connection with this case that could be subjected to DNA testing. The defendant further understands that, following conviction in this case, he could file a motion with the Court to require DNA testing of physical evidence pursuant to 18 U.S.C. § 3600 and § 3600A in an attempt to prove his innocence. The defendant understands his right to have all the physical evidence in this case tested for DNA, has discussed this right with his counsel, and knowingly and voluntarily waives his right to have such DNA testing performed on the physical evidence in this case. Defendant understands that, because he is waiving this right, the physical evidence in this case will likely be destroyed or will otherwise be unavailable for DNA testing in the future.

4

Case 12-565, Document 27, 10/05/2012, 740170, Page33 of 219

## ACKNOWLEDGMENT OF GUILT AND VOLUNTARINESS OF PLEA

The defendant acknowledges that he is entering into this agreement and is pleading guilty freely and voluntarily because he is guilty. The defendant further acknowledges that he is entering into this agreement without reliance upon any discussions between the Government and him (other than those described in the plea agreement letter), without promise of benefit of any kind (other than the concessions contained in the plea agreement letter), and without threats, force, intimidation, or coercion of any kind. The defendant further acknowledges his understanding of the nature of the offense to which he is pleading guilty, including the penalties provided by law. The defendant also acknowledges his complete satisfaction with the representation and advice received from his undersigned attorney. The defendant and his undersigned counsel are unaware of any conflict of interest concerning counsel's representation of the defendant in the case.

The defendant acknowledges that he is not a "prevailing party" within the meaning of Public Law 105-119, section 617 ("the Hyde Amendment") with respect to the count of conviction or any other count or charge that may be dismissed pursuant to this agreement. The defendant voluntarily, knowingly, and intelligently waives any rights he may have to seek attorney's fees and other litigation expenses under the Hyde Amendment.

## SCOPE OF THE AGREEMENT

The defendant acknowledges that this agreement is limited to the undersigned parties and cannot bind any other federal authority, or any state or local authority. The defendant acknowledges that no representations have been made to him with respect to any civil or administrative consequences that may result from this plea of guilty because such matters are solely within the province and discretion of the specific administrative or governmental entity involved. Finally, the defendant acknowledges that this agreement has been reached without regard to any civil tax matters that may be pending or which may arise involving him.

## COLLATERAL CONSEQUENCES

The defendant further understands that if he pleads guilty, he will be adjudicated guilty of each offense to which he has pleaded guilty and may thereby be deprived of certain federal benefits as provided in 21 U.S.C. § 862 and will be deprived of certain rights, such as the right to vote, to hold public office, to serve on a jury, or to possess firearms. The defendant understands that pursuant to section 203(b) of the Justice For All Act, the Bureau of Prisons or the Probation Office will collect a DNA sample from the defendant for analysis and indexing. Finally, the defendant understands that the Government reserves the right to notify any state or federal agency by which he is licensed, or with which he does business, as well as any current or future employer of the fact of his conviction.

The defendant understands that if he pleads guilty, the Court may ask him questions about

5

A-326

each offense to which he pleads guilty, and if he answers those questions falsely under oath, on the record, and in the presence of counsel, his answers may later be used against him in a prosecution for perjury or making false statements.

The defendant acknowledges that he has been advised and understands that under the Sex Offender Registration and Notification Act, federal law requires that he must register and keep the registration current in each of the following jurisdictions: where he resides; where he is an employee; and where he is a student. He understands that the requirements for registration include providing his name, his residence address, and the names and addresses of any places where he is or will be an employee or a student, among other information. He further understands that the requirement to keep the registration current includes informing at least one jurisdiction in which he resides, is an employee, or is a student not later than three business days after any change of his name, residence, employment, or student status. The defendant has been advised, and understands, that the failure to comply with these obligations subjects him to prosecution for failure to register under federal law, 18 U.S.C. § 2250, which is punishable by a fine or imprisonment, or both.

## NO OTHER PROMISES

The defendant understands that there are **no** other promises, agreements, or conditions that bind the Government in his case.

This letter shall be presented to the Court, in open court, and the Government will ask that it be filed in this case.

Very truly yours,

DAVID B. FEIN
UNITED STATES ATTORNEY

The defendant certifies that he has read this plea agreement letter and its attachment or has had it read or translated to him, that he has had ample time to discuss this agreement and its attachments with counsel and that he fully understands and accepts its terms.

EDGARDO SENSI
The Defendant

7/8/10
Date

I have thoroughly read, reviewed and explained this plea agreement and its attachment(s) to my client, who advises me that she understands and accepts its terms.

ROBERT BERKE, ESQ.
Attorney for the Defendant

7/8/10
Date

6

## RIDER CONCERNING RESTITUTION

Pursuant to 18 U.S.C. § 2259, the Court shall direct the defendant to pay the full amount of each victim's losses, including any costs incurred for:

    (A)    medical services relating to physical, psychiatric, or psychological care;

    (B)    physical and occupational therapy or rehabilitation;

    (C)    necessary transportation, temporary housing, and child care expenses;

    (D)    lost income;

    (E)    attorneys' fees, as well as other costs incurred; and

    (F)    any other losses suffered by the victim as a proximate result of the offense.

Restitution is payable immediately unless ordered otherwise by the Court. The order of restitution must be a condition of probation or supervised release. Failure to make restitution as ordered may result in a revocation of probation, or a modification of the conditions of supervised release, or in the defendant being held in contempt under 18 U.S.C. § 3583(e). Failure to pay restitution may also result in the defendant's re-sentencing to any sentence which might originally have been imposed by the Court. 18 U.S.C. § 3614. The Court may also order that the defendant give notice to any identifiable victim(s) of his offense under 18 U.S.C. § 3555. Finally, the order of restitution has the effect of a civil judgment against the defendant.

A-328

## RIDER: ADDITIONAL CONDITIONS OF SUPERVISED RELEASE

1.  The defendant shall participate in mental health treatment, with an emphasis on sexual offender treatment, either inpatient or out-patient, to include participation with polygraph administration, as directed by the United States Probation Office.  The defendant shall pay all, or a portion of, the costs associated with mental health treatment based on his ability to pay, in an amount to be determined by the United States Probation Office;

2.  The defendant shall agree that any device that he uses with Internet access, including a computer, will be equipped with monitoring software that will permit the United States Probation Office to determine whether he has been in contact with minors, either through email, chat rooms, instant messaging, or any other electronic means.[1]  The defendant shall pay all, or a portion of, the costs associated with computer monitoring based on his ability to pay, in an amount to be determined by the United States Probation Office;

3.  The defendant shall consent to third-party disclosure to any employer, potential employer, community service site, or other interested party, as determined by the United States Probation Office, of any computer-related restrictions that are imposed;

4.  The defendant shall have no unsupervised contact with any child under 18 years of age without the express permission of the United States Probation Office and treatment provider.  On release, the United States Probation Office will determine whether the defendant may have unsupervised contact with his own children;

5.  The defendant shall permit the United States Probation Office, accompanied with either local, state, or Federal law enforcement authorities, upon reasonable suspicion,[2] to conduct a search of the defendant's residence, automobile, and workplace for the presence of sexually explicit materials involving minors;

6.  The defendant shall comply with any applicable federal, state and local sex offender registry laws and requirements;

---

[1] Narrowly tailored to conform to United States v. Lifshitz, 369 F.3d 173 (2d Cir. 2004).

[2] Id.

8

A-329

7.  The defendant shall provide the United States Probation Office with access to any requested financial records, including but not limited to, telephone bills and credit card statements;

8.  The defendant shall not loiter around playgrounds, schools, arcades or any other places where children under the age of 18 congregate.  The defendant shall not associate with or have contact with convicted sex offenders or those considered inappropriate by the United States Probation Office because of a connection to sexual abuse of minors or sexually explicit materials involving minors, unless as part of an approved counseling group;

9.  The defendant is prohibited from holding any position of authority or guidance over children or youth groups involving individuals under the age of 18; and

10.  The defendant is prohibited from accessing or possessing sexually explicit materials involving minors.

## Elements of the Offenses and Statutory Maximum Sentences for the Counts in the Indictment of
### United States v. Edgardo Sensi 3:08cr253 (WWE)

| Count | Charge | Elements of the Offense | Maximum Penalties and Notice of Mandatory Minimum Jail Sentence |
|---|---|---|---|
| One | Conspiracy to Produce Child Pornography — 18 U.S.C. § 371 | First, that two or more persons entered into the particular unlawful agreement charged in Count One of the Indictment (an agreement to produce child pornography); Second, that the defendant knowingly and willfully became a member of the conspiracy; Third, that one of the members of the conspiracy knowingly committed at least one of the overt acts charged in the indictment; and Fourth, that the overt act(s) which was (were) committed were committed to further some objective of the conspiracy. | Term of imprisonment of up to 5 years; a fine of up to $250,000; supervised release of up to life; a $100 special assessment; and restitution |
| Two | Production of Child Pornography in the U.S. — 18 U.S.C. § 2251(a)   DSF | First, that M.V. #1 was under the age of eighteen; Second, that the defendant used (or employed or persuaded or induced or enticed or coerced) M.V. #1 to take part in sexually explicit conduct for the purpose of producing a visual depiction of that conduct; and Third, that the visual depiction was mailed or actually transported in interstate or foreign commerce, or that the materials used to produce the visual depiction were transported in interstate or foreign commerce, or that the defendant knew or had reason to know that such visual depiction would be transported in interstate or foreign commerce. | Mandatory minimum term of imprisonment of 15 years but not more than 30 years; a fine of up to $250,000; supervised release of up to life; a $100 special assessment; and restitution |
| Three | Illicit Sexual Conduct in Foreign Places — 18 U.S.C. § 2423(c) | First, that the defendant is a United States citizen; Second, that the defendant traveled in foreign commerce; and Third, that the defendant engaged in illicit sexual conduct with another person. | Term of imprisonment of not more than 30 years; a fine of up to $250,000; supervised release of up to life; a $100 special assessment; and restitution |
| Four | Production of Child Pornography Outside the U.S. — 18 U.S.C. § 2251(c)(1) | First, that M.V. #2 was under the age of eighteen; Second, that the defendant used (or employed or persuaded or induced or enticed or coerced) M.V. #2 to take part in sexually explicit conduct for the purpose of producing a visual depiction of that conduct; and Third, that the defendant ~~visual depiction was mailed or actually~~ transported ~~in interstate or foreign~~ the visual depiction, or that the defendant intended for such visual depiction to be transported to the United States by any means. | Mandatory minimum term of imprisonment of 15 years but not more than 30 years; a fine of up to $250,000; supervised release of up to life; a $100 special assessment; and restitution |

EXHIBIT A

A-331

(Rev. 4/05)

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA    :
                            :
            v.              :    CASE NO.          (WWE)
                            :
_EDGARDO SENSI_             :

PETITION TO ENTER PLEA OF GUILTY
PURSUANT TO RULES 10 AND 11 OF
THE FEDERAL RULES OF CRIMINAL PROCEDURE

The above-named defendant respectfully petitions this

Court to permit him/her to withdraw his/her previously entered

plea of "Not Guilty" to Count(s) _ALL FOUR COUNTS_ of

the Indictment/Information in Criminal No. _3:08CR253_(WWE),

and to plead "GUILTY" at this time to Count(s) _ALL FOUR COUNTS_

In support of this petition, petitioner represents to the

Court as follows:

   (1)   My full and legal name is: _EDGARDO SENSI_

_____

I request that all proceedings against me be had in this name.

   (2)   I am _54_ years of age.  I was born on _4/13/1956_ .

   (3)   I was born in (City, State, etc.) _CHICAGO, IL_ .

   (4)   [Place check in appropriate places.]

         (a)   I am able to read _X_ and write _X_ in the

English language.

    (b)  I am not able to read and write English, and I have had the benefit of the interpretation and translation services of _____ (name of interpreter), who is fluent in _____ (name of language).  I continue to require such an interpreter.

  (5)  (a)  I have received the following education in the United States (check the highest level completed):

Grade School   1___2___3___4___5___6___7___8 X

High School _____4_____ (Years)

College _____4_____ (Years)

Graduate School _____ (Years)

    (b)  If education received in foreign country, give details_____

_____.

  (6)  I am represented by counsel and the name of my attorney is _ROBERT BERKE_____.

  (7)  (a)  I have received a copy of the Indictment/Information, I have read and discussed it with my attorney, and I understand every accusation made against me in this case.

2

A-333

(b)   As stated below in my own words, I understand

that in the counts of the Indictment/Information

to which I am now offering to plead guilty, I am

charged with the following crime(s):

CONSPIRACY , PRODUCTION OF CHILD PORNOGRAPHY

IN THE US, AIDING AND ABETTING, ILLIGO

SEXUAL CONDUCT IN FOREIGN PLACES PRODUCTION

OF CHILD PORNOGRAPHY OUTSIDE THE US.

[Identify each count and the nature of the

crime charged therein.]

(8)   (a)   I have given my attorney a full statement of all

the facts and surrounding circumstances as known

to me concerning the matters mentioned in the

Indictment/Information, and I believe that my

attorney is fully informed as to all such

matters.

(b)   After I gave my attorney the statement just

mentioned in 8(a), my attorney informed,

counseled, and advised me as to the nature of

every accusation against me, and as to any

possible defense I might have with respect to

these accusations.

(9)   My attorney has advised me that, with respect to the

3

A-334

Count(s) to which I intend to plead "GUILTY," the punishment which the law provides is as follows:

[Add up the punishments on each count.  For example, if a defendant is pleading guilty to counts one and two, and there is a two-year maximum sentence on count one, and a five-year maximum sentence on count two, write in seven years as the maximum amount of imprisonment, and $100 as the mandatory special assessment. Fill in only those blanks that are applicable.]

    (a)   A maximum of _85 YEARS_ imprisonment.

    (b)   A mandatory minimum of _15 years_ imprisonment.

    c)   A maximum fine of $ _1,000,000_ .

    (d)   A minimum fine of $ _____ .

    (e)   A maximum term of supervised release of _life_ years following imprisonment for the offense(s) charged in Count(s) _1 - 4_ of the Indictment/Information.

    (f)   A minimum term of supervised release of at least _n/a_ years following imprisonment for the offense(s) charged in Count(s)_____ of the Indictment/Information.

        I understand that if I violate any condition of the supervised release before the term expires, I may be required to serve a further term without any credit for the time already spent on

4

supervised release of:
(a) _____ years imprisonment
(b) the entire term of supervised release.

(g)   A maximum order of restitution equal to the
      amount of loss resulting to any victims of the
      offense(s) charged in the Indictment/
      Information to which I am offering to plead
      guilty.

(h)   I understand that I must also pay a mandatory
      special assessment of $ ___10___ on each count

(10) My attorney has also advised me that:

[Check applicable line.]

____  (a) Because the offense to which I am offering to

      plead "GUILTY" is a Class A/B felony, the Court is

      not authorized to sentence me to probation.

_____ (b)  Probation is a possible sentence, but that it

      may or may not be granted.

(11) My attorney has also advised me that in imposing a

sentence on the offense(s) to which I am now offering to plead

guilty, the Court must consider the Guidelines promulgated by

the United States Sentencing Commission and the related policy

statements.  The Court, however, is not bound by the Guidelines

5

but must consider them along with other factors set forth in 18
U.S.C.§3553.

My attorney has counseled me with his/her opinion on what
my sentencing range might be.  I fully understand that my
attorney's opinion (or my own) may be incorrect and that any
disputed facts and objections to application of the Guidelines
calculation will be made by a preponderance of the evidence.
I understand that my attorney's opinion or prediction
concerning the Guidelines to be considered is not binding on
the Court nor are the Guidelines themselves binding on the
Court; and that I have no right to withdraw my plea on the
ground that my attorney's opinion or prediction (or my own)
concerning any sentence proved to be incorrect.  I fully
understand that the sentence could be up to the maximum
provided by the statute.

My attorney has advised me that in certain instances,
conduct which is found or stipulated to have occurred will be
taken into consideration in computing the applicable Guidelines
to be considered, even though that conduct does not form the
basis of the specific count(s) to which I am pleading guilty.

My attorney has advised me, and I fully understand, that parole has been abolished for offenses committed on or after November 1, 1987, and that if I am sentenced to prison, I will not be released on parole.

_____(12) Consequences for parole and probation. [Check if defendant is on probation or parole in this or any other court.]

I understand that by pleading GUILTY here, my probation/parole may be revoked and I may be required to serve time in prison in the case in which I am on probation/parole, in addition to any sentence imposed upon me in this case. Moreover, my attorney has advised me that my status on probation/parole at the time of the offense charged in this case may result in an increase in the Guideline range or in the sentence imposed.

(13) My attorney has advised me that if I plead "GUILTY" to more than one offense, the Court may order the sentence to be served consecutively -- that is, one after another.

(14) I understand that I may, if I so choose, plead "NOT GUILTY" to any offense charged against me, and that I may continue to plead "NOT GUILTY," if I have already so pleaded.

7

A-338

(15) I understand that if I choose to plead "NOT GUILTY,"
I may proceed to trial at the time set by the Court.   I further
understand that the United States Constitution guarantees me:

    (a)   the right to a speedy and public
trial by jury;

    (b)   the right to see, hear, and
question all witnesses called by
the government against me;

    C)   the right  to use the power and
process of the Court to compel
the production of any evidence,
including the attendance of any
witnesses, in my favor;

    (d)   the right to have the assistance
of counsel in my defense at all
stages of these proceedings, as
well as upon the trial; and

    (e)   the right not to be compelled to
incriminate myself; that is, I
understand that if I go to trial,
I may remain silent and I cannot
be compelled to take the witness
stand.

    (f)   the right to be found "not guilty" on any
charge for which the evidence lawfully admitted
at trial does not sustain a finding of guilt
beyond a reasonable doubt.

(16) I understand that, by pleading "GUILTY," I waive
(that is, I give up) my right to a trial, and that there will

8

Case 12-565, Document 27, 10/05/2012, 740170, Page47 of 219

be no further trial of any kind.

(17) I understand that, if I plead "GUILTY," the Court may ask me questions about the offense to which I am pleading "GUILTY."  I also understand that if I answer these questions under oath, on the record, and in the presence of counsel, my answers, if false, may later be used against me in a prosecution for perjury or false statement.

I understand also that, by pleading "GUILTY," I waive any right against self-incrimination concerning the facts constituting the offense to which I am pleading "GUILTY."

(18) I understand that, if I plead "GUILTY," the Court may impose the same punishment as if I had pleaded "NOT GUILTY," stood trial, and had been convicted by a jury.

(19) I further understand that if I plead "GUILTY," I waive (that is, I give up) any defenses I may have had and, in particular, that I waive any claims which I may have had based upon any previous violations of my statutory or constitutional rights.  I understand that if I were to continue to plead "NOT GUILTY," I would be entitled to have my attorney make

Case 12-565, Document 27, 10/05/2012, 740170, Page48 of 219

A-340

appropriate application to the Court based upon any such

violations -- for example, a motion to suppress evidence.

(20) I declare that no officer or agent of any branch of

government (federal, state or local), nor any other person, has

made any promise or suggestion of any kind to me, or within my

knowledge to anyone else, that I would receive a lighter

sentence, or probation, or any other form of leniency, if I

would plead "GUILTY," except to the extent that my plea of

"GUILTY" may be a factor considered by the Court in determining

whether I have accepted responsibility for my criminal conduct

within the meaning of the Guidelines or to the extent indicated

in my written plea agreement with the Government.

(21) I declare that I have not been _threatened_ or _forced_

in any way to plead guilty at this time or any other times.

(22) My decision to plead "GUILTY" arises out of

discussions between me and my attorney, who advised me that if

I plead "GUILTY" to Count(s) _____ _____

the government has agreed to the following: [Staple here a copy

of any written agreement between the government and the

10

A-341

defendant. If there is no written agreement, state the nature

of the agreement in the space below.]

*I AGREE TO A CONDITIONAL PLEA OF GUILTY RESERVING*
*IN WRITING MY RIGHT TO HAVE AN APPELLATE COURT*
*REVIEW AN ADVERSE DETERMINATION OF MY PRETRIAL*
*MOTIONS. IF I PREVAIL ON APPEAL, I MAY THEN WITH-*
*DRAW MY PLEA.*

(23) I understand that the Court may accept or reject the

terms of this agreement, or may defer its decision to accept or

reject the agreement until it has had an opportunity to

consider a presentence report prepared by the United States

Probation Office.

(24) (a)  I have made this decision to plead "GUILTY"

freely and voluntarily and as a result of my own

11

reasoning processes.

(b)  I know that the Court will not accept a plea of "GUILTY" from any one who claims to be innocent and I am not pleading "GUILTY" for any reason other than that I am indeed guilty.

(25) [Place check mark in appropriate place:]

I have_____/have not__X__ made any statement to any law enforcement officer or anyone else in which I admitted the crime or any part of the crime to which I now want to plead guilty.

[Check if defendant has made such a statement:]

_____ I would choose to plead "GUILTY" even if I knew that the statement could not be used against me.

(26) I understand that, in cases prior to November 1, 1987, a federal judge has no authority to order a federal sentence of imprisonment to run at the same time as a state sentence of imprisonment.  However, for an offense committed after November 1, 1987, I understand that under 18 U.S.C. § 3584(a), a federal judge may impose terms of imprisonment that run concurrently.

12

A-343

(27) I believe and understand that my attorney has done all that an attorney should have done to counsel and assist me with respect to this case.

(28) I am not now under the influence of any drugs or alcohol.

(29) Within the last seven (7) days, I have taken the following drugs, medicines, pills or alcoholic beverages:

LANTUS — 2X DAILY INJECTED

LISINOPRIL   1 X DAILY

ZOCOR (GENERIC)   1 X DAILY

NEUROPATHY MEDICATION   1 X DAILY

TYLENOL   2X DAILY

13

Case 12-565, Document 27, 10/05/2012, 740170, Page52 of 219

(30) The following is my own statement as to what
occurred, which shows that I am, in fact, guilty of each charge
to which I am now offering to plead "Guilty."  [Defendant must
set forth, in his/her own handwriting, or through an
interpreter, his/her own statement as to each count with which
he/she is charged.  Use additional sheets if necessary and
attach to this petition.]

COUNTS 1 AND 2: I VIDEOTAPED SEXUAL RELATIONS WITH A
MINER AND HER MOTHER IN THE USA
COUNTS 3 AND 4: I VIDEOTAPED SEXUAL RELATIONS WITH A
MINOR AND HER MOTHER OUTSIDE THE USA

14

A-345

Court to omit and consider as waived (that is, to consider as given up) by me all reading of the Indictment/Information in open court, and all further proceedings upon my arraignment, and to consider any undecided motions previously made by me as withdrawn.

(33) I request that the Court enter now my plea of "GUILTY" as set forth above in reliance upon my statements in this petition.

Signed by me in open court in the presence of my attorney at New Haven, Connecticut, this _8TH_ day of _JULY_, 20_10_.

_____
Defendant

## CERTIFICATE OF COUNSEL

The undersigned, as attorney and counselor for the defendant, _Edgardo Sens,_____, hereby certifies as follows:

(1)   I have read and fully explained to the defendant all the accusations against the defendant which are set forth in the Indictment/Information in this case;

(2)   To the best of my knowledge and belief each statement set forth in the foregoing petition is in all respects accurate and true;

(3)   The plea of "GUILTY," as offered by the defendant in the foregoing petition, accords with my understanding of the facts as related to me by the defendant, and is consistent with my advice to the defendant;

(4)   In my opinion, the defendant's waiver of the reading of the Indictment/Information in open court, and of all further proceedings upon arraignment as provided in the Federal Rules of Criminal Procedure, is voluntarily made; the defendant understood what he/she was doing when he/she waived the reading; and I recommend to the Court that the waiver be accepted by the Court;

(5)   In my opinion the plea of "GUILTY," as offered by the defendant in the foregoing petition, is voluntarily and understandingly made, and I recommend to the Court that the plea of "GUILTY" be now accepted and entered on behalf of the defendant as requested in the defendant's petition;

(6)   I have read and understood and explained to the defendant all the provisions of Rules 10 and 11 of the Federal Rules of Criminal Procedure, and I believe the defendant understands the substance of both of those Rules;

(7)   I have caused a copy of the foregoing petition, completed by the defendant, to be delivered to the Assistant United States Attorney in charge of this case prior to the parties' appearance in court at the plea proceeding.

Signed by me in open Court and in the presence of the defendant above named defendant at Bridgeport, Connecticut, this _____ day of _____July_____, 20_10_

_____
Attorney for the Defendant

17

A-348

O R D E R

Good cause appearing from the foregoing petition of the defendant above named and the certificate of his counsel, and from all proceedings heretofore had in this case, it is hereby ORDERED that the petition be granted and that the defendant's plea of "GUILTY" be accepted and entered as prayed in the defendant's petition and as recommended in the certificate of his counsel.

Done in open court in Bridgeport, Connecticut, this 8 TH day of July, 2010.

/s/ Warren W. Eginton, SUSDJ
_____
Warren W. Eginton
United States District Judge

18

1

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA,       .    Case No. 3:08-CR-00253
                                .    (WWE)
                Plaintiff,      .
                                .    Bridgeport, Connecticut
        v.                      .    July 8, 2010
                                .
EDGARDO SENSI,                  .
                                .
                Defendant.      .
. . . . . . . . . . . . . . . .

