# 12-565

*To Be Argued By:*
KRISHNA R. PATEL

---

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

## Docket No. 12-565

––––

UNITED STATES OF AMERICA,

*Appellee,*

-vs-

EDGARDO SENSI,

*Defendant-Appellant.*

––––

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF CONNECTICUT

## BRIEF FOR THE UNITED STATES OF AMERICA

DAVID B. FEIN
*United States Attorney*
*District of Connecticut*

KRISHNA R. PATEL
*Assistant United States Attorney*
ROBERT M. SPECTOR
*Assistant United States Attorney (of counsel)*

# **Table of Contents**

Table of Authorities .......................................... iv

Statement of Jurisdiction ................................. xi

Statement of Issues Presented for Review ..... xii

Preliminary Statement......................................1

Statement of the Case  ......................................3

Statement of Facts and Proceedings
Relevant to this Appeal ......................................4

A. Offense conduct .............................................4

B. Search warrant..............................................6

C. The search...................................................9

D. Motion to suppress evidence....................... 11

E. The plea hearing.......................................... 14

F. The sentencing hearing............................... 18

Summary of Argument ................................... 28

Argument.......................................................... 30

I.  The district court properly denied
    Sensi's motion to suppress evidence
    obtained during a lawful search of
    his home ......................................................30

A. Relevant facts..........................................30

B. Governing law and standard of
   review .................................................30

C. Discussion ..............................................34

II. This Court should dismiss the rest of the
    appeal because Sensi waived his right to
    appeal any issue other than the denial of
    the motion to suppress ............................43

A. Relevant facts..........................................43

B. Governing law and standard of
   review .................................................43

C. Discussion .............................................45

III. Even if this court allows Sensi to appeal his
     sentence, the district court's sentence was
     substantively reasonable...........................48

A. Relevant facts..........................................48

B. Governing law and standard of
   review .................................................48

C. Discussion ..............................................51

ii

Conclusion ...................................................... 59

Certification per Fed. R. App. P. 32(a)(7)(C)

iii

# Table of Authorities

Pursuant to "Blue Book" rule 10.7, the Government's citation of cases does not include "certiorari denied" dispositions that are more than two years old.

## Cases

*Florida v. Jimeno,*
    500 U.S. 248 (1991)........................................ 33

*Gall v. United States,*
    552 U.S. 38 (2007).................................... 48, 49

*Hessel v. O'Hearn,*
    977 F.2d 299 (7th Cir. 1992)............. 33, 34, 36

*Horton v. California,*
    496 U.S. 128 (1990)....................................... 37

*Illinois v. Gates,*
    462 U.S. 213 (1983)....................................... 31

*Maryland v. Garrison,*
    480 U.S. 79 (1987)......................................... 31

*Rita v. United States,*
    551 U.S. 338 (2007)................................. 49, 58

iv

*Setser v. United States*,
132 S. Ct. 1463 (2012)..................................49

*United States v. Beasley*,
688 F.3d 523 (8th Cir. 2012)........................53

*United States v. Betcher*,
534 F.3d 820 (8th Cir. 2008)........................54

*United States v. Bonilla*,
618 F.3d 102 (2d Cir. 2010), *cert. denied*,
131 S. Ct. 1698 (U.S. 2011) ........................49

*United States v. Booker*,
543 U.S. 220 (2005)...............................48, 49

*United States v. Brunetti*,
376 F.3d 93 (2d Cir. 2004) .....................46, 47

*United States v. Buissereth*,
638 F.3d 114 (2d Cir. 2011) ........................44

*United States v. Cavera*,
550 F.3d 180 (2d Cir. 2008)
(en banc) ................................................48, 49

*United States v. Clark*,
638 F.3d 89 (2d Cir. 2011) ..........................30

*United States v. Crosby*,
397 F.3d 103 (2d Cir. 2005) ........................51

v

*United States v. David,*
681 F.3d 45 (2d Cir. 2012) ............................ 49

*United States v. Djelevic,*
161 F.3d 104 (2d Cir. 1998)
(per curiam) ................................................. 43

*United States v. Dorvee,*
616 F.3d 174 (2d Cir. 2010) .......................... 51

*United States v. Dzialak,*
441 F.2d 212 (2d Cir. 1971) .................... 39, 40

*United States v. Fernandez,*
443 F.3d 19 (2d Cir. 2006) ...................... 49, 50

*United States v. Gomez-Perez,*
215 F.3d 315 (2d Cir. 2000) ................... 44, 45

*United States v. Huffstatler,*
561 F.3d 694 (7th Cir. 2009)........................ 53

*United States v. Irey,*
612 F.3d 1160 (11th Cir. 2010).................... 54

*United States v. Johns,*
469 U.S. 478 (1985)...................................... 33

*United States v. Johnson,*
451 F.3d 1239 (11th Cir. 2006).................... 54

vi

*United States v. Jones,*
  531 F.3d 163 (2d Cir. 2008) .......................... 51

*United States v. Kapordelis,*
  569 F.3d 1291 (11th Cir. 2009).................... 53

*United States v. Kyles,*
  40 F.3d 519 (2d Cir. 1994) ..................... 31, 36

*United States v. Marti,*
  421 F.2d 1263 (2d Cir. 1970) ....................... 38

*United States v. Martin,*
  157 F.3d 46 (2d Cir. 1998) ........................... 37

*United States. v. Monsalve,*
  388 F.3d 71 (2d Cir. 2004)
  (per curiam) ................................................... 43

*United States v. Morgan,*
  386 F.3d 376 (2d Cir. 2004),
  *aff'd on reconsideration,*
  406 F.3d 135 (2d Cir. 2005) .......................... 44

*United States v. Oehne,*
  698 F.3d 119 (2d Cir. 2012)
  (per curiam) ................................................... 52

*United States v. Paull,*
  551 F.3d 515 (6th Cir. 2009).................. 31, 36

*United States v. Preacely*,
 628 F.3d 72 (2d Cir. 2010) ........................... 48

*United States v. Pugh*,
 515 F.3d 1179 (11th Cir. 2008).................... 54

*United States v. Raplinger*,
 555 F.3d 687 (8th Cir. 2009)........................ 53

*United States v. Rattoballi*,
 452 F.3d 127 (2d Cir. 2006) ......................... 50

*United States  v. Rigas*,
 583 F.3d 108 (2d Cir. 2009) ................... 50, 51

*United States v. Riggi*,
 649 F.3d 143 (2d Cir. 2011) ......................... 45

*United States v. Riley*,
 906 F.2d 841 (2d Cir. 1990) ................... 33, 38

*United States v. Rodriguez*,
 356 F.3d 254 (2d Cir. 2004) ......................... 34

*United States v. Ross*,
 456 U.S. 798 (1982).................... 32, 33, 34, 35

*United States v. Salcido-Contreras*,
 990 F.2d 51 (2d Cir. 1993) .................... 43, 47

*United States v. Sarras*,
 575 F.3d 1191 (11th Cir. 2009).................... 52

viii

*United States v. Savoca,*
    596 F.3d 154 (2d Cir. 2010) .......................... 50

*United States v. Terry,*
    702 F.2d 299 (2d Cir. 1983) ................... 32, 35

*United States v. Thomas,*
    628 F.3d 64 (2d Cir. 2010) ........................... 48

*United States v. Travisano,*
    724 F.2d 341 (2d Cir. 1983) ................... 30, 31

*United States v. Ventresca,*
    380 U.S. 102 (1965) ....................................... 31

*United States v. Voustianiouk,*
    685 F.3d 206 (2d Cir. 2012) ................... 39, 40

*United States v. Vowell,*
    516 F.3d 503 (6th Cir. 2008) ........................ 53

*United States v. Wagner-Dano,*
    679 F.3d 83 (2d Cir. 2012) ........................... 49

*United States v. Whitten,*
    610 F.3d 168 (2d Cir. 2010) ......................... 34

*United States v. Woltmann,*
    610 F.3d 37 (2d Cir. 2010) ........................... 45

ix

*Wyoming v. Houghton*,
　526 U.S. 295 (1999) ....................................... 33

## Statutes

18 U.S.C. § 371 ..................................................... 3

18 U.S.C. § 2251 ...................................... 3, 53, 54

18 U.S.C. § 2252 .......................................... 53, 54

18 U.S.C. § 2423 ................................................. 3

18 U.S.C. § 3231 ............................................... xi

18 U.S.C. § 3553 ......................................... *passim*

28 U.S.C. § 1291 ............................................... xi

Fed. R. App. P. 4 .............................................. xi

Fed. R. Crim. P. 11 .......................................... 16

## Guidelines

U.S.S.G. § 2G2.1 ............................................... 18

U.S.S.G. § 5G1.1 ............................................... 19

x

## Statement of Jurisdiction

The district court (Warren W. Eginton, J.) had subject matter jurisdiction over this federal criminal prosecution under 18 U.S.C. § 3231. Judgment entered on February 1, 2012. Joint Appendix ("JA")500. On February 6, 2012, Sensi filed a timely notice of appeal under Fed. R. App. P. 4(b). JA510. This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## Statement of Issues
## Presented for Review[1]

1. Whether the district court properly denied Sensi's motion to suppress based on its conclusion that videos found in a locked black duffle bag were properly seized pursuant to a state search warrant?

2. Whether Sensi waived his right to challenge his sentence when he executed a valid appeal waiver at the time of his guilty plea?