            MOTION AND CHANGE OF PLEA HEARING
        BEFORE THE HONORABLE WARREN W. EGINTON
          SENIOR UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:       Office of the U.S. Attorney
                         By:  KRISHNA PATEL, AUSA
                              DAVID FEIN, AUSA
                         915 Lafayette Boulevard
                         Bridgeport, CT 06604

For the Defendant:       Law Offices
                         By:  ROBERT M. BERKE, ESQ.
                         640 Clinton Avenue
                         Bridgeport, CT 06605

Electronic Court
Recorder Operator:       MS. SANDI BALDWIN

Transcriptionist:        MS. HELEN C. FALCK

Proceedings recorded by electronic sound recording.
Transcript prepared by transcription service.
------------------------------------------------

BOWLES REPORTING SERVICE
P.O. BOX 607
GALES FERRY, CONNECTICUT 06335
(860) 464-1083

2

```
 1              (Proceedings commenced at 10:35 a.m.)
 2              THE COURT:  All right.  This is United States
 3    v. Sensi, 3:08-CR-253.
 4              The matter before me is Defense Counsel, Mr.
 5    Berke's, motion to withdraw, and then there's a letter
 6    from Mr. Sensi asking for a continuance.
 7              Now, to bring myself up to speed here, I've
 8    read the materials filed by both Mr. Berke and by the
 9    Government.  I am not sure what the current situation
10    is.
11              The Government notes in its memorandum that
12    the material it received was heavily redacted, so I'm
13    not sure to what extent the Government has briefed on
14    the full nature of the ex parte motion to withdraw as
15    counsel, and I'm not sure whether the Government has
16    seen the two-page continuance letter that Mr. Sensi
17    furnished the Court.
18              So, the government better advise me as to
19    what they know and what they don't know at this point.
20              MS. PATEL:  Your Honor, with respect to the
21    motion, I do have a copy of the motion that was
22    publically filed.  On the first page it simply
23    indicates that the Defense Counsel is seeking
24    permission to withdraw his appearance.
25              It's heavy redacted on the second page.  The
```

3

1    only paragraph that is there is the one that begins,

2    "In the alternative, if the Court is inclined to deny

3    the request to withdraw."  That paragraph is there, and

4    then the signature line.

5            I assume that Mr. Berke redacted this, in

6    part, because what is contained in the middle, it

7    contains either defense strategy issues or, more

8    importantly, attorney/client communications, and if

9    that is the case, we certainly do not want to see a

10   full motion.

11           THE COURT:  So, a short answer to my question

12   is that nothing's changed since the Government said it

13   has a heavily redacted --

14           MS. PATEL:  Right.

15           THE COURT:  -- copy, and I assume you're

16   telling me that it still is heavily redacted.

17           MS. PATEL:  It is, Your Honor.

18           THE COURT:  Okay.

19           Now, I've read it in full and I understand

20   why it's redacted, and your assumption is correct, that

21   there is information in there which the Government

22   should not be given.  So, I'm in agreement with Mr.

23   Berke on redaction.  However, I wanted to make sure,

24   and you've just reassured me, that the paragraph which

25   concludes that motion is known to the Government.

4

1           So, the Government knows that Mr. Berke has

2    said that, "It's possible for the Court to appoint the

3    undersigned as counsel as under the CJA."  Now that

4    we'll have to start talking about.

5           But now, let's get to my next question.  Have

6    you seen any or all of the two-page submission by Mr.

7    Sensi?

8           MS. PATEL:  Your Honor, the only submission

9    that we have seen to date is one that I believe came in

10   on July 2nd.  So, we did not see the first one which

11   Your Honor filed under seal.  We saw one on July 2nd.

12   We understand there may have been one very recently,

13   but we have not seen that one.

14           THE COURT:  Well, the one I'm talking about

15   is dated June 27, 2010.  It's two pages.

16           MS. PATEL:  Yeah, that's the same one.  We do

17   -- We have seen that one.

18           THE COURT:  Okay.  That's one I wanted to

19   make sure you've seen it because then you know that

20   it's not correct, as Mr. Sensi has stated, that Mr.

21   Galante (phonetic) is going to come into the case.

22   See, Mr. Sensi has requested a continuance only because

23   of Mr. Galante's unavailability to immediately respond,

24   but Mr. Galante has responded and he's told us he's not

25   going to do anything in this case at all for Mr. Sensi,

A-353

5

1   so that sort of disposes of Mr. Sensi's request for a

2   continuance.

3        But that still leaves us with where we stand

4   on his representation of counsel, because there are

5   statements made in Mr. Berke's papers which could give

6   me a problem with his relationship with Mr. Sensi,

7   although I don't think there's any basis for Mr. Sensi

8   to have any feelings about Mr. Berke, other than that

9   Mr. Berke, in the opinion of the Court, is a very

10   responsible and experienced criminal defense attorney

11   who's certainly capable of adequately, and more than

12   adequately, representing Mr. Sensi.

13        Well, anyway, what's the Government's

14   position as of the moment, before I ask Mr. Berke for

15   his position?

16        MR. FEIN:  Your Honor, as we set forth in our

17   memorandum, our position is that Mr. Berke's motion to

18   withdraw as counsel should be denied, that any

19   breakdown in the communication between the Defendant

20   and his counsel appears to be entirely of the

21   Defendant's own choosing.  The case law is very clear.

22   The Defendant can not, on his own, call -- necessarily

23   create delays in trials, especially in a case like this

24   where Your Honor has been very patient with the

25   Defendant.  We've waited more than 18 months for this

6

1   trial.

2          Your Honor has been very clear in prior court

3   appearances about the fact that this is a firm trial

4   date.  The Defendant has been satisfied with his

5   counsel, in fact, chose his counsel.  It appears only

6   upon Your Honor's ruling denying his motion to suppress

7   the evidence, that this latest spate of communications

8   regarding an apparent dissatisfaction with his counsel

9   has arisen.

10         So, we believe there is no basis in fact for

11  withdrawal for Mr. Berke.  We believe these are delay

12  tactics.  We think the case law is very clear, giving

13  Your Honor the ability to insist upon the previously

14  scheduled trial date and to move forward.

15         THE COURT:  Well, all right.

16         There are two aspects of what Mr. Fein has

17  just said, in addition to the aspects which you

18  referred to, as set forth in the Government's

19  memorandum in opposition to Defense Counsel's motion to

20  withdraw.

21         Now, my reaction to that Government

22  memorandum is this, that if I'm going to adhere to the

23  fourteenth date, which I certainly agree should be

24  done, in light of what the Government has said about

25  its preparation, I'm going to insist that we go forward

A-355

7

1    with this case on a full-scale basis.  In other words,

2    I can no longer feel that I can accommodate Mr. Fein in

3    his request to have sort of a half-day situation, which

4    I thought I might be able to do because of it being a

5    bench trial, but I don't want to do that, in the light

6    of the Government's representations to me that these

7    people are coming in all the way from Nicaragua, et

8    cetera, et cetera.  And that I don't want people to

9    come into this court and get any impression that the

10   Court is sitting half-time instead of full-time on a

11   case where they're inconveniencing their lives to come

12   into Bridgeport, Connecticut.

13         So, it is the intention of the Court to sit

14   full -- in fact, I'm thinking about 8:30 to 5:30 days

15   to get this in quickly.  So I hope Mr. Fein can live

16   with that because that's the reaction of the Court to

17   the Government's memorandum.

18         MR. FEIN:  Your Honor, we support that

19   completely, and it was the -- the prior request was

20   actually just limited to the event of a jury trial, and

21   not of -- nothing to do with my schedule, but the

22   suggestion of what courts have been doing around the

23   country with a modified schedule for jurors.

24         Seeing as this is a bench trial, we're

25   prepared to go all day and perhaps finish this trial in

8

```
 1    two days rather than the three that we thought it would
 2    take.
 3             THE COURT:  Okay.  I misunderstood that.  I
 4    thought it was to help you get oriented to your new
 5    position.
 6             MR. FEIN:  No, not at all, Your Honor.
 7             THE COURT:  All right.  Fine.  We're all in
 8    agreement then.  We're going to have a full-press
 9    trial.
10             All right.  Now we get to the issue, what do
11    we do about Mr. Sensi and counsel.  So let me hear from
12    Mr. Berke.  I read your memo, in full, of course.  My
13    copy was not redacted.
14             MR. BERKE:  Your Honor, generally, without
15    getting into the specifics of the communications, at
16    some point in time my client had expressed to the
17    Court, his intention of bringing on Attorney Galante
18    who I, prior to Mr. Galante speaking to your clerk, I
19    had spoken to him, and I believe he expressed that to
20    your clerk, that he had told me that he was not coming
21    into this case.  He was pretty adamant about that.  It
22    was not ambiguous at all.
23             THE COURT:  He was very adamant to my clerk,
24    he is not coming into this case.
25             MR. BERKE:  I don't -- It didn't appear to me
```

9

 1    that there was any room for waver and --

 2            THE COURT:  I agree.  There doesn't seem to

 3    be any room for waver at all.

 4            MR. BERKE:  And so when I spoke to Mr. Sensi,

 5    he was generally questioning why I was preparing for

 6    trial when I wasn't his trial counsel.  So, it's quite

 7    difficult to defend someone in a criminal trial when

 8    they refuse to not only discuss the case with you but

 9    deny the fact that you are, in fact, their trial

10    counsel.

11            So I, being concerned about that, felt that I

12    had the ethical obligation to present this to the Court

13    in the form of a motion to withdraw.

14            What I also -- The second part, and in the

15    final paragraph of that motion is, there are certain

16    financial obligations that they had presented.  They

17    had met some of them, but at the point -- at some point

18    during this representation, when they decided that I

19    was no longer going to be the counsel, those have

20    completely ceased.

21            And as a solo practitioner, that would be

22    somewhat devastating, to have to prepare and try a

23    matter, at least in the position that I'm in right now.

24    So, considering, number one, that the Court has denied

25    Mr. Sensi's request for continuance, in fact, I had not

Case 12-565, Document 27, 10/05/2012, 740170, Page66 of 219

```
 1    seen that letter, but I under -- I was told that was
 2    the general gist of it, that Attorney Galante was going
 3    to appear and therefore he needed a continuance.
 4            The Court has denied that request.  The trial
 5    is scheduled for next week, and I guess the issue
 6    remains, whether my client is going to represent
 7    himself and I am standby counsel, or I am trial
 8    counsel.  I guess that's a --
 9            THE COURT:  You and I see the picture exactly
10    the same way, and I've been doing a lot of research on
11    this.  It seems to me that the danger that the
12    Government faces here has been well set forth in the
13    Second Circuit in the Parker case, and so I've looked
14    at that, and in Parker, the trial judge denied the
15    appointment of the CJA and never got to another part of
16    the CJA statute, but the Second Circuit made pretty
17    clear what its view was of the situation.
18            Now, 306(a) talks about adequate
19    representation of defendants, 18 United States Code,
20    and in 306(a) -- and then you have the subparts, so you
21    turn to subpart (b) which has to do with appointment of
22    counsel, and subpart (b) is very, very clear that the
23    U.S. Magistrate or the Judge, the Article III Judge,
24    either one, has to conduct a hearing and must advise
25    the person that he will only be given counsel if he's
```

11

1      financially unable to obtain counsel.

2              So, the court has to be satisfied, after

3      appropriate inquiry, that the person is financially

4      unable to obtain counsel before counsel can be

5      appointed under the CJA.

6              Now, there is a line in here, and the line is

7      what is really discussed by the court in Parker.  It

8      says:

9              "The United States Magistrate or the Court

10             shall appoint separate counsel for persons

11             having interests that cannot properly be

12             represented by the same counsel, or when

13             other good cause is shown."

14             And I've tried to figure out what "other good

15     cause is shown" means, and apparently, according to the

16     Parker case, by the way I'll give you the citation on

17     Parker, Parker is 439 F.3d 81, came down in 2006 from

18     the Second Circuit, having to deal with a situation

19     arising out of the Western District of New York, and

20     Judge Arcara was the sitting judge in that Western

21     District case, and there's a big discussion in the case

22     about the rules of the Western District, and how they

23     apply, but when the court gets around to considering

24     the interest of justice, which is what we're

25     considering, the argument was made by the Defendant,

12

```
 1    who in this case had appealed because the District

 2    Court refused to let him get counsel under the CJA, and

 3    also held that mid-case appointment of another counsel

 4    would not be in the interest of justice.

 5            And they don't go into a decision, a review

 6    of the interest of justice because they found that his

 7    original ruling was a fair ruling and a correct ruling,

 8    so that a -- it says this:

 9            "Because a finding of financial eligibility

10            is necessary, although not sufficient

11            condition under the Act, we need not examine

12            the District Court's interest of justice

13            determination, whereas here, the District

14            Court was not clearly erroneous in finding

15            the Defendant financially ineligible to

16            qualify under the CJA."

17            So they never got around to a discussion of

18    good cause, and if I -- can I go -- and I haven't been

19    able to find anything that enables me to say that we

20    can do what we did with Peter Truebner, that nobody

21    raises any fuss about what we did with Peter Truebner,

22    we appointed him under the CJA.

23            But here we are with this issue squarely

24    before me, and I want the Government to be aware of the

25    problems and what might happen here if we try to
```

A-361

13

1    proceed under some basis that the Second Circuit might

2    later say rendered the whole trial useless and we have

3    to start all over.  We don't want that to happen

4    certainly.

5         So, let me see if the Government has any

6    thoughts about what we do with Mr. Berke at this point,

7    before I tell you what my thoughts are.

8         MR. FEIN:  Your Honor, we don't know the

9    answer to the question of the Defendant's means, at

10   this time, and I -- perhaps the best thing that could

11   be done now is to determine if the Defendant himself,

12   through his counsel, believe they can satisfy -- make

13   the representations that would satisfy the Court that

14   an appointment under CJA is appropriate.

15        THE COURT:  Yeah, there are several issues

16   involved here.  The relationship between Counsel and

17   Mr. Sensi to begin with, and then the financial

18   situation for Mr. Sensi, and then the whole question of

19   whether there's good cause here, for me to go ahead, in

20   the interest of justice, and appoint Mr. Berke.

21        All right.  We'll put the ball over in Mr.

22   Berke and Mr. Sensi's corner then, and see what the

23   reaction is.

24        MR. BERKE:  If I can one moment, sir?

25        THE COURT:  No, you can have more than one.

14

```
1    Take as much time as you need.  In fact, if you want to
2    go into another room to confer, you can do that.  You
3    can go back in the robing room if you want to.
4         (Pause.)
5         MR. BERKE:  Your Honor, he had reported to
6    me, "he" being my client, that essentially that's one
7    of the reasons, at least in his opinion, why Attorney
8    Galante will not appear, is that he doesn't have any
9    money to retain him.  Attorney Galante had represented
10   him in a Florida state court proceeding -- is
11   representing him in a state court proceeding, according
12   to Mr. Sensi.
13        I did speak to Attorney Galante and he
14   confirmed, to some extent, that he has done work on his
15   behalf in that state, but he has -- does not own a
16   home, has not worked in two years, reports to me he
17   doesn't have any property.
18        So generally, I can have him complete a
19   financial affidavit, as he would having first arrived
20   in court.
21        THE COURT:  Let me explain one thing to Mr.
22   Sensi because he's a very intelligent person, and you
23   can help with this also.
24        When you look at the Parker case and read
25   what the Second Circuit said, they are very, very
```

Case 12-565, Document 27, 10/05/2012, 740170, Page71 of 219

A-363

15

1    generous and liberal, and very open to any kind of an

2    affidavit.  In other words, they really say that, they

3    say, "We're not going to say that there are certain

4    things you have to do, there are certain hoops you have

5    to jump through to prove that you're financially not

6    able to qualify, and therefore you do qualify under the

7    CJA.  We'll take anything that satisfies the Court, in

8    the wide discretion of the Court, that the financial

9    instability's been shown."

10           So, you and Mr. Sensi get together between

11   now and the fourteenth and file whatever affidavit he

12   wants to file with me that will show his eligibility.

13   It doesn't have to be detailed, but just enough to make

14   him --

15           All right.  Then we will go forward on the

16   fourteenth, and again, I can only tell Mr. Sensi that I

17   have a very high opinion of Mr. Berke.  I think he

18   should act fully as your counsel.  If you are

19   uncomfortable with that, we have no problem with your

20   using him as advisory counsel.  We can pay him under

21   the CJA, but I would recommend to you that you use him

22   as full counsel.

23           All right.  Does that dispose of what we're

24   taking care of today?

25           MR. BERKE:  Sir, not entirely.  I'd ask the

Case 12-565, Document 27, 10/05/2012, 740170, Page72 of 219

16

1    Court to allow myself to speak to the Government.  If

2    we could have a recess, there may be some discussions

3    that --

4              THE COURT:  Again, I -- take as much time as

5    you want.

6              MR. BERKE:  Okay.

7              THE COURT:  Take -- Use -- Why don't you use

8    the jury conference room, the jury room back here, and

9    just tell me when you want to proceed.

10             MR. BERKE:  Okay.  Thank you.

11             THE COURT:  I'm here today, all day.

12        (Recess at 11:01 a.m., until 1:37 p.m.)

13                        AFTER RECESS

14             THE COURT:  I think we better probably take a

15   look at this document that Mr. Sensi. I guess, has

16   signed and submitted to me, because I'm supposed to

17   sign an order based upon it.

18             If you take a look at page 15, I don't know

19   whether I'm missing anything or whether it just doesn't

20   make any sense, or what, but -- it doesn't seem to make

21   much English (phonetic).  "Court to omit and consider

22   as waived by me, all reading that the entire" -- I

23   guess it makes English, but -- I guess it says that I

24   am to omit, and the Defendant is waiving the reading of

25   the Indictment or the Information in open court.  Then

Case 12-565, Document 27, 10/05/2012, 740170, Page73 of 219

A-365

17

```
 1   we'd have to do an arraignment and consider any
 2   undecided motions previously made by me is withdrawn.
 3   Okay.
 4              Have I interpreted that correctly?
 5              MS. PATEL:  I believe so, Your Honor.
 6              THE COURT:  All right.  Okay.
 7              Then is there any objection -- I'm going to
 8   put him under oath first.  This is, again, a
 9   continuation of United States v. Sensi, 3:08-253, now
10   before me on a change of plea, petition to enter a plea
11   of guilty.
12              The -- Why don't we start by -- Let's bring
13   him forward and then put him under oath.
14              THE CLERK:  Please raise your right hand.
15         (The Defendant is Sworn.)
16              THE CLERK:  Thank you.
17              THE COURT:  All right.
18              Let's bring him forward to the podium here
19   and we'll go over this.
20              Now, does anybody have any objection to my
21   proceeding with this petition to enter the plea of
22   guilty rather than going through a Plea Agreement?
23   This basically contains everything that a plea
24   agreement should have, so I intend to use this instead
25   of anything that is denominated a "plea agreement."
```

18

1           This will satisfy?

2           MS. PATEL:  Your Honor, I believe for the

3    purposes of the rule that I canvassed, that the

4    petition to enter the plea agreement will satisfy.

5           If Your Honor would afford us the

6    opportunity, however, just to go ahead and briefly

7    summarize the pertinent portions of the Plea Agreement?

8           THE COURT:  Well, I'm going to let you do

9    that --

10          MS. PATEL:  Okay.

11          THE COURT:  -- at the appropriate moment,

12   yeah.

13          MS. PATEL:  Okay.  That will be fine then.

14   Thank you.

15          THE COURT:  Yeah.  Before we finish up I'll

16   ask you to make any comments you want to make, of any

17   type.

18          All right.  You're now put under oath.

19          You are Edgardo Sensi?

20          THE DEFENDANT:  Yes, Your Honor.

21          THE COURT:  All right.

22          And you don't need an interpreter, quite

23   obviously.

24          And you're appearing before me represented by

25   Attorney Berke.

Case 12-565, Document 27, 10/05/2012, 740170, Page75 of 219

A-367

19

```
1              Now, this is an unusual change of plea for
2    me, because usually when the change of plea comes
3    before me, I have not seen the Defendant at all, and
4    I've no knowledge of the Defendant's relationship with
5    the attorney representing him at the time of change of
6    plea.  So I customarily just ask if the Defendant is
7    satisfied with the representation of that attorney.
8              Now, here we have a background experience.
9    I've seen you for quite a few sessions.  I know there
10   has been an interesting interaction between you and
11   Attorney Berke, and I have the greatest respect for
12   Attorney Berke and for his ability and his integrity,
13   so I'm going to ask you this.
14             For the purposes of the entry of this plea
15   today, a plea of guilty, are you satisfied that you are
16   being properly represented by Attorney Berke?
17             THE DEFENDANT:  Yes, I am, Your Honor.
18             THE COURT:  All right.  So am I.  I'm
19   comfortable with that.  All right.
20             Now, you've obviously had no alcoholic
21   beverages or -- I don't -- I'll just limit it to
22   alcoholic beverages at the moment.
23             You've had no alcoholic beverages?
24             THE DEFENDANT:  No, Your Honor.
25             THE COURT:  Now, you have had some
```

20

1    medication, and the medication is set forth at page 13

2    of the proposed agreement here.  I am familiar with

3    some of these things because I have a relative who is

4    on a lot of these things so I know about them, but I

5    don't believe that they affect your ability, and you

6    don't appear to be affected right now, your ability to

7    understand the nature of these proceedings and what's

8    happening?

9              THE DEFENDANT:  No, they don't inhibit at

10   all.

11             THE COURT:  All right.

12             You're satisfied, Mr. Berke, that he

13   understands the nature of these proceedings and can

14   assist you in this presentation?

15             MR. BERKE:  Yes, sir, I am.

16             THE COURT:  All right.

17             Any reason why we cannot proceed?

18             MR. BERKE:  No, sir.

19             THE COURT:  Hearing none, we will go ahead.

20             Now, I want you to understand that any

21   agreement you enter into today, with respect to

22   entering a plea of guilty, is strictly between you and

23   the United States Attorney's Office for this District

24   only.

25             You understand that?

21

1           THE DEFENDANT:  Yes, I do.

2           THE COURT:  No other United States Attorney's

3      Office is involved.  No state agency is involved.

4      There is no civil agencies or any operations of any

5      kind that are involved in this matter.  This is

6      strictly a criminal change of plea.

7           You understand that?

8           THE DEFENDANT:  I do, Your Honor.

9           THE COURT:  All right.

10          Your education is four years of college?

11          THE DEFENDANT:  Yes, Your Honor.

12          THE COURT:  And you appear to me to be quite

13     an intelligent individual, and I've had some experience

14     with you in that.

15          Now, you understand that you are going to

16     plead guilty to four counts, and those four counts I

17     did have up here, but I guess I don't now.  Yes I do.

18     No I don't.  All right.

19          Did you take away the sheet of paper that has

20     the four counts on it?  It's the last page.  If you

21     just tear it off.  Yeah, that's what I want.  Thanks.

22     Okay.  Thanks.  All right.

23          There are four counts.

24          Count One is conspiracy to produce child

25     pornography, which is covered by 18 United States Code,

22

1   Section 371.

2        Count Two is production of child pornography

3   in the United States, which is 18 United States Code,

4   2251(a).

5        The third is illicit sexual conduct in

6   foreign places, 18 United States Code 2423(c); and

7        four is production of child pornography

8   outside the United States, which is 18 United States

9   Code, 2251(c)(1).

10        You understand those four counts are what you

11   propose to plead guilty to?

12        THE DEFENDANT:  I do, Your Honor.

13        THE COURT:  Now, one count carries a term of

14   imprisonment up to five years.

15        Another one has a mandatory minimum

16   imprisonment term of 15 years, not more than 30.

17        One has a term of imprisonment of not more

18   than 30 years.

19        One has a mandatory minimum term of

20   imprisonment of 15 years and not more than 30.  And

21   remember, those two are the same -- production of child

22   pornography in the United States and production of

23   child pornography outside the United States have the

24   same terms and conditions and penalties.

25        And you understand that I would be entitled,

A-371

23

1    at the time of sentencing, to apply those

2    consecutively?

3              THE DEFENDANT:  Yes, I do understand.

4              THE COURT:  So you get -- A total of 95 years

5    of imprisonment is a possibility?

6              THE DEFENDANT:  I understand.

7              THE COURT:  All right.

8              Also, there are some other things we'll go

9    over, about, in addition to the term of imprisonment,

10   including a fine and term of supervised release.

11             In addition to the 95 years that I have just

12   spoke to you about, there's a mandatory minimum of 15

13   years under those four combined.

14             There's a maximum fine of $1 million and

15   there's a maximum term of supervised release of up to

16   life following imprisonment, for all those offenses

17   charged in Counts One through Four.  The minimum term

18   of supervised release -- and since I can't read it --

19   So is it five?

20             MR. BERKE:  I believe it's five years, sir,

21   yes.

22             THE COURT:  I think it's five also, but it's

23   hard to read that on this particular page.  All right.

24             And there's restitution.  We'll go over the

25   restitution in due course.

24

1               There's a mandatory special assessment which

2        says $100, but as far as -- I believe it's $400.

3               Am I correct about that?

4               MR. BERKE:  It was the intention of 100 each

5        count should have said, but it's four hundred in total.

6               THE COURT:  Yeah, that's what I thought too.

7        So, we should put in here, "Each count."  You might

8        have to initial that.  Okay.

9               Now, you understand, and we -- customarily it

10       happens in federal court anyway, but it's significant

11       here, we can't put you on probation.  You're not

12       authorized for probation.

13              You understand that?

14              THE DEFENDANT:  Yes, Your Honor.

15              THE COURT:  I can't recall when I last had

16       somebody who was eligible for probation, but it does

17       come up every once in awhile.

18              You understand that the Federal Sentencing

19       Guidelines are no longer binding on a federal judge,

20       but they are the start.  It's where we take off from as

21       we consider sentencing.  It's a starting point.

22              You understand that?

23              THE DEFENDANT:  Yes, Your Honor.

24              THE COURT:  So, we'll be going over those

25       eventually, and you will -- I'll be talking to you

25

1    about how you cooperate with probation in between now

2    and the time of sentencing, because what Probation

3    recommends in the presentence report is always very,

4    very important.  I'm sure Mr. Berke, who's had a lot of

5    experience with this, will counsel you on the

6    importance of your cooperation with Probation and,

7    indeed, with everybody else.