3. Whether the district court abused its discretion and imposed an unreasonable sentence when it correctly calculated the guideline range, thoroughly analyzed the relevant factors under 18 U.S.C. § 3553(a), and sentenced Sensi to 85 years' imprisonment, based on the egregious nature of the criminal conduct in this case?

---

[1] Sensi also filed a *pro se* brief raising two issues. First, like his counsel, he claims the district court erred in denying his motion to suppress the items seized from the locked black duffle bag discovered during the execution of the state search warrant at his home. Second, in the context of challenging the district court's denial of a motion to continue sentencing, he claims that the state judge's signature on the inventory sheet from the search was forged. The government addresses this second claim as part of its response to the argument regarding the denial of the motion to suppress.

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

## Docket No. 12-565

_____

UNITED STATES OF AMERICA,

*Appellee,*

-vs-

EDGARDO SENSI,

*Defendant-Appellant.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF CONNECTICUT

## BRIEF FOR THE UNITED STATES OF AMERICA

### Preliminary Statement

In or about 2001, Edgardo Sensi conspired with a mother to gain access to her eight-year old child, who he repeatedly and sadistically abused and filmed the abuse. In or about 2004, while purporting to do charitable work, he also seduced a young, poor, woman who was working as a maid in Nicaragua to gain access to her

four-year old daughter who he also repeatedly sexually abused and filmed the abuse.

On July 8, 2010, after the district court denied his motion to suppress evidence seized during the execution of a search warrant at his residence, Sensi pleaded guilty to all four counts of a Superseding Indictment charging him with production of child pornography in the United States and in Nicaragua and traveling to Nicaragua to sexually exploit a four-year-old child. In exchange for his right to challenge the denial of his suppression motion, Sensi waived his right to appeal on all other grounds. The district court, after viewing the abhorrent conduct in this case, which included the unrepentant, sadistic exploitation of several young children, and expressing its concerns about Sensi's risk of recidivism and danger to others, sentenced him to 85 years' imprisonment.

In this appeal, Sensi raises three principle claims: (1) he maintains that the district court erred in denying his motion to suppress evidence seized from a locked black duffle bag discovered during the execution of a state search warrant at his Florida residence; (2) he argues that his knowing and voluntary appeal waiver should not be enforced because he entered into it without any consideration; and (3) he claims that the district court abused its discretion by imposing an unreasonable sentence. For the reasons set forth below, these claims have no merit, and the dis-

2

trict court's judgment of conviction should be affirmed.

## Statement of the Case

On December 5, 2008, a federal grand jury returned a two-count indictment charging Edgardo Sensi with conspiracy to produce child pornography in the United States in violation of 18 U.S.C. § 371, and production of child pornography in violation of 18 U.S.C. § 2251(a). JA16. These charges were based on Sensi's repeated sexual abuse and filming of a minor victim ("MV#1"), who was eight-years old when the abuse began. JA16-17. On April 2, 2009, a federal grand jury returned a Superseding Indictment which added charges of production of child pornography outside the United States, in violation of 18 U.S.C. § 2251(c)(3), and illicit sexual conduct in foreign places, in violation of 18 U.S.C. § 2423. JA21. These charges were based on the repeated abuse of a young woman's four-year-old child who Sensi met when he traveled with a charity to Nicaragua. JA27-28.

On January 19, 2010, Sensi filed a motion to suppress some of the physical evidence seized by law enforcement officers pursuant to a lawfully obtained state search warrant of Sensi's Florida residence, which was executed on September 10, 2008. JA30. On June 8, 2010, after conducting an evidentiary hearing, the district court (Warren W. Eginton, J.) found that the evidence at

3

issue was lawfully seized pursuant to the search warrant. JA291.

On July 8, 2010, which was the eve of trial, Sensi completed a petition to enter a plea of guilty and did plead guilty to all four counts in the Superseding Indictment. JA331. In exchange for reserving his right to challenge the denial of the suppression motion, Sensi waived all of his other appeal rights, including his right to challenge his sentence. JA321.

On January 31, 2012, the district court sentenced Sensi to 85 years of imprisonment, followed by a life term of supervised release. JA500. On February 6, 2012, Sensi filed his notice of appeal. JA510. He is currently in federal custody serving his sentence.

## Statement of Facts and Proceedings Relevant to this Appeal

### A. Offense conduct

The following facts are essentially undisputed and based almost entirely on the version of offense conduct set forth in the Pre-Sentence Report ("PSR"). JA 457.

Sensi met co-conspirator Laura Culver in 2000 while employed at a travel agency in Westport, Connecticut. PSR ¶ 8. They became involved romantically in 2001. PSR ¶ 8. Sensi and Culver conspired to abuse and did in fact abuse Culver's daughter, MV#1, who was eight-years

4

old at the time. Sensi and Culver videotaped Sensi repeatedly sexually abusing MV#1. PSR ¶ 8. The videotapes show Sensi directing MV#1 to touch his penis, to perform oral sex on him, and to suck her mother's breasts, and MV#1 following Sensi's directions. PSR ¶ 8. On one tape, Culver and Sensi take turns instructing MV#1 on how the penis works and how she should go about touching Sensi's penis. PSR ¶ 8. Culver and MV#1 both then touch Sensi's penis, and Culver directs MV#1 to imitate her. PSR ¶ 8. On another tape, Sensi and Culver are seen instructing MV#1 on how to perform oral sex on Sensi. PSR ¶ 8. The videotapes also show MV#1 drinking Sensi's urine and screaming in pain from intercourse with Sensi. PSR ¶ 10. Sensi and Culver instructed MV#1 not to tell anyone about the abuse. PSR ¶ 8.

Sensi maintained his own private collection of homemade child pornography. PSR ¶ 9. He marked all the tapes with the victims' names and usually rated them. PSR ¶ 9. For example, Sensi identified tapes "XX" and "XXX" apparently depending in the severity of the conduct contained on the tape. PSR ¶ 9. The tapes were located with other sex toys, written stories of incest and child rape, and images of child pornography. PSR ¶ 9.

In 2004, Sensi traveled with a charity based in Fairfield County, Connecticut to Nicaragua. PSR ¶ 12. In Nicaragua, Sensi befriended a 19-

5

year old woman who had a four-year old daughter. PSR ¶ 12. The woman lived a remote and destitute area where she worked as a maid. PSR ¶ 12. Sensi seduced and exploited this woman, giving her gifts and money, and offering to marry her. PSR ¶¶ 12, 69. Sensi abused the woman's four-year old daughter ("MV#2") and produced videotapes of this abuse. PSR ¶ 12. Sensi transported these videos back to the United States where they were ultimately found in 2008 in his Florida residence. PSR ¶ 12.

These videos depict Sensi directing MV#2 to play with his penis, to play with a "dildo," and to perform oral sex on him. PSR ¶ 12. Sensi also videotaped MV#2's vagina while she slept. PSR ¶ 12.

## B. Search warrant

Brian Broughton, an 18-year veteran detective in the Crimes against Children Division of the Marin County, Sheriff's Office, in Florida, was a trained investigator of child pornography crimes who had investigated crimes involving the physical and sexual abuse of children, and the exploitation of children on the internet, for 14 years. JA140-141. While investigating child sexual abuse, Broughton identified an Internet Protocol (IP) address associated with two movies of child pornography. JA63. Using law enforcement databases, he determined that this particular IP address had been associated with several

other images and videos of child pornography. JA63.

Broughton served a subpoena on the subscriber for the IP address and determined that the individual associated with it was Edgardo Sensi and that the address connected to it was 2750 NW Windemere Drive, Jensen Beach, FL 34957 (Sensi's residence). JA63. He then prepared a 15-page affidavit setting forth the facts demonstrating that a computer at Sensi's residence and associated with Sensi was used to access known files associated with images of child pornography. JA302-316. The IP address associated with Sensi's residence accessed these files approximately 78 times from August 23, 2008 through August 26, 2008. JA310-311. The affidavit described some of the images and stated that, based on Broughton's training and experience, he was aware that individuals who access child pornography from the internet maintain the child pornography and also communicate with a community of others on other devices. JA311-313. The affidavit specifically discussed removing the evidence from the residence site so that it could be forensically searched off site. JA312. Specifically, the affidavit provided as follows:

> Your affiant knows from training and experience that searches and seizures of evidence from computers require agents to seize most or all computer items

7

(hardware, software, passwords and in-
structions) to be processed later by a
qualified person in a laboratory or other
controlled enforcement. Computer stor-
age media to include but not limited to
floppy disks, hard drives, tapes, DVD
disks, CD-ROM disks or other magnetic
optical or mechanical storage which can
be accessed by computers to store or re-
trieve data or images of child pornogra-
phy can store the equivalent of thousands
of pages of information. Users may store
information or images in random order
with deceptive file names, which requires
searching authorities to examine all the
stored data to determine whether it is in-
cluded in the warrant. This sorting pro-
cess renders it impractical to attempt this
kind of data search on site.

JA312.

Broughton sought and obtained a search war-
rant authorizing the search and seizure of,
among other things,

1. Images, movies, or visual depictions
of sexual conduct or sexual performance
by a child or children . . . . 4. Computer
storage media and the digital content to
include but not limited to floppy disks,
hard drives, tapes, DVD disks, CD-ROM
disks or other magnetic, optical or me-
chanical storage which can be accessed by

8

computers to store or retrieve data or images of child pornography.

JA299-300.