8            Nobody can tell you the exact sentencing in

9    this case.  I can't tell you, and I wouldn't if I could

10   at this point, and I have no concept until I see what

11   Probation recommends.

12           Probation can't tell you, at this point, what

13   the sentencing would be.

14           Your attorney, Mr. Berke, cannot tell you.

15           The United States Attorney and the Assistants

16   cannot tell you.

17           In fact, nobody can tell you.  So if you're

18   relying on anybody predicting what the sentence will be

19   and you turn out to be wrong, you can't withdraw your

20   plea.

21           You understand that?

22           THE DEFENDANT:  Yes, Your Honor.

23           THE COURT:  That will be mentioned several

24   times throughout here, that there may be several

25   expectations, and if there are and they're not met, you

26

1    can't withdraw your plea.

2           I told you there's no probation, and as a

3    matter of fact there's no parole.  There was parole up

4    until November 1, 1987, but since then we've not had

5    parole in the federal system.

6           We will talk about violation of the term of

7    supervised release, however, and I'll be getting to

8    that.

9           Now, I want you to understand, and I'm sure

10   you do understand but let's make sure it's on the

11   record, that you're giving up several important rights,

12   and you know about that because we were about to go on

13   trial before me with a bench trial.

14          So you're well aware that you would have had

15   a right, if you hadn't waived it, you had a right to

16   have a jury trial, and the Government would have had to

17   convene a jury of 12 persons, and they would hear the

18   evidence, or as the Court, I would have heard the

19   evidence, and it may be that as the trial developed you

20   would have a right to cross-examine, through your

21   attorney or through yourself, any witnesses the

22   Government brings in against you; you can challenge the

23   Government's case from start to finish, and you have a

24   right to be represented by counsel at no expense to you

25   at all phases of that matter, if you could not afford

1    counsel.

2            You not only have the right to question

3    witnesses against you, but you have the right to use

4    the power of this court, the processes of the court, to

5    have subpoenas issued to compel people to come into

6    court and testify on your own behalf.

7            You have a right to testify in your own

8    behalf but, of course, you have the very important

9    right, under our Constitution, not to testify.  You

10   cannot be compelled to testify.  You cannot be

11   compelled to put on any case whatsoever before a jury

12   or before me.  The Government has to prove your guilt

13   beyond a reasonable doubt, which is a heavy burden of

14   proof for the Government to bear, and they have to

15   convince that jury, or convince me, that you are guilty

16   beyond a reasonable doubt.  And that might not happen

17   and you might never be convicted in such a trial and

18   you'd be set free.

19           But if you are convicted, then you have a

20   right of appeal to the Court of Appeals for the Second

21   Circuit of New York, and we have that reserved here,

22   and we'll talk about that, and again, to be represented

23   by counsel of your own choice or by court-appointed

24   counsel if you cannot afford a counsel.

25           And that court might reverse a conviction,

28

1   might set you free or they might order a new trial.

2         And you're waiving all those rights, you

3   understand that, by pleading guilty?

4         THE DEFENDANT:  I do, Your Honor.

5         THE COURT:  All right.

6         Now, you understand we put you on oath as you

7   started to answer questions before me, and if you fail

8   to tell me the truth you could be subject to a charge

9   of perjury?

10        THE DEFENDANT:  I understand, Your Honor.

11        THE COURT:  All right.

12        So by pleading guilty, you're waiving any

13  right against self-incrimination concerning the facts

14  which constitute the offense to which you're pleading

15  guilty, and there are four of those.  I may impose the

16  same punishment as if you had pleaded not guilty, stood

17  trial, and been convicted by a jury.

18        If you plead guilty you waive, you're giving

19  up any defenses you may have had, and waive any claims

20  upon any previous violations of statutory or

21  Constitutional rights.  And we've already covered that,

22  that you're going to withdraw any motions that have not

23  been ruled upon at this time, where I did make rulings.

24        We'll talk about that in a moment.  All

25  right.

29

```
 1              Now, the only thing we've got to make sure
 2    we cover here, before I get into specifics, no officer
 3    or agent of any branch of the government, federal,
 4    state, or local, or anybody else, has made any promises
 5    to you, or suggestions to you of any kind, that you
 6    would receive a lighter sentence or a other form of
 7    leniency by pleading guilty at this time, except that I
 8    can consider, and we do have a reduction in the
 9    sentencing guidelines ranges for what we call the "fast
10    track" and for entering a plea of guilty and accepting
11    responsibility.
12              So you understand there may be some benefit
13    to you by this guilty plea?
14              THE DEFENDANT:  I understand, Your Honor.
15              THE COURT:  All right.  Now, you're going to
16    enter a conditional plea of guilty.  You're going to
17    reserve your right to have an appellate court, that'd
18    be the Second Circuit, review an adverse determination
19    of your pretrial motions, specifically the one I know
20    about is my ruling on the suppression, and there may be
21    others, but you may appeal that, and if you prevail,
22    you can then withdraw your guilty plea.
23              You understand that?
24              THE DEFENDANT:  I do, Your Honor.
25              THE COURT:  All right.  Now you understand,
```

Case 12-565, Document 27, 10/05/2012, 740170, Page86 of 219

A-378

30

1    despite what I said to you about my ability to impose

2    consecutive sentences, I also have an ability to impose

3    concurrent sentences?

4            THE DEFENDANT:  I understand, Your Honor.

5            THE COURT:  And that may be done with respect

6    to any state situation.  If there's a state sentence, I

7    can make that run concurrently.

8            THE DEFENDANT:  Understood.

9            THE COURT:  All right.

10           Let me have the Government set forth the

11   elements and the evidence it would use, and also

12   anything else the Government wants to put on the

13   record.

14           MS. PATEL:  Thank you, Your Honor.

15           At this -- I will first start with the

16   elements of the offense, as laid out in Exhibit A.

17           Just so the record is clear, I was a little

18   careless in all of the elements, and so we have made a

19   minor correction to the third element in Count Four in

20   the original Plea Agreement, and we'll make sure, for

21   the purposes of the record, that Attorney Berke, Your

22   Honor, as well as the Defendant, reviews that prior to

23   signing the Plea Agreement.

24           As Your Honor has already outlined, there are

25   four counts.

1              With respect to Count One there are four

2    elements.

3              First, that two or more persons entered into

4    a particularly unlawful agreement.  In this particular

5    case it was an agreement to produce child pornography;

6              second, that the Defendant knowingly and

7    willfully became a member of the conspiracy;

8              Third, that one -- one or more members of the

9    conspiracy knowingly committed at least one of the

10   overt acts charged in the Indictment; and

11             fourth, that the overt act which was

12   committed, was committed to further some object of the

13   conspiracy.

14             If this case were to proceed to trial,

15   through the testimony of lay witnesses, law enforcement

16   witnesses, documentary and other evidence, the

17   Government would prove as follows.

18             That in or about 2001, more specifically,

19   between April of 2001 and April of 2002, that Edgardo

20   Sensi and a Co-conspirator by the name of Laura Culver,

21   entered into an understanding or an agreement.  Both

22   members became knowingly and willfully part of that

23   agreement.

24             The agreement was to produce child

25   pornography, specifically to engage in sex acts with

32

1    Minor Victim Number 1, to film those sex acts, and the

2    overt acts, among others, that the Government would

3    prove, were that -- was that they actually manufactured

4    the videos, and actually engaged in the sex acts with

5    the minor victim for that purpose.

6              With respect to Count Two, production of

7    child pornography, there are three counts.

8              First, that the minor victim -- three

9    elements, I apologize.

10             First, that the minor victim was under the

11   age of 18;

12             second, that the Defendant used, employed,

13   persuaded, induced, enticed, or coerced Minor Victim

14   Number 1 to take part in sexually explicit conduct for

15   the purpose of producing a visual depiction of that

16   conduct; and

17             third, that the visual depiction was actually

18   transported in interstate or foreign commerce, or it

19   was actually manufactured using materials that were

20   transported in internet -- in interstate or foreign

21   commerce.

22             Again, if this case were to proceed to trial,

23   the Government would prove that Minor Victim 1 is a

24   real person;

25             that she was approximately eight years old in

1    2001 when the conduct took place;

2         that the Defendant did, in fact, persuade

3    her, induced her, enticed her, and certainly it is the

4    Government's position that we can prove that he coerced

5    her, to take part in the sexually explicit conduct for

6    the purpose of producing the visual depiction.

7         There -- The Government's -- There are two

8    different ways the Government would be able to prove

9    the third element.

10        First, in particular, there was a visual

11   depiction.  The Defendant and his Co-conspirator

12   manufactured one of the videos in Providence, Rhode

13   Island.  That video was then transported to

14   Connecticut.

15        All of the videos, the Government would

16   argue, were transported to Florida, and therefore, the

17   Government would be able to prove that all of the

18   videos manufactured by the Defendant were actually

19   transported in interstate commerce.

20        Second, the Government would independently be

21   able to prove that they were manufactured using

22   particularly High-8 cassette tapes.  These High-8 tapes

23   were produced by -- Sony, JVC or TDK, were the three

24   manufacturers.  None of those companies manufacture any

25   tapes in Connecticut, and therefore all of the visual

A-382

34

1    depictions in this case were manufactured using video

2    tapes, particularly High-8 video tapes, that were

3    manufactured in interstate or foreign commerce.

4         With respect to the third element -- the

5    third, sorry, the third count, illicit sexual conduct

6    in foreign places, under 18 U.S.C. 2423(c), there are

7    three elements.

8         First, that the Defendant is a United States

9    citizen;

10        second, that he traveled in foreign commerce;

11   and

12        third, that the Defendant engaged in illicit

13   sexual conduct with another person.

14        If this case were to proceed to trial, the

15   Government would prove the Defendant, in fact, is a

16   United States citizen.  He was born in Illinois.  He

17   maintains a United States passport, and has held

18   himself out to be a United States citizen;

19        second, that the Defendant did, in fact,

20   travel from the United States to Nicaragua on several

21   occasions in or about 2004, beginning January of 2004;

22   and

23        third, that on more than one occasion during

24   his travels, the Defendant engaged in what is defined

25   as "illicit sexual conduct" with another person.  That

35

1   person is Minor Victim Number 2.  She was approximately

2   four years old at that time, and under the definition

3   of "illicit sexual conduct," as well as for the

4   purposes of Counts Two and Four, we would be able to

5   prove that the sexual acts that took place fit the

6   definition of "illicit sexual conduct" and, as noted in

7   Count Two, "sexually explicit sexual conduct."

8          With respect to Count Four, production of

9   child pornography outside of the United States, there

10  are three elements.

11         First, that the minor victim was under the

12  age of 18;

13         second, that the Defendant used, employed,

14  persuaded, induced, enticed, or coerced Minor Victim

15  Number 2 to take part in sexually explicit conduct

16  outside of the United States for the purpose of

17  producing a visual depiction; and

18         third, that the Defendant actually

19  transported the visual depiction to the United States,

20  or that the Defendant intended for the visual depiction

21  to be transported to the United States by any means.

22         If this case were to proceed to trial, the

23  Government would be able to prove, with respect to

24  Element Number 1, that the minor victim was

25  approximately four years old at the time of the

36

1    offense;

2           second, that the Defendant did actually

3    employ, persuade, induce, or entice her to take part in

4    what is clearly sexually explicit conduct, and that he,

5    in fact, produced a visual depiction of that conduct

6    when he filmed the sexual acts that constitute the

7    explicit conduct; and

8           third, that the Defendant did actually

9    transport those video tapes and that he intended for

10   them to be transported.  Indeed, they were found in his

11   home in Florida.

12          So with respect to the factual elements,

13   certainly the court -- the Government is willing to

14   provide further details for any of those elements, that

15   those are the elements and the proofs that the

16   Government would offer at trial.

17          THE COURT:  Now, in an excess of caution,

18   before I ask Mr. Sensi and take him through the four

19   counts and see if he's pleading guilty to conduct which

20   violated those statutes, I want to cover with the

21   Government, the two riders that I did have before me

22   with the Plea Agreement, that I don't have before me

23   now, and see if we should cover those with Mr. Sensi

24   before we take a plea.

25          One is a rider having to do with restitution,

37

1    and the other is a rider having to do with the terms of

2    supervised release.

3           Should I go over those with him before we

4    take his plea?

5           MS. PATEL:  Yes, Your Honor.

6           I would actually like to summarize other

7    portions of the Plea Agreement as well.  So with Your

8    Honor's permission, I can do that at this time.

9           THE COURT:  Why don't you do that, including

10   the two riders then, and then I'll be in shape to ask

11   about his plea.

12          MS. PATEL:  Terrific.  Okay.

13          By letter agreement, dated today's date, July

14   8th, 2010, by Plea Agreement, by letter dated today,

15   between the United States Attorney's Office for the

16   District of Connecticut and the Defendant, Edgardo

17   Sensi, the parties have entered into the following

18   Agreement.

19          The Defendant has agreed to enter a plea to

20   all four counts in the Superceding Indictment pursuant

21   to Federal Rule of Criminal Procedure, Rule 11(a)(2),

22   in that he's agreed to enter into a conditional plea.

23   He has reserved his right, in writing, as required by

24   the statute and as evidenced by this letter, to be able

25   to appeal only the Court's June 8th, 2010 ruling, and

38

1    no other ruling of this Court, or no other aspect of

2    his conviction in this case, and in exchange for that,

3    the Government has consented him to permit -- consented

4    to permit him to actually go ahead and reserve his

5    right to appeal the Court's June 8th ruling.

6            As the letter agreement, dated July 8th,

7    indicates, the elements of each offense -- each count

8    in each of the offense -- each of the elements are set

9    forth in Exhibit A.  It is the last page to this

10   agreement.

11           As the Court has already noted, the Court has

12   the discretion to order any of the terms of

13   imprisonment on each count to run concurrently or

14   consecutively, but that there is a mandatory minimum of

15   15 years on both Counts Two and Four.

16           That the Defendant, as Your Honor has already

17   set forth, understands that any sentence of

18   incarceration must be followed by a term of supervised

19   release of at least five years, and as much as up to

20   life.

21           He understands further that he has

22   obligations to register under the Sex Offender

23   Registration and Notification Act, and if he were to

24   violate any condition of supervised release, he would

25   be required to serve a term of supervised -- a term of

39

1    imprisonment of up to five years for any violation of

2    supervised release.

3          There is a rider for additional conditions of

4    supervised release.  That rider provides ten separate

5    paragraphs that the Defendant would be required to

6    follow if he were placed on supervised release

7    following any term of incarceration.  I can go through

8    them in detail --

9          THE COURT:  Let's ask Mr. Berke.

10          Have you been over the ten paragraphs of that

11    rider with him?

12          MR. BERKE:  I did.

13          THE COURT:  Okay.  Thanks.

14          MS. PATEL:  They are set -- As indicated

15    then, they are set forth in the Plea Agreement.

16          The Defendant understands that he is subject

17    to alternate fine position -- fine provisions, and they

18    are set forth on page 2 of the Plea Agreement.

19          In addition, he understands that he is

20    required to pay a special assessment of $100 on each

21    count, for a total of $400 on the day of his

22    sentencing.

23          The Plea Agreement also contains a

24    restitution provision.  There is a special restitution

25    provision on 18 United States Code 2259, in cases

40

1    involving the sexual exploitation of children.  There

2    is a rider with respect to that restitution provision.

3    It is right before the rider on the supervised release.

4         If Attorney Berke has reviewed the rider in

5    detail with the Defendant, I won't go into any further

6    detail.  Otherwise, I'm happy to do that.

7         THE COURT:  Yeah, remember the importance

8    here.

9         Mr. Berke, have you been over all six items,

10   which are significant items, in the rider concerning

11   restitution?

12        MR. BERKE:  We did discuss those six items,

13   in addition to the penalties for noncompliance.

14        THE COURT:  Yes.  Okay.  Thank you.

15        MS. PATEL:  The Plea Agreement also contains

16   a forfeiture provision, and at this time the Defendant

17   understands that he is not a substantially prevailing

18   party for the purposes of this Plea Agreement, and

19   therefore, that is indicated in the Agreement.

20        The Plea Agreement also contains a section on

21   the Sentencing Guidelines.  The Defendant understands

22   that the Court is required to consider any applicable

23   Sentencing Guidelines, as well as all of the factors

24   enumerated under 18 United States Code, Section 3553,

25   when tailoring a sentence in this case.

1            The Defendant further understands that he has

2     no right to withdraw his guilty plea if the sentence or

3     the guideline applications is other than he

4     anticipated.  As Your Honor went through with him,

5     there is nobody, not the Government, not his lawyer,

6     and not, at this time, the Court, that can promise him

7     any sentences for the purposes of entering the plea,

8     and that, in fact, nobody has made any promises to him

9     at all, with respect to what his sentence will be.

10            The Government is further notifying the

11     Defendant that the Government's calculation of his

12     guideline sentence is that his exposure is up to 95

13     years of incarceration, and that he would be subject to

14     supervised release of up to life, and all of the

15     conditions that are attached in the rider.

16            There is a section on his waiver of his right

17     to appeal or otherwise collaterally attack his

18     sentence.  This is a particularly important provision

19     for the purposes of this Plea Agreement.

20            The Government has, in exchange for this

21     waiver, agreed to consent and to permit the Defendant

22     to reserve his right to appeal the June 8th order.

23     Therefore, we have set forth in great detail, that the

24     Defendant acknowledges that he does have a

25     constitutional right to appeal.  Notwithstanding his

42

```
 1    guilty plea, he reserves only his right to appeal the
 2    District Court's order, dated June 8th, 2010, which
 3    denied his motion to suppress.  There is no other
 4    appeal right that he has reserved, and if --
 5             THE COURT:  I think there is one.  If I go
 6    above 95 years, isn't there?
 7             MS. PATEL:  That is true, Your Honor.  I
 8    apologize.  Except -- And that is included here.  I --
 9    I'm making reference to any other motions.
10             And by way of example, one of the motions
11    that was filed in this case was a motion on the statute
12    of limitations issue.  He is not -- Under this Plea
13    Agreement, he is not reserving his right, nor will he
14    be able to appeal any other ruling or order from this
15    Court, except for the motion to suppress, and then,
16    obviously, any sentence over 95 years.
17             He also, in this appeal waiver, is giving up
18    his right to collaterally attack his conviction in any
19    proceeding, including any habeas under 2255 or 2241,
20    and as Your Honor just indicated, if he were to receive
21    a sentence of 95 years or less, a fine of up to $400
22    and -- Sorry, a special assessment of up to $400, a
23    fine up to $1 million, and supervised release of up to
24    life, he is, again, waiving his right to appeal.
25             The Defendant acknowledges this waiver of his
```

A-391

43

1    appeal rights, and he's entering into it knowingly and

2    intelligently, and both parties agree that any

3    challenge to the Defendant's sentence that is not

4    foreclosed by this provision will be limited to that

5    portion of the sentencing calculation that is

6    inconsistent with, or not addressed by this waiver.

7              There is a section in this Plea Agreement

8    called "Information to the Court."  The Government

9    reserves its right to address the Court with any issues

10   with respect to the appropriate sentence in this case.

11   Moreover, the Government will discuss the facts of this

12   case with the probation officer, and we reserve our

13   right to introduce not only the -- not only statements

14   from the victims in this case, but also additional

15   victims that have come forward during this

16   investigation with respect to tailoring -- asking the

17   Court to tailor a sentence in this case.

18             And I think that, again, is a very important

19   point that Mr. Sensi is quite aware that the Government

20   fully intends to use other relevant conduct in making

21   its sentencing recommendation to Your Honor at the time

22   of sentencing.

23             The Plea Agreement also contains the waiver

24   of rights.  Your Honor has covered most of them,

25   certainly in his trial right and the consequences of

44

1    pleading guilty.

2              His waiver of his statute of limitations,

3    this is particularly noteworthy in this case, where the

4    Defendant is not only waiving his statute of

5    limitations by entering this Plea Agreement, but that

6    he's also waiving his right to challenge any prior

7    rulings on statute of limitations issues that have come

8    up in this case.

9              The Defendant understands that the Government

10   may have various items of physical evidence in its

11   possession in connection with this case, where he would

12   be able to request DNA testing be done.  If he enters

13   into this Plea Agreement, he is waiving his right to

14   have any other physical evidence inspected, and he also

15   understands the physical evidence may be destroyed or

16   may become unavailable for DNA testing.

17             With respect to his trial rights, the one

18   thing I did want to just very quickly cover, Your

19   Honor, is that if he were to proceed to trial, he would

20   have a right, or his attorney, to confront and cross-

21   examine witnesses.

22             Certainly, he has a right against self-

23   incrimination; that is, he does not have to take the

24   stand, and he has to prove nothing.  It is the

25   Government's burden, at all times, to prove Mr. Sensi

45

1    is guilty beyond a reasonable doubt, of all four

2    counts.  He can, if he wishes, maintain his right to

3    testify.  He would have a right to present evidence.

4    He would have subpoena power to compel the attendance

5    of --

6              THE COURT:  I did go over all of that, --

7              MS. PATEL:  I know that.  I just wanted --

8              THE COURT:  -- every single element of

9    that --

10             MS. PATEL:  I apologize, Your Honor.  I just

11   wanted to make sure that that was clear.

12             And then the Defendant, finally, acknowledges

13   that he's entering into this agreement and is pleading

14   guilty freely and voluntarily, because he is guilty,

15   and he also understands that, as Your Honor indicated,

16   this agreement is limited to the undersigned parties

17   and doesn't bind anyone else.

18             And the collateral consequences section, he

19   understands he may be deprived of certain federal

20   benefits, and they are set forth in that section.

21             THE COURT:  And that includes, by the way,

22   the right to carry firearms.  That's the most important

23   of those.  And you lose your right to vote perhaps, and

24   -- but the firearms is the critical part of that.

25             MS. PATEL:  The -- And finally, there's also

Case 12-565, Document 27, 10/05/2012, 740170, Page102 of 219

46

1    a section in the collateral consequences section under

2    (inaudible) the Sex Offender Registration and

3    Notification Act, that he will be subjected to and it

4    is set forth there.

5            Finally, the Defendant understands that no

6    other promises, agreements, or conditions have been

7    made to him, and that all of promises that have been

8    made are contained in this letter.

9            THE COURT:  Yes, let me pick that up because

10   before I take your plea, I want to make sure of that.

11           Has anybody made any promises to you, other

12   than as set forth in the Plea Agreement, to induce you

13   to change your plea to guilty on all four counts?

14           THE DEFENDANT:  No, Your Honor.

15           THE COURT:  Anybody threaten you or try to

16   coerce you or force you to change your plea of guilty?

17           THE DEFENDANT:  No, Your Honor.

18           THE COURT:  All right.

19           You're entering the plea because you are

20   guilty of conduct which Ms. Patel set forth in detail,

21   which violates 18 United States Code, Section 371; 18

22   United States Code, Sections 2251(a) and (c)(1), and 22

23   -- 2423(c)?

24           THE DEFENDANT:  Yes, Your Honor.

25           THE COURT:  You're guilty of conduct which

47

1    violates all those.  All right.

2              Now, the Petition to Enter a Plea of Guilty

3    has already been signed by you, and apparently needs --

4    and then also by your attorney, and apparently needs

5    only a signature by me, so I will do that here, but

6    before I have you sign the Plea Agreement, I'm going to

7    have the clerk put you under the plea and make sure

8    that you are pleading guilty, and then we will see

9    about having the Plea Agreement signed.

10             All right then.

11             THE CLERK:  In the case of The United States

12   v. Edgardo Sensi, Criminal Number 3:08-CR-253 (WWE), as

13   to Count One of the Superceding Indictment charging you

14   with a violation of Title 18, United States Code,

15   Section 371, what is your plea?

16             THE DEFENDANT:  Guilty.

17             THE CLERK:  As to Count Two of the

18   Superceding Indictment, charging you with a violation

19   of Title 18, United States Code, Section 2251(a), what

20   is your plea?

21             THE DEFENDANT:  Guilty.

22             THE CLERK:  As to Count Three of the

23   Superceding Indictment, charging you with a violation

24   of Title 18, United States Code, Section 2423(c), what

25   is your plea?

A-396

48

1           THE DEFENDANT:  Guilty.

2           THE CLERK:  As to Count Four of the

3    Superceding Indictment, charging you with a violation

4    of Title 18, United States Code, Section 2251(c)(1),

5    what is your plea?

6           THE DEFENDANT:  Guilty.

7           THE CLERK:  Your Honor, the Defendant pleads

8    guilty to Counts One, Two, Three and Four of the

9    Superceding Indictment.

10          THE COURT:  All right.

11          The petition has already been signed by

12   everybody, including me, but I don't believe the Plea

13   Agreement, itself, has been signed.

14          MS. PATEL:  Your Honor, just for the record,

15   the United States Attorney just signed the Plea

16   Agreement and we've just turned it over to Attorney

17   Berke and, as noted earlier, there is a Post-It on the

18   -- on Exhibit A, with some minor corrections to Count

19   Three -- to Element 3 of Count Four.

20          MR. BERKE:  May I approach your clerk, Your

21   Honor.

22          THE COURT:  Yeah.

23          By the way, Mr. Berke, I took the financial

24   affidavit and will make that part of the record.

25          Is there anything you want me to do at this

A-397

49

1    point, about the financial affidavit?  Should I -- I

2    guess I should ask you, Mr. Sensi, is this your

3    signature on the financial affidavit?

4              THE DEFENDANT:  Yes, it is, Your Honor.

5              THE COURT:  All right.

6              And you tell me that everything in here is

7    true.

8              To the best of your information,

9    recollection, it's true?

10             THE DEFENDANT:  That's correct, sir.

11             THE COURT:  All right.

12             Anything else you want?

13             MR. BERKE:  No.  I just ask the Court to

14   consider my request to be appointed under the Act.

15             THE COURT:  Yes.

16             Under CJA, right?

17             MR. BERKE:  Yes, sir.

18             THE COURT:  That is done.

19             All right.  Now, by August 19, 2010, the

20   initial presentence report will be disclosed to

21   counsel.