## C. The search

On September 10, 2008, armed with the search warrant, Broughton and a colleague approached Sensi's house, identified themselves, and briefly interviewed him. JA64. Broughton told Sensi that he was investigating child pornography. JA155. During the interview, Sensi evaded questions and denied possessing or viewing child pornography. JA65. After speaking with Sensi, Broughton and his colleague provided Sensi with a copy of the search warrant and read the warrant to him, which is their common protocol in Florida. JA155. Sensi checked the address in the warrant to make certain that it was his residence. JA155. Sensi was not arrested, nor was he physically restrained when the search was conducted.

During the execution of the search warrant, Broughton and his colleague seized compact disks labeled, in handwriting, "PTHC," which acronym refers to Pre-Teen Hardcore. JA65. They also seized a laptop computer. JA65. In Sensi's closet, they found Hi8 videotapes of homemade pornography. JA66. These videotapes were labeled, in handwriting, "XXX" with a female name. JA66. They also found a video camera which utilized Hi8 tapes, cables, and wires.

9

JA66. Images from these Hi8 tapes could be transferred onto a computer hard drive. JA66.

Mixed with this homemade child pornography, the officers located two duffle bags next to each other in Sensi's closet: a big, red bag and a black bag. JA172. The red duffle bag contained additional Hi8 tapes with markings that included MV#2's first name, "XXX," and dates that corroborated Sensi's dates of travel to Nicaragua. These videos depicted Sensi sexually abusing MV#2 and engaging in sex acts with an adult female. JA167.

The black duffle bag was locked. Boughton approached Sensi and asked him if he had a key. JA171. Broughton did not want to break the lock, but did want to see the contents because the bag was found in close proximity to other evidence of child pornography, including sexual devises and homemade videos, marked with "XXX," stored in an unlocked red duffel bag. JA171. When Broughton asked Sensi about the key to the lock, Sensi responded, "Take it, it's porn." JA171. In fact, the inventory sheet described the black bag as "(Locked containing misc. porn)" based on Sensi's description. JA431.

When officers subsequently opened the locked black bag at the police department, they found Hi8 tape videos and floppy disk pictures of Sensi engaged in sex acts with MV#1. JA185-188. The bag also contained handwritten notes addressed to "Ed" discussing sex with Sensi's co-

10

conspirator and her daughter. JA187. Also in the black bag were a stack of printed text stories relating to incest and sex with children. JA174. And there was a book called "Puppetry of the Penis," which depicted different ways to manipulate a penis and various sexual devices. JA66; JA169-170.

After returning to his office and viewing the homemade video tapes, Broughton contacted agents with Immigration and Customs Enforcement ("ICE"). JA67. Broughton and ICE conducted further investigation and ultimately located and arrested the mother of the eight-year-old child who could be seen being abused on the video. Based on her cooperation and other information, ICE agents were able to identify at least two of the other minor victims depicted in the materials and confirm that Sensi abused MV#1 in Fairfield County and MV#2 in Nicaragua. JA67.

**D. Motion to suppress evidence**

On January 19, 2010, Sensi filed a motion to suppress the physical evidence seized from his home. JA30-61. He contended that the videotapes depicting him sexually abusing children were unlawfully seized from the locked black duffle bag. JA55. He argued that the four cor-

11

ners of the warrant did not authorize the seizure of these videos.[2] JA55.

In its opposition memorandum, the government maintained that, because the plain language of the search warrant authorized the seizure of any images or videos of child pornography, the seizure of the homemade videos from the bag was proper under the warrant. JA69. In addition, the government argued that the seizure of the black bag and its contents was proper because Sensi explicitly consented to it. JA70.

After conducting an evidentiary hearing, during which Broughton and Sensi testified, the district court denied the motion to suppress in an oral ruling. JA291. The court explained:

> I'm going to rule from the bench on it because it didn't turn out to be as complicated as I thought it might be, so I'll just rule from the bench.
>
> I agree with counsel that the issue of the scope of the search warrant is for me to determine, not for credibility of witnesses to determine. It's an issue of my examining the language of the search

---

[2] Sensi also claimed, *inter alia*, that the warrant itself was not supported by probable cause and that the portion of the warrant authorizing the seizure of images and videos of child pornography was not sufficiently particularized. JA36-55. He does not raise these issues on appeal.

12

warrant and determining whether it covers anything other than computer documents. And I hold on the basis of the language in it that paragraph 1 is broad enough, and my attention was also called to paragraph 4. I'm relying mainly on paragraph 1 as being enough to cover the documents which are in question here as having been seized. So on that issue I rule in favor of the Government.

The issue of custody I also find in favor of the Government, that he was not in custody while they were making their relatively brief investigation of the house and the contents to determine what they could seize under the search warrant.

Now, on the third issue I cannot find for the Government, I cannot really find, make any finding with respect to consent with respect to the black duffle bag, which was locked. I find that there are credibility issues and I cannot really resolve those credibility issues as to what he said or didn't say with respect to that black duffle bag. So the black duffle bag would have to be covered, as I am covering my ruling, with respect to the language of the search warrant.

JA291-292.

13

### E. The plea hearing

The district court had scheduled a status conference on July 8, 2010 because Sensi had sought to obtain new counsel on the eve of trial and therefore his counsel of record at that time filed a motion to withdraw. JA10; JA350-354. On that date, the government learned for the first time that Sensi had decided to plead guilty to all of the counts in the Superseding Indictment. A plea petition was provided to Sensi who completed the petition with the assistance of his attorney. JA331-348. Sensi provided information regarding his background, his exposure at sentencing, acknowledged all of the rights that he waived, and understood the bargain with the government stating, "I agree to a conditional plea of guilty reserving in writing my right to have an appellate court review an adverse determination of my pretrial motions. If I prevail on appeal, I may then withdraw my plea." JA341. Sensi further acknowledged: "I understand that, if I plead 'GUILTY,' the Court may impose the same punishment as if I had pleaded 'NOT GUILTY,' stood trial, and had been convicted by a jury . . . . I fully understand that . . . I have no right to withdraw my plea on the ground that my attorney's opinion or prediction (or my own) concerning any sentence proved to be incorrect. I fully understand that the sentence could be up to the maximum provided by the statute." JA331, 336. As part of the plea peti-

14

tion, Sensi wrote out a brief factual basis for the charges and signed the petition. JA344-345.

The government also prepared a plea letter on the same date setting forth the terms of the conditional plea agreement. JA321-330. The first paragraph clearly stated that Sensi would give up all of his appeal rights and plead guilty to all four counts and in exchange he reserved his right to appeal the denial of his suppression motion. JA321. Specifically, Sensi reserved "his right to appeal the district court's order dated June 8, 2010, which denied his motion to suppress. *In consideration of this conditional plea*, in all other respects, *the defendant agrees not to appeal*." JA323 (emphasis added). Finally, in the conditional plea agreement, "[t]he defendant acknowledges that he is entering into this agreement . . . without promise of benefit of any kind (other than the concessions contained in the plea agreement letter)." JA325.

The plea letter also explained that, in the government's view, "the applicable term of incarceration under the Guidelines is ninety-five (95) years of incarceration," JA322, which was also the maximum permissible statutory penalty for all four counts. JA330. Prior to sentencing, the government indicated that it had been mistaken in the plea letter and that the correct Guidelines range was 85 years' incarceration because Sensi's conduct in Count Two was statutorily capped at 20 years' incarceration under the

15

2001 statute, not 30 years' incarceration, as the plea letter had indicated. JA330, 417.

The district court conducted a plea canvass in full compliance with Fed. R. Crim. P. 11. Under Rule 11(b)(2), the court addressed Sensi personally in open court and determined that the plea was entered into voluntary and did not result from force, threats, or promises (other than promises in a plea agreement), JA394, and that under Fed. R. Crim. P. 11(b)(3) there was a factual basis for the plea, JA379-384. The court advised Sensi of each of the following, as required under Rule 11(b)(1):

> (A) the government's right, in a prosecution for perjury or false statement, to use against the defendant any statement that the defendant gives under oath during the plea hearing, JA376;

> (B) the right to plead not guilty, or having already so pleaded, to persist in that plea, JA374.

> (C) the right to a jury trial, JA374.

> (D) the right to be represented by counsel–and if necessary have the court appoint counsel–at trial and at every other stage of the proceeding, JA374.

> (E) the right at trial to confront and cross-examine adverse witnesses, to be protected from compelled self-

16

incrimination, to testify and present evidence, and to compel the attendance of witnesses, JA374-375

(F) the defendant's waiver of these trial rights if the court accepts a plea of guilty or nolo contendere, JA374;

(G) the nature of each charge to which the defendant is pleading, JA379-384;

(H) any maximum possible penalty, including imprisonment, fine, and term of supervised release, JA370-371;

(I) any mandatory minimum penalty, JA370;

(J) any applicable forfeiture, JA388;

(K) the court's authority to order restitution, JA388;

(L) the court's obligation to impose a special assessment, JA390;

(M) the court's obligation to apply the Sentencing Guidelines, and the court's discretion to depart from those guidelines under some circumstances, JA388-89; and

(N) the terms of any plea-agreement provision waiving the right to appeal or to collaterally attack the sentence, JA389.

Sensi explicitly acknowledged that he waived his right to appeal any of the rulings below

17

save the one on his motion to suppress. JA323, 337.