22             By August 31st, 2010, counsel will submit any

23   objections to Probation in writing, or a statement that

24   there aren't any objections.

25             And then by September 15, 2010, Probation

```
 1    will submit the final presentence report and any

 2    addenda.  The sentencing memorandum date will be

 3    September 21, 2010, and response to the sentencing

 4    memorandum is September 23, 2010.

 5              Sentencing date is September 24, 2010 at

 6    10:30 a.m.

 7              All right.  Anything else I've forgotten?

 8              MS. PATEL:  Nothing from the Government, Your

 9    Honor.

10              THE COURT:  All right.  Thank you.

11              Thank you, Mr. Berke, very much, appreciate

12    it.

13              MR. BERKE:  Thank you, sir.

14              Actually, sir, there's one other thing that

15    my client had asked me.  In light of his impending

16    trial, he has been transferred to the local jail, I

17    understand, which would be the Bridgeport Correctional

18    Center.  As the Court is aware, based on his disclosure

19    regarding his medications, he's being treated medically

20    by the folks at the Wyatt Correctional Facility, and he

21    is asking to return there because he has gotten

22    significantly decent treatment there, and he's

23    concerned about that.

24              THE COURT:  I'm always amazed that the --

25    Every once in awhile, and it's very rare, I hear
```

1   somebody criticizing Wyatt.  Since I know Wyatt, I know

2   some other institutions, I wouldn't be criticizing

3   Wyatt.  So I'm sure he's happy to go back there and

4   we'll recommend that he go back there.

5          MR. BERKE:  Thank you, sir.

6          MS. PATEL:  Your Honor, I apologize.  I'm

7   just -- you know, you're giving Rule 11(b)(3), and it

8   does require that the Court determine that there is a

9   factual basis for the plea and to accept the plea.

10         We just ask that for the purposes -- for the

11  record, that the Court make a finding on that.

12         THE COURT:  Yes.  I took him through each one

13  of the four counts, and I take it the -- remember that

14  Ms. Patel went over the facts, as the Government would

15  bring them out through the evidence, and you admit

16  those facts are true?

17         THE DEFENDANT:  Yes, sir.

18         THE COURT:  All right.  Thank you.

19         Okay.  Anything else?

20         MR. BERKE:  No, sir.

21         THE COURT:  All right.  Thank you very much.

22     (Proceedings concluded at 2:27 p.m.)

23

24

25

52

C E R T I F I C A T E

I certify that the foregoing is a correct transcript

from the electronic sound recording of the proceedings

in the above-entitled matter.


/s/_____          January 21, 2011

STEPHEN C. BOWLES

A-401

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA     :

    :    3:08CR00253 (WWE)

v.

EDGARDO SENSI     :

    :    January 7, 2012

OBJECTIONS AND CORRECTIONS TO SENTENCING REPORT
PREPARED BY
RAYMOND LOPEZ SENIOR UNITED STATE'S PROBATION OFFICER
ON DECEMBER 19, 2011

A review of the Presentence Report dated December 19, 2011 revealed the
following corrections and/or objections by defendant:

Page 2

Race:  Mr. Sensi indicates he is a White Italian non Hispanic

Education:  Mr. Sensi indicates he has completed three years of college

Dependants:  One

Legal Address:  3100 VIA ROYALE #3105, JUPITER, FL 33458

Paragraph 1

Should indicate Mr. Sensi entered conditional guilty pleas that allowed for appeal of
suppression hearing.

Paragraph 13

Given the lack of verifiable information regarding the accusations in paragraph 13
and also that none of the alleged allegations have been substantiated in a court of
law it is our contention that paragraph 13 should be eliminated.

A-402

Paragraph 48

Defendant was divorced from his wife Rosa Maria Sensi on August 16, 2011 due to tax liabilities however parties are still together and maintain communication.  Mr. Sensi and his former wife have a son together who recently turned 18.

Paragraph 49

Should indicate that Mr. Sensi is a 55 year old white Italian male.

Paragraph 53

Should indicate period of employment from 200 to sometime in 2004.

Paragraph 66

Although the probation officer is correct that this is a serious offense the court must also consider the characteristics of 18 § 3553a (6) that provides that the court should take into consideration the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

Mr. Sensi conduct is no more egregious than the acts perpetrated by defendant Douglas Perlitz,  09CR207 who admitted to sexually abusing more than two dozen homeless boys in Haiti and on December 21, 2010 received a sentence of 19 ½ years from Judge Arterton.  In addition the co-defendant in this case Lisa Culver who is the mother of one of the alleged victims and as a parent her actions could be considered even more harmful to the victim than Mr. Sensi given her position of trust faces a maximum sentence of 20 years.  To impose a sentence greater than 20 years would reflect an unjustified disparity of similar sentences for similar actions.

Paragraph 67

Defendant objects to the use of the term "diabolical" this term is subjective in nature and suggests a state of mind that has not been established in this case.

A-403

Paragraph 69

Defendant objects to the use of the term sexual terror in that it is highly
inflammatory and prejudicial.

Respectfully submitted,

Edgardo Sensi

By:

Gerald L. Harmon (ct13523)
290 Pratt Street
Meriden, CT 06450
(203) 639-1956

## CERTIFICATION

I hereby certify that copies of the foregoing Objections/Corrections to the

Pre-Sentence Report were mailed first class mail and electronically distributed to

the following parties on January 7, 2012 as follows:


U.S. Probation Office
Senior Probation Officer Raymond Lopez
1000 Lafayette Boulevard
Bridgeport, CT 06604

Attorney Krishna R. Patel
Assistant U.S. Attorney
1000 Lafayette Boulevard
Bridgeport, CT 06604

United States Clerk of Court
District Court of Connecticut
Criminal Clerk's Office
915 Lafayette Boulevard
Bridgeport, Ct 06604


Gerald L. Harmon

A-405

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA            :

v.                                  :

                                    :    CRIM. NO:3:08CR000253 (WWE)
EDGARDO M.SENSI

            Defendant               :

                                    :      January 22, 2012

SENTENCING MEMORANDUM

The defendant Edgardo Sensi in the above referenced matter through his

counsel hereby respectfully submits this sentencing memorandum to be considered

on his current sentencing date of January 31, 2012.

Edgardo Sensi is a 55 year old man born in Illinois.  Mr. Sensi has no prior criminal

convictions and this is his first appearance in federal criminal court.  Mr. Sensi is the

father of Francesco Sensi who recently turned 18.  Mr. Sensi was previously

married to Rosa Maria Sensi and although they have recently divorced due to tax

liabilities she maintains emotional support for Mr. Sensi and has acted as a strong

family advocate for Mr. Sensi.

Mr. Sensi has pled guilty to a number of offenses involving child

pornography, production of child pornography, illegal sexual conduct in a foreign

place and production of child pornography outside of the United States.   Due to the

number and severity of the counts that Mr. Sensi has pled guilty to his guideline

range is 95 years.

A-406

The conduct at issue involves two minor children ages 8 and 4 and activity that occurred in both Connecticut and Nicaragua involving the minor children and their mothers.   The mother of the 8 year old minor is Laura Culver who has also been charged and is awaiting sentencing with a maximum sentence of 20 years.

**A sentence within the guideline range of 95 years is greater than necessary to accomplish the goals of sentencing, in light of the defendant's minimal criminal history and the need to impose similar sentences for similar conduct among defendants.**

As the Court is aware the factors to be considered in sentencing in addition to the discretionary use of the guidelines are as follows:

    (1) The nature and circumstances of the offense and the history and characteristics of the defendant.

    (2) The need for the sentence imposed-

        (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

        (B) to afford adequate deterrence to criminal conduct;

        (C) to protect the public from further crimes of the defendant; and

        (D) to provide defendant with needed educational or vocational training, medical care, or other corrective treatment in a most effective manner.  18 U.S.C. §3553(a).

In our case as previously stated Mr. Sensi has no prior criminal history.   To impose a sentence of 95 years as the probation office suggests would incarcerate Mr. Sensi for the remainder of his life and he would die while incarcerated.

The probation office and Government are correct that these charges are serious and have caused substantial harm on the minor victims we are only asking that the Court adhere to the 18 U.S.C. §3553(a)(6) to address the need for the sentence to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

Although the district court  must consider each 3553(a) factor in imposing a sentence, United States v. Campanelli, 479 F.3d 163, 165 (2d Cir. 2007), the weight to be afforded any single §3553(a) factor is a matter firmly committed to the discretion of the sentencing judge. Id.; United States v. Verkhoglyad, 516 F3d 122. 131 (2d Cir. 2008).  Accordingly, it is well within the sentencing court's discretion to select a sentence blow the Guidelines range:

District judges are, as a result, generally free to impose sentences outside the recommended range.  When they do so however, they "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of variance." Id. at 597.  In this way, the district court reaches an informed and individualized judgment in each case as to what is sufficient, but not greater than necessary" to fulfill the purposes of sentencing.

A-408

**It is our contention that a sentence of 20 years is sufficient but not greater than necessary to accomplish the purposes set forth in 18 U.S.C. 3553a and provides like sentences for similar defendants.**

In our case Mr. Sensi has pled guilty to acts that involve conduct with two minor victims.  In U.S. v. Perlitz 3:09cr207 the defendant admitted to acts similar acts with according to the Government at least 15 minor children and admitted at sentencing to acts with at least 8 minor children.  The acts by the defendant Perlitz involved vulnerable, poverty stricken victims who in many cases had recently lost their parents in a tragic natural disaster in Haiti.  Mr. Perlitz who also had no criminal record and  was recently sentenced by the Second Circuit to 19 and half years of prison for his actions.

In addition,  Ms. Laura Culver the mother of the 8 year old minor in USA v. Culver  09CR00077(WWE) which is also before this court is charged with similar activities as Mr. Sensi and faces a maximum sentence of 20 years.

We therefore respectfully ask this Court to impose a sentence of 20 years that we feel will satisfy all the characteristics of the sentencing guidelines.  To warehouse Mr. Sensi for 95 years as the government advocates is an unnecessary use of Federal resources.

Mr. Sensi at the conclusion of his sentence of 20 years would be placed on supervised release for the remainder of his life.   A sentence of twenty years is highly significant at Mr. Sensi's current age of 55.  The sentence would reflect the

seriousness of the offense and afford adequate deterrence to criminal conduct. Given the defendant would be on supervised release for the remainder of his life the public would also be protected from further crimes from the defendant.  It is more than likely that any conditions of supervised release will require no contact with minor children in any capacity.   In addition the defendant during his period of incarceration would be able to seek the mental and emotional counseling necessary after conviction to attempt rehabilitation for these offenses.

A sentence of 20 years would avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar offenses.  The actions of Mr. Sensi while tragic and of an extreme nature are no more tragic than the actions of defendant Perlitz on a greater number of minor victims or the mother Laura Culver who perpetrated the acts upon her own daughter.

A-410

**Conclusion**

For the foregoing reasons, defendant urges the Court to find the requested sentence of 240 months and an appropriate period of supervision appropriate in this matter.

Respectfully submitted,

Edgardo Sensi

By _____
Gerald L. Harmon Esq. (ct13523)
290 Pratt Street
Meriden, CT 06450
(203) 639-1956

A-411

CERTIFICATION

I hereby certify that copies of the foregoing Sentencing Memorandum were electronically distributed to the following parties of record on January 23, 2012 as follows:

Attorney Krishna R. Patel
Assistant United States Attorney
1000 Lafayette Boulevard
Bridgeport, CT 06604

District Court of Connecticut
Criminal Clerk's Office
915 Lafayette Boulevard
Bridgeport, CT 06605

Senior U.S. Probation Office
Mr. Raymond Lopez
915 Lafayette Boulevard
Bridgeport, CT 06604

Gerald L. Harmon, Esq.

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| **UNITED STATES OF AMERICA** | : |
| | : |
| | :    **No. 3:08CR253 (WWE)** |
| **v.** | : |
| | :    **January 26, 2012** |
| | : |
| **EDGARDO SENSI** | : |

## SENTENCING MEMORANDUM OF THE UNITED STATES

### Preliminary Statement

The United States submits this sentencing memorandum in connection with the January 31, 2012 sentencing of defendant Edgardo Sensi. The Government respectfully requests that Sensi be sentenced to a term of incarceration approximating the Guidelines calculation of 85 years.

The investigation revealed a more than 25-year history of abuse involving many minor victims. The abuse and the video-recordings of the crimes in this case are simply indescribable, and words fail to convey the cruelty that Sensi has inflicted on his victims. Sensi's abuse of children over such a lengthy period of time is a particularly heinous crime that our society recognizes has long-term deleterious effects on the victims.

In addition to the heinous crimes he committed in the United States, Sensi travelled to foreign countries to exploit some of the most vulnerable individuals in the world . That he traveled with a charitable organization claiming to serve those less fortunate when in fact he was a dangerous predator seeking to prey upon the most vulnerable children in the world is even

worse.  Sensi manipulated a young woman from an impoverished community to ensure her compliance and access to her child.

In short, Sensi deserves no leniency or sympathy from this Court.  The number of victims, the length of time that Sensi engaged in acts of abuse, and his sadistic behavior toward children informs the Court's assessment of whether Sensi continues to pose a danger in our society.  Moreover, Sensi has never fully acknowledged his abuse, fully accepted responsibility or shown any genuine remorse for his actions.  He deserves nothing less than to spend the remainder of his natural life incarcerated.

## **Factual Background**

Edgardo Sensi has pled to all four counts in the Indictment, which charged him with video-taping and conspiring with another person to videotape himself sexually abusing minors in the United States and abroad.  Moreover, during the course of the investigation, the Government located other women who were sexually molested by Sensi when they were minors, some of whom plan to come to Court to talk about their own victimization.

### Minor Victim #1 (MV1)

With respect to Count One, the video-tapes depict Sensi and the co-conspirator repeatedly abusing MV1 and filming the abuse in Connecticut and elsewhere.  Sensi and the co-conspirator met while employed at a travel agency in Fairfield County and began a romantic relationship.  MV1 was approximately eight years old at the time of the sex acts.  The actual videotapes show the repeated sexual abuse of MV1.  For example, on one tape, Sensi and the co-conspirator take turns instructing the minor victim on how the penis works and how she should go about touching Sensi's penis.  The co-conspirator and the minor victim then both touch Sensi's penis and the co-conspirator directs the minor victim to imitate her.  On another tape,

Sensi and the co-conspirator are seen instructing minor victim on how to perform oral sex on Sensi. The co-conspirator and minor victim are then encouraged by Sensi to engage in a competition to see which one of them is better at performing oral sex, with the co-conspirator instructing the minor victim to do as she does.

The video-tapes also show Sensi and the co-conspirator's desire to maintain secrecy about their conduct. The co-conspirator is heard asking the minor victim if the minor victim is telling anyone about the sex acts that are taking place. At the same time, Sensi instructs the minor victim not to tell anyone about the sex acts.

The video-tapes were all maintained as part of Sensi's home collection and were marked by Sensi with the victims' names and usually given a rating. For example, Sensi identified tapes "XX" and "XXX," apparently depending on the severity of the conduct contained on the tape. These video-tapes were located with other sex toys, detailed and disturbing stories about incest and rape of children, and images of other child pornography.

### Minor Victim #2 (MV2)

In 2004, Sensi traveled with a Fairfield County-based charity to Nicaragua. While in Nicaragua, he befriended a nineteen-year-old woman, who had a four-year-old child (MV2). The Nicaraguan woman lived in a remote and destitute area in Nicaragua where she worked as a maid. Sensi seduced the Nicaraguan woman by promising to marry her and by providing her with gifts and money. Eventually, Sensi was able to access the woman's child and began to abuse MV2. The sexual abuse that MV2 suffered included being required to play with Sensi's penis, playing with a dildo, and performing oral sex on Sensi. In addition, the tapes show Sensi videotaping the minor victim's vagina as she sleeps.

## Legal Standard

The Supreme Court clarified the continuing role of the Sentencing Guidelines and the

scope of the sentencing court's discretion in United States v. Booker, 543 U.S. 220 (2005).

Booker makes clear that this Court must consider both the sentencing factors set forth in 18

U.S.C. Section 3553(a), and the Sentencing Guidelines in fashioning a reasonable sentence.  Id.

at 764.  While the Sentencing Guidelines are no longer mandatory following Booker, they must

still be considered in determining the appropriate sentence.  The Second Circuit has recognized

the continuing relevance of the Sentencing Guidelines following Booker in determining an

appropriate sentence:

> [I]t is important to bear in mind that Booker/ Fanfan and section 3553(a)
> do more than render the Guidelines a body of casual advice, to be consulted or
> overlooked at the whim of a sentencing judge.  Thus, it would be a mistake to
> think that, after Booker/Fanfan, district judges may return to the sentencing
> regime that existed before 1987 and exercise unfettered discretion to select any
> sentence within the applicable statutory maximum and minimum.  On the
> contrary, the Supreme Court expects sentencing judges faithfully to discharge
> their statutory obligation to "consider" the Guidelines and all of the other factors
> listed in section 3553(a).  We have every confidence that the judges of this Circuit
> will do so, and that the resulting sentences will continue to substantially reduce
> unwarranted disparities while now achieving somewhat more individualized
> justice. United States v. Crosby, 397 F.3d 103, 113-14 (2d Cir. 2005).

Under the non-mandatory Guideline regime established by <u>Booker</u> and <u>Crosby</u>, the

sentencing judge is empowered to make the factual findings necessary for determining what the

recommended Guideline sentence is in a particular case.  <u>Crosby</u>, 397 F.3d at 113 ("the

sentencing judge is entitled to find all the facts appropriate for determining either a Guidelines

sentence or a non-Guidelines sentence").

The PSR properly calculates the Guidelines range as follows.

U.S.S.G. § 2G2.1 - base level offense . . . . . . . . . . . . . . . . . . . . . . . . . . .  32

U.S.S.G. §2G2.1(b)(1)(A) - victim under age of 12 . . . . . . . . . . . . . . .  +4

U.S.S.G. §2G2.1(b)(2)(A) - commission of sex act  . . . . . . . . . . . . . . .  +2

U.S.S.G. §2G2.1(b)(4) - sadomasochistic conduct[2] . . . . . . . . . . . . . . .  +4

---

[2]        A district court can apply the sadistic enhancement under USSG 2G2.2(b)(4) solely on
the basis of an image depicting sexual contact with a prepubescent child. The reactions of the
people in the image are not relevant. The district court, however, must make a finding that the
depicted activity would have caused pain to the minor.  In *United States v. Freeman*, 578 F.3d
142 (2d Cir. 2009), the Second Circuit upheld a district court's decision to apply the sadistic
enhancement. The district court found that the sexual contact in the image "would have to be
painful" to the children depicted, some of whom appeared to be as young as six or seven years
old. *Id.* at 147.  The Second Circuit held that the determination of whether an image is sadistic
under U.S.S.G. § 2G2.2(b)(4) is an objective one. *Id.* at 146. The "purpose of the act depicted
[and] the reaction of the actor" are irrelevant to this determination. *Id.* A sentencing court needs
only to find that (1) an image depicts sexual activity involving a minor and (2) the depicted
activity would have caused pain to the minor. *Id.; see also  United States v. Delmarle*, 99 F.3d
80, 83 (2d Cir.1996), (upheld the sadistic enhancement by concluding that anal penetration of
eight- or nine-year old boy "would have to be painful."); *United States v. Jones*, 210 F.3d 356,
356 (2000) (upheld the sadistic enhancement for images that depicted adult men engaged in
sexual intercourse with prepubescent girls and the insertion of objects in the vaginas of
prepubescent girls); *U.S. v. Rearden*, 349 F.3d 608, 615 (9th Cir. 2003) (held that a district court
can apply the sadistic conduct enhancement any time images portray the penetration of
prepubescent children by adult males because such images are necessarily pleasurable for the
participant and painful for the child.); *Id.* at 615 (district court found from examining the pictures
"that they show sadistic acts, both because the act itself must necessarily be a painful one, and
physical and, also, because it's a painful psychological and emotional experience."); *See, e.g.*,
*United States v. Lyckman*, 235 F.3d 234, 239 n. 22 (5th Cir.2000) ("One hardly requires a
medical degree to ascertain that vaginal intercourse with an adult male would involve pain, both
physical and emotional, for a young girl."); *United States v. Caro*, 309 F.3d 1348, 1352 n. 1
(11th Cir.2002) (surveying legal landscape and concluding that "no circuit requires expert

Sensi easily satisfies the sado-masochistic enhancement in this case.  The video-tapes depict Sensi engaged in sadistic behavior with the minor victims.  For example, Sensi drinks the minor victim's urine and makes her drink urine.  Sensi engages in intercourse with the minor victim and she is seen screaming from what is a painful and abusive experience.  Sensi also utilizes a battery-operated device with a minor victim.

U.S.S.G. §2G1.3(b)(1) - minors were in the custody, care, or supervisory control of the defendant. . . . . . . . . . . . . . . . . . . . . . . . . +2

Acceptance of Responsibility. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -0

Total Offense level:                                              44

Because of the second minor victim, Sensi is subjected to an additional two points, resulting in an offense level of 46.  Because of the comment in Chapter 5, Part A, which contemplates that the rare case of a total offense level of more than 43 should be treated as offense level 43, the Guideline calculation is CHC 1 and an offense level of 43 resulting in a sentence of life.

In light of the statutory maximum sentences, the Government notified Sensi at the time of his plea that we believed that the statutory maximum is 95 years.   Because Sensi's conduct as to Count One is statutorily capped at 20 years, Sensi's statutory maximum is actually 85 years.  Therefore, the Guideline calculation is 85 years.

**A. The Nature and Circumstances of the Offense.**

The Supreme Court has consistently recognized that the protection of children is a paramount governmental and societal interest and the permanent record of abuse created by child

medical testimony in determining whether child pornography, which a defendant possessed, was sadistic").

pornography creates a pervasive harm that revictimizes a child.  *See New York v. Ferber*, 458

U.S. 747, 757 (1982) ( "the prevention of sexual exploitation and abuse of children constitutes a

government objective of surpassing importance.").  The victims in this case were subjected to

repeated brutal and sado-masochistic abuse.  Moreover, Sensi created a permanent record of the

harm and maintained a private collection, which he likely viewed over and over again.  The

victims are left with the haunting knowledge that their child abuse was video-taped and

continuously viewed, which can only further exacerbate the psychological harm caused by the

initial act of abuse.

     Both MV1 and MV2 were forced into submission and silenced because Sensi placed

himself in a position of trust and authority by dating each of the victims' mothers.  For MV1,

Sensi successfully broke down M.V.'s defense mechanisms by engaging in a lengthy period of

grooming, which included, among other things: (1) desensitizing her to sexual acts by showing

her pornography; (2) touching her; and (3) purchasing items for her.  For MV2, Sensi easily

gained access to the child of an economically and socially devastated mother who worked as a

maid in an impoverished community in Nicaragua.  Sensi's crimes involved psychological abuse,

physical abuse, manipulation, and constant humiliation. They are among the most abhorrent

crimes committed by a member of our society.  By traveling to developing countries to access

poor children, Sensi undoubtedly intended to continue his conduct without fear of prosecution.

Indeed, for over two decades, Sensi succeeded in escaping any detection of his criminal sexual

child abuse.

    **B.  History and Characteristics of the Defendant**.

     Unlike so many defendants who come before this Court, Sensi appears to have had the

support of family members and friends, an education, and a career.  Thus, his upbringing and

Case 12-565, Document 27, 10/05/2012, 740170, Page127 of 219

opportunity cannot be the cause of his decision to abuse children.  Sensi's actions indicate that

for most of his life he demonstrated a strong sexual interest in children and his willingness to

sexually abuse children.  He repeatedly sexually molested the victims in this case and many other

victims who wish to speak at his sentencing.  The statements by the other victims are not offered

to determine relevant conduct but are offered so that the Court can gain a better understanding of

Sensi's background, character and propensity to engage in contact offenses against children.  *See*

*e.g. Pepper v. U.S.*, 131 S.Ct 1229, 1239-41 (2011) (lengthy discussion about a district court's

ability to consider a variety of information and to obtain as much information as possible on an

individual's character, background, and conduct).[3]   The Government believes that Sensi is a

dangerous predator who will take any opportunity to engage in offensive behavior against minor

females and therefore cannot be permitted to remain free in our society.

### C. The Sentence Must Promote Respect for the Law

---

[3]     The Supreme Court has recently talked about the importance of a district court to receive
the fullest information possible about a defendant's background, character and conduct for
sentencing.  *Pepper v. U.S.*, 131 S.Ct. 1229, 1240  (2011) ( "'[C]ourts in this country and in
England practiced a policy under which a sentencing judge could exercise a wide discretion in
the sources and types of evidence used to assist him in determining the kind and extent of
punishment to be imposed within limits fixed by law.' *Williams, 337 U.S. at 246.* In particular,
we have emphasized that '[h]ighly relevant-if not essential-to [the] selection of an appropriate
sentence is the possession of the fullest information possible concerning the defendant's life and
characteristics.' *Id. at 247.* Permitting sentencing courts to consider the widest possible breadth
of information about a defendant 'ensures that the punishment will suit not merely the offense
but the individual defendant.' *Wasman v. United States, 468 U.S. 559, 564 (1984)*."); *Pepper*,
131 S.Ct. at 1241-42 ("Preliminarily, Congress could not have been clearer in directing that '[n]o
limitation ... be placed on the information concerning the background, character, and conduct' of
a defendant that a district court may 'receive and consider for the purpose of imposing an
appropriate sentence.' *18 U.S.C. § 3661.* The plain language of § 3661 makes no distinction
between a defendant's initial sentencing and a subsequent resentencing after a prior sentence has
been set aside on appeal. We have recognized that 'the broad language of § 3661 ' does not
provide 'any basis for the courts to invent a blanket prohibition against considering certain types
of evidence at sentencing.'") *citing Watts, 519 U.S., at 152, 117 S.Ct. 633*.").