### F. The sentencing

In anticipation of Sensi's sentencing, the probation office prepared a PSR using the Noevmber 1, 2011 Guidelines Manual. PSR ¶ 16. For Counts One and Two, the PSR recommended a base offense level of 32 under § 2G2.1(a), and further recommended a four-level enhancement because the victim was under the age of 12 (§ 2G2.1(b)(1)(A)), a two-level enhancement because the offense involved the commission of a sexual act (§ 2G2.1(b)(2)(A)), an additional four-level enhancement because the offense involved material that portrays sadistic conduct (§2G2.1(b)(5)), and an additional two-level enhancement because the minor victim was in the supervisory control of Sensi (§2G2.1(b)(1)(A)). PSR ¶¶ 18-22.

For Counts Three and Four, the PSR recommended a base offense level of 32 under § 2G2.1(a), and further recommended a four-level enhancement because the victim was under the age of 12 (§ 2G2.1(b)(1)(A)), a two-level enhancement because the offense involved the commission of a sexual act (§ 2G2.1(b)(2)(A)), and an additional two-level enhancement because the minor victim was in the supervisory control of Sensi (§2G2.1(b)(1)(A)). PSR ¶¶ 27-34.

18

The highest adjusted offense level was 44, plus a two-level increase for the number of units, resulting in a combined adjusted offense level of 46, to be treated as an offense level of 43. PSR ¶¶ 38-40, 42.

Sensi had no criminal history, resulting in a criminal history category of I. PSR ¶ 44. An offense level of 43, with a criminal history category of I, resulted in a guideline range of life. Because Sensi's maximum statutory penalty was 85 years, the guideline range became 85 years. PSR ¶ 56; U.S.S.G. §§ 5G1.1(a) and 5G1.2(d).

In his sentencing memorandum, Sensi argued that "[a] sentence within the guideline range is greater than necessary to accomplish the goals of sentencing, in light of the defendant's minimal criminal history and the need to impose similar sentences for similar conduct among defendants." JA406. He maintained "that the Court should consider a downward variance under 18 U.S.C. § 3553(a)(6) to address the need for the sentence to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." PSR ¶ 66. Citing two recent sentences of less than twenty years, Sensi asked for a twenty-year sentence. JA408.

The government argued for a guideline sentence of 85 years, emphasizing that Sensi brutally and repeatedly abused the minor victims, that the victims endured harm long after the acts

19

stopped, especially because Sensi filmed them, that Sensi poses a danger to society, that Sensi refused to accept meaningful responsibility, and that only a lengthy punishment would promote general deterrence of child sexual abuse. JA418-420.

Sentencing took place on January 31, 2012. JA455. At the outset, the court, with no objection from either side, adopted the findings of fact in the PSR. JA457. The court heard from several victims. MV#1's foster mother discussed the continuing effects of Sensi's crime on her foster daughter. She spoke about MV#1's continuing "humiliat[ion]." JA468. MV#1 "has this hanging around her neck." JA470. The foster mother said that she herself was "not a primary victim but [has] had the experience of picking up the pieces. . . . There are more than one victim in this circumstance." JA467. Although she "never liked to be a victim," MV#1's foster mother noted that her "family was deeply impacted by this as well," including MV#1's three foster sisters. JA469. Similarly, MV#1's foster father discussed "[n]ot only the victims themselves that endured physical acts of this defendant, but the many, many, many, many lives those tragedies touch." JA472.

The court also heard from other victims not charged in the Superseding Indictment who were abused by Sensi. One victim, who was referred to as "L," met Sensi when she was seven years old. JA478. L told the court that Sensi

20

groomed her by showing her pornography and telling her that they were going to act it out. JA478. After a year of this abuse, L became suicidal. JA479. Later, L tried to kill herself by taking twenty pills. JA480. Crying, L told the court that Sensi "always ended up calling and [causing her to] reliv[e] everything all over again. . . . Right now [L] just need[s] closure on this." JA481.

Another victim, referred to as "E," explained that when she was fifteen, she took voice lessons from Sensi and babysat for him. JA474. Sensi attempted to abuse her sexually. He kissed her and touched her on the way to voice recitals. JA474-76. E said that Sensi "ruined my life in a lot of ways." JA477. E also explained that she is "afraid for [her two sons and two daughters] knowing that there are monsters like [Sensi]." JA476. Her husband, Mr. E., confirmed that the abuse E suffered at the hands of Sensi continues to affect her. JA478.

After hearing from the victims, the court considered the government's sentencing argument. The government stated:

> When we look and your Honor looks at the 3553 factors in determining the correct sentence, and you consider the nature and circumstances of the offense and the history and characteristics of the Defendant, and the need for the sentence imposed to reflect the seriousness of the

21

offense to promote respect for the law and to provide just punishment for the offense, and to afford adequate deterrence to criminal conduct and to protect the public from further crimes of the Defendant, based on the entire record before you it is the view of the United States Attorney's Office that the only appropriate sentence is 85 years as called for by the guidelines and by the statutory maximum. . . .

As your Honor has seen and heard and knows from the charges [to which] the Defendant pled guilty, you have before you a Defendant with a more than 25-year history of abuse involving many minor victims, some of which you heard from today.

In the case and the counts the Defendant pled guilty to, your Honor, the abuse and the video recordings that captured that abuse are absolutely horrendous and cruel. As one of the unfortunate individuals who has watched just minutes of those videotapes, I personally can attest to the scarring impact of seeing the horrendous things that the Defendant engaged in and caused others to engage in. . . .

[T]he pain that any viewer of the videotapes felt is of course nothing compared

22

to what the victims felt and continue to feel.

As you know, the victims live with deep pain and permanent and devastating impact from this abuse. The defendant preyed on vulnerable women as your Honor has said of different ages . . . .

In doing so the Defendant subverted the natural bond between mother and daughter and the trusting relationship and one of the most important relationships in someone's life. And the Defendant subverted that repeatedly.

He engaged in this horrific behavior not only here in the District of Connecticut, but also in an impoverished community in Nicaragua . . . involving an 18 or 19-year-old and her 4-year-old daughter who was abused. And this was done tragically under the guise by the Defendant of a charitable mission to Nicaragua.

The Defendant never fully acknowledged his abuse, accepted responsibility or showed any genuine remorse for his actions . . . .

It is our view that no type of penalty can be structured to protect the most vulnerable in society from this Defendant other than the serious period of incarceration that is called for by the sentencing

23

guidelines. The defendant showed no mercy to his many victims and is entitled to no such mercy from the Court.

JA482-485.

Sensi then spoke at length and was entirely unrepentant. He denied the allegations made against him by L and E, blamed their suffering on "obviously . . . dysfunctional upbringing," JA495, and claimed that the entire criminal case against him resulted from the unlawful seizure of the black duffle bag from his Florida residence. JA488-491. Although he seemed to acknowledge his horrendous acts by referring to them as "mutually reprehensible and misguided behavior," JA491, he did not appear to be at all remorseful, stating, "I am most repentful to what has happened as a result of this injustice through the investigation of Brian Broughton," referring to the claimed unlawful search of his Florida residence. JA494. He argued, "The only victim here is perhaps the justice system at least as far as Florida is concerned, your Honor." JA496.

The district court responded:

I didn't think the record would end up being as clear as it is as a result of that. Everything Mr. Sensi said supports the conclusion which [Probation] has reached, which the Government reached and which I have reached, that he is just

24

incapable of accepting any responsibility for his conduct. It's all due to technicalities and misjustice in Florida and he is the victim. There aren't any other victims except Edgardo Sensi here.

JA496. Sensi disagreed, claiming that he was accepting responsibility for the "mutually reprehensible" behavior of him and Culver, JA497, but the court was not persuaded, pointing out that Sensi was entirely focused on attacking the Florida investigators. JA497. The court concluded, "Everything Mr. Sensi said in talking about his battling to the end to prove . . . he didn't do any of these heinous acts is refuted" by "[t]he tapes. I mean the film is just there and you cannot ignore that file and I hope that the Second Circuit will have an opportunity to look at that film when they get this appeal." JA497.[3]

The government likewise responded, calling it "breathtakingly appalling that this man can . . . sit here in Court today and now seek to blame the very victims for destroying his life and his relationship [with] his child when all he has done is destroyed the lives of so many people." JA498.

---

[3] The video containing the summary of the evidence was marked as government's Exhibit 1 during the sentencing hearing and remains in the custody of the case agent. It will be made available to this Court if requested.

25

The district court, referring to the "record" as "very, very clear," sentenced Sensi to a total effective term of 85-years of imprisonment and life of supervised release. JA500-501. In particular, the court sentenced Sensi to consecutive terms of five years' incarceration on Count One, twenty years' incarceration on Count Two, thirty years' incarceration on Count Three, and thirty years' incarceration on Count Four. JA500.

After reviewing the videos of the abuse, presiding over the suppression hearing, and hearing from the victims, the court stated, "I regard [Sensi] . . . as probably the most evil, anti-soci[al] . . . person I have ever had to deal with . . . and I've dealt with . . . people who were regarded as the dregs of our society, and they did a lot of damage but they didn't do the damage that this Defendant has done . . . ." JA486. Referring to the videos, the court stated, "I've been on the bench over 30 years and I've never seen anything like that before in my experience." JA483. The court noted that Sensi's wife and son, who both submitted letters in support of him at sentencing, were also victims in the sense that "they continue to believe that this man is a good role model." JA485-486. The court also found it compelling that women were so intent on "hang[ing] onto [Sensi] and keep[ing] him in their lives" that they "sacrifice[d] the[ir] children to accomplish their own aims." JA484. In response to L's testimony, the court stated, "Well, your presen-

26

tation illustrates the modus operandi which is disturbing and is the pattern here of reaching the infants through seducing immature vulnerable older women and the preying on the offspring. It's just a very sad story." JA481. And when MV#1's foster father stated, "This Defendant has preyed upon the vulnerable in our society, to seek access to the most vulnerable in our society. . . . He is evil, he is vile, he is despicable," the court replied, "You've just said everything I was thinking about saying. So I agree with everything you've set forth . . . ." JA472-473.