The sentence in this case must reflect the seriousness of the offense committed by Sensi. Given Sensi's complete disregard and contempt for our laws, the punishment imposed in this case should promote respect for our laws. The sentence in this case must reflect the seriousness of the offense committed by Sensi and provide a message of deterrence to Sensi and all others who engage in this type of activity.  It is very important that Sensi finally understand that he, and others like him, must respect the laws of our society.  Given his complete disregard and contempt for our laws, the punishment imposed in this case should promote respect for our laws.

### D.  The Court Should Consider General Deterrence

One of the factors the Court must consider in imposing sentence is the need for the sentence to "afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B).  A substantial prison sentence for such conduct can serve as a powerful deterrent against the commission of these abhorrent crimes.

As outlined by the Government, Sensi's conduct will have long-term consequences for his victims.  Unless individuals who engage in this heinous activity understand that there are serious and certain consequences for their actions, the temptation to continue to engage in such exploitation and to prey on those are among the most vulnerable cannot be tempered, let alone, eliminated.  The Court's sentence should send a clear and strong message of general deterrence.  General deterrence serves an important function, and its impact should not be underestimated particularly here where the victims are children.

### E.  Sensi Has Earned A Sentence Comparable to Those Imposed on Similarly Situated Offenders.

The Sentencing Guidelines were promulgated, in part, to minimize disparities in federal sentences.  Although those Guidelines are no longer mandatory, the importance of eliminating

sentencing disparities remains an important factor which the Court must separately consider

pursuant to 18 U.S.C. § 3553(a)(7).  The Guidelines here serve as a good marker for the

appropriate sentence.

### F. Forfeiture and Restitution

Unfortunately, Sensi appears to have no assets that the Government can forfeit.   The

victim and her family members have been informed about the availability of restitution.  If the

Court is willing to enter an order of restitution in this case, the Court can inform MV1's family

members that they can provide a claim of an amount of restitution within 90 days to the Court.

### Conclusion

The only appropriate sentence that would be fair and just after considering the facts and

applicable section 3553 factors is one close to the Guideline range as outlined in the PSR.


Respectfully submitted,

DAVID B. FEIN
UNITED STATES ATTORNEY

/S/
KRISHNA R. PATEL
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. CT 24433
1000 Lafayette Boulevard, 10TH fLOOR
Bridgeport, CT 06604
(203) 696-3000
(203) 575-5575

A-422

## **CERTIFICATION**

I hereby certify that on January 26, 2012, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing, as indicated on the Notice of Electronic Filing.  Parties may access this filing through the court's CM/ECF System.


/S/_____
KRISHNA R. PATEL
ASSISTANT UNITED STATES ATTORNEY

A-423

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| UNITED STATES OF AMERICA | : | |
| v. | : | |
| | : | CRIM. NO:3:08CR00253 (WWE) |
| EDGARDO SENSI | : | |
| Defendant | : | |
| | : | January 25, 2012 |

**MOTION TO CONTINUE SENTENCING**

The defendant in the above referenced matter hereby requests that the Court continue his current sentencing date of January 31, 2012 due to the discovery of new evidence which if proven may provide a basis of full exoneration of the charges pending against Mr. Sensi in Florida State court which are the underlying basis for his current guilty pleas and charges here in U.S. District Court.

FACTUAL BACKGROUND

On September 9, 2008, an affidavit for search and seizure warranted was presented to Judge Elizabeth A. Metzger of the Circuit Court of Martin County (Florida) by Detective Brian Broughton of the Martin County Sheriff's Office for "items . . .relevant to proving a violation of Florida State law . . .possession of computer child pornography at the defendant's residence in Jensen Beach Florida.  (See exhibit A)

On September 10, 2008, the search warrant was executed by Detective Broughton and Patrick Colassuono of the Martin County Sheriff Office. An inventory list was given to Mr. Sensi at the conclusion of the search describing the seized items. This copy of the search warrant's inventory list has not been in Mr. Sensi's possession since the afternoon of September 10, 2008 , when Mr. Sensi gave his copy to his employer, Mr. Sanghrahtka. During Detective Broughton's subsequent search of Mr. Sensi's office on September 13, 2008, Mr. Sanghrajtka gave Mr. Sensi's copy of the inventory list to Detective Broughton. (See Exhibit B.)

Mr. Sensi has continuously maintained and testified at this June 8, 2010 evidentiary hearing that the search warrant inventory list submitted to the Federal Prosecutors had been tampered and falsified by Detective Broughton and Detective Colassuono to support their false allegation that Mr. Sensi had given consent to seize a large locked black duffel bag (which contained all of the evidence that resulted in charges against Mr. Sensi in both State and Federal court) that was outside the parameters of the search warrant by claiming that Mr. Sensi stated to them at the time of arrest " Oh take the bag also it contains porn".

We have now uncovered new evidence to support the contention that the inventory list was falsified and the search and seizure of Mr. Sensi's residence was unlawful and all evidence seized must be ruled inadmissible.

**A request of evidence from Mr. Sensi's Florida counsel has revealed that the inventory list filed in this matter was altered and falsified.**

Defense counsel has recently received a copy of the inventory list that was allegedly filed in this matter when Detective Broughton conducted the search in the above matter.

Mr. Sensi's Florida Counsel Attorney Edward Galante had the alleged Judge Metzger signature on the inventory list analyzed by forensic experts Haywood Forensic Document Examinations on January 25, 2012.  Mr. Charles L. Haywood who examined the signatures is a certified by the FBI laboratory and worked for the FBI from 1981 to 2002.  Mr. Haywood concluded that the **signature that Detective Broughton claimed was Judge Metzger's signature was not written by Judge Metzger and was forged.**  (See Exhibit C results of examination.)   Your Honor may also remember that the validity of this signature was questioned at Mr. Sensi's suppression hearing but a forensic examination was not conducted.

As the court will note this inventory list that was submitted by Detective Broughton has the Judge's signature and date on the inventory list although the inventory list does not provide a place for the Judge to sign neither would it be common for a Judge to sign an inventory list after a search warrant has been executed.  (See Exhibit D)

Case 3:08-cr-00253-WWE    Document 164    Filed 01/27/12    Page 4 of 7

It is our contention that this preliminary evidence and further evidence to be discovered in Florida will reveal that the inventory list was altered and falsified by Detective Broughton and will result in an dismissal of all charges.

Detective Broughton in a sworn deposition given on November 19, 2008 when first asked about the inventory list stated "we included that in the inventory (list), but we did not look at the contents until we got back to the Sheriff's department.  So the inventory list I think I saw this list right here, it just says Black Canvas Bag, it doesn't have the contents because we didn't know what was in it.  (See Exhibit E).

In addition we have requested on multiple occasions copies of the inventory list from the Court in Florida to no avail.  (See attached requests and responses Exhibit F.)  Each time we requested copies of the inventory list we were referred to the Sheriff's office and told that the Court had no copies of this list even though it was allegedly signed by Judge Metzger.   In fact Attorney Galante recently researched the Florida court files and it was noted that no inventory list was ever filed in this case.

In fact in a copy of the evidence report obtained from the Sheriff department the report only indicates a "Black Canvas "Locked" bag and makes no indication as to the contents in complete agreement with Mr. Sensi's contentions regarding the illegal seizure of this evidence.  (See Exhibit G)

Mr. Sensi's legal counsel in Florida is currently preparing a motion to suppress all evidence seized in relation to this case and based on the new evidence anticipates filing this January 30, 2012.   Mr. Sensi has requested a continuance based on this request.   (See Exhibit H)   We respectfully ask that this Court await the results of the Motion to Suppress in Florida court and suspend Mr. Sensi's sentencing until the issues in the Florida court are resolved.

**THE COURT WOULD BE DEPRIVING MR. SENSI OF VALUABLE LEGAL RIGHTS IF THEY GO FORWARD WITH THE SENTENCING ON JANUARY 31, 2012.**

Although we understand this request comes at the eleventh hour we did not receive the requested forensic examination of the signature until January 25, 2012 and this motion was filed immediately thereafter.  Once Mr. Sensi is sentenced in Federal Court it has been indicated to his Florida counsel that the State's Attorney's Office is planning to dismiss the charges against him at that point based on the imposition of his federal sentence.  Once the charges are dismissed/nolled in Florida Mr. Galante's counsel would be unable to proceed on a motion to suppress based on the falsification of the Judge's signature and also the allegations that the original inventory list did not contain the phrase

"contains misc. porn" as it relates to the black canvas bag and that all evidence seized from the black canvas bag must be deemed inadmissible as fruit of the poisonous tree because no charges would be pending against Mr. Sensi.

As the court is aware the black canvas bag contains all of the evidence utilized to indict Mr. Sensi in Federal Court.   If the evidence is deemed outside of the search warrant and inadmissible in Florida it would also be inadmissible in Federal court and all charges based on this evidence must be dismissed. However if the charges are dismissed prior to this finding at a suppression hearing in Florida State court Mr. Sensi would be left without a remedy to attack the illegal seizure of this evidence.

We are therefore in the interest of justice and equity requesting that Mr. Sensi's sentencing be continued until March of 2012 to allow for a ruling regarding the suppression of the seized evidence that is the basis of his indictment and guilty plea.

Respectfully submitted,

Edgardo Sensi

By
Gerald L. Harmon Esq. (ct13523)
290 Pratt Street
Meriden, CT 06450
(203) 639-1956

A-429

CERTIFICATION

I hereby certify that copies of the foregoing Motion to Continue Sentencing were delivered electronically on January 27, 2012 as follows:

> Attorney Krishna Patel
> Assistant United States Attorney
> 915 Lafayette Boulevard
> Bridgeport, CT 06604
>
> District Court of Connecticut
> Criminal Clerk's Office
> 915 Lafayette Boulevard
> Bridgeport, CT 06604
>
> Probation Office
> Mr. Ray Lopez
> 915 Lafayette Boulevard
> Bridgeport, CT 06604

Gerald L. Harmon, Esq.

TO: MAHEN SANGHRAJKA, Big Five Tours        mahan@bigfive.com

TEXT: During the morning of Sept. 10, 2008, I handed to Ashish my copy of the Search Warrant and Inventory List (pink colored copy) which had been served to me earlier in the morning by Det. Brian Broughton of the M.C.S.O. On Sept. 13, Broughton met with you at Big Five office. You consented for him to seize a computer, MY key chain and keys, and "various papers."

From approximately May 2009 to June 2010, I have written to you on at least three occasions; and my wife, as well as my brother, have spoken to you and Ashish on various occasions regarding MY copies of the aforementioned legal court documents. On each occasion, your replies via telephone conversations and emails (which have been saved) have claimed that you and Ashish had simply thrown MY legal court documents together with my personal effects, which were picked-up from your office by my wife at some point in October, 2008. Rosamaria has never been able to locate these documents amongst these personal effects.

Det. Broughton will shortly be testifying at an evidentiary hearing in Martin County Circuit Court. He will be questioned thoroughly regarding searches he carried out in my case. I strongly recommend you contact my attorney, Edward R. Galante in Stuart, as soon as possible to provide a sworn statement in regards to MY copies of the Search Warrant and Inventory List which I entrusted to Ashish. You may act accordingly.

Edgardo Sensi

Dated:

JUN-14-2010 MON 03:08 ... Case 3:08-cr-00253-WWE  Document 164-1  Filed 01/27/12  Page 23 of 52    P. 002/002

Brian Broughton 220·7086

MARTIN COUNTY SHERIFF'S OFFICE         CASE # 08-10166

                                      DATE  9-10-08

## INVENTORY

The following is a true inventory of property taken pursuant to a search warrant:

Dell _____ _____ _____ _____
Various CD/DVD Media
8 High 8 Video Tapes
Sony Video High 8 HandyCam  sn 135-2781 in case
Bag (Lucked Containing Misc Porn)
Warrant Papers

I, Brian Broughton the officer by whom the search warrant was executed, do
swear that the above inventory contains a true and detailed account of all property taken by me
or at direction pursuant to said warrant.

Signature _____                    ID#

Sworn to me before Det. Patrick Colasvonno a law enforcement officer.

Signature _____  Det. _____     ID# 622/142

S.O.P. #303.00
APPENDIX A

A-432

# HAYWOOD FORENSIC DOCUMENT EXAMINATIONS, LLC

15751 Sheridan Street, #208 Fort Lauderdale, Florida 33331

Charles L Haywood, B.S., M.F.S.                    Telephone   (954) 309-0471
Forensic Document Examiner                         Facsimile   (954) 252-9026

## Report of Examinations

CASE NO:      12012201                    YOUR NO.:

RE:     State of Florida vs. Edgardo M. Sensi

*Prepared for*
*Lawrence Messina*
*266 S.E. Ethan Terr.*
*Stuart , Florida 34997*

*by*
*Charles L. Haywood, Forensic Document Examiner*
*Haywood Forensic Document Examinations, LLC*
*15751 Sheridan Street, #208*
*Fort Lauderdale, Florida 33331*
*Telephone      (954) 309-0471*
*Facsimile      (954) 252-9026*
*e-mail          Clhaewud@aol.com*

January 25, 2012

Attachment
Enclosures (10)

## *Table of Contents*

Questioned Document ..........................................................................................................2

Specimen Documents ..........................................................................................................2

Also Submitted (A/S) ..........................................................................................................2

Purpose of Examinations .....................................................................................................3

Photocopy Examination Limitations ...................................................................................3

Examinations ........................................................................................................................3

Result of Examinations ........................................................................................................5

Remarks ................................................................................................................................5

HFDE# 12012201
RE: STATE v. SENSI Case 3:08-cr-00253-WWE   Document 164-1   Filed 01/27/12   Page 27 of 52

DOCUMENTS EXAMINED: This report makes reference to documents hand delivered to Forensic Document Examiner (FDE) Charles L Haywood by Lawrence Messina, 266 S.E. Ethan Terr., Stuart, Florida 34997, in the vicinity of Haywood Forensic Document Examinations, LLC (HFDE) Laboratory, mailing address 15751 Sheridan Street, #208, Fort Lauderdale, Florida 33331 on 1/22/2012. Documents received for examination are further described as follows:

## Questioned Document

Q1c   One (1)-page machine copy of a form document with the heading, "INVENTORY," dated 9/10/2008, bearing a disputed signature along the bottom edge purported to be that of Elizabeth A. Metzger, Judge, Circuit Court, Martin County, Florida.

## Specimen Documents

K1.1c – K1.6c. Six (6) machined copied related court documents bearing uncontested signatures of Elizabeth A. Metzger, Judge, Circuit Court, Martin County, Florida, further described as follows:

K1.1c   One (1)-page machine printed document beginning, "12.        Data maintained on the computer….," dated 9/9/2008.

K1.2c   One (1)-page machine printed document beginning, "Sworn to and subscribed before me in Martin County, Florida….," dated 9/9/2008.

K1.3c   One (1)-page machine printed form document with the heading, "Warrant  IN THE COUNTY COURT  MARTIN COUNTY, FLORIDA  COUNT 4: POSSESSION OF CHILD PORNOGRAPHY ….," dated 9/10/2008.

K1.4c   One (1)-page machine printed form document with the heading, "Warrant  IN THE COUNTY COURT  MARTIN COUNTY, FLORIDA  COUNT 8: POSSESSION OF CHILD PORNOGRAPHY ….," dated 9/10/2008.

K1.5c   One (1)-page machine printed form document with the heading, "Warrant  IN THE COUNTY COURT  MARTIN COUNTY, FLORIDA  COUNT 9: POSSESSION OF CHILD PORNOGRAPHY ….," dated 9/10/2008.

K1.6c   One (1)-page machine printed form document with the heading, "Warrant  IN THE COUNTY COURT  MARTIN COUNTY, FLORIDA  COUNT 10: POSSESSION OF CHILD PORNOGRAPHY ….," dated 9/10/2008.

## Also Submitted (A/S)

A/S 1   Duplicate copy of Q1c

A/S 2   One (1)-page machine printed document with the heading, "IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT IN AND FOR MARTIN COUNTY, FLORIDA  SEARCH WARRANT."

2

A/S 3        One (1)-page machine printed document with the heading, "IN THE CIRCUIT
COURT OF THE NINETEENTH JUDICIAL CIRCUIT IN AND FOR
MARTIN COUNTY, FLORIDA <u>AFFIDAVIT FOR SEARCH WARRANT</u>."

## Purpose of Examinations

The previously described questioned and specimen documents were examined and compared in
an effort to determine, if possible, whether the disputed signature on the document from which
Q1c originated, was or was not written by Elizabeth A. Metzger, Circuit Court Judge, whose
uncontested signatures appear on the K1.1c through K1.6c specimen documents.

## Photocopy Examination Limitations

When attempting to conduct a comparison of signatures on non-original documents, certain
limitations are present. First, it is impossible to conduct a microscopic examination of the
signature for evidence of any line quality defects associated with simulated and/or traced
signatures. The reproduction process may distort the writing or mask evidence of simulation or
tracing. In the case of faxed documents, the digitizing of the document during transmission
disrupts the continuity of the signature as it is printed on the receiving machine.

Secondly, the possibility of a "cut and paste" fabrication cannot be eliminated based upon an
examination of a copy. The product of modern photocopiers and fax machines is such that an
authentic signature can be reproduced and pasted onto a document without leaving discernible
evidence of this fabrication. It is also possible to insert a computer graphic (scanned) image of an
authentic signature onto a document that was never signed in ink. Another process may involve
the production of a signature through mechanical means, such as the use of a rubber stamp or an
offset printing process. The only reliable method to eliminate these possibilities is to examine the
original inked signature.

Thus, it is not possible to conclusively identify the signer of a document when no inked original
can be produced. However, it may be possible to eliminate a particular person as having signed a
document where only a photocopy exists or is available for examination. When fundamental
differences are observed that cannot be attributed to the reproduction process, such as basic
divergences in size and proportions of letters, placement on the signature line, writing style and
slant; a conclusion of non-authorship may be rendered.

## Examinations

The Q1c questioned document was physically examined with the aid of a microscope and other
magnifying instruments. This examination confirmed the machine copied nature of the document
and its handwritten entries, to include the disputed signature purported to be that of Elizabeth A
Metzger, Judge, Circuit Court of Martin County. Due to the machine copied nature of the
disputed signature, examinations and comparisons were limited to pictorial characteristics that
included letter formations; relative size and height of letters and parts of letters; alignment of the
signature segments to the imaginary baseline; beginning, ending and connecting strokes; and
relative spacing between letters and segments of the signature.

RE: STATE vs. SENSI

The machine copied nature of the document precluded determination of the type of writing instrument, the color of ink used in the writing instrument and pen pressure habits of the writer preparing the disputed signature. However, the disputed signature on Q1c exhibited sufficient clarity of letter formations and direction of pen stroke movement. Thus, it was determined to be suitable for limited comparisons of the pictorial characteristics.

Due to the photocopied nature of the Qc1 questioned document, evidence of traced or drawn simulation may be obscured or eliminated.

The submitted specimen documents, K1.1c through K1.6c, consisted of machine copies of course of related court documents. The specimen signatures exhibited sufficient clarity of letter formations and direction of pen stroke movement. Although some variations were noted between the specimen signatures, these variations were determined to be within the normal and expected range of variations for one writer. No fundamental difference was noted to indicate more than one writer. Thus, these specimen signatures were determined to be sufficient for meaningful handwriting comparisons.

The specimen documents are dated between 9/9/2008 and 9/10/2008 which is inclusive of the date appearing on the Q1c questioned document and, therefore, considered sufficiently contemporaneous to Q1c questioned document.

In comparing the handwriting characteristics /features observed in the disputed signature on Q1c questioned document with characteristic/features observed in the K1.1c through K1.6c specimen signatures, fundamental differences were observed in letter formations; direction of pen stroke move; relative size and height of letters and parts of letters; and beginning, ending and connecting strokes. *Figure 1* below depicts the Q1c disputed signature juxtaposed to K1.1c specimen signature. Relative points of comparisons are shown by enumerated arrows.



Figure 1. Relative points of comparisons between Q1c, disputed signature, and K1.1c, specimen signature.

A comparison Chart depicting the questioned and specimen signatures was prepared as part of the analysis in this case. A copy of this chart appears as an attachment to this report for ease of reference.

4

## Result of Examinations

Examinations and comparisons of the disputed signature on Q1c questioned document with the uncontested specimen signatures of Elizabeth A. Metzger, K1.1c through K1.6s, as described in greater detail in the body of this report, lead to the following conclusions:

1. The disputed signature exhibited sufficient clarity of letter formations and direction of pen stroke movement to allow for limited comparisons of the pictorial handwriting characteristics. Due to the photocopied nature of the Qc1 questioned document, evidence of traced or drawn simulation may be obscured or eliminated.

2. The specimen signatures on K1.1c through K1.6c consisted of related court documents. They were determined to be sufficiently contemporaneous to the Q1c questioned document. Although some variations were observed between the specimen signatures, no fundamental difference was observed to indicate more than one writer. Thus, these specimen signatures were considered sufficient for meaningful handwriting comparisons.

3. As a result of comparisons of handwriting characteristics observed in the Q1c disputed signature with the handwriting characteristics observed in the K1.1c through K1.6c specimen signatures, it was determined that the disputed signature on the document from which Q1c originated was not written by Elizabeth A. Metzger.

## Remarks

The submitted documents, Q1c, K1.1c through K1.6c and A/S 1 through A/S 3 are being returned herewith.

Respectfully Submitted,

*Charles L. Haywood*

Charles L Haywood
Forensic Document Examiner

A-438

PEOPLE'S EXHIBIT 1
Chart# 1

Questioned Signature

Specimen Signatures of
Elizabeth A. Metzger

Q1c
Inventory
9/10/2008

K1.1c
Warrant
9/9/2008

K1.2c
Affidavit
9/9/2008

K1.3c
Warrant
9/10/2008

K1.4c
Warrant
9/10/2008

K1.5c
Warrant
9/10/2008

K1.6c
Warrant
9/10/2008

Images Enlarged 100 %

# Haywood Forensic Document Examinations, LLC

### 15751 Sheridan Street, #208, Fort Lauderdale, Florida 33331

Charles L Haywood, B.S., M.F.S.                 Telephone (954) 309-0471
Forensic Document Examiner                      Facsimile   (954) 252-9026
Diplomate - ABFDE

## Curriculum Vitae (CV)

### Experience:

| | |
|---|---|
| 1/20/02 - Present | **Haywood Forensic Document Examinations, LLC (HFDE)**<br>Fort Lauderdale, Florida |
| 1996 -- 2002 | **Federal Bureau of Investigation (FBI) Miami Field Office**<br>N. Miami Beach, FL |
| 1981 – 1996 | **FBI Laboratory**<br>Washington, D.C. |

### Certification:

| | |
|---|---|
| 1983 | **FBI Laboratory, Washington, D.C.**<br>Certified in all aspects of examinations and comparisons of questioned or disputed documents, to include handwriting, typewriting, printing, machine copies, and alterations. |
| 2007 | **Diplomate - American Board of Forensic Document Examiners (ABFDE)**, 7887 San Felipe, Suite #122, Houston, TX 77063.<br>Certified in all aspects of examinations and comparisons of questioned or disputed documents, to include handwriting, typewriting, printing, machine copies, and alterations. |

### College:

**Georgia State University**
Atlanta, Georgia
Bachelor of Science, Criminal Justice – 1975

**The George Washington University**
Washington, D.C.
Master of Forensic Science – 1987

### Professional Associations:

| | |
|---|---|
| **Diplomate** | American Board of Forensic Document Examiners (ABFDE) |
| **Associate Member** | American Academy of Forensic Sciences (AAFS) -- Questioned Document Section |
| **Provisional Member** | American Society of Questioned Document Examiners (ASQDE) |
| **Member** | ASTM International |

| Member | International Association for Identification (IAI) |
| Member | Florida Division of International Association for Identification (FDIAI) |

## Presentation of Professional Papers:

**"CONTINUING THE SEARCH FOR THE BLACK "J" AND "W"**
1991 – ASQDE – Orlando, FL

**"The Traveling Kit for the Forensic Document Examiner"**
2008 – ASQDE – Ashville, NC

**"Ball Point Pen Striae Revisited: Presence and Significance"**
2011 – ASQDE – Philadelphia, PA

## Professional Training:

**Basic Forensic Document Examination Training: Two (2) Year Apprenticeship**
1981 – 1983 - FBI Laboratory, Washington, D.C.

**Crime Laboratory Forensic Photography School**
1982– FBI Academy, Quantico, VA.

**Printing Techniques for Questioned Document Examiners Seminar**
1985 – Rochester Institute of Technology, Rochester, NY.

**Fundamentals of Document Examination for Laboratory Personnel**
1986 – FBI Academy, Quantico, VA.

**Document Examination Techniques in Non-Handwriting Problems;** ABFDE, Las Vegas, Nevada 2004.

**Photocopier, Facsimile & Microfilm Training Workshop;** ABFDE/Canon, Norcross, GA, October 2002.

## Most Recent Continuing Education and Training:
ABFDE – "Signature Examination Workshop – Complex Issues and Common Problems," Philadelphia, Pennsylvania, August 2011.

ASQDE Annual Conference, Philadelphia, PA, August 2011

ASQDE/SWAFDE Annual Conference, Victoria, BC, Canada, August/September 2010.

ASQDE Annual Conference, Dearborn, MI, August 2009.

AAFS Annual Conference, Denver, Colorado, February 2009.

ASQDE Annual Conference, Ashville, NC, August 2008.

AAFS Annual Conference, Washington, D.C., February 2008.

ASQDE Annual Conference, Boulder, Colorado, August 2007.

AAFS Annual Conference, Seattle, Washington, February 2006.