In imposing sentence, the court incorporated the government's sentencing arguments:

> There's no point in my adding anything to what everybody has said here because it has been said so well [and] . . . all of the points that Mr. Fein brought out are what I was planning to bring out on 3553, and I concur with everything he said about the importance of the various elements of 3553, which has always been my Bible. I think the sentencing guidelines which happily are no long[er] binding upon us, but are a good example of trying to carry out the goals of 3553 and that's what I use.

JA501.

27

## Summary of Argument

1. The evidence obtained from the locked black bag was seized and searched pursuant to a lawfully obtained warrant. The search warrant expressly authorized law enforcement officers to search Sensi's house for, and to seize evidence of, child pornography, to include images and videos. While executing the lawfully obtained warrant, law enforcement officers found a locked black bag in Sensi's bedroom in close proximity to other evidence of child pornography, including a red bag which contained child pornography. When asked about the contents of the bag, Sensi admitted the bag contained pornography. This discovery and the presence of other child pornography in a second, unlocked bag stored next to the locked bag caused officers to believe that Sensi may have stored child pornography in the locked bag. As a result, the officers seized and subsequently searched the bag without obtaining an additional search warrant. Because the black bag was a closed container that could reasonably be considered to hold items described in the search warrant, a separate warrant to search the bag was not necessary.

2. In consideration for his plea and in exchange for his waiver of his right to challenge his sentence or any other aspect of his conviction, Sensi pleaded guilty conditional on his right to appeal the suppression decision. A chance to appeal a dispositive pretrial motion

28

and, by doing so, to challenge his underlying conviction, is certainly ample consideration for an appeal waiver. Had Sensi not been able to plead guilty with this provision, the only way he could have challenged the district court's denial of his suppression motion would have been for him to proceed to trial, which he evidently did not want to do. The appeal waiver was knowingly and voluntarily entered and should be enforced.

3. Even if this Court considers the reasonableness of defendant's sentence, the relevant legal inquiry is whether the sentence is an outlier among sentences for producers of child pornography. It is not. For 25 years, Sensi abused children as young as four years old. His behavior was egregious, and the damage he caused long-term. He stood before the district court defiant and unwilling to accept any responsibility. Indeed, he blamed the victims in the courtroom. His sentence was appropriately harsh: the court below, sentencing Sensi according to the guidelines, rightly called "one of the easiest I've ever done. . . ." JA500.

# Argument

## I. The district court properly denied Sensi's motion to suppress evidence obtained during a lawful search of his home

### A. Relevant facts

The facts pertinent to the consideration of this issue are set forth above in the Statement of Facts and Proceedings Relevant to this Appeal.

### B. Governing law and standard of review

The Constitution provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. To establish probable cause for a search warrant, a magistrate judge must determine, based on "facts and any reasonable inferences to be derived from them," that a crime was committed and that there is probable cause to believe that evidence of that crime is located at the residence. *United States v. Travisano*, 724 F.2d 341, 345 (2d Cir. 1983). Probable cause is a practical, nontechnical concept that turns on the assessment of probabilities in specific factual contexts. *United States v. Clark*, 638 F.3d 89, 94 (2d Cir. 2011). The applicable standard is that there is a "fair probability that the premises will yield the

30

objects specified in the search warrant." *Travisano*, 724 F.2d at 346 (citing *Illinois v. Gates*, 462 U.S. 213 (1983)).

The standard used by a court must not be "so stringent, technical or grudging as to discourage the use of search warrants." *Id.* (citing *United States v. Ventresca*, 380 U.S. 102, 108 (1965)). As the Supreme Court concluded in *Gates*, "Probable cause deals with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Gates*, 462 U.S. at 241 (internal quotations omitted). An affidavit in support of a search warrant is not required to prove that contraband exists at a residence. Rather, it must only establish probable cause, which is "a flexible, common-sense standard." *Gates*, 462 U.S. at 239.

The "scope of a search pursuant to a valid warrant is defined by the warrant's description of the premises and the objects of the search, and by the places in which the officers have probable cause to believe those objects may be found." *United States v. Kyles*, 40 F.3d 519, 523 (2d Cir. 1994) (citing *Maryland v. Garrison*, 480 U.S. 79, 84 (1987)). For example, where there is probable cause to issue a warrant to search for child pornography, there is "probable cause to search in the most likely hiding places." *United States v. Paull*, 551 F.3d 515, 523-24 (6th Cir.

31

2009) (holding that seizure of pornography from triple-bagged bundles in a garbage can in a garage did not demonstrate that warrant to search house was overbroad).

Moreover, "[a] lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search." *United States v. Ross*, 456 U.S. 798, 820-821 (1982). "Thus, a warrant that authorizes an officer to search a home for illegal weapons also provides authority to open closets, chests, drawers, and containers in which the weapon might be found. A warrant to open a footlocker to search for marihuana would also authorize the opening of packages found inside. A warrant to search a vehicle would support a search of every part of the vehicle that might contain the object of the search." *Id.* at 821, n.27. "When a legitimate search is under way, and when its purpose and its limits have been precisely defined, nice distinctions between closets, drawers, and containers, in the case of a home, or between glove compartments, upholstered seats, trunks, and wrapped packages, in the case of a vehicle, must give way to the interest in the prompt and efficient completion of the task at hand." *Id.*; *see also United States v. Terry*, 702 F.2d 299, 309 n.9 (2d Cir. 1983) (citing *Ross* and noting that "items found in closed containers during a lawful

32

search do not require a separate warrant"). The scope of a search is reasonable if it is limited to the area that is able to conceal the object of the search. *See, e.g.*, *Wyoming v. Houghton*, 526 U.S. 295, 307 (1999) (officers "may inspect passengers' belongings found in the car that are capable of concealing the object of the search"); *Florida v. Jimeno*, 500 U.S. 248, 251 (1991) ("The scope of a search is generally defined by its expressed object"); *United States v. Johns*, 469 U.S. 478, 487 (1985) (upholding search as reasonable because "there is no plausible argument that the object of the search could not have been concealed in the packages"); *Ross*, 456 U.S. at 820 ("A lawful search . . . generally extends to the entire area in which the object of the search may be found").

Finally, executing officials may "exercise some minimal judgment as to whether a particular document falls within the described category." *United States v. Riley*, 906 F.2d 841, 845 (2d Cir. 1990). Police officers executing a warrant are "required to interpret it." *Hessel v. O'Hearn*, 977 F.2d 299, 302 (7th Cir. 1992). It would be a mistake for police to interpret a warrant narrowly, "because items not in fact necessary for proceedings against the owner can always be returned whereas items not seized are unlikely to be found the next time the police go looking for them." *Id*. (citation omitted). Where there is not "a case of flagrant disregard," the court will ask

33

whether "[r]easonably construed, the warrant in this case covers all of the items seized." *Hessel*, 977 F.2d at 302.

Whether seized evidence falls within the four corners of a warrant is a question of law. "The standard of review for evaluating the district court's ruling on a suppression motion is . . . *de novo* as to questions of law." *United States v. Whitten*, 610 F.3d 168, 193 (2d Cir. 2010) (quoting *United States v. Rodriguez*, 356 F.3d 254, 257-58 (2d Cir. 2004)).

## C. Discussion

There is no dispute here that the officers searching Sensi's Florida residence were armed with a properly issued state search warrant. Sensi concedes that the warrant was supported by probable cause and does not attack any aspect of the search other than the officers' seizure and search of a locked black duffle bag which contained homemade videos of child pornography. As to this bag, he claims that the officers needed another search warrant to open it and look through it. He is wrong.

The state warrant authorized the officers to search for "[i]mages, movies, or visual depictions of sexual conduct or sexual performance by a child or children." Armed with this warrant, the officers were allowed to search any area of the residence that could contain this evidence, including any closed container. *See Ross*, 456 U.S.

34

at 820-821; *Terry*, 702 F.2d at 309 n.9. As long as the locked black bag could have been a container for images or movies of child pornography, which it was, the officers were permitted to open it and search it without a second warrant. *Id.*

Contrary to Sensi's argument, a valid warrant to search the premises of a home authorizes the seizure and search of any closed container within the home that may contain the evidence that is the target of the warrant. *See Ross*, 456 U.S. at 820-821; *Terry*, 702 F.2d at 309 n.9. A suspect does not protect an item from being seized merely by hiding it in a locked container, especially when officers have already obtained a search warrant for the suspect's residence. Such a rule does not exist. Moreover, if such a rule did exist and if law enforcement was required to obtain a new warrant for each locked container they found, requiring the repeated invasion by police of the home, such a rule would destroy the privacy the Warrant Clause protects, as well as strain judicial and investigative resources.