2

## Testimonies:

Provided testimony in excess of a hundred cases (estimate) in Federal and State courts throughout the United States, including the U.S. Virgin Islands, and the Commonwealth of the Bahamas.  Testimonies related to determining the origin or authenticity of questioned or disputed document(s), and included examination and comparisons of handwriting, and other aspects of the document(s).

## Training and Lecturing:

Assisted in the training of new FBI laboratory Forensic Document Examiners (FDE's). Designed a selection process for FBI Laboratory FDE's and coordinated the selection process.

Assisted the United States Department of Justice (DOJ), Washington, D.C. in training new and experienced attorneys in the area of direct and cross examination of expert witnesses. Lectured on the subject of Forensic Document Examination at a seminar for attorneys of the Public Integrity Section, Criminal Division, DOJ.

Lectured bank employees of a local South Florida Bank on the detection of fraudulent financial instruments.

Presentation to the Coral Gables, Florida Bar Association on factors to be considered in selecting a forensic document examiner (FDE).

## Commendations:

1994   Director, FBI -  Performance related to the successful prosecution in a Public Corruption of State and Local Public Officials matter in the Southern District of Florida.

1995   Director, FBI - Performance related to the designing and implementation of a selection process for FBI Laboratory Forensic Document Examiners, while maintaining a substantial caseload.

3



516 SW Camden Avenue, Stuart, Florida, 34994

LAW OFFICE OF

## Edward B. Galante

Attorney and Counselor
at Law

Tel: (772) 283-2412
Fax: (772) 283-9509

January 11, 2012

Mr. Harmon
290 Pratt St.
Meriden, Ct 06450

Re: Edgardo Sensi

Dear Mr. Harmon,

Enclosed is the information we received from the first attorney, Bob Watson. Please note the inventory sheet does not have the signature of the Judge or a date.

Also, it is highly unusual that a Judge would sign the inventory sheet after the warrant is executed. If the officer searched beyond the confines of the warrant the Judge can not approve the officer's actions after the fact.

Should you have any questions or concerns please feel free to call or write.

Respectfully,

Edward B. Galante, Esq.

EBG/cp

A-443

MARTIN COUNTY SHERIFF'S OFFICE

CASE # 08-10162

DATE 9-10-08

## INVENTORY

The following is a true inventory of property taken pursuant to a search warrant:

Dell Inspiron B130 SN-CN0GD3667016661702ME in Black Case

Various CD/DVD Media

8 High 8 Video Tapes

Sony Video High 8 HandyCam SN 1352781 in Case

Bag (Locked containing misc porn)

Various Papers

I, Brian Broughton, the officer by whom the search warrant was executed, do swear that the above inventory contains a true and detailed account of all property taken by me or at direction pursuant to said warrant.

Signature _____  ID# _____

Sworn to me before _Det. Patrick Colasuonno_ a law enforcement officer.

Det. _____ 633/1552

Signature _____  ID# _____

S.O.P. #303.00
APPENDIX A

9-10-08

A-444

1    IN THE CIRCUIT COURT OF THE NINETEENTH

2    JUDICIAL CIRCUIT IN AND FOR

3    MARTIN, FLORIDA

4    CASE NO. 432008CF1285A

5

6

7    STATE OF FLORIDA,

         Plaintiff,

8

     vs.

9

     EDGARDO SENSI,

10

         Defendant.

11    _____ /

12

13

14

15    DEPOSITION OF DETECTIVE BRIAN BROUGHTON
      TAKEN ON BEHALF OF THE DEFENDANT

16

17

18

19

20          Stuart, Florida
            November 19, 2008
21          9:00 a.m. -  10:45 a.m.

22

23    TREASURE COAST COURT REPORTING, INC.

24          (772) 221-3244

25

*— YEARS, STRESSED —!*

1   was taking care of her the last few days.  It was

2   basically sitting in a room adjacent to the

3   computer room.  It was in the front of the house

4   all by itself.  It was kind of a room, there's a

5   small bed there and this was just sitting there.

6          So, getting back to the videotapes, that

7   black bag that we had seized, we didn't want to

8   seize it if there was nothing pertinent to our

9   investigation in it, so I asked specifically Mr.

10  Sensi if he had a key to this black bag because we

11  didn't want to, first of all, take this if we

12  didn't have to, and we didn't want to have to

13  cutoff the lock if we didn't have to.  He looked at

14  me and said he didn't have a key to this black bag

15  that was locked up and prohibited us from viewing

16  its contents.  I said well, what's in here, he goes

17  take it, it's just porn. *LIE*

18     Q.  He said take it.

19     A.  He said take it, it's just porn.  So at this

20  point I said okay, so we included that in the

21  inventory but we did not look at the contents of it

22  until we got back to the Sheriff's Department.  So

23  the inventory, I think I saw this list right there,

24  it just says black canvas bag, it doesn't have the

25  contents cause we didn't know what was in it. *THEY LATER ADDED WORDS "PORN" TO IT AFTER SWAPPED!*

1          Q.  Understood.  I want to stop you right there.

2                    MR. DECKARD:  I need a relief break.

3                    MS. KIRKWOOD:  No problem.

4                    (Short recess was taken.)

5     BY MR. DECKARD:

6          Q.  The black bag that we were discussing that

7     had the lock on it.

8          A.  Yes.

9          Q.  That was found in the same closet with the

10    red bag and the box.

11         A.  Correct.

12         Q.  The male closet master bedroom.

13         A.  Yes.

14         Q.  And I believe you had told me that when you

15    had asked about a key Sensi had told you the bag

16    only contained porn?

17         A.  Well, he said he didn't have a key, and then

18    he said take it, it's just porn. — *OBVIOUSLY, HE'S LYING, CONSTANTLY REPEATING THIS ...*

19         Q.  Told you to take it.

20         A.  Take it, it's just porn.  I should also note

21    that during this time of us searching we would

22    periodically talk to him and say what is this, what

23    is this?  We noticed that he started sweating

24    profusely and --

25         Q.  At the time you were discussing the black

A-447



# GERALD L. HARMON

### ATTORNEY AT LAW

Meriden: (203) 639-1956
New Haven: (203) 497-8030

Facsimile: (203) 639-1959
24 Hours: 1-888-464-8042

Clerk of Circuit Court
Ms. Marsha Ewing
P.O. Box 9016
Stuart, Florida 34995-9016

Re:  State v. Sensi
     432008CF1258A
     Document Request

FILED FOR RECORD
MARTIN COUNTY FLORIDA
2011 JAN 13 AM 9:04
MARSHA EWING
CLERK OF CIRCUIT COURT
BY _____ D.C.

Dear Clerk of Circuit Court:

Please be advised that our office represents Mr. Edgardo Sensi in Federal Court, CRIM NO:3-08CR00253 in the Second District of Connecticut. We would like to request certified copies of the following documents from the Court files to be utilized in his Federal case:

1. Case #08-10166
Inventory List for search warrant executed at residence in Jensen Beach on September 10, 2008.  *Contact Sheriffs Ofc. 772-220-7000*

2. Inventory list of the search warrant executed at his office in Stuart Florida on September 13, 2008 (BIG FIVE TOURS and Expeditions, Mr. Mahen Sanghratka (owner) and Mr. Ashish Sanghratka (president).  *S/A*

3. Warrant in the County Court, Martin Florida for each count numbers 11 through 76 issued on September 23, 2008.  *attached*

Please advise if a fee is required for the requested copies. Thank you for your attention to this matter. If you have any questions please give me a call.

Sincerely,

Attorney Gerald Harmon

Office:
59 Elm Street, 2nd Floor
New Haven, CT 06510

Office:
290 Pratt Street
Meriden, CT 06450

Mailing Address:
290 Pratt Street
Meriden, CT 06450

A-448



## GERALD L. HARMON
### ATTORNEY AT LAW

Meriden: (203) 639-1956
New Haven: (203) 497-8030

Facsimile: (203) 639-1959
24 Hours: 1-888-464-8042

August 15, 2011

Martin County
Ms. Marsha Ewing Clerk of Court
100 East Ocean Boulevard Suite 200
Stuart, Florida 34994

Dear Ms. Ewing –Clerk of Court

Please be advised that this office represents Edgardo Sensi in Federal Court (Crim. No. 3-08CR00253 in the Second District of Connecticut. Due to our representation and pursuant to the Freedom of Information Act we would like to request certified copies of the following documents from your files to be utilized in his Federal case:

1. Case No. 432008CF001258XXAXMX
   08001258CFMA
   File copy of the Inventory list for search warrant executed at residence in Jensen Beach on September 10, 2008.

2. Inventory list of the search warrant executed at his office in Stuart Florida on September 13, 2008 (Big Five Tours and Expeditions, Mr. Mahen Sanghratka(owner) and Mr. Asish Sanghratka (president).

Please advise if a fee is required for the requested copies. Mr. Sensi's Federal case is   scheduled for imminent resolution therefore tour prompt attention is appreciated. Thank you for your attention to this matter. If you have any questions please give me a call.

Sincerely,

Attorney Gerald Harmon

Office:
59 Elm Street, 2nd Floor
New Haven, CT 06510

Office:
290 Pratt Street
Meriden, CT 06450

Mailing Address:
290 Pratt Street
Meriden, CT 06450

Case 3:08-cr-00253-WWE   Document 164-1   Filed 01/27/12   Page 46 of 52

**MARTIN COUNTY SHERIFF'S OFFICE**
800 S.E. MONTEREY RD.    STUART, FLORIDA 34994-4599
USE BLACK BALL POINT PEN ONLY - PRESS HARD

_INCIDENT TITLE_ Child Porn

**INITIAL PROPERTY / EVIDENCE RECEIPT**

_DATE & TIME OF RECEIPT_ 9-10-08

Comp
Self
OFFICE USE ONLY

CASE NUMBER 08-10166

LOCATION OF INCIDENT 2750 NW Windemere Dr, Jensen Bch
_ADDRESS_          _CITY_

LOG # _____
S ☒ D ☐ V ☐ O ☐ F ☐          S ☐ D ☐ V ☐ O ☐ F ☐

#1 NAME  Edgardo Sensi                #2 NAME _____
ADDRESS  2750 Windemere Dr            ADDRESS _____
CITY Jensen Beach  ZIP 34957          CITY _____  ZIP _____
PHONE # _____                PHONE # _____
S ☐ D ☐ V ☐ O ☐ F ☐

#3 NAME _____                SPECIAL INSTRUCTIONS  Hold for
ADDRESS _____                evidence / Process
CITY _____  ZIP _____
PHONE # _____

CHECK ONE ABOVE    S=SUSPECT   D=DEFENDANT   V=VICTIM   O=OWNER   F=FINDER

| PROPERTY/EVIDENCE CLASSIFICATION: (Check One) | All Evidence: Note if Crime Scene (C) Or Recovered Stolen (R) In Box (E) (See E Box Below) | Return To # Above When Case is Closed. Place An "X" When Ownership is Unknown (See •••• Box Below) |
|---|---|---|
| ☒ EVIDENCE  ☐ FOUND  ☐ SECURITY  ☐ DESTROY | | |

| ITEM # | QTY. | DESCRIPTION, MAKE, MODEL, SERIAL NUMBER, TYPE, ETC. | E | VALUE | •••• |
|---|---|---|---|---|---|
| BB1 | 1 | Dell Inspiron | | | |
| BB2 | | Various CD/DVD Media | | | |
| BB3 | 84 | High 8 Video tapes ☒ Ret to ICE | | | |
| BB4 | | Sony Video Hi-8 ☒ Handycam Ret to ICE | | | |
| BB5 | | Various Paper | | | |
| BB6 | | Black Canvas "Locked" Ret to ICE | | | |
| XX | | BB1 contains BB2 & BB5 | | | |

FOR ADDITIONAL ITEMS USE A CONTINUATION FORM

CITIZEN _____  DATE _____

DELIVERED BY (NAME & PAYROLL NUMBER)  6-26/0778
L ☒ P. ☐

RECEIVED BY (NAME) DATE & TIME RECEIVED  0245
2/13/9  1145

#224

PROPERTY SEALED?
(YES)   UNABLE

TOOLS OF THE CRIME WILL NOT BE RETURNED WITHOUT A COURT ORDER.
DELIVER ALL COPIES TO THE EVIDENCE CONTROL CLERK.

SIGNATURE OF CLAIMANT _____
ADDRESS _____
PHONE NUMBER _____

HAVING PROPER AUTHORITY TO RECEIVE THE ABOVE ITEM (S)
NUMBER _____
I HAVE RECEIVED THEM:
AS THE OWNER   FOR OWNER

RECORDS COPY

A-450

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
IN AND FOR MARTIN COUNTY, FLORIDA

**STATE OF FLORIDA**                      **Case No: 08CF1258**

v

**EDGARDO SENSI**

        Defendant.
_____/

**SUBPOENA DUCES TECUM WITHOUT DEPOSITION**
*(*Mail-in Only*)*

To:    Detective Broughton
       C/O Martin County Sheriff Office
       800 SE Monterey Road
       Stuart, Florida 34994

        **YOU ARE HEREBY COMMANDED** to appear at **The Law Offices of Edward B.
Galante, Esq., 516 SW Camden Avenue, Stuart, Florida 34994, Phone: (772) 283-2412
Facsimile: (772) 283-9509[1]**, on or before thirty (30) days of receipt of this Subpoena and have
with you at that time and place the following:

        *Any and all reports, search warrant(s), inventory lists, or other documents related to
        the search warrant, before or after execution and returned warrant, regarding Edgardo
        Sensi, Martin County Clerk of Court Case Number 08CF1258.*

These items will be inspected and may be copied at that time.  You will not be required to
surrender the original items.  You may comply with this subpoena by providing *"legible"* copies
of the items to be produced to the attorney whose name appears on this subpoena on or before
the scheduled date of production.  You may condition the preparation of the copies upon the
payment in advance of the reasonable cost of preparation.  *\*You may mail or deliver the copies
to the attorney whose name appears on this subpoena and thereby eliminate your appearance
at the time and place specified above.  (if the cost for copies exceeds $50.00, please contact the
attorney for approval.)*  You have the right to object to the production pursuant to this subpoena
at any time before production by giving written notice to the attorney whose name appears on
this subpoena.

        If you fail to:

_____
[1] *Issued by the attorney of record per Rule 1.351*

(1)     appear as specified; or
(2)     furnish the records instead of appearing as provided above; or
(3)     object to this subpoena,

you may be in contempt of court.  You are subpoenaed by the attorneys whose names appear on this subpoena and unless excused from this subpoena by the attorneys or the Court, you shall respond to this subpoena as directed.

**I HEREBY CERTIFY** that I gave notice to every other party to this action of my intent to serve a subpoena upon a person who is not a party to this action directing that person to produce documents or things without deposition.

EDWARD B. GALANTE, ESQ.
Fla. Bar No. 199125
516 SW Camden Avenue
Stuart, Florida 34994
Telephone: (772) 283-2412
Facsimile: (772) 283-9509

Page 1 of 3

November 21, 2011
Via Certified Mail

The Honorable Sherwood Bauer, Jr.
Circuit Court for Martin County, Florida
100 East Ocean Boulevard
Stuart, Florida 34994

Re: State of Florida vs. Edgardo Sensi
    Case No.  08-1258 CFMA

Dear Judge Bauer:

In reference to the above mentioned case in
your Honor's court, I respectfully submit this
petition to grant me a SUPPRESSION HEARING
as soon as possible. My counsel, Attorney Edward
B. Galante of Stuart, is in the process of submit-
ting to the court the formal motion for this request.
In the meantime, I pray the court will set aside a
time and date for this suppression hearing prior
to the Christmas Holiday, as I face a firm pro-
cedural deadline in my federal case in the
District Court of Connecticut which would be
directly impacted by the results of this hearing
in the Circuit Court for Martin County, Florida.

Your Honor, as a result of previously ineffective
counsel I have not been given the critically
necessary benefit of a suppression hearing
in Martin County. Since my arrest on September
10, 2008, I have been wrongfully incarcerated,
mostly in a federal detention facility over 1,200

(continues to page 2)

PAGE 2 OF 3

MILES FROM MY HOME, DESPERATELY SEEKING TO
HAVE THIS HEARING. ATTORNEY GALANTE WILL BE
PRESENTING TO THE COURT SEVERAL STRONG AND
PERSUASIVE ARGUMENTS, WITH SUPPORTING DOCU-
MENTATION, CHALLENGING AND DEMONSTRATING THE
FOLLOWING:

• DELIBERATE AND RECKLESS OMISSIONS IN THE
  SEARCH WARRANT AFFIDAVIT AND ACTUAL SEARCH
  WARRANT AS PREPARED BY DETECTIVE BRIAN
  BROUGHTON WITH THE MARTIN COUNTY SHERIFF'S
  OFFICE.
• LEGAL IMPOSSIBILITY AND INSUFFICIENT EVIDENCE
  TO SUPPORT MY ARREST ON 77 COUNTS OF AN IDENT-
  ICAL QUANTITATIVE STATUTE CLEARLY STATING
  THAT THE MAXIMUM AMOUNT OF A SPECIFIC ILLE-
  GAL POSSESSION IS INFINITY ("TEN OR MORE IMAGES").
• UNWARRANTED INCREASE IN THE VERY NARROW SPECIFIC
  SCOPE OF THE SEARCH WARRANT RESULTING
  IN THE ILLEGAL SEIZURE OF ALLEGED EVIDENCE.
• ALTERATION OF THE COURT SUBMITTED INVENTORY
  LIST, SENT TO BOTH THE STATE ATTORNEY AND
  U.S. ATTORNEY IN CONNECTICUT. THE ALTERED
  COPY OF THE INVENTORY LIST, WHICH WAS
  FALSIFIED TO SHOW CONSENT TO SEIZE A
  LOCKED CONTAINER, WAS THEN FALSELY AU-
  THENTICATED WITH THE FORGERY OF JUDGE
  ELIZABETH METZGER'S SIGNATURE, OSTEN-
  SIBLY BY SOMEONE WITH THE M.C.S.O.
• OTHER VARIOUS QUESTIONABLE PROCEDURES AND
  ACTIONS BY DET. BROUGHTON REGARDING THE
  SEARCH AND SEIZURE OF EVIDENCE, PROBABLE
  CAUSE ISSUES AND MY SUBSEQUENT ARREST.

(CONTINUES TO PAGE 3)

Page 3 of 3

Your Honor, I greatly appreciate the Court's urgent attention to my request for a suppression hearing. I will be unable to testify at the hearing, but respectfully request that I be allowed to participate via video conference or telephone conference, which are both available to me here at the Wyatt Detention Facility in Rhode Island.

Thank you for your time and may God bless you.

Sincerely,

Edgardo Sensi,   Federal ID # 17211-014
Donald Wyatt Detention Facility
950 High Street
Central Falls, Rhode Island  02863

cc:  Edward B. Galante, Esq.
       516 S.W. Camden Avenue
       Stuart, FL  34994

       Gerald L. Harmon, Esq.
       290 Pratt Street
       Meriden, CT  06450

1

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA,      .    Case No. 3:08-CR-00253
                               .    (WWE)
              Plaintiff,       .
                               .    Bridgeport, Connecticut
       v.                      .    January 31, 2012
                               .
EDGARDO SENSI,                 .
                               .
              Defendant.       .
. . . . . . . . . . . . .       .

SENTENCING HEARING
BEFORE THE HONORABLE WARREN W. EGINTON
SENIOR UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:        Office of the U.S. Attorney
                          By:  KRISHNA PATEL, AUSA
                               DAVID FEIN, AUSA
                          915 Lafayette Boulevard
                          Bridgeport, CT 06604

For the Defendant:        Law Offices
                          By:  GERALD L. HARMON, ESQ.
                          290 Pratt Street
                          Meriden, CT 06450

For Pretrial Services:  By:  RAYMOND LOPEZ, SUSPO

Electronic Court
Recorder Operator:      MS. SANDI BALDWIN

Transcriptionist:       MS. SUZANNE BENOIT

Proceedings recorded by electronic sound recording.
Transcript prepared by transcription service.
_____

BOWLES REPORTING SERVICE
P.O. BOX 607
GALES FERRY, CONNECTICUT 06335
(860) 464-1083

A-456

2

```
 1              (Proceedings commenced at 10:24 a.m.)

 2              THE CLERK:  The United States District Court

 3    is now open.

 4              THE COURT:  All right.  Good morning.

 5              MS. PATEL:  Good morning, your Honor.

 6              THE COURT:  This is United States v. Edgardo

 7    M. Sensi, 3:08CR253 before me for sentencing.  He is

 8    represented by Attorney Gerald Harmon and the United

 9    States is represented by Ms. Patel.  And I see the

10    United States Attorney is with us again today.  I

11    welcome -- I'm happy to have him here.

12              MR. FEIN:  Good morning, your Honor.

13              THE COURT:  All right.  We'll swear him

14    first.

15              THE CLERK:  Mr. Sensi, would you please rise

16    and raise your hand.

17       EDGARDO SENSI, DEFENDANT HEREIN, SWORN

18              THE CLERK:  Thank you.  You may be seated.

19              THE COURT:  Are you Edgardo Sensi?

20         MR. SENSI:  Yes, your Honor.

21              THE COURT:  You're represented by Attorney

22    Gerald Harmon.  You're satisfied by his representation

23    of you?

24              MR. SENSI:  Yes, your Honor.  Very much.

25              THE COURT:  Have you partaken of any drugs or
```

A-457

3

1    alcoholic beverages today?

2            MR. SENSI:  No, your Honor.

3            THE COURT:  All right.  You understand you're

4    before me for sentencing for violation of laws of the

5    United States.

6            MR. SENSI:  Yes, sir.

7            THE COURT:  All right.

8            Are you satisfied, Mr. Harmon, he understands

9    the nature of these proceedings and (inaudible) will

10   work with you today?

11           MR. HARMON:  Yes, your Honor, I am.

12           THE COURT:  All right.  Well, I'll proceed.

13           You've been over the presentence

14   investigation report with him?

15           MR. HARMON:  Yes, I have, your Honor.

16           THE COURT:  Any exceptions to it?

17           MR. HARMON:  I think the things that we had

18   exceptions to have been added to the PSR report, your

19   Honor.  In terms of that we did have some corrections

20   that were made that we requested that a part of the

21   addendum that was made to the last PSR report --

22           THE COURT:  I've read that, yeah.  So

23   otherwise the factual representations, they're correct

24   and we can accept it as part of the record?

25           MR. HARMON:  Yes, your Honor.

A-458

4

1            THE COURT:  All right.  I will do that, and
2     that will be made part of the record.
3            All right.  Why don't you -- I read a lot of
4     things in this case and of course I had an allied
5     sentencing yesterday, which was one of the most
6     difficult sentencings I ever had in my life.  So I'm
7     very familiar with the background of this whole case
8     and I have read all of the submissions.
9            Why don't you proceed as we have and if you
10    feel it's more comfortable it's perfectly happy with me
11    if you will sit down because then you can speak into
12    the mic.
13           MR. HARMON:  Thank you, your Honor.
14           I would ask that a ruling be made on our
15    motion to continue that was submitted to the Court,
16    your Honor.
17           THE COURT:  Oh.  Oh, good, sure.  I spoke to
18    Judge Metzger who was very, very cooperative.  As I
19    said there at the end of our conversation I appreciate
20    it very much.  She called me, I was going to call her
21    but she called me and she assured me that's her
22    signature, she remembers it and there is no reason for
23    me to grant your motion.  So on the basis of my
24    conversation with Judge Metzger, I will deny that
25    motion for a continuance.

A-459

5

1           MR. HARMON:  Thank you, your Honor.

2           I just wanted to point out for the record

3  that we did have concerns regarding why an inventory

4  sheet would be signed.  We do have concerns about the

5  possibility of dismissal of the charges in Florida and

6  Mr. Sensi's ability to attack those charges once that

7  occurs, your Honor.

8           THE COURT:  All right, you've made your

9  record.

10           MR. HARMON:  Thank you.

11           THE COURT:  So take a seat and proceed on his

12  behalf.

13           MR. HARMON:  Thank you, your Honor.

14           In terms of that, your Honor, we come here

15  today, it's a tragedy what we're here before.  There's

16  no winners, there's nothing positive that's going to

17  come out of today.

18           We do understand the Government's position

19  regarding this case, your Honor.  We do understand the

20  events and the things that are talked about within the

21  Government's sentencing memorandum and within this case

22  are tragic, horrific events that have occurred.

23           At the same time, your Honor, as I indicated

24  in my motion to the Court, I'm asking that similar

25  sentences be imposed for similar-type offenses, your

6

1   Honor.  I think given that yesterday we had the mother

2   of one of the alleged victims here in this case, she

3   received a sentence well below what is being

4   contemplated for Mr. Sensi.  I think in terms of a

5   trusted position, no one is in more of a trusted

6   position to a child than their mother, so I think we

7   have to look at that in terms of how sentences are

8   carried out, your Honor.

9           And in terms of that, in addition to that, I

10  know we had a similar case, not before your Honor but

11  before this Court, regarding an individual who molested

12  over 15 young boys in Haiti who were also in positions

13  of or subject to abuse and in very volatile positions

14  themselves, your Honor, and I don't think our

15  allegations against us are any more serious or any more

16  inhumane than what occurred in that case, your Honor.

17  And in that case a person received a sentence of 19 and

18  a half years, your Honor.

19          So I'm asking that the Court, in terms of Mr.

20  Sensi's case, give a case similar -- a sentence similar

21  to those sentences, your Honor, and that would be

22  appropriate, would be within the guidelines -- not

23  within the guidelines but would be within the 3553

24  characteristics that we're looking for in terms of

25  sentencing.  It would cause deterrents to occur.  It

A-461

7

1    would be a just punishment.  If at any time, I mean Mr.
2    Sensi is 55 years old, your Honor.  A sentence of 20
3    years is going to put him at 75 years old.  If he were
4    to be even released at that point, he would be on a
5    lifetime supervision by the Officer of Probation.
6    There are restrictions that could be in place to limit
7    his contact with minors, to limit what occurs.  He
8    could receive treatment after he's released also, your
9    Honor, in terms of this.  I don't think that
10   warehousing an individual for the remainder of his life
11   is an answer to this offense, your Honor.