Sensi challenges only the warrant's execution with respect to the locked black bag, and not the underlying warrant itself or its execution with respect to other evidence seized. *See* Def.'s Br. 38. He claims that the bag's closure excludes it from the warrant, but cites to no authority to support his argument. Indeed, none exists. The relevant inquiry is not whether the container is open or locked, but whether the container could

35

hold evidence that officers are authorized to search by the warrant. Courts have consistently held that law enforcement officers executing a valid warrant to search a house may search the places in that house where evidence is likely to be found. *See, e.g., Kyles*, 40 F.3d at 523; *Paull*, 551 F.3d at 524 (suggesting that any argument that placing pornography in a bag would protect it from seizure would be futile). Sensi ignores the warrant and relies instead on cases in which law enforcement officers seize evidence pursuant to a warrant exception. And, of course, in those cases, the fact that evidence might be sealed in a closed container may matter. But here, the lock on the black bag, while certainly demonstrating a reasonable expectation of privacy by Sensi as to the items in the bag, does not withstand a properly issued and interpreted search warrant. Here, Broughton "reasonably construed" the warrant. *Hessel*, 977 F.2d at 302. The locked bag was sitting next to an unlocked bag which contained child pornography and next to sexual devices, and Sensi himself told the officer that the locked bag contained pornography. Moreover, the warrant authorized the officers to conduct any necessary searches at an off-site location. JA316 (warrant authorized law enforcement "to seize and safely secure same, and to search and analyze said Property at an off-site location as needed"). Officers did not have the necessary equipment to search the videos on site and were

36

permitted to take any evidence off site for review.

Having advanced an incorrect legal basis for the law enforcement search, Sensi cites to inapplicable cases to support his claim. For example, the proposition for which defendant cites *United States v. Martin*, 157 F.3d 46 (2d Cir. 1998), does not apply to the present case. In *Martin*, the police seized a UPS package without a warrant and searched it after obtaining a warrant eleven days later. Here, the officers seized the black bag based on a properly issued warrant. Similarly, defendant cites *Horton v. California*, 496 U.S. 128 (1990), for the proposition that "[a] lawfully seized container may be opened only pursuant to either a search warrant or one of the well-recognized exceptions to the warrant requirement." Def.'s Br. at 45. But again, this portion of the *Horton* decision concerns items seized *without* a warrant at all. *See Horton*, 496 U.S. at 142 n.11. Although Sensi concedes that *Martin* concerns "different setting" than the present case, Def.'s Br. at 46, he fails to acknowledge that, because there was a lawfully obtained search warrant here, the search of the bag, which fell within the scope of that warrant, was proper.

It also bears note that Broughton seized and searched the black bag both because he thought, based on his training and experience, that it could contain child pornography, and because

37

Sensi himself told Broughton that the bag contained pornography. This Court allows an officer executing a valid, particularized warrant to "exercise some minimal judgment" in interpreting its terms. *United States v. Riley*, 906 F.2d 841, 845 (2d Cir. 1990). The plain language of the warrant in the present case permitted law enforcement agents to search for and seize "[i]mages, movies, or visual depictions of sexual conduct or sexual performance by a child or children. . . ." JA299. It was certainly reasonable for officers to believe that a locked duffle bag could contain these items. *See United States v. Marti*, 421 F.2d 1263, 1268 (2d Cir. 1970) (holding that a warrant instructing police to seize all material violating New York's obscenity law was unconstitutional, but observing that "some discretion must be given executing officials to interpret the words of every warrant no matter how particularly the items to be seized are described."). For example, if a warrant instructs an official to seize illegal guns in a particular house, the official must determine which rooms of the house to search and which guns to seize.

The *Marti* court suggested that a warrant could "command[ . . .] the seizure of films 'depicting natural or unnatural sexual acts.'" *Id.*, 421 F.2d at 1268. Here, the warrant particularly commanded Broughton to seize "[i]mages, movies, or visual depictions of sexual conduct or sexual performance by a child or children." This in-

38

struction "restricted significantly the discretion of the executing officials." *Id.* Broughton exercised "some" judgment in interpreting the words of the search warrant—as is appropriate. *Id.* In the end, Broughton and his colleague searched exactly the location the judge intended them to search and found exactly what the judge intended them to find: evidence of child pornography.

Sensi relies on *United States v. Voustianiouk*, 685 F.3d 206 (2d Cir. 2012), for the proposition that an improperly executed particularized warrant is invalid. *See* Def.'s Br. at 38-39. But the *Voustianiouk* officers erred twice, where Broughton did not err at all. First, the *Voustianiouk* officers searched the second-floor, rather than first-floor, apartment. Second, they deliberately concealed from the criminal defendant that the warrant did not authorize a search of his apartment. The legal principle articulated in *Voustianiouk* clearly and explicitly concerns cases "when officers search a *location* other than the one that the magistrate judge intended to be searched, as was the case here." *Id.* at 212. Here, the officers searched the proper location and were completely upfront with Sensi regarding the scope and the substance of the warrant.

Sensi also relies on *United States v. Dzialak*, 441 F.2d 212 (2d Cir. 1971). *See* Def.'s Br. at 44. *Dzialak* concerned a general warrant. Law enforcement officers in that case "spent more than four hours ransacking appellant's house for any

39

possible incriminating evidence. On the items seized, those which were not described in the warrant far outnumbered those described." *Id.* at 217.

In contrast, Broughton did not ransack a location not contained in the warrant, nor did he ransack Sensi's house. He did not seize volumes of evidence that he was not authorized to search. He did not search the wrong location. Moreover, he did not lie to Sensi about the validity of his warrant. In fact, the record makes clear that Broughton read the warrant to Sensi and provided him with a copy. Broughton's searched Sensi's residence for 20-30 minutes and not four hours. Broughton's actions are not close to those of the officers in *Voustianiouk* or *Dzialak*.

In his *pro se* brief, Sensi appears to challenge the seizure of the locked black bag on a few other theories: (1) that the plain view doctrine should not apply in this case; (2) that he did not give his consent to seize the black bag; and (3) that Broughton altered the inventory sheet and forged the state court judge's signature on the copy that was introduced in evidence at the time of the suppression hearing. Sensi's Br. at 14-15, 19. As for Sensi's first argument, the government has never relied on the plain view doctrine in this case. As to his second argument, the district court never reached the issue of consent at the time of the suppression hearing, finding instead that the black bag and its contents were

40

covered within the four corners of the warrant. And his final argument that law enforcement altered the inventory sheet is not supported by the record.

As set forth above, the inventory sheet was completed on the day of the search, and a copy was provided to Sensi before law enforcement left his home. JA211, 249-250. Broughton confirmed that, on the inventory sheet, next to the information about a black bag, there was a notation in parentheticals that read: "(Locked containing misc. porn)," JA431, indicating that the bag contained pornography. JA249-250, 431 (copy of inventory sheet). Because the bag was still locked at this time and was not opened until the officers returned to their office, this information could only have been based on Sensi's conversation with Broughton about what was in the black bag.

During the suppression hearing, Sensi asked his attorney: "Can I explain about the inventory list that was given to me?" JA257. His attorney simply responded: "there's no question." JA 257. During cross-examination, Sensi claimed that his copy of the inventory sheet contained no indication that the black bag contained pornography. JA271. When asked where his copy of the inventory sheet was, Sensi stated "they're trying to get a copy of it," but admitted that he had no copy for the hearing. JA271. As a result, at the time of the suppression hearing, Sensi

41

failed to produce any evidence to suggest that the inventory sheet was false.[4]

Thus, none of Sensi's *pro se* claims undercut the district court's denial of his motion to suppress, and the district court acted properly in concluding that the closed black bag could be opened and searched based on the issuance of the search warrant.

---

[4] Having failed to produce any copy of his alleged inventory sheet, Sensi nevertheless filed a motion on the eve of sentencing seeking to continue his sentencing (after his attorney had been advised that victims would be appearing at the sentencing) claiming that the Florida state court judge's signature had been forged on the inventory sheet. In support of this claim, Sensi submitted a forensic report conducted by Charles Haywood, who opined that the state judge's signature was a forgery. JA437. When the government received this report, it immediately contacted Broughton and asked him to provide the report in person to the state court judge. After reviewing the report, the state judge telephoned the district court and confirmed that she had signed the inventory sheet. JA458.

## II. This Court should dismiss the rest of the appeal because Sensi waived his right to appeal any issue other than the denial of the motion to suppress

### A. Relevant facts

The facts pertinent to the consideration of this issue are set forth above in the Statement of Facts and Proceedings Relevant to this Appeal.

### B. Governing law and standard of review

This Court has long recognized that "in no circumstance . . . may a defendant, who has secured the benefits of a plea agreement and knowingly and voluntarily waived the right to appeal a certain sentence, then appeal the merits of a sentence conforming to the agreement. Such a remedy would render the plea bargaining process and the resulting agreement meaningless." *United States v. Salcido-Contreras*, 990 F.2d 51, 53 (2d Cir. 1993) (dismissing defendant's appeal consistent with waiver in plea agreement); *see also United States. v. Monsalve*, 388 F.3d 71, 72 (2d Cir. 2004) (per curiam); *United States v. Djelevic*, 161 F.3d 104, 106 (2d Cir. 1998) (per curiam) ("It is by now well-settled that a defendant's knowing and voluntary waiver of his right to appeal a sentence within an agreed upon guideline range is enforceable."). A waiver is generally enforceable against the de-

43

fendant as long as the record clearly demonstrates that the defendant knowingly and voluntarily waived his right to appeal. *See United States v. Morgan*, 386 F.3d 376, 378-79 (2d Cir. 2004) (upholding enforceability of appellate waiver, which magistrate judge had discussed at length to ensure defendant was waiving his rights knowingly and voluntarily), *aff'd on reconsideration*, 406 F.3d 135 (2d Cir. 2005) (appeal waivers enforceable against *Booker* claims).