12          THE COURT:  Well, Mr. Harmon, you're doing a
13   good job in his behalf as you should.  I would comment
14   only on what you said about Laura Culver, the mother,
15   and what we did yesterday.

16          The Government and Ms. Patel made I think a
17   superb presentation.  I couldn't improve on it so I
18   adopted it as my own.  But she covered every aspect of
19   what I had to consider in sentencing the mother and
20   really was the reason I went to 8 years.  I had been
21   considering going to 6 years, but the Government
22   persuaded me that what you just said about the
23   culpability of the mother should result in the sentence
24   that I gave her.

25          Anything else you want to add?

8

1           MR. HARMON:  No, your Honor.

2           THE COURT:  You have a difficult situation.

3    I'm aware of that.

4           And now before I turn to the Government, it's

5    my understanding that the Government would like to

6    present quite a bit of testimony here, and I'm not only

7    going to permit that, I'm all in favor of it.  So I

8    invite the Government to proceed as the Government sees

9    fit.

10          MS. PATEL:  Thank you, your Honor.

11          If it's okay, both Attorney Fein and I are

12   going to split our duties today.  For the purposes of

13   the record first, two things in response, just for the

14   record.  To Mr. Harmon's motion to continue I would say

15   that this issue of the accusation is at that the

16   inventory sheet was somehow changed by the detectives

17   in this case.  Clearly that is not the case.  As your

18   Honor indicated, Judge Metzger stated very clearly that

19   she signed that inventory sheet.

20          This is an issue that came up at the

21   suppression hearing.  It's an issue that just the

22   Friday before a Tuesday sentencing, was one of the many

23   different ways that Mr. Sensi has tried to delay his

24   inevitable judgment day, which is today.  But just for

25   the record we have now spent three years on this case

9

1    and at every turn in this case Mr. Sensi has made some

2    attempt to delay his sentencing, and we believe that

3    this was nothing more than a false assertion to

4    continue to attempt to delay it.

5         Second, we know that the Court has had an

6    opportunity to review a lot in this case, and as we

7    indicated yesterday and I think it's worth repeating

8    today for this record, the Court is in a unique and yet

9    unfortunate position of actually having viewed the

10   crimes in this case.  The Government has submitted a

11   very brief summary, minutes of what is actually hours

12   and hours of abuse of two minor victims, a 4-year-old

13   and an 8-year-old child, and so that the record is

14   clear the Government is going to seek to mark those two

15   videotapes both that were made available to Defense

16   counsel and certainly the entire set of underlying

17   videos have been made available to Defense counsel and

18   the Defendant in this case, having those marked as

19   Exhibit 1 and 1A.

20        So if I may approach just to have those

21   marked at this time?

22        THE CHAIRMAN:  Yeah, I'm very much in favor

23   of having those made part of the record because I would

24   just ask, you know, there is an appeal reservation in

25   this case so it's necessary to have an appeal record,

10

1   and I would hope that those films would be part of that

2   appeal record because I would like those judges on the

3   Court of Appeals to go through the experience I had of

4   looking at those films.

5          MS. PATEL:  I'll go ahead and approach with

6   those, your Honor.

7          THE COURT:  Yes.

8      (Pause.)

9          MS. PATEL:  Your Honor, while those are being

10  marked, the Government has also provided the Court and

11  Defense counsel with Exhibits 2 through 5.

12         2 is a letter that was located on a floppy

13  disk at Mr. Sensi's home during the search, and it

14  relates to a victim who is going to speak today.  We're

15  going to identify her as L.  And again, I know we went

16  through this exercise yesterday, we're going to go

17  through the same exercise today, we're asking that none

18  of the victims' names in this case or their spouses or

19  the foster parents' names be identified.  And to the

20  extent anybody makes any mistakes, we certainly ask

21  members of the public and the press that are here today

22  to honor our request, and it is just that, a request to

23  do everything possible to preserve the dignity of the

24  children.

25         THE COURT:  Well, I will tell you that my

11

1   experience over decades with Mike Mayko is that when
2   you ask Mike to do something, he does it.  And if you
3   read the story in the paper this morning you saw that
4   he observed very carefully the ground rules we asked
5   him to observe.  And I'm sure he'll do that today and I
6   hope that he will serve as an example to any other
7   members of the press that are here that are not
8   normally used to sitting in the courtroom.  I see Mike
9   all the time.

10          So I would hope they would follow his
11  example.

12          MS. PATEL:  Thank you, your Honor.

13          So Exhibit 2 is that letter.  And Exhibits 3
14  through 5 are drawings that were made by the 8-year-old
15  child.  These particular drawings appear to have been
16  done in Rhode Island and there was particular videotape
17  of the abuse that took place in Rhode Island.  We think
18  they're somewhat instructive in terms of what is
19  happening to these children while the abuse is taking
20  place.  So we offer Government's Exhibits 2 through 5
21  for the appellate effort and ask that they be marked.

22          THE COURT:  Okay.  Thank you.

23          While you're doing that I will comment also,
24  I cannot today any more than I could yesterday mention
25  the foster parents by name, but I am very pleased to

12

1   see that they are here today.  They've made a long trip
2   up here and I was hoping that they would be here today
3   and I expected that they would be here today.  They've
4   given us very strong support in this case.
5           MS. PATEL:  And just so the record is clear,
6   your Honor, those drawings refer to NB1.  And with that
7   I think for the purposes of the record the Government
8   has nothing further.  But at this time we think it
9   would probably be best to proceed with having the folks
10  who are present here today who wish to address your
11  Honor, particularly regarding one of the 3553 factors
12  which is the history and the characteristics of this
13  Defendant.  In addition, you did hear from the foster
14  parents of victim number one and they stand here
15  slightly in a different position to represent the voice
16  of victim number one who is in this indictment.
17          THE COURT:  What's the Government's position
18  and Defense position on these people as they come
19  forward here?  Do you want them sworn or do you want
20  them to just speak?
21          MS. PATEL:  We'd be perfectly okay with them
22  just coming forward like most victims do in these cases
23  and just speaking.
24          THE COURT:  We don't customarily swear the
25  victims.  Is that okay with the Defense?

13

1          MR. HARMON:  It is, your Honor.  I guess just

2  to -- only to indicate, I mean with the two adoptive

3  parents I understand that, but the others are for I'm

4  assuming some type of relevant conduct.  This isn't

5  something Mr. Sensi is being charged with here today,

6  your Honor.

7          THE COURT:  All right.

8          MS. PATEL:  Okay.  Thank you, your Honor.

9          We're going to actually go ahead and begin

10  with the foster parents.

11    (Pause.)

12          THE COURT:  As I said, I'm pleased to have

13  you back today and I appreciate your participation.

14          MRS. H:  Thank you, your Honor.  Good

15  morning.

16          I'm the foster mother of victim number one,

17  not a primary victim but I have had the experience of

18  picking up the pieces when she has occasionally come

19  apart.  There are more than one victim in this

20  circumstance.

21          First there is S, and I cannot even begin to

22  think about what happened to my young cousin as an 8-

23  year-old.  This was the time that she came back into

24  our lives and we had no idea what was going on.

25  Eventually her mother tried to leave it all behind and

A-468

14

1    moved here to be closer to family.  We are their only

2    family, only close family.  My father was living at the

3    time, and my brother and that's it.  They moved to be

4    closer to us and to (inaudible).

5            When S turned 15 they had been living close

6    to us in a daily part of our lives for about two years.

7    She had the additional problem of her mother being torn

8    away from her, and living through the indignity of

9    having everything exposed in the press.  People knew

10   who she was, who her mother was, what the relationship

11   was.  She was deeply humiliated and mortified and

12   injured again.

13       (Pause.)

14       MRS. H:  The next level of a victim is Laura,

15   her mother.  And I would no way begin to excuse what

16   she allowed to happen, what she did.  There's -- I

17   can't wrap my head around it.  I can't even think about

18   that.  I cannot deal with her and think about what she

19   allowed to happen.  I have to separate that.

20           She tried to escape and hide it and put it

21   behind her.  It didn't -- it didn't work.  Her life has

22   been ruined.  She had a successful career, friends,

23   small close family.

24           When my father died in October he still was

25   unable to forgive Laura.  Her life is ruined.

A-469

15

1        And next, I don't -- I never liked to be a
2   victim, but our family was deeply impacted by this of
3   course.  The victim's own father would not take her and
4   signed her over very quickly to us.  We were able to
5   bring her back home within about three days, which was
6   a great blessing.

7        We have three daughters, one that's older
8   than her and two that are younger, so she had the
9   additional stress of trying to hold her head up and go
10  to school.  Our community embraced her and was greatly
11  supportive of her, and I don't think anybody ever said
12  a word to her.  But she had been an only child and now
13  was injected into -- you know, she became one of four
14  in her teenage years and so that was -- that was hard
15  for her.  We're a very noisy rambunctious family.

16       But she is a survivor.  She fights with her
17  sisters, she loves her sisters.  They play together.
18  They scream and laugh and giggle and it's all as normal
19  as it can be.  And she makes great effort to make
20  everything normal.

21       But it has also effected our other daughters.
22  Our oldest daughter pretty much knows what happened to
23  her.  Our youngest two ask questions.  They stopped
24  asking questions about a year ago because it was not
25  something that I could even discuss with them as young

16

1    girls. And the time will come.

2       As for the victim now, what she does is she

3    tries to put it behind her. She moves forward. She's

4    an honor student. She -- I'm sorry, she graduated as

5    an honor student from high school. She's a hard

6    worker. She has many honors and accolades. She's in

7    college now as you know, and making very, very good

8    grades. She's doing well.

9       But when I talked to her yesterday I was very

10    worried about a meltdown. She's trying to go forward

11    and study and do her job and do her work and make

12    something of her life and be a success story, which is

13    very difficult for a person that has this hanging

14    around their neck. She puts it away.

15       She's very strong. We will be there, we will

16    help her for the rest of her life, and I know now that

17    I'm going to have to watch her for the rest of her

18    life. She knows what the warning signs are. She knows

19    to look for them. But that's not enough.

20       I'll let my husband speak.

21       THE COURT: Well, as I said yesterday and I

22    can only repeat now, the importance of you is manifest

23    because as you point out you're the only close family

24    that she can rely upon right now and these are critical

25    years for her. So you may be right that it will have

A-471

17

1   to last a lifetime but it certainly is critical right

2   now and I very much appreciate what you two are doing.

3   You've got a strong family which is important.

4          And you go ahead, Mr. H.

5          MR. H:  Thank you, your Honor.

6          I'd like to begin, you know, there's not a

7   lot to add to the impact that all these tragic events

8   that have been brought upon my family.  This is, you

9   know, a tremendous, tremendous load to bear and I'd

10   like to say that I'm very grateful for having a

11   wonderful wife who has been strong through all of this.

12   She's had to maintain our family in my absence.

13          THE COURT:  She's a very strong woman.

14          MR. H:  She certainly is, and very beautiful

15   too.  So I'm very --

16          THE COURT:  She is.  Congratulations.

17          MR. H:  Thank you.

18          As I mentioned yesterday, there are some

19   extraordinary horrific and unfortunate circumstances

20   that bring is here today, but they're despicable.  It's

21   difficult to understand from a man's standpoint, from a

22   father's standpoint, from a human's standpoint how any

23   such monster can inflict the kind of pain and suffering

24   that this Defendant has inflicted upon all of the

25   victims, some represented here today and many not.  Not

18

1    only the victims themselves that endured physical acts

2    of this Defendant, but the many, many, many, many lives

3    that those tragedies touch.

4            I'd like to say that, you know, as I

5    mentioned yesterday, I'm very, very grateful for the

6    justice system that we have today in our society.  And

7    I'm grateful, extremely grateful, for the efforts of

8    the agents, the probation officers, the U.S. Attorney's

9    Office for bringing all these events to a culmination.

10   This is a sad day, but this is a good day.

11           This is the point in time and the place where

12   good meets evil, and that moment is now.  This

13   Defendant has preyed upon the vulnerable in our

14   society, to seek access to the most vulnerable in our

15   society.  You are the pimp of child pornography.

16   That's exactly what this man is.  He is evil, he is

17   vile, he is despicable.  And I'm certain that this

18   Court understands that.

19           THE COURT:  You know, I commented already

20   that Ms. Patel said things better than I could, so I

21   made her comments part of my comments in the record.  I

22   think that's what I should do with your comments.

23   You've just said everything I was thinking about

24   saying.  So I agree with everything you've set forth

25   and I also agree that we were very fortunate, and I've

19

```
1    been in this district for over 30 years, we have
2    Probation officers like Ray Lopez who is, as you've
3    discovered, is a very understanding, experienced
4    professional.  And we have a United States Attorney and
5    Assistant United States Attorneys that reflect what I
6    find around the country, that the law enforcement
7    people are not looking for the last ounce of blood,
8    they're trying to be very fair and common sense in
9    their approach.
10            So I agree with everything you've said and I
11   appreciate your saying it -- you said it for me.
12            MR. H:  Thank you, your Honor.
13            And, you know, I have little to add to that
14   other than to underline my appreciation to the Court,
15   and that finally this day has arrived, and I'm certain
16   that the Court will meet out a very, very just sentence
17   for this Defendant.
18            THE COURT:  I too.
19            MR. H:  Thank you, sir.
20            MS. PATEL:  Your Honor, the next victim we're
21   going to go ahead and refer to her as E, and she's
22   going to come up with her husband.
23        (Pause.)
24            MRS. E:  Good morning, your Honor.
25            THE COURT:  Good morning.
```

A-474

20

1    MRS. E:  I met the Defendant when I was 15

2    years old.  Pardon me.

3        (Pause.)

4        MRS. E:  I believe I was fortunate enough to

5    know what was starting to happen was wrong, but yet I

6    was also unfortunate -- I was scared.  Things didn't

7    get too far because I separated myself from him.

8        He was my voice teacher.  I met him in my

9    church.  My mother would attend voice lessons with me

10   once or twice a week, and it was when she started

11   taking college classes and I was dropped off, I was

12   alone, that things had started.  And I don't know if I

13   remember everything but I, you know, what I do remember

14   was baby-sitting for him once and him pulling over to

15   the side of the road and kissing me.

16       And I remember him -- I continued, I baby-sat

17   for him that day.  I don't think -- and it was a

18   funeral and I was watching his son, and I remember him

19   paying me a lot of money that day, you know, to watch

20   -- which, you know, was strange and I knew, you know,

21   but again was afraid.

22       And I continued lessons.  I brought my sister

23   with me actually to sit on the couch because I was

24   afraid to be alone.  You know, he would then write

25   things in Italian in the books I was singing from

(no content)

21

1  because he knew I knew what they meant.

2       He then brought me to a place, there's an

3  opera society in our area, told me how wonderful I was

4  at singing and how great and -- it was on a car ride up

5  there.  My parents went with us the first time and the

6  second time he took me.  When he put his hand between

7  my legs and I pushed away and got as far over to the

8  right side of the car as I could, and I remember him

9  telling me that he thought I was more mature than that

10  and that I should have been able to handle that.  He

11  thought I could handle this.

12       It wasn't -- I might have -- I can't remember

13  how much longer -- it wasn't long, I remember lying to

14  my parents and telling them that I went to the lesson

15  because his lessons I was taking at one point were down

16  the street from my house where I still live today.  But

17  I would tell my parents that I went even though I

18  didn't.  And I remember telling Ed that I was sick and

19  that's why I couldn't go, but please, here, please

20  still cash the check so my parents didn't know that I,

21  you know, didn't go, you know.  I kind of had --

22  because I was afraid, I didn't know if what happened

23  was -- I knew it wasn't right.

24       I didn't know that there were more.  I'm glad

25  I knew enough to (inaudible), and it's hard because I

1    love music still to this day, it's a passion I have

2    that I have never been able to follow because my

3    confidence, my -- I don't really think I knew how much

4    it affected me until I read the story a few years ago

5    while I was at work and my stomach, you know, turned.

6         And I read the story of this poor little girl

7    that he had abused and knowing it was after his attempt

8    with me and why didn't I, you know, I should have been

9    strong enough to say something, you know. Maybe he

10   would have been exposed then and maybe this little girl

11   could have been spared. Or the other little girl who

12   was 4, maybe she could have been spared. But I think

13   that a lot of it was put in the back of my head and I

14   just kind of walked out. And still to this day I

15   struggle with my confidence and trust.

16        I have four children now, two girls and two

17   boys, and I'm afraid for them knowing that there are

18   monsters like him.

19        And I've met some amazing people here today

20   who I know have it a lot worse than I and I feel very

21   fortunate again in that sense. I'm not trying to take

22   the positive out of that but I'm -- he needs to be in

23   there for the rest of his life because he can't do this

24   to anybody else. I mean he deserves to sit really

25   alone and think about the hurt he's caused people and

A-477

23

1   their family members. And it is, you know, you have

2   your ups and downs, and I have days where I'm fine.

3   And I do think about it every day, and I look at my

4   children and pray that I can protect them. And I want

5   them to know that it's okay to say something and not to

6   be afraid, you know. And I speak to other people who

7   did say, you know, here today who did say something and

8   no one believed them. You know, and it's sad that

9   that's the way it is, but --

10          He's an evil man. He needs to -- ruined my

11  life in a lot of ways, and I hope this will, you know,

12  put closure to it for me and my family and for everyone

13  else involved.

14          THE COURT:  Thank you.

15          MRS. E:  Thank you.

16          MR. E:  I just -- I'd just like to say a

17  couple of things. I've never -- I never knew who he

18  was or anything like that, but I could see what effects

19  she had because of the thing that he attempted and

20  tried. You know, I've been with my wife for eleven

21  years and I had never heard her sing. She doesn't --

22  it has tremendously hurt her confidence. Luckily right

23  now she's starting to get back into playing the piano

24  because our daughters are interested in the same way,

25  but even the smallest little things, driving past the

1    house where he used to live, she just -- she kind of

2    gets sick or she, you know, she -- the smallest little

3    -- she'll hear a song and say, ugh, that reminds me of

4    Ed, whatever.  But with a disgust, you know.

5         So not only does it just, you know, the -- the

6    major (inaudible) with major things too.  Even the

7    smallest little contact with people I'm sure that it

8    rubs off in the smallest ways where they can't even

9    enjoy a song that they love and 10 or 12 years

10   (inaudible) because of what this guy did.

11        And that's all I have to say.

12        THE COURT:  Okay.  Thank you.

13    (Pause.)

14        MS. PATEL:  Your Honor, the next victim that's

15   going to speak is going to be identified as L.  We're

16   just going to go slowly.

17        MS. L:  Yeah.  He used to live with my mother

18   and was my mother's boyfriend.  I was 7 years old and

19   just remember bits and pieces of it, but one vision I

20   have is I remember seeming him naked in my bed and

21   showing me pornographic magazines and saying that we're

22   going to act out these pictures and I just (sobbing,

23   inaudible).  And he would always -- I had a hard time

24   dealing with this because I would tell my mother what

25   happened and she didn't believe me.  Later on what I

1    found out is that she knew what was going on.  I had a

2    hard time dealing with this, especially the fact that

3    nobody believed me.

4           And the first time I ever thought about

5    killing myself I was 8 years old.  I remember having a

6    chemistry set and (inaudible) little bottles that said

7    maybe you failed, pour them in my glass of water in

8    hopes that (inaudible).  I just remember staring at

9    that glass.

10          Throughout the years I would make believe that

11   everything never happened.  And it even got to the

12   point where my mother, you know, was very supportive

13   and she's like, oh, you know, all your friends go on

14   vacations, we'll send you to New York for a trip.  I

15   was a teenager and I was, you know, made to believe

16   that none of this ever happened.  And he never touched

17   me during that trip but he always had a lot of

18   pornographic materials and he exposed himself at that

19   time and I just remember saying I want to go home.

20          I remember at a later point my mother always

21   got money from him over the years and I remember her

22   saying that my sister is 11 years younger than me,

23   she's like, oh, maybe I should send him there, over to

24   Eddie, we'd give all this money but not really send

25   her.  I just had to deal with it.  Nobody's believed me

A-480

26

1 over the years.

2       It wasn't until I was diagnosed with being

3 bipolar and I ended up having a panic episode and I

4 confronted him and then he did confess to me and stuff,

5 this happened when I was 7, and that he was hoping I

6 would end up being like my mother. And after he said

7 that I remember a few days later I took a handful of

8 pills and tried to kill myself. And just dealing with

9 everything, I just couldn't handle it. And my ex-

10 husband at the time thought he was just a great guy,

11 and like, oh, he's like the father you should have had.

12 And then dealing with all this stuff and trying to deal

13 with what kind of mother let this happen (sobbing,

14 inaudible) and I couldn't handle anything anymore

15 knowing my stability was gone. I remember taking well

16 over 20 pills (inaudible).

17       The doctors (inaudible) and they were shocked

18 that I had no residual affects from that and I

19 (inaudible) just fine, no defects or anything. I've

20 been in therapy trying to deal with everything. I had

21 learned to label my mother as being toxic and that I

22 should just deal with the fact that she exposed me to

23 this predator, this monster that (inaudible) and really

24 had an impact on my life.

25       And then always when I thought I was getting

27

1  better -- and my mother always forgot my birthday and
2  my dad always did, but he always ended up calling and
3  reliving everything all over again.  So just when I
4  feel like I got a stable life (inaudible).
5      So right now I just need closure on this so I
6  can continue to (inaudible) my family, my husband who
7  believed me from the beginning and my son (inaudible)
8  and knowing that somebody like this is put away
9  forever.  I just, I just need this, this closure, and I
10  need to be strong for my son and try to protect him
11  from (inaudible) out there.
12      THE COURT:  Well, your presentation
13  illustrates the modus operandi which is disturbing and
14  is the pattern here of reaching the infants through
15  seducing immature vulnerable older women and then
16  preying on the offspring.  It's just a very sad story.
17      Thank you very much.
18  (Pause.)
19      MS. PATEL:  And we don't have any more
20  witnesses or victims to present.  I'm going to go ahead
21  and turn it over to Attorney Fein for closing
22  arguments.  I don't know if your Honor would like to
23  hear from Mr. Sensi before we do that or whether Mr.
24  Sensi will be permitted to speak at the end.
25      THE COURT:  I think we'll let him speak at the

1    end.

2              MR. FEIN:  Thank you, your Honor.

3              It has been my privilege to serve as co-

4    counsel to Ms. Patel on this and other child

5    exploitation cases.

6              THE COURT:  She's a very, very experienced

7    prosecutor.

8              MR. FEIN:  And very dedicated.

9              THE COURT:  And very fair.  That's very

10   important.

11             MR. FEIN:  When we look and your Honor looks

12   at the 3553 factors in determining the correct

13   sentence, and you consider the nature and circumstances

14   of the offense and the history and characteristics of

15   the Defendant, and the need for the sentence imposed to

16   reflect the seriousness of the offense to promote

17   respect for the law and to provide just punishment for

18   the offense, and to afford adequate deterrence to

19   criminal conduct and to protect the public from further

20   crimes of the Defendant, based on the entire record

21   before you it is the view of the United States

22   Attorney's Office that the only appropriate sentence is

23   85 years as called for by the guidelines and by the

24   statutory maximum.

25             THE COURT:  And as supported also by Mr.

A-483

29

1    Lopez's reaction as Probation officer.

2            MR. FEIN:  As your Honor has seen and heard

3    and knows from the charges toward the Defendant pled

4    guilty, you have before you a Defendant with a more

5    than 25-year history of abuse involving many minor

6    victims, some of which you heard from today.

7            In the case and the counts the Defendant pled

8    guilty to, your Honor, the abuse and the video

9    recordings that captured that abuse are absolutely

10   horrendous and cruel.  As one of the unfortunate

11   individuals who has watched just minutes of those

12   videotapes, I personally can attest to the scarring

13   impact of seeing the horrendous things that the

14   Defendant engaged in and caused others to engage in.

15           THE COURT:  I've been on the bench over 30

16   years and I've never seen anything like that before in

17   my experience.

18           MS. FEIN:  As Ms. Patel pointed out, your

19   Honor and I have just watched minutes of hours of such

20   videotapes.  But the pain that any viewer of the

21   videotapes felt is of course nothing compared to what

22   the victims felt and continue to feel.

23           As you know, the victims live with deep pain

24   and permanent and devastating impact from this abuse.

25   The defendant preyed on vulnerable women as your Honor

1   has said of different ages, including from minor victim

2   to a very young woman with a young child. And he

3   manipulated them and got them to surrender their young

4   daughters to him.

5           THE COURT: Because apparently they -- that's

6   the way they thought they could hang onto him and keep

7   him in their lives. So they sacrifice the children to

8   accomplish their own aims.

9           MR. FEIN: In doing so the Defendant subverted

10  the natural bond between mother and daughter and the

11  trusting relationship and one of the most important

12  relationships in someone's life. And the Defendant

13  subverted that repeatedly.

14          He engaged in this horrific behavior not only

15  here in the District of Connecticut, but also in an

16  impoverished community in Nicaragua where Assistant

17  United States Attorney Patel and Agent Catobi traveled

18  hours outside of any city to investigate and document

19  the case, and that formed the basis for Counts Three

20  and Four of the indictment involving an 18 or 19-year-

21  old and her 4-year-old daughter who was abused. And

22  this was done tragically under the guise by the

23  Defendant of a charitable mission to Nicaragua.

24          The Defendant never fully acknowledged his

25  abuse, accepted responsibility or showed any genuine

A-485

31

1   remorse for his actions, instead engaging in a three-
2   year course of delay of the proceedings for his trial,
3   then his plea, and continuing right up including last
4   week on the eve of sentencing.  Your Honor has been
5   extremely patient through all of this, through all of
6   the many counsel that the Defendant has gone through in
7   this proceeding and that brings us to today.