Although exceptions to the enforceability of appellate waivers "occupy a very circumscribed area of our jurisprudence," *United States v. Gomez-Perez*, 215 F.3d 315, 319 (2d Cir. 2000), "an appeal waiver . . . does have some limits." *United States v. Buissereth*, 638 F.3d 114, 118 (2d Cir. 2011). As this Court has explained:

> [A] defendant may have a valid claim that the waiver of appellate rights is unenforceable . . . when [1] the waiver was not made knowingly, voluntarily, and competently, [2] when the sentence was imposed based on constitutionally impermissible factors, such as ethnic, racial or other prohibited biases, [3] when the government breached the plea agreement, or [4] when the sentencing court failed to enunciate any rationale for the defendant's sentence, thus amounting to an abdication of judicial responsibility subject to mandamus.

44

. (quoting *Gomez-Perez*, 215 F.3d at 319).

"Because plea agreements are subject to the public policy constraints that bear upon the en-force-ment of other kinds of contracts, . . . a defendant who waives his right to appeal does not subject himself to being sentenced entirely at the whim of the district court." *Id.* (internal quotation marks and brackets omitted); *see also United States v. Woltmann*, 610 F.3d 37, 39-40 (2d Cir. 2010) ("[B]ecause plea agreements are 'unique contracts, . . . we temper the application of ordinary contract principles with special due process concerns for fairness and the adequacy of procedural safeguards.'"). A waiver may be voided where a sentencing court fails "to enunciate any rationale for the defendant's sentence." *Woltman*, 610 F.3d at 40 (internal quotation marks omitted). "[A] defendant who waives his right to appeal does not subject himself to being sentenced entirely at the whim of the district court." *United States v. Riggi*, 649 F.3d 143, 148 (2d Cir. 2011) (internal quotation marks omitted).

## C. Discussion

There is no dispute that Sensi waived his appeal rights as to every issue other than the district court's denial of his motion to suppress. There is likewise no dispute that this waiver was knowing and voluntary. As a result, Sensi should not now be able to challenge the substantive reasonableness of his sentence or any other

45

issue unrelated to the denial of his motion to suppress.

Sensi now claims, for the first time, that he did not receive adequate consideration for his appeal waiver. But Sensi received more than adequate consideration: his ability to appeal the denial of his motion to suppress evidence. This conditional plea allowed him to do something he would typically be unable to do: challenge a ruling on a motion to suppress without proceeding to trial. This type of conditional plea is rare. Indeed, even an appeal waiver targeted at a lower sentence than the maximum incarceration term would typically not also allow a defendant to challenge an underlying suppression ruling.

This Court's decision in *United States v. Brunetti*, 376 F.3d 93 (2d Cir. 2004), is instructive. Gino Brunetti was indicted for federal drug crimes that triggered a mandatory minimum life sentence. *Id.* at 94. Brunetti pleaded guilty in exchange for the government's agreement to sit with him in a post-plea proffer session. *Id.* The government engaged in the proffer session, but refused Brunetti's offer to cooperate. *Id.* At sentencing, he asked the court to reduce his sentence, arguing the same lack of consideration argument Sensi now makes. *Brunetti*, 376 F.3d at 95.

This Court rejected Brunetti's argument finding that his "guilty plea *was* supported by consideration. Faced with a mandatory term of life

46

imprisonment, Brunetti decided to trade a guilty plea for a chance at a reduced sentence. An element of risk was part of his bargain." *Id.* at 95. The Court explained that "a reduced sentence . . . was not what Brunetti bargained for, and the *ex post* worthlessness of the consideration he received does not render nugatory the *ex ante* value of what Brunetti got." *Id.* at 96. If Brunetti had adequate consideration, Sensi, who was able to argue for whatever sentence he wanted, and was able to appeal the denial of his suppression motion (which would have impacted the underlying charges), certainly has received consideration.

The remedy Sensi seeks, if granted, "would render the plea bargaining process and the resulting agreement meaningless." *Salcido-Contreras*, 990 F.2d at 53. Sensi undoubtedly "secured the benefits" of his plea agreement by appealing the denial of his suppression motion, and yet he now wants to undo that agreement by appealing his sentence. Had he wanted to reserve his appellate rights as to his sentence, he certainly could have done so, but would have sacrificed his ability to appeal the denial of the suppression motion. Instead, no doubt thinking that his suppression motion has merit and will impact the underlying charges, Sensi opted to sacrifice his appeal rights as to his sentence and instead appeal the suppression issue. To allow

47

Sensi to default on his appeal waiver would render his plea agreement meaningless.

### III. Even if this court allows Sensi to appeal his sentence, the district court's sentence was substantively reasonable

#### A. Relevant facts

The facts pertinent to the consideration of this issue are set forth above in the Statement of Facts and Proceedings Relevant to this Appeal.

#### B. Governing law and standard of review

The United States Sentencing Guidelines are "effectively advisory." *United States v. Booker*, 543 U.S. 220, 245 (2005). At sentencing, a district court must begin by calculating the applicable guidelines range. *See United States v. Thomas*, 628 F.3d 64, 67 (2d Cir. 2010) (citing *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc)). *See United States v. Preacely*, 628 F.3d 72, 79 (2d Cir. 2010) ("The district court should ordinarily 'begin all sentencing proceedings by correctly calculating the applicable Guidelines range,' and then consider the factors listed in 18 U.S.C. § 3553(a).") (citing *Gall,* 552 U.S. at 49). After giving both parties an opportunity to be heard, the district court should then consider all of the factors under 18 U.S.C. § 3553(a). *See Gall*, 552 U.S. 39, 49-50 (2007).

48

This Court "presume[s], in the absence of record evidence suggesting otherwise, that a sentencing judge has faithfully discharged her duty to consider the [§ 3553(a)] factors." *United States v. Fernandez*, 443 F.3d 19, 30 (2d Cir. 2006). *See also United States v. Wagner-Dano*, 679 F.3d 83, 89 (2d Cir. 2012) ("In this Circuit, 'we presume 'that a sentencing judge has faithfully discharged her duty to consider the statutory factors.'") (quoting *United States v. Verkhoglyad*, 516 F.3d 122, 129 (2d Cir. 2008)).

On appeal, a district court's sentencing decision is reviewed for reasonableness. *See Booker*, 543 U.S. at 260-62. The reasonableness standard requires review of sentencing challenges under an abuse-of-discretion standard. *See Setser v. United States*, 132 S. Ct. 1463, 1465 (2012) citing *Gall*, 552 U.S. at 46; *see also United States v. David*, 681 F.3d 45, 48 (2d Cir. 2012) (citing *Gall*, 552 U.S. at 46, and *Cavera*, 550 F.3d at 189 (en banc)), *United States v. Bonilla*, 618 F.3d 102, 108 (2d Cir. 2010) (citing *Gall*).

Although this Court has declined to adopt a formal presumption that a within-guidelines sentence is reasonable, it has "recognize[d] that in the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances." *Fernandez*, 443 F.3d at 27; *see also Rita v. United States*, 551 U.S. 338, 347-51 (2007) (holding that courts

49

of appeals may apply presumption of reasona-bleness to a sentence within the applicable Sentencing Guidelines range); *United States v. Rattoballi*, 452 F.3d 127, 133 (2d Cir. 2006) ("In calibrating our review for reasonableness, we will continue to seek guidance from the considered judgment of the Sentencing Commission as expressed in the Sentencing Guidelines and authorized by Congress.").

Further, the Court has recognized that "[r]easonableness review does not entail the substitution of our judgment for that of the sentencing judge. Rather, the standard is akin to review for abuse of discretion. Thus, when we determine whether a sentence is reasonable, we ought to consider whether the sentencing judge 'exceeded the bounds of allowable discretion[,] . . . committed an error of law in the course of exercising discretion, or made a clearly erroneous finding of fact.'" *Fernandez*, 443 F.3d at 27 (citations omitted). *See also United States v. Savoca*, 596 F.3d 154, 160 (2d Cir. 2010) *cert. denied* 130 S. Ct. 3528 (U.S. 2010) (quoting *Fernandez*). A sentence is substantively unreasonable only in the "rare case" where the sentence would "damage the administration of justice because the sentence imposed was shockingly high, shockingly low, or otherwise unsupportable as a matter of law." *United States v. Rigas*, 583 F.3d 108, 123 (2d Cir. 2009). This Court recently likened its substantive review to "the consideration of a mo-

tion for a new criminal jury trial, which should be granted only when the jury's verdict was 'manifestly unjust,' and to the determination of intentional torts by state actors, which should be found only if the alleged tort 'shocks the conscience.'" *United States v. Dorvee*, 616 F.3d 174, 183 (2d Cir. 2010) (quoting *Rigas*, 583 F.3d at 122-23). On review, this Court will set aside only "those outlier sentences that reflect actual abuse of a district court's considerable sentencing discretion." *United States v. Jones*, 531 F.3d 163, 174 (2d Cir. 2008).

## C. Discussion

Sensi does not contend that his sentence was procedurally unreasonable. He does not maintain that the district court failed to treat the Guidelines as advisory, failed to consider the applicable Guidelines range and policy statements, or failed to consider the other Section 3553(a) factors. *Crosby*, 397 F.3d at 115. Rather, his sentencing challenge is that the sentence imposed was substantively unreasonable because it varied from the sentences of criminal defendants in other, recent child pornography cases. PSR ¶ 66. Def.'s Br. at 55-56.