8          It is our view that no type of penalty can be
9   structured to protect the most vulnerable in society
10  from this Defendant other than the serious period of
11  incarceration that is called for by the sentencing
12  guidelines.  The Defendant showed no mercy to his many
13  victims and is entitled to no such mercy from the
14  Court.  Thank you.

15         THE COURT:  You know, Mr. Harmon has done a
16  very good job here professionally in his responsible
17  role to represent the Defendant properly, but Mr.
18  Harmon did something here which has really affected me
19  a great deal.  He submitted two letters to me and it
20  makes me realize we have to add two more victims to
21  this list that the Government has.  For some reason the
22  wife and the son have stood by him through this and
23  wrote me a couple of letters which are amazing, I mean
24  just amazing.  And they are real victims here because
25  they continue to believe that this man is a good role

32

1     model.  I regard him as everybody else has said so far

2     as probably the most evil, the most anti-society goals

3     person I have ever had to deal with, and I've dealt

4     with Charter Oaks, Hell's Angels, drug people, people

5     who were regarded as the dregs of our society, and they

6     did a lot of damage but they didn't do the damage that

7     this Defendant has done and I feel very, very saddened

8     by the misplaced affection and loyalty shown by the

9     wife and the son who are going to suffer here because

10    they are going to see, go to prison to visit him and

11    will be the only way they'll have contact with him.

12         So those letters were indicative of another

13    phase of victims in the case that you don't normally

14    think about.

15         All right, Mr. Harmon.  I guess we're ready

16    for Mr. Sensi.

17         MR. HARMON:  Yes, your Honor, but before he

18    speaks I just wanted to reiterate to the Court as we

19    said previously that although these actions are of a

20    heinous nature, there's been other actions like this

21    before the Court that received severed sentences of

22    like I indicated 6 years for the mother and 20 years

23    for someone who abused 15 children.  I think something

24    along those lines would be appropriate, your Honor.

25         MR. FEIN:  If I could, your Honor, just on

33

1  that point, just to point out to the Court and make

2  part of the record in a case that Ms. Patel and I

3  prosecuted, United States v. Oni (phonetic) in the

4  District Court here in Bridgeport involving the

5  production and distribution of child pornography just

6  to give an example of a sentence quite different than

7  what counsel has referred to.

8        Judge Hall sentenced Mr. Oni to 45 years

9  imprisonment for the sexual abuse of a young girl that

10 was charged in that case, and I think any fair

11 comparison of the two cases supports the fact that the

12 guidelines call for a much more severe sentence than

13 even the very severe sentence in that case.  They

14 support the more severe sentence here.

15       THE COURT:  Well, one of the goals of 3553 is

16 some sort of uniformity, but that has to be varied by

17 the individual circumstances that the sentencing judge

18 confronts and we all are aware of that.  Thank you very

19 much.

20       MR. HARMON:  Thank you, your Honor.

21       THE COURT:  Thank you, Mr. Harmon.

22       All right, Mr. Sensi, you've got your turn at

23 bat.

24    (Pause.)

25       MR. HARMON:  You can stay right here.  There's

A-488

34

1   a mic right here.  Sorry.

2          THE COURT:  Yes, stay seated because then you

3   speak into the mic.

4          MR. SENSI:  I thought I had to go up there.

5          Your Honor -- is it working?

6          THE COURT:  Yes.

7          MR. SENSI:  Okay.  I don't know what to

8   address first.  You've made mention to the two letters

9   that were sent to you by my son and my wife, and you

10  seem to be incredulous as to how they could stand by

11  me.  These are people obviously that I've known for --

12  in my wife's case over 25 years and my son is 18 years

13  old.  I feel they should know be a tad better than the

14  witnesses that came before today to basically destroy

15  my life and destroy the life at the same time of my

16  son.

17         And I would like to mention to the Court that

18  my son continues to stay in contact with minor victim

19  one by Facebook.  They have a friendly relationship and

20  they've shared the anguish that they've gone through

21  these past three years or so, 41 months, where I have

22  been trying with all my effort to show the truth of

23  what happened when the detectives came to my house.

24  And I'm in utter shock that you spoke to Judge Metzger

25  today or yesterday and claim that she signed, and

1    obviously we need to believe her, that she signed the

2    inventory list.

3            When we had my suppression hearing I realized

4    this isn't the time to continue to battle my case, but

5    it does affect not only me but also Laura Culver, minor

6    victim one, and obviously my family.

7            The alleged evidence was taken illegally from

8    my house in violation of every Fourth Amendment right

9    that we are given by the Constitution, your Honor.

10   Even at the evidentiary hearing your Honor did not

11   believe that I gave consent to take the bag, the locked

12   bag which contained this evidence.  You could not side

13   with the Government, so you included it, the locked bag

14   in the language of the search warrant.  And your Honor,

15   with all due respect, I've been looking for the

16   language in the search warrant that says that a

17   detective can take a locked bag without consent.

18           And I'd also like to point out that the

19   detective's own words in a deposition that he gave in

20   November of 2008 when asked by at that time my

21   attorney, what happened when you were shown the black

22   bag.  He said take it, it's just porn.  So at this

23   point I said okay, so we included that in the inventory

24   list, but we did not look at the contents of it until

25   we got back to the sheriff's department.  So the

1    inventory list, I think I saw this list right there, it

2    just says black canvas bag.  It doesn't have the

3    contents because we didn't know what was in it.

4         He subsequently changed his story to show that

5    I gave consent, which would be the only reason and the

6    only way that he could take the bag.

7         I will continue to fight.  I understand I have

8    an appeal in place of the evidentiary hearing.  It may

9    take years before it is ever heard.  I've been

10   described here in a way that I'm not quite sure who

11   these people are speaking of, particularly the

12   prosecutors.

13        Your Honor, I wasn't anticipating to have a

14   sentence today.  I truly believed in the rule of law

15   and the Constitution and the truth that I would be

16   granted the motion to continue my sentencing, with the

17   hope that I would have an evidentiary hearing in

18   Florida where we could show of the criminal misconduct

19   that the detectives engaged in.  But that will not be

20   possible, the first thing that they will do when

21   judgment is given is dismiss the charges in Florida so

22   I will have no legal recourse to prove my innocence.

23   And again, it's not just mine, but it is Laura

24   Culver's.  And perhaps she's happy with 8 years.  She

25   should never have spent even one day.

A-491

37

1      And while our mutually reprehensible and

2  misguided behavior brought us here, by rule of law none

3  of that evidence should have ever, ever been seen.  And

4  it's called production of child pornography.

5      In all of these years of investigating they

6  haven't been able -- the Government has yet to find

7  anyone that even knew these tapes existed or were

8  viewed by anyone, or distributed by anyone, but I have

9  been portrayed as a kingpin, an international kingpin

10  of child pornography.

11      I didn't ask my countless friends, your Honor,

12  or relatives, former business associates and religious

13  ministers from around the would to send in character

14  references or to even appear here.  Again, I wasn't

15  expecting to have a sentencing.

16      I did not participate with the PSI, having

17  helped countless Hispanic inmates in my unit for the

18  past three years and knowing full well how PSIs work

19  and sentencing guidelines work, a reduction of two or

20  three points off of what the Government intends to give

21  me would reduce it from 85 years to 80 I guess,

22  something of this sort.

23      I don't have any of those character references

24  to send the letters except for the two people closest

25  to me and that have known me and know who I am for all

38

these years.  And that's my wife and my son.  I didn't
have my mother's Hispanic caretakers come here to
testify how I selflessly took the sole responsibility
of my widowed mother's care the last seven years of her
life so that she wouldn't be placed in an assisted
living facility.  Rather I tried to give back her
unconditional love and care that she always gave to her
children and grandchildren, and gave her the dignity to
pass away at home just six weeks prior to my arrest.

        I'm afraid, your Honor, I don't know the
person that was described in the Government's
sentencing memorandum.

        I've made some notes about the two witnesses
that have stepped up.  I'm afraid I can't address the
adoptive parents of S, a minor victim, and I certainly
am most impressed that they've taken care of her when
she was orphaned because of the criminal misconduct on
the part of the detectives in Florida.  That's why she
was orphaned.

        Erin was -- E was a voice student of mine as
she testified from the time she was 18 and she
developed a crush on me, giving me her high school
pictures and love notes.  None of this came out here.
She continued taking voice lessons with me up until
perhaps 2006 or 5, after she was married, after having

39

1    children, continuing to come to my house for voice
2    lessons.  In never met her husband oddly, and she
3    claimed that he was a jealous type.  And perhaps all of
4    this may have something to do with that.  By I never,
5    never acted improper or sexually or otherwise with her.
6         I've known L also for over 30 years.  She
7    fails to mention that I left Chicago when she was in
8    first grade, which makes here about 6 I suppose, and
9    none of the horrific acts that she claims to have
10   happened occurred, but what is a fact is that
11   immediately after I left her mother married a neighbor,
12   her stepfather.  And I don't know if he was arrested,
13   but certainly he was accused of abusing L's half
14   sister, repeatedly over and over again to the point
15   where she left this man, this horrific man, after
16   having three children with him.  That is L's
17   stepfather.
18        And yes, she did state how I continued to help
19   her whenever I could and her ex-husband when she was
20   fired from her job because of a bipolar incident as a
21   nurse.  I put her in touch with attorneys to file a
22   civil suit against the hospital.  And yes, I did call
23   her on her birthdays because I did care for her and
24   loved her as a platonic relationship.
25        But here too, I was told after she married her

40

1   second husband, no longer be in touch with her, she had
2   a very jealous husband.
3            These are the many victims that supposedly
4   have come forth today describing me as this monster.
5            God knows who I am, your Honor.  He is the
6   ultimate judge, and I have certainly found God.  I have
7   found what the Holy Spirit truly is, and I thought he
8   would never abandon me and I really don't think he has
9   today either.  I will continue to fight this case, your
10  Honor.  I'm sorry, I've written many, many letters of
11  Hispanic inmates to judges to help them to give their
12  apology to the Government, to the prosecutors, to the
13  Court that they have a contrite heart, they are
14  repentful, and your Honor I am most repentful to what
15  has happened as a result of this injustice through the
16  investigation of Brian Broughton (phonetic).
17           I haven't even touched upon the reason I was
18  arrested, which was possession of supposed child
19  pornography on the computer.  77 counts I've read,
20  possession of child pornography, 10 or more images.  No
21  one has been able to explain to me how one can be
22  arrested on multiple counts that read 10 or more of
23  anything.  More is infinity.  But this is the culture
24  in Florida of law enforcement, your Honor.
25           He changed the complete complaint affidavit

A-495

41

1    after he realized that he may have a federal case.
2    There is no mention of a black box -- a black bag in
3    the first affidavit.  He made a supplemental narrative
4    five days later after he had taken my copy of the
5    inventory list from my boss, whom he met three days
6    later in my office when he confiscated my office
7    computer.  So now he had the inventory list, and he
8    could come up with this concoction, this lie that I
9    gave consent and told him the contents.

10           Your Honor, that has resulted in what we have
11   here.  For E and L that they have suffered so much from
12   obviously perhaps dysfunctional upbringing, I can only
13   apologize if I had in any way even indirectly something
14   to do with that.  I did not prey on women.  I did not
15   prey on children.  And I do apologize to your Honor if
16   I'm still trying to fight my case but my life is on the
17   line, and it's not so much my life but the life of my
18   son and the words that he wrote to your Honor are not
19   misguided, they are not coerced.  No one asked him to
20   write this, neither did my wife who knows me, and knows
21   the people that are here with the exception of L.

22           So many people in Florida that know me and
23   could attest to my character; how I accompanied many
24   children on the piano for their music recitals and for
25   competitions, including my son.  No other victims.

42

1    There are no other victims.  The only victim here is

2    perhaps the justice system at least as far as Florida

3    is concerned, your Honor.  And I regret to say that.  I

4    know that your Honor feels obviously differently.

5             MS. PATEL:  Your Honor, we'd briefly like to

6    respond.

7             MR. SENSI:  I guess I can't say anything more.

8             THE COURT:  I don't think you're going to have

9    to.

10            MR. SENSI:  God bless you, your Honor.

11            THE COURT:  I'll respond before you have to

12   respond.

13            I didn't think the record would end up being

14   as clear as it is as a result of that.  Everything Mr.

15   Sensi said supports the conclusion which Ray Lopez

16   reached, which the Government reached and which I have

17   reached, that he is just incapable of accepting any

18   responsibility for his conduct.  It's all due to

19   technicalities and misjustice in Florida and he is the

20   victim.  There aren't any other victims except Edgardo

21   Sensi here.  And he regards himself --

22            MR. SENSI:  I'm sorry, your Honor, but I did

23   not state that.  I state there are many victims here

24   and I did accept responsibility for the mutually

25   reprehensible behavior.  I do apologize.

A-497

43

1       THE COURT:  Of mutual reprehensible behavior

2   of the Florida investigators.  Yeah, you accept

3   responsibility --

4       MS. SENSI:  No.  I'm sorry, your Honor.

5       THE COURT:  -- for somebody else.

6       MS. SENSI:  I'm sorry if I -- you

7   misunderstood me.  No.

8       THE COURT:  I sure do.

9       MS. SENSI:  Mutually reprehensible was Laura

10  Culver and mine.  I apologize, your Honor.  That's what

11  I referred to.  That could be the only reference.

12      THE COURT:  Well, I was going to add and I'll

13  add now and I'll let Ms. Patel say whatever she wants

14  to say, but everything Mr. Sensi said in talking about

15  his battling to the end to prove I guess he didn't do

16  any of these heinous acts is refuted as he's referred

17  to Culver and to S.  The tapes.  I mean the film is

18  just there and you cannot ignore that film and I hope

19  that the Second Circuit will have an opportunity to

20  look at that film when they get this appeal.

21      Go ahead, Ms. Patel.

22      MS. PATEL:  Now, I think your Honor has

23  indicated in part what we want to say, that it is

24  breathtakingly appalling that this man can stand here

25  or sit here in Court today and now seek to blame the

A-498

44

```
1   very victims for destroying his life and his

2   relationship which his child when all he has done is

3   destroyed the lives of so many people.

4           MR. SENSI:  I feel like I'm (inaudible).  I

5   never said that, your Honor.  I'm sorry.  But when did

6   I state that?

7           THE COURT:  Well, the record, the record will

8   speak for itself.  You made the record very, very clear

9   for us.

10          MR. SENSI:  I did, correct, your Honor.

11          THE COURT:  All right.

12          MR. SENSI:  But I did not blame any victims.

13          THE COURT:  No, you didn't blame the victims,

14  you blamed the Government's judicial process and --

15          MR. SENSI:  In Florida, your Honor.  Yes, with

16  all due respect --

17          THE COURT:  He ignores the fact that once they

18  got all this information --

19          MR. SENSI:  I had shown where he committed

20  perjury here, your Honor.

21          THE ECRO:  You can't talk at the same time.

22          MR. SENSI:  Oh, excuse me, I'm sorry.

23          THE COURT:  Once you got all this information

24  that it came out in the tapes, in the tapes.

25          All right.  Anything else anybody wants to
```

45

1    say?

2            MS. PATEL:  Just very quickly, your Honor.

3    What he's unwilling to take accountability for are the

4    two victims that we don't have videotapes for.  We do,

5    however, do have a letter where he simply admitted all

6    of the abuse to L.  It's been provided as Government's

7    Exhibit 2.  And for Mr. Sensi's sake, if he's wondering

8    who it is that the Government is talking about in terms

9    of the cruel, sadistic human being that has abused

10   children for 25 years, he need only look in the mirror.

11           It is very clear based on this record that the

12   only penalty that is just and fair is one where the

13   balance of his natural life will be spent in

14   incarceration.

15           But I would just say for the victims who have

16   come today that on behalf of the United States

17   Attorney's Office, we so support and note the

18   incredible amount of strength that it has taken for

19   them to come today, and I hope for their sake that they

20   are able to take some justice away today.

21           THE COURT:  Well, the outstanding people,

22   there are a lot of outstanding people in the courtroom,

23   but the foster parents are to my mind just absolute

24   saints.  And just very fortunate that we have them in

25   the picture.

A-500

46

1        Well, I'm ready for sentencing.  Yesterday was

2    one of the most difficult sentencings that I've every

3    done.  Today is one of the easiest I've ever done and

4    the record is very, very clear.

5        So I'm going to sentence him to the custody of

6    the Attorney General or his representative and we'll

7    talk with his counsel, Mr. Harmon, about various

8    details of this, but I sentence consecutively on Counts

9    One, Two, Three and Four.

10        Five years on Count One.

11        Twenty years on Count Two.

12        Thirty years on Count Three.

13        Thirty years on Count Four, for a total of 85

14    years.

15        The term of supervised release of three years

16    will probably not be an important situation.  Actually

17    I think what Mr. Lopez wants me to do is sentence him

18    to a life term of supervised release.

19        MR. LOPEZ:  That's correct, your Honor.

20    That's the statutory -- the statute provides for a term

21    of life on each count, and the guidelines also

22    recommend a term of life.

23        THE COURT:  Life.  Okay.  So it's going to be

24    academic I think, but we'll make it -- term of

25    supervised release concurrent on all the counts for

47

1   life.

2          There will be no fine imposed.  He can't

3   afford to pay a fine.  He submitted a financial

4   affidavit.  And restitution is not applicable here.

5   There's a mandatory special assessment of $400, has to

6   be paid as of today.

7          There's no point in my adding anything to what

8   everybody has said here because it has been said so

9   well said that all of the points that Mr. Fein brought

10  out are what I was planning to bring out on 3553, and I

11  concur with everything he said about the importance of

12  the various elements of 3553, which has always been my

13  Bible.  I think the sentencing guidelines which happily

14  are no long binding upon us, but are a good example of

15  trying to carry out the goals of 3553 and that's what I

16  use.

17         Now, we'll go into a lot of things here that I

18  don't think are ever to come into play but I really

19  have to go through them anyway.  The standard

20  conditions of supervised release will apply if it ever

21  takes effect.

22         The Defendant shall not commit another

23  federal, state or local offense.

24         The Defendant shall not unlawfully possess a

25  controlled substance.  The Defendant is going to

48

1   refrain of any unlawful use of a controlled substance

2   and submit to one drug test within 15 days of release

3   on supervised release, and at least two periodic drug

4   tests thereafter for use of controlled substance.

5   That's the mandatory requirement that we have on drugs

6   is considered applicable.

7          The assessment, as I noted, has to be paid of

8   $400.

9          Now, there are certain things that apply here

10  which the Bureau of Prisons can worry about I suppose,

11  but this is what occurs when you get into the term of

12  supervised release.  He must report any address where

13  he's going to reside after the Bureau of Prisons and

14  any subsequent change of residence to the Probation

15  officer.  The Probation officer responsible for him

16  will of course be a very important figure in his life.

17         He must register as a sex offender in any

18  state that requires that where he resides or is

19  employed and carries on a vocation.  He might have to

20  cooperate with collection of a DNA sample.

21         There are special conditions because of the

22  nature of this.  I went through them yesterday with Ms.

23  Culver and they're applicable here also.

24         Avoid any contact with victims in the subject

25  offenses of conviction.  I was asked to modify that

49

1   with Mrs. Culver and I am certainly willing to note
2   that the Bureau of Prisons will govern as the Bureau of
3   Prisons will govern here all visitation to Defendant
4   and the Bureau of Prisons.  But I did recommend that
5   there be contact between S and Culver if that is
6   appropriate under the circumstances.
7           He must participate in sex offender treatment
8   approved by Probation and abide by any policies or
9   procedures of the program which may include polygraph
10  testing.
11          He's not to use a computer, internet cable
12  device or any other similar electronic device that
13  comes along down the pike here as technology improves
14  in this area constantly.
15          It reminds me of when I used to buy movie
16  projectors and they improved every year so I had to buy
17  a new projector every year, and now it's even worse.
18  You have to buy a new iPod or something that comes
19  along to replace the iPod in the next month.  But he is
20  not to use any of those to promote sexual relations
21  with minors.
22          He shall consent to the use of any computer
23  program which will monitor suspect computer use on any
24  computer owned or controlled by him.  The programs used
25  will be designed to identify for probation only the

1  viewing, downloading, uploading, transmitting or

2  otherwise using any images or content of a sexual

3  nature on suspect computer use.  Suspect computer use

4  shall be identified by the installed program and the

5  Probation Office through the screening of Defendant's

6  computer usage for certain key words, phrases and

7  images.  He may have to pay all or portion of costs

8  associated with all of this, but that again depends on

9  Probation, and that will not apply during his Bureau of

10 Prisons term.

11        He shall not associate with children under the

12 age of 18 except in the presence of a responsible adult

13 aware of the nature of his background and current

14 offense and has been approved by Probation.

15        Submit his person, residence, office or

16 vehicle to any search conducted by a United States

17 Probation officer at a reasonable time and a reasonable

18 manner based on reasonable suspicion of contraband or

19 evidence for a violation of a condition of release.

20 Failure to submit to a search may be grounds for

21 revocation and he would have to serve an additional

22 prison sentence.

23        He shall warn any other residents of premises

24 that they may be subject to search.

25        He shall participate in a program approved by

1    Probation for mental health treatment.  I'm going to

2    say the same thing to the Bureau of Prisons.  I hope

3    that wherever he ends up that they will have a program

4    of mental health and especially guidance on this whole

5    question of the predatory nature of dealing with

6    minors.

7            Provide the Probation officers he has with

8    access to requests for financial information that may

9    apply down the road also.

10           He may not possess a firearm or any other

11   dangerous weapon.

12           He must notify under the terms of the

13   Probation officer third parties or any (inaudible) that

14   may be occasioned by his criminal record or personal

15   history or characteristics, and permit the Probation

16   officer to notify such people.

17           He shall not loiter around playgrounds,

18   schools, arcades or any other places where children

19   under the age of 18 congregate.

20           He shall not associate with or have contact

21   with convicted sex offenders and those considered

22   inappropriate by probation because of some connection

23   to sexual abuse of minors or sexually explicit

24   materials involving minors, unless it's part of an

25   approved counseling group which Probation would review.

A-506

52

1    He is prevented from holding any position of

2    authority or guidance over children or youth groups

3    involving any individuals under the age of 18, and he's

4    prohibited from accessing or possessing sexually

5    explicit materials involving minors.

6         Now, having said all that there are two more

7    things I guess to say, and one is that I hope the

8    Bureau of Prisons will also actively participate in

9    counseling for him.

10        Now, let's get to a couple of other things.

11   Mr. Harmon, where do you want him incarcerated?

12        MS. HARMON:  I guess I would ask somewhere on

13   the East Coast if possible, your Honor.  I don't know

14   if the Court makes recommendations regarding -- or

15   maybe the Bureau of Prisons actually handles similar

16   type Defendants to prevent any type of retaliation

17   within the prison system itself, your Honor.

18        THE COURT:  All right, you've said it better

19   than I could and I'll adopt your comments in my

20   recommendation to the Bureau of Prisons.

21        Now, you have a right of appeal of this, and

22   you know you have the right of appeal because there is

23   going to be an appeal and your counsel is aware of

24   this, must be taken within 14 days of today to the

25   Second Circuit.

A-507

53

1         What have I forgotten?

2         MS. PATEL:  Your Honor, just two things really

3    quickly.  One is that for the purposes of restitution

4    under the Justice for All Act, minor victim one is

5    entitled to restitution.  I know that our victim

6    service structure here will again speak to the family.

7    If they do decide to put an application in they know

8    they have 90 days from today to be able to do that.

9         And then obviously whether or not Mr. Harmon

10   continues to stay as Mr. Sensi's attorney, he should

11   know that he must file his appeal within 14 days with

12   or without his lawyer, but he certainly has a right to

13   counsel through the appellate process as well.

14        THE COURT:  Yeah, you're entitled to counsel

15   at all stages, Mr. Sensi, if Mr. Harmon for any reason

16   cannot continue.

17        The restitution order does not exist at this

18   point so keep in mind what Ms. Patel has just said to

19   all of you who intend to file such a petition.

20        All right.  I want to thank everybody involved

21   in this, including Mr. Harmon who had a difficult job,

22   but the Government did a superb job here and we all

23   ought to thank Mr. Lopez and we certainly should thank

24   the people who showed up here today, especially those

25   foster parents.

A-508

54

1          Thank you very much.

2      (Proceedings concluded at 11:44 a.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A-509

55

C E R T I F I C A T E

I certify that the foregoing is a correct transcript
from the electronic sound recording of the proceedings
in the above-entitled matter.


/s/_____          June 23, 2012
STEPHEN C. BOWLES

A-510

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT
AT BRIDGEPORT

UNITED STATES OF AMERICA            :

v.                                   :

                                     :          CRIM. NO:  3:08CR00253 (WWE)

EDGARDO SENSI

                    Defendant        :

                                     :          February 6, 2012

NOTICE OF APPEAL

The defendant Edgardo Sensi,  through his counsel

hereby asserts his right to appeal in the above referenced matter.

This case was disposed of on January 31, 2012.


                              Respectfully submitted,

                              Edgardo Sensi



                    By_____
                    Gerald L. Harmon Esq. (ct13523)
                    290 Pratt Street
                    Meriden, CT 06450
                    (203) 639-1956

A-511

# CERTIFICATION

I hereby certify that copies of the foregoing Notice of Appeal were electronically distributed to the following parties of record on February 6, 2012 as follows:

Attorney Krishna Patel
Assistant United States Attorney
915 Lafayette Blvd
Bridgeport, Ct 06604

District Court of Connecticut
Criminal Clerk's Office
915 Lafayette Boulevard
Bridgeport, Ct 06604

U.S. Probation Office
Senior Officer Raymond Lopez
915 Lafayette Blvd
Bridgeport, Ct 06604

Gerald L. Harmon, Esq.