Here, it is Sensi's conduct, not his sentence, that shocks the conscience. Sensi's sentence appropriately reflected the extreme and unmitigated sexual abuse of many minor victims, the filming of the abuse, the willingness to prey on oth-

51

ers to access young children, the lack of remorse
and the danger he posed to children. Sensi en-
gaged in extreme and sado-masochistic conduct
with very young children. Furthermore, the dis-
trict court appropriately considered the need to
impose a sentence to serve as a deterrent to oth-
ers.

In light of Sensi's conduct, this sentence is
not an outlier among sentences for producers of
child pornography. Recognizing the deleterious
and long-term consequences on the victims of
this conduct, courts of appeals have upheld
lengthy sentences as substantively reasonable.

This Court and others have recognized that
lengthy sentences are not unreasonable for those
who engage in these heinous crimes. *See United
States v. Oehne*, 698 F.3d 119, 125-6 (2d Cir.
2012) (per curiam), (upholding a 540-month term
of incarceration for an individual who repeatedly
sexually abused an eight-year old child where
the defendant filmed the abuse and distributed
the abusive images).

The Eleventh Circuit affirmed as reasonable
a 100-year (1,200 months) sentence for a first-
time offender who sexually abused a 13-year-old
girl and produced pornographic images of the
victim. *United States v. Sarras*, 575 F.3d 1191,
1220-21 (11th Cir, 2009). In doing so, the Elev-
enth Circuit determined that "the district court
imposed a sentence that reflects the nature and
circumstances of the offense and the other con-

52

siderations stated in § 3553(a). Thus, the district court committed no sentencing error in choosing to impose an advisory guidelines sentence of 1,200 months' imprisonment in this case." *Id.*

Other courts recently have upheld lengthy sentences in child exploitation cases as substantively reasonable. *See United States v. Beasley*, 688 F.3d 523, 530 (8th Cir. 2012) (upholding sentence of 3,480 months followed by lifetime supervised release for multiple counts of production, attempted production, and possession of child pornography); *United States v. Huffstatler*, 561 F.3d 694, 698 (7th Cir. 2009) (upholding as reasonable an above-guidelines, 450-month sentence for producing pornographic pictures of a 14-year-old boy); *United States v. Raplinger*, 555 F.3d 687, 695 (8th Cir. 2009) (upholding as reasonable a 457-month sentence for photographing and having sexual intercourse with a 15-year-old girl); *United States v. Kapordelis*, 569 F.3d 1291, 1318-19 (11th Cir. 2009) (upholding as reasonable a 420-month sentence, which represented an upward variance from the 262-327-month advisory guidelines range and included 240-month sentences on counts charging production of child pornography under § 2251(a) and 180-month consecutive sentences on counts charging receipt of child pornography under § 2252A(a)(2)(A)); *United States v. Vowell*, 516 F.3d 503, 511-13 (6th Cir. 2008) (upholding as reasonable a 780-

month sentence for a 40-year-old man who had sexual intercourse with his girlfriend's eight-year old daughter while being videotaped by his girlfriend); *United States v. Betcher*, 534 F.3d 820, 827-28 (8th Cir. 2008) (upholding as reasonable a 750-year sentence for a first-time offender who had taken pornographic pictures of five eight- to 11-year old girls, including two of his granddaughters); *United States v. Johnson*, 451 F.3d 1239, 1244 (11th Cir. 2006) (upholding as reasonable a 140-year sentence for abusing and photographing three boys between the ages of eight and 16 based on consecutive statutory maximums under 18 U.S.C. § 2251(e) and § 2252A(b)(1)).

Sensi cites a few recent cases of child exploitation to support his argument that his sentence is abnormally lengthy. As the examples above suggest, however, it is not. "Child sex crimes are among the most egregious and despicable of societal and criminal offenses." *United States v. Irey*, 612 F.3d 1160, 1206 (11th Cir. 2010). *See also United States v. Betcher*, 534 F.3d 820, 828 (8th Cir. 2008) ("The absurdity of a 750 year sentence, or even a 10,000 year sentence, should not detract from the gravity of" the crime of production of child pornography); *United States v. Pugh*, 515 F.3d 1179, 1202 (11th Cir. 2008) ("[W]e have typically treated child sex offenses as serious crimes, upholding severe sentences in these cases."). As shown above, courts of appeals

54

commonly recognize as reasonable lengthy sentences for producers of child pornography. Given the extreme and unmitigated abuse to which Sensi subjected his victims, his denial of his criminal conduct, and the continuing risk he poses to the community, his argument fails.

For 25 years, Sensi abused children as young as four years old. JA412. He engaged in extreme sexual abuse of several minor victims and created a permanent record of that abuse when he filmed it. Sensi's victims in the charges that he pleaded guilty to were four and eight years old. PSR ¶¶ 7, 12. At least four other minor victims suffered abuse at Sensi's hands. PSR ¶ 13. One of Sensi's victims, to whom the sentencing hearing record refers as L, was seven years old when Sensi began to abuse her. JA478. Another victim, to whom the sentencing hearing record refers as E., was fifteen years old when she met Sensi. JA474.

Sensi groomed his victims. First, he would develop relationships with their mothers to gain access to these young children, JA474, 478, PSR ¶¶ 8, 12. Sensi gave gifts and money to the mothers of some victims. PSR ¶ 12, JA479. He promised to marry MV#2 mother who lived in a rural and poor area in Nicaragua. JA414. Sensi sometimes began by exposing himself to his victims, JA478, and showing them pornography, *Id*., JA418. He taught MV#1 how to touch his penis, PSR ¶ 8, and how to perform oral sex on

55

him, *Id*. Next, Sensi encouraged her to compete with her mother at performing oral sex on him. *Id*. Similarly he had MV#2 play with his penis, perform oral sex on him, and play with a "dildo." PSR ¶ 12. Sometimes, Sensi did not bother with instruction; he videotaped MV#2's vagina while she slept. PSR ¶ 12.

Sensi engaged MV#1 in painful intercourse; the videotapes show her screaming in pain. PSR ¶ 10. Although all sexual abuse of children is horrible behavior, Sensi engaged in particularly sadistic behavior. For example, he forced MV#1 to drink his urine, and drank hers. PSR ¶ 10. Sensi took care to hide his crimes, instructing MV#1 not to tell anyone about his abuse of her. PSR ¶ 8.

Sensi abused his victims, in part, so that he could videotape the abuse. PSR ¶¶ 9, 12. He rated these homemade videotapes "XX" or "XXX" depending on the severity of the abuse. PSR ¶ 9. He maintained this collection among stories of child rape and pictures of child pornography. *Id*. The existence of the library perpetuated his abuse. Sensi's victims continue to suffer. At least one of his victims tried to kill herself because of his abuse. JA480. The foster family of MV#1 stated that her whole family has suffered because of Sensi's crimes. JA469. (The family of MV#2 resides in Nicaragua and did not speak in court.) Similarly, the family members of other

56

victims said that Sensi's abuse continues to affect their lives. JA477.

Sensi expressed no remorse for his abuse. PSR ¶ 70. In fact, he blamed his victims and their families for their own suffering. Sensi claimed that one victim, who spoke to the sentencing court about her suffering at Sensi's hands, had a "crush" on him and was speaking against him because her husband "was a jealous type." JA492-493. Sensi claimed that another victim, whom he claimed to "love[] as a platonic relationship," was abused by her stepfather, not him, and that she spoke against him because of "a jealous husband." JA493-494.

Sensi's multi-decade history of abuse is horrendous and cruel. Sensi manipulated women – in the case of the Nicaraguan woman, a very vulnerable woman – in order to abuse their young daughters. He destroyed the bond between mother and her daughter. His behavior was egregious, and the damage he caused longterm. Sensi's sentence was appropriately harsh because his conduct was so egregious. In the end, Sensi showed no mercy to his victims. His sentence will ensure that he will no longer harm children and will serve as general deterrence.

Given these reasons, the sentence imposed below was substantively reasonable. The record demonstrates that the district court fully understood its authority to depart or vary from the guidelines and its obligation to consider and ap-

ply the § 3553(a) factors. Given all of the circumstances of Sensi's conduct, the sentence here was not unduly harsh. Sensi committed a horrible crime and deserved a substantial penalty. The court below, having listened to victims' testimony, called Sensi "probably the most evil, most anti-society goals person I have ever had to deal with." JA486. The Guideline sentence was reasonable. *Rita*, 551 U.S. at 347 ("[A] court of appeals may apply a presumption of reasonableness to a district court sentence that reflects a proper application of the Sentencing Guidelines.").

## Conclusion

For the foregoing reasons, the judgment of the district court should be affirmed.

Dated: April 17, 2013

Respectfully submitted,

DAVID B. FEIN
UNITED STATES ATTORNEY
DISTRICT OF CONNECTICUT

KRISHNA R. PATEL
ASSISTANT U.S. ATTORNEY

Robert M. Spector
Assistant United States Attorney (of counsel)

59

## Federal Rule of Appellate Procedure
## 32(a)(7)(C) Certification

This is to certify that the foregoing brief complies with the 14,000 word limitation of Fed. R. App. P. 32(a)(7)(B), in that the brief is calculated by the word processing program to contain approximately 12,694 words, exclusive of the Table of Contents, Table of Authorities, Addendum, and this Certification.


KRISHNA R. PATEL
ASSISTANT U.S. ATTORNEY